**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE:

**CANAVERAL CROSSROADS, LLC,**

Debtor.
_______________________________/

Case No. 6:26-bk-05426-GER
Chapter 11

# PLAN OF REORGANIZATION FOR CANAVERAL CROSSROADS, LLC

CANAVERAL CROSSROADS, LLC (the "Debtor"), by and through its undersigned counsel, proposes the following plan of reorganization (the "Plan") pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

## ARTICLE I — DEFINITIONS

For the purpose of this Plan, the following terms shall have the meanings set forth below. A term used and not defined herein but that is defined in the Bankruptcy Code has the meaning given to it in the Bankruptcy Code.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Code and referred to in § 507(a)(1) of the Code, including, without limitation, the actual, necessary costs and expenses incurred after the commencement of the Chapter 11 Case of preserving the Debtor's Estate and operating the business of the Debtor, including wages, salaries, or commissions for services, compensation for legal and other services and reimbursement of expenses awarded under §§ 330(a) or 331 of the Code, and all fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code.

**"Administrative Claims Bar Date"** means the date established by the Court, prior to the Confirmation Date, by which all Administrative Claims must be filed.

**"Allowed Administrative Claim"** means all or that portion of any Administrative Claim that has been allowed by a Final Order of the Court, including the Debtor's costs and expenses incurred in connection with the solicitation of the Plan, the Disclosure Statement, and related exhibits.

**"Allowed Amount"** means the amount of an Allowed Claim.

**"Allowed Claim"** means a Claim (a) for which a proof of Claim was filed pursuant to § 501 of the Code and Rule 3001 within the applicable limitation period; or (b) deemed filed under § 1111(a) of the Code by having been scheduled and not listed as disputed, contingent, or unliquidated; or (c) deemed an Allowed Claim under this Plan or by a Final Order of the Court. A Claim that is the subject of a pending objection is not an Allowed Claim until the objection is resolved by Final Order, except to the extent temporarily allowed for voting under Rule 3018(a). No Allowed Claim shall accrue post-petition interest unless expressly provided herein.

**"Allowed Interest"** means an Interest for which a proof of Interest was filed within the period fixed by Rule 3001 (or by a Final Order), or which is scheduled under Rule 1007(b) and to which no objection has been interposed.

**"Allowed Secured Claim"** means an Allowed Claim that is a Secured Claim to the extent of the value of the collateral securing such Claim.

**"Allowed Unsecured Claim"** means an Unsecured Claim to the extent it is or becomes an Allowed Claim.

**"Assets"** means the Debtor's real and personal property.

**"Ballot"** means the form(s) distributed to each holder of a Claim in an impaired Class entitled to vote, on which the holder indicates acceptance or rejection of the Plan.

**"Ballot Date"** means the date established by the Court by which all Ballots must be received in order to be counted.

**"Bankruptcy Case"** means the Debtor's Chapter 11 case pending before the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Case No. 6:26-bk-05426-GER, as converted from Chapter 7 pursuant to 11 U.S.C. § 706(a).

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended and applicable to the Bankruptcy Case.

**"Bankruptcy Court" or "Court"** means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

**"Bankruptcy Estate" or "Estate"** means the estate created under § 541 of the Code upon the commencement of the Bankruptcy Case, including all property of the Estate.

**"Bar Date"** means the date fixed by the Court by which non-governmental and/or governmental creditors must file a proof of Claim.

**"Business Day"** means a day other than a Saturday, Sunday, or a day on which banks in Orlando, Florida are required or authorized to close.

**"Cash"** means cash and cash equivalents, including checks, bank deposits, and similar items.

**"Causes of Action"** means all actions, claims, and causes of action, and the proceeds thereof, vested in the Debtor or the Estate, including without limitation (a) proceedings under § 502 and §§ 544 through 551 of the Code; (b) all claims against Creditors, holders of Interests, and other parties who have dealt with the Debtor, including parties named in the Debtor's schedules, statement of financial affairs, or pleadings, and former officers, directors, managers, and members, and their successors and assigns, but excluding any claim against the Debtor (which is released and discharged upon entry of the Confirmation Order); and (c) the Debtor's rights of setoff, recoupment, contribution, reimbursement, subrogation, and indemnity.

**"Claim"** has the meaning set forth in § 101(5) of the Code.

**"Claim Objection Bar Date"** means the date that is ninety (90) days after the Confirmation Date, which is the last date on which the Reorganized Debtor may object to any Claim.

**"Class"** means any class into which Claims or Interests are classified pursuant to Article II of this Plan.

**"Class 8 Closing Date" means the earlier of (i) the date on which the final Distribution to the holders of Allowed Class 8 Claims is made at the end of the twenty (20) year Distribution period described in Article IV, and (ii) the date on which all Allowed Class 8 Claims are paid in full. Class 8 is "closed" on the Class 8 Closing Date.**

"Commercial Operator License Fee" means, with respect to each Commercial Operator, (i) the fee of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00) per month payable to the Reorganized Debtor for access to and use of the public and common areas of the Retained Properties and of the Lift Station, including the Lift Station capacity serving the one hundred forty-seven (147) boat slips and lifts at the two marina operations in the aggregate — thirty-one (31) at the marina operated on the Canaveral Port Authority leasehold and one hundred sixteen (116) at the other, together with the right to use the name, trade dress, trademarks, trade names, and signage of the resort, and (ii) a royalty equal to three percent (3%) of the gross revenues derived from that Commercial Operator's operations at or from the Property, which royalty is in addition to, and not in lieu of, the monthly fee. The Commercial Operator License Fee is consideration for access to and use of the Retained Properties and the Lift Station and for the right to use the resort's name and marks on and after the Effective Date. It is not rent, it is not consideration for the premises occupied by any Commercial Operator under a lease or other instrument to which the Debtor is not a party — including the Canaveral Port Authority leases assigned in 2022 — and it is not consideration for ingress and egress over Tingley Drive, which the Access Easement identifies as a public right of way, and it neither satisfies nor reduces any claim preserved under Article VI(1)(h) or Article VI(1)(h)(2).

**"Commercial Operators"** means, collectively, the restaurant and the two (2) marina operations located at the Property, each of which is separately identified in the Disclosure Statement.

"Common-Area Access Charge" means the charge of One Hundred Twenty-Five and 00/100 Dollars ($125.00) per unit per month payable to the Reorganized Debtor by the Master Association for access to and use of the clubhouse, the swimming pool, any fitness facility, and the other public and common areas and amenities of the Retained Properties, as described in Article VI of this Plan. The Common-Area Access Charge is not consideration for, and is not imposed upon, the right of ingress and egress conveyed by the Access Easement.

**"Confirmation"** means the process leading to and including the entry of the Confirmation Order under § 1129 of the Code.

**"Confirmation Date"** means the date of entry of the Confirmation Order.

**"Confirmation Order"** means the order of the Court confirming this Plan.

**"Creditor"** has the meaning set forth in § 101(10) of the Code.

**"Disclosure Statement"** means the disclosure statement filed by the Debtor pursuant to § 1125 of the Code with respect to this Plan, as it may be amended, modified, or supplemented.

**"Disputed Claim"** means a Claim against the Debtor that is not an Allowed Claim and has not been disallowed by Final Order.

**"Distribution"** means the distribution to be made under this Plan to holders of Allowed Claims.

**"Effective Date"** means the third (3rd) Business Day following the date on which the Confirmation Order becomes a Final Order.

**"Estimated Insurance Escrow"** means the monthly amount to be escrowed for insurance on the Debtor's real property, equal to one-twelfth (1/12) of the estimated yearly insurance premiums, as set forth in the Loan Documents.

**"Estimated Tax Escrow"** means the monthly amount to be escrowed for real estate property taxes, equal to one-twelfth (1/12) of the estimated yearly taxes, as set forth in the Loan Documents.

**"Final Order"** means an order or judgment of the Court as to which the time to appeal or seek certiorari has expired and as to which no appeal or petition for certiorari is pending.

**"Homemakers" means Homemakers Real Estate, LLC, the debtor in the Chapter 11 case styled In re Homemakers Real Estate, LLC, Case No. 6:25-bk-05570, pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Homemakers Case").**

**"Homemakers Plan"** means the plan of reorganization confirmed (or to be confirmed) in the Homemakers Case, as it may be amended or modified, together with the confirmation order entered thereon.

**"Impaired Class"** means any Class the members of which hold Claims or Interests that are impaired within the meaning of § 1124 of the Code.

**"Insider"** has the meaning set forth in § 101(31) of the Code.

**"Interest"** means the issued and authorized outstanding membership or equity interests in the Debtor, and any warrants, options, or other rights to acquire the same.

**"IP and Signage License Fee"** means, with respect to each unit at the Property that is engaged in commercial activity, the fee payable monthly to the Reorganized Debtor for the use of the Debtor's signage, trademarks, trade names, and other intellectual property, equal to the greater of (i) three percent (3%) of the gross revenues derived from the commercial activity conducted at or from such unit, or (ii) One Hundred Five and 00/100 Dollars ($105.00) per month.

**"Lien"** means any mortgage, lien, charge, security interest, encumbrance, or other security device affecting the Debtor's property, but only to the extent recognized as valid by a court of competent jurisdiction if challenged.

**"License Fees" means, collectively, the IP and Signage License Fee, the Commercial Operator License Fee, and the Reservation System Access Fee.**

**"Lift Station"** means the sewage lift station and related infrastructure owned by the Debtor and serving the Property.

**"Lift Station Access Fee" means the fee of Eighty-Eight and 00/100 Dollars ($88.00) per unit per month payable to the Reorganized Debtor by the owner of each unit at the Property for access to and use of the Lift Station.**

**"Loan Documents"** means, with respect to each holder of a Secured Claim, the promissory note(s), mortgage(s), security agreement(s), loan agreement(s), forbearance and modification agreement(s), and related documents evidencing and securing such holder's Claim against the Debtor.

**"Master Association" means Cape Crossing Resort Management, Inc., a Florida not-for-profit corporation, being the master association established under the Master Declaration, and, where the context requires, includes each sub-association of unit owners at the Property, namely the Cape Crossing Condominium Association, Inc. and the Cape Crossing Townhomes Homeowners Association, Inc.**

"Master Declaration" means the Declaration of Covenants, Conditions and Restrictions for Cape Crossing Resort and Marina Living, executed by the Debtor as Developer and recorded May 31, 2016 at CFN 2016102579, O.R. Book 7626, Page 1609, Public Records of Brevard County, Florida, as amended by the First Amendment thereto recorded February 7, 2022 at CFN 2022030749, O.R. Book 9407, Page 1645, and as the same may hereafter be amended, together with the Articles of Incorporation and By-Laws of the Master Association.

**"Operating Expenses"** means the Debtor's post-petition bills, expenses, invoices, and charges, including the Estimated Tax Escrow and Estimated Insurance Escrow, incurred by the Debtor or the Reorganized Debtor in the ordinary course of business.

**"Person"** means an individual, corporation, limited liability company, partnership, joint venture, trust, estate, unincorporated organization, or governmental unit or political subdivision thereof.

**"Petition Date"** means July 20, 2026, the date on which the involuntary Chapter 7 petition was filed against the Debtor commencing the Bankruptcy Case.

**"Plan"** means this Chapter 11 plan of reorganization, as it may be amended or modified.

**"Plan Revenues" means all revenues received by the Reorganized Debtor on and after the Effective Date from or on account of the Retained Properties, including without limitation all payments under the Property Use Agreement, the Common-Area Access Charge, the Lift Station Access Fee, and the License Fees. Plan Revenues do not include the net proceeds of Causes of Action, which are distributed as provided in Article IV.**

**"Plan Supplement" means the compilation of documents and forms filed by the Debtor with the Court not later than seven (7) days before the Confirmation hearing, including the Johnson Stipulation described in Article IV, the form of Property Use Agreement, the forms of license agreement for the IP and Signage License Fee, the Commercial Operator License Fee, and the Reservation System Access Fee, the form of the one-time release described in Article VI(1)(h)(2) and the period during which that offer remains open, certified copies of the Master Declaration and of the townhome and condominium declarations as recorded, and the form of amendment to the Master Declaration described in Article VI(1)(a)(2), and the disclosure of the identity, affiliations, and compensation of the Reorganized Debtor's post-confirmation management required by § 1129(a)(5) of the Code.**

**"Priority Tax Claim"** means a Claim of a governmental unit (other than an Administrative Claim) entitled to priority under § 507(a)(8) of the Code.

**"Pro Rata"** means proportionately, such that the ratio of the amount of a Distribution on account of a particular Allowed Claim to the aggregate Distribution on account of all Allowed Claims of the applicable Class equals the ratio of such Allowed Claim to the aggregate amount of all Allowed Claims of that Class.

**"Professional"** means (i) any professional retained under §§ 327 or 1103 of the Code; (ii) any attorney or accountant seeking compensation under § 503(b) of the Code; and (iii) any entity whose fees are subject to Court approval as reasonable under § 1129(a)(4) of the Code.

**"Property"** means the Cape Crossing development in which the Retained Properties are located.

**"Property Use Agreement"** means one or more agreements to be entered into on or after the Effective Date between the Reorganized Debtor, on the one hand, and the owners of the units at the Property and/or the Master Association, on the other hand, providing for the payments described in Article VI(1)(b) of this Plan.

**"Reorganized Debtor" or "Reorganizing Debtor"** means the Debtor on and after the Effective Date.

**"Retained Properties"** means all real and personal property owned by the Debtor as of the Effective Date, including without limitation the land underlying the buildings at the Property, the clubhouse and other common and public areas, the Lift Station, the Debtor's signage, and the Debtor's trademarks, trade names, and other intellectual property.

**"Reservation System" means the reservation, booking, and channel-management system owned or licensed by the Debtor and used in connection with the marketing, booking, and rental of units and facilities at the Property, together with the associated software, data, listings, and goodwill.**

**"Reservation System Access Fee" means the fee payable monthly to the Reorganized Debtor by each Person who accesses or uses the Reservation System, equal to five percent (5%) of all revenues generated through the Reservation System by or for that Person, whether or not the underlying booking is ultimately fulfilled through another channel.**

**"Rules"** means the Federal Rules of Bankruptcy Procedure, as supplemented by the Local Rules of the Bankruptcy Court.

**"Secured Claim"** means a Claim secured by a Lien on property of the Estate that is valid, perfected, and enforceable and not subject to avoidance, to the extent of the value of such collateral; any deficiency (the difference between the Allowed Claim and the Allowed Secured Claim) is an Allowed Unsecured Claim under Class 8.

**"Statutory Rate"** means the applicable rate of interest required to be paid on ad valorem real property taxes under applicable law.

**"Unsecured Claim"** means a Claim that arose, or is deemed to have arisen, prior to the Petition Date and that is not a Secured Claim, a Priority Claim, or an Administrative Claim.

**"Unsecured Creditor Share"** means seventy-five percent (75%) of Plan Revenues, which shall be distributed Pro Rata to the holders of Allowed Class 8 Claims, without interest, for twenty (20) years following the Effective Date, as provided in Article IV of this Plan.

**"United States Trustee"** means the Office of the United States Trustee for Region 21, Middle District of Florida, Orlando.

## ARTICLE II — CLASSIFICATION OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims, United States Trustee's fees, and Priority Tax Claims (which are treated in Article III and are not classified), are placed in the following mutually exclusive Classes:

### A. Class 1 — Allowed Secured Claim of Paul Rene, Jr., as Assignee of the Jetton Investments, Inc. Mortgage.

Class 1 consists of the Allowed Secured Claim of Paul Rene, Jr., as assignee of the first-lien mortgage note originally held by Jetton Investments, Inc. (CFN 2018121113, OR BK 8176 Pg 930, recorded May 30, 2018, as modified by the Forbearance and Modification Agreement dated November 19, 2024) ("Rene"), scheduled in the amount of $1,468,484.37. Class 1 is impaired.

### B. Class 2 — Allowed Secured Claim of Tamamoi, LLC.

Class 2 consists of the Allowed Secured Claim of Tamamoi, LLC ("Tamamoi"), scheduled in the amount of $2,469,844.80. The Debtor disputes the Class 2 Claim and reserves all objections to it; the treatment provided in Article IV applies only to the Allowed Amount of the Claim as finally determined. Class 2 is impaired.

### C. Class 3 — Allowed Secured Claim of Carton Family Trust of 1992.

Class 3 consists of the Allowed Secured Claim of the Carton Family Trust of 1992 ("Carton"), scheduled in the amount of $310,000.00 and secured by a UCC-1 fixture filing and mortgage on a single resort unit valued at $550,000.00 (CFN 2019103166, OR BK 8438 Pg 1707). Class 3 is impaired.

### D. Class 4 — Allowed Secured Claim of Horton S. Johnson (First Note).

Class 4 consists of the Allowed Secured Claim of Horton S. Johnson ("Johnson") arising from the first construction-loan mortgage note secured by the Debtor's Cape Crossing real property, reduced to a consent final judgment in Brevard County Case No. 05-2025-CA-013106 and scheduled in the amount of $3,608,845.31 (the "Johnson First Note"). Of that amount, One Million Dollars ($1,000,000.00) is exchanged for equity in the Reorganized Debtor as provided in Article IV, and the balance of $2,608,845.31 is treated as an Allowed Unsecured Claim in Class 8. Class 4 is impaired.

### E. Class 5 — Allowed Secured Claim of Horton S. Johnson (Second Note).

Class 5 consists of the Allowed Secured Claim of Johnson arising from the second note, likewise reduced to judgment in Brevard County Case No. 05-2025-CA-013106 and secured by a judgment lien recorded on May 13, 2025 against the Debtor's real property, scheduled in the amount of $2,388,178.15 (the "Johnson Second Note"). The Allowed Class 5 Claim is paid in monthly installments Pro Rata with the holders of Allowed Class 8 Claims, as provided in Article IV. Class 5 is impaired.

### F. Class 6 — Allowed Secured Claim of PEDIXON LLC.

Class 6 consists of the Allowed Secured Claim of PEDIXON LLC ("Dixon") arising from the balloon mortgage recorded as CFN 2023043479, OR BK 9731 Pg 1341 (recorded March 3, 2023), scheduled in the disputed amount of $500,000.00. The Debtor disputes the Class 6 Claim in its entirety. Class 6 is impaired. The Debtor disputes the Class 6 Claim in its entirety and contends that the obligation is not an enforceable debt in the courts of this State under § 687.071(7) of the Florida Statutes, the effective rate of interest computed as § 687.03(3) prescribes exceeding the twenty-five percent threshold of § 687.071(2), as set out in Article VIII of the Disclosure Statement. The Reorganized Debtor shall object to the Class 6 Claim on that ground and on all others available, and reserves all rights under § 544(a) of the Code with respect to the perfection of the Lien asserted. No Distribution on account of Class 6 is projected, and no amount on account of Class 6 is included in Exhibit A.

### G. Class 7 — Allowed Secured Claims of Tax Certificate Holders.

Class 7 consists of all Allowed Secured Claims held against the Assets of the Debtor in connection with any tax certificates. The Debtor will amend the Plan to provide separate sub-classes for each tax certificate holder in accordance with the Bankruptcy Code. Class 7 is impaired.

### H. Class 8 — General Unsecured Claims.

Class 8 consists of all Allowed Unsecured Claims against the Debtor, including the unsecured deficiency Claims of the holders of Claims in Classes 1, 2, 3, 6, and 7, the $2,608,845.31 balance of the Johnson First Note remaining after the One Million Dollar ($1,000,000.00) equity exchange provided for in Class 4, and the $4,400,000.00 Claim of Sherwood Construction, Inc. Class 8 is impaired.

### I. Class 9 — Equity Interests.

Class 9 consists of all Equity Interests in the Debtor. Class 9 is impaired and, because the Interests are being cancelled as provided in Article IV, holders of Class 9 Interests are deemed to reject the Plan and are not entitled to vote.

## ARTICLE III — ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

### A. Administrative Expense Claims.

Each holder of an Allowed Administrative Claim shall receive Cash equal to the Allowed amount of such Claim, in full satisfaction thereof, either (i) as soon as reasonably practicable after the Effective Date, or (ii) if the Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which such Claim becomes Allowed. Obligations incurred in the ordinary course of business may be paid in the ordinary course, consistent with past practice, without further Court approval.

*The Debtor anticipates that Allowed Administrative Claims will total approximately One Hundred Twenty-Five Thousand Dollars ($125,000.00), consisting of the fees and expenses of the Debtor's counsel in excess of the pre-petition retainer and the compensation of the Debtor's Chief Restructuring Officer, in each case subject to Court approval under §§ 330(a) and 331 of the Code.*

### B. United States Trustee's Fees.

All fees due to the United States Trustee under 28 U.S.C. § 1930(a)(6) that are unpaid as of the Effective Date shall be paid in full in Cash on the Effective Date, and the Reorganized Debtor shall continue to pay such fees until the case is closed, converted, or dismissed.

**C. Priority Tax Claims.**

Except to the extent a holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, on account of such Claim, deferred Cash payments in accordance with § 1129(a)(9)(C) of the Code, together with interest at six percent (6%) per annum, with monthly payments commencing on the first day of the first full calendar quarter following the later of the Effective Date or the date such Claim becomes Allowed, and with the final payment due no later than five (5) years after the date of the order for relief.

## ARTICLE IV — TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

**A. Determination of Allowed Amounts.**

The treatment set forth in this Article IV applies only to the Allowed Amount of each Claim. If the Allowed Amount of a Claim has not been determined as of a Distribution date, no Distribution shall be made on account of such Claim until it becomes an Allowed Claim. The Reorganized Debtor reserves the right to object to any Claim (other than a Claim deemed Allowed under the Plan) and to assert equitable subordination. The Reorganized Debtor is responsible for all Claim objections, which shall be filed on or before the Claim Objection Bar Date (ninety (90) days after the Confirmation Date). The Court retains jurisdiction to adjudicate all such objections.

**B. Class 1 — Paul Rene, Jr., as Assignee of the Jetton Investments, Inc. Mortgage.**

In full satisfaction of Rene's Allowed Class 1 Claim: (a) Rene shall retain all of his Liens on the Assets of the Debtor to the same validity, extent, and priority as existed prior to the Petition Date; (b) the Allowed Class 1 Claim shall be paid in the Homemakers Case, by Homemakers, pursuant to and in accordance with the Homemakers Plan, in monthly installments as provided therein, and all payments received by Rene from or on behalf of Homemakers shall be credited dollar-for-dollar against the Allowed Class 1 Claim; and (c) the Reorganized Debtor shall have no obligation to make any payment on account of the Allowed Class 1 Claim unless and until Homemakers defaults in the payment of the monthly installments due under the Homemakers Plan and such default is not cured within thirty (30) days after written notice of the default is given to Homemakers and the Reorganized Debtor, in which event the Reorganized Debtor shall assume and pay the monthly installments coming due on account of the Allowed Class 1 Claim, as and when due under the Homemakers Plan, until the earlier of (i) the cure or other resolution of the Homemakers default and the resumption of payments by Homemakers, or (ii) payment of the Allowed Class 1 Claim in full. The balance of Rene's total Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 8. Class 1 is impaired and Rene is entitled to vote on the Plan.

**C. Class 2 — Tamamoi, LLC.**

In full satisfaction of Tamamoi's Allowed Class 2 Claim: (a) Tamamoi shall retain all of its Liens on the Assets of the Debtor to the same validity, extent, and priority as existed prior to the Petition Date; (b) the Allowed Class 2 Claim shall be paid in the Homemakers Case, by

Homemakers, pursuant to and in accordance with the Homemakers Plan, in monthly installments as provided therein, and all payments received by Tamamoi from or on behalf of Homemakers shall be credited dollar-for-dollar against the Allowed Class 2 Claim; and (c) the Reorganized Debtor shall have no obligation to make any payment on account of the Allowed Class 2 Claim unless and until Homemakers defaults in the payment of the monthly installments due under the Homemakers Plan and such default is not cured within thirty (30) days after written notice of the default is given to Homemakers and the Reorganized Debtor, in which event the Reorganized Debtor shall assume and pay the monthly installments coming due on account of the Allowed Class 2 Claim, as and when due under the Homemakers Plan, until the earlier of (i) the cure or other resolution of the Homemakers default and the resumption of payments by Homemakers, or (ii) payment of the Allowed Class 2 Claim in full. The balance of Tamamoi's total Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 8. Class 2 is impaired and Tamamoi is entitled to vote on the Plan.

**D. Class 3 — Carton Family Trust of 1992.**

In full satisfaction of Carton's Allowed Class 3 Claim: (a) Carton shall retain all of its Liens on the Assets of the Debtor to the same validity, extent, and priority as existed prior to the Petition Date; (b) the Allowed Class 3 Claim shall be paid in the Homemakers Case, by Homemakers, pursuant to and in accordance with the Homemakers Plan, in monthly installments as provided therein, and all payments received by Carton from or on behalf of Homemakers shall be credited dollar-for-dollar against the Allowed Class 3 Claim; and (c) the Reorganized Debtor shall have no obligation to make any payment on account of the Allowed Class 3 Claim unless and until Homemakers defaults in the payment of the monthly installments due under the Homemakers Plan and such default is not cured within thirty (30) days after written notice of the default is given to Homemakers and the Reorganized Debtor, in which event the Reorganized Debtor shall assume and pay the monthly installments coming due on account of the Allowed Class 3 Claim, as and when due under the Homemakers Plan, until the earlier of (i) the cure or other resolution of the Homemakers default and the resumption of payments by Homemakers, or (ii) payment of the Allowed Class 3 Claim in full. The balance of Carton's total Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 8. Class 3 is impaired and Carton is entitled to vote on the Plan.

**E. Class 4 — Horton S. Johnson (First Note).**

In partial satisfaction of Johnson's Allowed Class 4 Claim of $3,608,845.31: (a) Johnson shall surrender part of the Johnson First Note and shall release the mortgage securing it to the extent of One Million Dollars ($1,000,000.00), and the Liens securing the Johnson First Note shall remain in place against the Debtor and its property, to the same validity, extent, and priority as existed prior to the Petition Date, until the Class 8 Closing Date; (b) One Million Dollars ($1,000,000.00) of the Allowed Class 4 Claim shall be exchanged for, and satisfied by, the issuance to Johnson on the Effective Date of one hundred percent (100%) of the newly issued membership interests in the Reorganized Debtor; and (c) the remaining balance of $2,608,845.31 shall be treated as an Allowed Unsecured Claim in Class 8 and shall share Pro Rata in Distributions to Class 8 on the same terms as every other Allowed Class 8 Claim, without interest. Class 4 is impaired and Johnson is entitled to vote on the Plan.

**From and after the Effective Date, the Liens retained under subsection (a) above shall secure only the Reorganized Debtor's performance of its obligations to Class 8 under this Plan. Johnson shall not be treated as the holder of a Secured Claim on account of the $2,608,845.31 balance of the Johnson First Note, and that balance shall be an Allowed Unsecured Claim in Class 8 for all purposes, including voting, classification, and Distribution. Johnson shall not enforce, or seek to enforce, the retained Liens except upon a default by the Reorganized Debtor in the performance of its obligations to Class 8 that remains uncured for thirty (30) days after written notice of the default is given to the Reorganized Debtor. Johnson shall subordinate the retained Liens to any Lien granted by the Reorganized Debtor to secure financing approved by the Court or permitted under this Plan, and shall execute such subordination agreements as the Reorganized Debtor may reasonably request. On the Class 8 Closing Date the retained Liens shall be released and shall be of no further force or effect without further order of the Court, and Johnson shall execute and deliver a satisfaction and release in recordable form within thirty (30) days after written request.**

**Johnson has consented to the treatment of the Allowed Class 4 Claim provided in this Article IV(E), including the partial release, the retention and subordination of the Liens, and the classification of the $2,608,845.31 balance as an Allowed Unsecured Claim in Class 8. That consent shall be evidenced by the Johnson Stipulation, executed by Johnson and filed with the Court as part of the Plan Supplement.**

*Nothing in this Article IV(E), and no part of the One Million Dollar ($1,000,000.00) equity exchange, the surrender of the Johnson First Note, the release of the mortgage securing it, or the Confirmation Order, shall release, discharge, impair, reduce, or otherwise affect the liability of any guarantor, co-obligor, or other non-debtor party — including without limitation FBC Holdings, LLC and Michael McPhillips — on account of any guaranty or other obligation owing to Johnson. Johnson expressly retains all rights and remedies against all such non-debtor parties, and all such guaranties and obligations remain in full force and effect outside this Bankruptcy Case.*

**F. Class 5 — Horton S. Johnson (Second Note).**

In full satisfaction of Johnson's Allowed Class 5 Claim of $2,388,178.15: (a) Johnson shall retain the judgment Lien securing the Johnson Second Note, to the same validity, extent, and priority as existed prior to the Petition Date, until the release provided for below; (b) no payment shall be due, and no interest shall accrue, on the Allowed Class 5 Claim for the twenty-four (24) month period commencing on the Effective Date, in order to permit the Reorganized Debtor's operations to stabilize and unit sales to increase; and (c) commencing on the first day of the calendar month immediately following the expiration of that twenty-four (24) month period, and continuing monthly through the end of the twenty (20) year Distribution period, the Allowed Class 5 Claim shall be paid in monthly installments consisting of its Pro Rata share of the Unsecured Creditor Share, shared Pro Rata with the holders of Allowed Class 8 Claims and on the same terms as those Claims, without interest. The Reorganized Debtor shall make no separate payment on the Allowed Class 5 Claim out of the twenty-five percent (25%) of Plan Revenues it retains. Class 5 is impaired and Johnson is entitled to vote on the Plan.

**Johnson has consented to the treatment of the Allowed Class 5 Claim provided in this Article IV(F), including the twenty-four (24) month deferral without interest and the**

**payment of a Secured Claim Pro Rata with the holders of Allowed Class 8 Claims, and has agreed to accept that treatment in full satisfaction of the Allowed Class 5 Claim notwithstanding §§ 1124 and 1129(b)(2)(A) of the Code. That consent shall be evidenced by a written stipulation executed by Johnson (the "Johnson Stipulation") and filed with the Court as part of the Plan Supplement not later than seven (7) days before the Confirmation hearing. The Johnson Stipulation shall also record Johnson's acceptance of the treatment of the Allowed Class 4 Claim under Article IV(E) and his agreement to the subordination and release provisions of that Article.**

**The judgment Lien securing the Johnson Second Note shall be released, and shall be of no further force or effect without further order of the Court, upon the earlier of (i) the completion of all Distributions under Article IV(I) at the end of the twenty (20) year Distribution period, and (ii) payment in full of the Allowed Class 5 Claim. Johnson shall execute and deliver a satisfaction of judgment and a release of lien in recordable form within thirty (30) days after written request following either event. Johnson shall not enforce, or seek to enforce, the judgment Lien in the interim except upon a default by the Reorganized Debtor in the making of Distributions under Article IV that remains uncured for thirty (30) days after written notice.**

**G. Class 6 — PEDIXON LLC.**

The Class 6 Claim is disputed by the Debtor in its entirety. In full satisfaction of any Allowed Class 6 Claim: (a) Dixon shall retain its Lien on the Assets of the Debtor to the same validity, extent, and priority as existed prior to the Petition Date, pending determination of the Claim; (b) if and to the extent the Class 6 Claim becomes an Allowed Secured Claim by Final Order, the Reorganized Debtor shall pay it, together with interest at four and eight-tenths percent (4.8%) per annum, in equal monthly installments amortized over thirty (30) years, commencing on the first day of the first full calendar month following the date on which the Claim becomes an Allowed Claim; and (c) any portion of the Class 6 Claim that is determined not to be an Allowed Secured Claim shall be treated as an Allowed Unsecured Claim under Class 8. Class 6 is impaired and Dixon is entitled to vote on the Plan.

**H. Class 7 — Tax Certificate Holders.**

Class 7 consists of all Allowed Secured Claims in connection with any tax certificates held against the Assets of the Debtor. The Debtor will amend its Plan to provide separate classes for all tax certificate holders in accordance with the Bankruptcy Code. In full satisfaction of any Allowed Class 7 Claim, each Class 7 Claimholder shall retain its Liens on the Assets of the Debtor to the same validity, extent, and priority as existed prior to the Petition Date, and, on the first day of the first full calendar quarter following the Effective Date, the Reorganized Debtor shall commence quarterly payments, together with interest at six percent (6%) per annum, in accordance with 11 U.S.C. § 1129(a)(9)(D), in an amount sufficient to pay each Allowed Class 7 Claim in full, with the final payment due no later than five (5) years after the date of the order for relief. Class 7 is impaired and the Class 7 Claimholders are entitled to vote on the Plan.

**I. Class 8 — General Unsecured Claims.**

In full and final satisfaction of each Allowed Unsecured Claim, each holder of an Allowed Unsecured Claim shall be entitled to receive: (1) a Pro Rata share of the Unsecured Creditor Share — that is, seventy-five percent (75%) of the Reorganized Debtor's Plan Revenues —

distributed monthly for twenty (20) years following the Effective Date, shared Pro Rata with the Allowed Class 5 Claim as provided in Article IV(F); and (2) a Pro Rata share of the net proceeds of all Causes of Action, after payment of professional fees, priority claims, and administrative claims. No interest shall accrue or be paid on any Allowed Unsecured Claim, and all Distributions to Class 8 shall be applied to principal only. The Allowed Class 8 Claims include the $4,400,000.00 Claim of Sherwood Construction, Inc., which shall be paid Pro Rata with, and on the same terms as, every other Allowed Class 8 Claim. Class 8 is impaired and holders of Allowed Unsecured Claims are entitled to vote on the Plan.

**J. Class 8 — Allowed Claim of Pino Law Group.**

In addition to the general unsecured Claims scheduled by the Debtor, the Pino Law Group holds an Allowed Class 8 general unsecured Claim in the amount of $138,485.00 on account of prepetition legal services rendered to the Debtor. Such Claim shall share Pro Rata in Distributions to Class 8 on the same terms as every other Allowed Class 8 Claim, without interest.

**K. Class 9 — Equity Interests.**

All existing Interests in the Debtor shall be cancelled on the Effective Date, and the holders of Class 9 Interests shall receive no Distribution on account of such Interests. On the Effective Date, one hundred percent (100%) of the newly issued membership interests in the Reorganized Debtor shall be issued to Horton S. Johnson in exchange for One Million Dollars ($1,000,000.00) of his Allowed Class 4 Claim, as provided in Article IV(E) above. Because the existing Class 9 Interests are being cancelled without Distribution, holders of Interests are deemed to reject the Plan and are not entitled to vote.

## ARTICLE V — UNEXPIRED LEASES AND EXECUTORY CONTRACTS

The Debtor shall have through and including the date of the Confirmation hearing to assume or reject any unexpired lease or executory contract. Any unexpired lease or executory contract that has not been assumed, and is not the subject of a pending motion to assume, as of the Confirmation hearing shall be deemed rejected as of the Confirmation Date. Any Claim for damages arising from the rejection of an unexpired lease or executory contract must be filed within thirty (30) days after entry of the order authorizing such rejection (or the Confirmation Order, as applicable) and shall be treated as a Class 8 Unsecured Claim. The Debtor's position, as reflected on Schedule G filed under Rule 1007(b)(1)(B), is that it was not a party to any executory contract or unexpired lease as of the Petition Date and is no longer the lessor under any unit lease at the Property; the foregoing right to assume or reject is preserved as to any executory contract or unexpired lease later identified.

## ARTICLE VI — MEANS OF IMPLEMENTATION

**1. Business Operations and Cash Flow.**

**(a) Retained Properties.** On the Effective Date, the Reorganized Debtor shall retain, and shall continue to own, operate, and control, the Retained Properties — all real and personal property that the Debtor then owns, including the land underlying the buildings at the Property, the clubhouse and other common and public areas, the Lift Station, the Debtor's signage, and the Debtor's trademarks, trade names, and other intellectual property. The Debtor owns, and on and

after the Effective Date the Reorganized Debtor shall continue to own, the common and public areas at the Property, the clubhouse, the Lift Station, and the trademarks, trade names, service marks, and signage associated with the Cape Crossing Resort & Marina, in each case other than those common-area parcels titled of record to the Cape Crossing Condominium Association, Inc. or the Cape Crossing Townhomes Homeowners Association, Inc. The Debtor believes that cash flow from the Retained Properties, under the arrangements described in this Section, will be sufficient to meet all Operating Expenses and Plan Payments.

(a)(2) Authority to Assess; the Access Easement. The Debtor is the Developer and declarant under the Master Declaration, recorded at CFN 2016102579, O.R. Book 7626, Page 1609, Public Records of Brevard County, Florida, as amended at CFN 2022030749, O.R. Book 9407, Page 1645. None of the Master Declaration, the Declaration of Covenants, Conditions and Restrictions for Cape Crossing Townhomes (O.R. Book 7626, Page 1747, as amended), or the Declaration of Condominium of Cape Crossing, a Condominium (O.R. Book 8418, Page 1832, as amended) requires the Debtor to convey, dedicate, or turn over to the Master Association, to either sub-association, or to the unit owners the clubhouse, the swimming pool, any fitness facility, the public and common areas, the Lift Station, or the Debtor's trademarks, trade names, or signage; the transfer-of-control provisions of the townhome and condominium instruments govern the composition of those associations' boards and effect no conveyance of property. Article IV of the Master Declaration provides that the Master Association shall bill all assessments to the two sub-associations and that each shall collect from its members and remit within five (5) days of receipt, and Article VII, Section 7 of the Master Declaration permits the Developer, so long as it owns one lot, condominium unit, or other parcel of land within the resort, to amend the Master Declaration without the consent or joinder of any other Person, a power the Debtor exercised in recording the First Amendment on February 7, 2022. On or after the Effective Date the Reorganized Debtor may, in addition to entering into the Property Use Agreement and the license agreements provided for in this Article VI, record a further amendment to the Master Declaration implementing the Common-Area Access Charge, the Lift Station Access Fee, and the License Fees as assessments collectible through the Master Association, and may take such further steps under Chapter 712 of the Florida Statutes as are necessary to preserve the covenants, which otherwise expire May 31, 2046, for the term of this Plan and of the Property Use Agreement. All rights granted under this Article VI are subject to the Easement recorded December 1, 2015 at CFN 2015233219, O.R. Book 7502, Page 1471 (the "Access Easement"), by which the Debtor granted the Cape Crossing Townhomes Homeowners Association and the Cape Crossing Condominium Association, their successors, assigns, guests, and invitees perpetual non-exclusive easements for ingress and egress over the streets, roadways, driveways, and walks of the Property and for the installation, maintenance, and use of utilities, including a lift station, at the grantees' cost. Neither the Common-Area Access Charge nor any other charge under this Article VI is imposed upon or in consideration of the right of way conveyed by the Access Easement. Nothing in this subsection limits the rights reserved to the Reorganized Debtor under Article VI(1)(h) and Article VI(1)(h)(2).

The Debtor confirms that there are eighty-two (82) units at the Property and that seventy (70) of them are engaged in commercial activity. All per-unit and aggregate figures in this Article VI and in Exhibit A are based on those counts. Revenue under this Plan is generated by six components. Four are payable by or on behalf of the unit owners: (i) the land lease under the Property Use Agreement; (ii) the access fee for the clubhouse and the public and common areas;

(iii) the royalty for use of the Debtor's trade names, trademarks, and signage under the IP and Signage License Fee; and (iv) the Lift Station use charge. The fifth is the Commercial Operator License Fee payable by the restaurant and the two marina operations, together with each Commercial Operator's share of commercial-area costs. The sixth is the Reservation System Access Fee.

**(b) Property Use Agreement with Unit Owners / Associations.** The Reorganized Debtor shall enter into the Property Use Agreement with the owners of the units at the Property and/or the Master Association, under which the unit owners (or the Master Association on their behalf) shall pay the Reorganized Debtor, in consideration of the continued use of and access to the Retained Properties, $250.00 per unit per month for thirty (30) years, which across approximately eighty-two (82) units generates approximately $20,500.00 per month (approximately $246,000.00 per year, and approximately $7,380,000.00 in the aggregate over the thirty (30) year term).

**(c) Common-Area Access Charge.** The Reorganized Debtor shall charge the Master Association $125.00 per unit per month for access to and use of the public and common areas of the Retained Properties, which charge the Master Association may assess against and pass through to each unit. Across approximately eighty-two (82) units, this charge generates approximately $10,250.00 per month (approximately $123,000.00 per year).

**(d) Lift Station Access Fee. The owner of each unit at the Property shall pay the Reorganized Debtor the Lift Station Access Fee of $88.00 per unit per month for access to and use of the Lift Station. Across approximately eighty-two (82) units, this fee generates approximately $7,216.00 per month (approximately $86,592.00 per year).**

**(e) IP and Signage License Fee.** Each unit at the Property that is engaged in commercial activity shall enter into a license agreement with the Reorganized Debtor and shall pay the IP and Signage License Fee for the use of the Debtor's signage, trademarks, trade names, and other intellectual property, in an amount equal to the greater of (i) three percent (3%) of the gross revenues derived from the commercial activity conducted at or from such unit, or (ii) $105.00 per month. Based on approximately seventy (70) units engaged in commercial activity, the minimum component of this fee generates approximately $7,350.00 per month (approximately $88,200.00 per year), exclusive of any additional amounts payable on account of the three percent (3%) royalty.

(f) Commercial Operator License Fee; Royalty; Share of Commercial Area Costs. Each Commercial Operator — the restaurant and each of the two (2) marina operations at the Property — shall enter into a license agreement with the Reorganized Debtor and shall pay the Commercial Operator License Fee. The monthly component of that fee is $2,500.00 per Commercial Operator for access to and use of the public and common areas of the Retained Properties and of the Lift Station, including the Lift Station capacity serving the one hundred forty-seven (147) boat slips and lifts at the two marina operations in the aggregate — thirty-one (31) at the marina operated on the Canaveral Port Authority leasehold and one hundred sixteen (116) at the other, together with the right to use the name, trade dress, trademarks, trade names, and signage of the resort. Across the three (3) Commercial Operators, that component generates $7,500.00 per month ($90,000.00 per year). In addition, each Commercial Operator shall pay a royalty equal to three percent (3%) of the gross revenues derived from its operations at or from

the Property, payable monthly in arrears, which royalty is in addition to the monthly component and is not included in the minimum Plan Revenues set forth in Exhibit A. In addition, and separate from the Commercial Operator License Fee, each Commercial Operator shall pay its proportionate share of the costs of maintaining, repairing, insuring, and operating the commercial common areas at the Property that lie outside the areas maintained by the homeowners associations. Those costs have been borne by the Debtor without reimbursement, and the license agreement shall provide for their allocation and periodic collection going forward. The consideration for the Commercial Operator License Fee is the use of the Lift Station, the use of the Debtor's public and common areas and amenities, and the right to use the resort's name, trade dress, trademarks, trade names, and signage on and after the Effective Date; it is not premised upon ingress and egress over Tingley Drive, which the Access Easement identifies as a public right of way. The restaurant and one of the two marina operations are conducted upon the Canaveral Port Authority leasehold described in Article VI(1)(a)(2), in which the Debtor no longer holds an interest; the second marina operation is not conducted upon that leasehold. The Commercial Operator License Fee is payable by each Commercial Operator without regard to the ownership of the premises upon which it operates. The Plan seeks no payment on account of the Canaveral Port Authority leases assigned by the Debtor in 2022, and no part of the Plan Revenues set forth in Exhibit A assumes that the Debtor holds or will recover any interest in that leasehold. If and to the extent those leases are avoided and recovered for the Estate under Article VI(1)(h)(3), the Reorganized Debtor may charge rent or the fair value of use in addition to the Commercial Operator License Fee.

**(g) Reservation System Access Fee. Each Person who wishes to access or continue to use the Reservation System shall enter into a license agreement with the Reorganized Debtor and shall pay the Reservation System Access Fee, equal to five percent (5%) of all revenues generated through the Reservation System by or for that Person, payable monthly in arrears. The Reorganized Debtor is not obliged to furnish access to the Reservation System to any Person that has not executed such an agreement and is not current in its payments. Because the Debtor cannot presently estimate the volume of bookings that will be made through the Reservation System, no amount on account of the Reservation System Access Fee is included in the minimum Plan Revenues set forth in Exhibit A; amounts actually received are Plan Revenues and are divided as provided in subsection (j) below.**

**(h) Recovery for Past Use of the Commercial Areas. For approximately five (5) years preceding the Petition Date, the costs of maintaining the commercial common areas outside the areas maintained by the homeowners associations — in particular those areas used by the restaurant and the marina operations — were borne by the Debtor and were not reimbursed by the parties that used and benefited from them. The Reorganized Debtor shall preserve and pursue, as a Cause of Action under this Plan, claims against the restaurant and the marina operations for the reasonable value of that past use and of the services rendered. The Debtor recognizes that the earlier portions of those claims may be subject to the applicable statute of limitations, laches, repose, or other defenses, and that the more recent portions are likely to be recoverable; on that basis the Debtor estimates a net recovery in the range of One Hundred Thirty Thousand Dollars ($130,000.00) to One Hundred Fifty Thousand Dollars ($150,000.00). Any net proceeds of these claims shall be distributed as net proceeds of Causes of Action under Article IV.**

(h)(2) Recovery for Past Use of the Name, Trade Dress, and Marks. The Reorganized Debtor shall preserve and pursue, as a Cause of Action under this Plan, claims against each Person that has used the Cape Crossing name, trade dress, trademarks, trade names, or signage without a license, for the reasonable value of that use prior to the Effective Date. The Reorganized Debtor shall extend to the owner of each of the eighty-two (82) units at the Property and to each of the three (3) Commercial Operators a one-time offer to resolve all claims for use of the name, trade dress, trademarks, trade names, and signage prior to the Effective Date upon payment of Three Thousand and 00/100 Dollars ($3,000.00), which offer shall remain open for the period fixed in the Plan Supplement. As to any Person that does not accept the offer within that period, the Reorganized Debtor shall be entitled to recover in quantum meruit the reasonable value of the use made, together with such interest, costs, attorney fees, and other relief as may be recoverable at law or in equity. Any net proceeds of these claims shall be distributed as net proceeds of Causes of Action under Article IV. For the avoidance of doubt: the offer made and any release given under this subsection extend only to use prior to the Effective Date; they are not a license and confer no right to use the Cape Crossing name, trade dress, trademarks, trade names, signage, amenities, Lift Station, or Reservation System on or after the Effective Date. Use on and after the Effective Date is licensed and charged exclusively under subsections (c) through (g) of this Article VI(1), and payment under this subsection neither satisfies nor reduces any such charge. No amount on account of these claims is included in Plan Revenues or in Exhibit A.

(h)(3) Avoidance and Recovery of the 2021 Transfer and the Port Authority Leases. The Reorganized Debtor preserves and shall prosecute, as Causes of Action under this Plan, claims to avoid and recover (i) a transfer made in 2021 in the amount of Two Million One Hundred Forty-Five Thousand and 00/100 Dollars ($2,145,000.00), and (ii) the assignments, recorded February 7, 2022 at CFN 2022030513 and CFN 2022030514, of the Debtor's leasehold interest under the December 9, 2014 lease from the Canaveral Port Authority, together with all related claims under §§ 544, 548, and 550 of the Code and Chapter 726 of the Florida Statutes. The Debtor asserts that the applicable limitations periods were tolled by concealment. Nothing in this Plan, in the Confirmation Order, or in any license agreement entered into under this Article VI releases, waives, or impairs those claims, and no Person's payment of any charge under this Article VI shall be construed as a release of them. Any net proceeds shall be distributed as net proceeds of Causes of Action under Article IV. No amount on account of these claims is included in Plan Revenues or in Exhibit A.

(i) Waiver of Past-Use Claims Against Individual Unit Owners. As to each individual owner of a unit at the Property who (i) executes the Property Use Agreement, or (ii) does not file an objection to confirmation of the Plan, any claim of the Debtor, the Estate, or the Reorganized Debtor (A) for the reasonable value of that owner's use of the commercial common areas prior to the Effective Date, and (B) for the reasonable value of that owner's use of the Cape Crossing name, trade dress, trademarks, trade names, or signage prior to the Effective Date, is waived and released on the Effective Date. An owner who neither executes the Property Use Agreement nor refrains from objecting remains subject to the one-time offer and to the claims described in Article VI(1)(h)(2). This waiver does not extend to the restaurant or to either marina operation, whose past-use claims are preserved and pursued under Article VI(1)(h) and Article VI(1)(h)(2). This waiver operates only upon claims for use prior to the Effective Date. It does not waive, reduce, defer, or otherwise affect any payment due under the Property Use Agreement, the

Common-Area Access Charge, the Lift Station Access Fee, or any of the License Fees for use on or after the Effective Date.

**(j) Schedule of Plan Income. The projected Plan Revenues from the foregoing sources, and their application to the Debtor's obligations under the Plan, are set forth in the Schedule of Plan Income attached hereto as Exhibit A and incorporated herein. Seventy-five percent (75%) of Plan Revenues — approximately $39,612.00 per month, or $475,344.00 per year at the minimum rate — constitutes the Unsecured Creditor Share and shall be distributed monthly, Pro Rata and without interest, to the holders of Allowed Class 8 Claims and to the holder of the Allowed Class 5 Claim, for twenty (20) years following the Effective Date. The remaining twenty-five percent (25%) of Plan Revenues — approximately $13,204.00 per month, or $158,448.00 per year at the minimum rate — shall be retained by the Reorganized Debtor and applied to Operating Expenses, United States Trustee's fees, Allowed Administrative Claims, Allowed Priority Tax Claims, and Plan Payments to Class 7. The three percent (3%) royalty components of the IP and Signage License Fee and of the Commercial Operator License Fee, and the Reservation System Access Fee, are excluded from the minimum shown in Exhibit A; as and when received they are Plan Revenues and are divided in the same seventy-five/twenty-five proportion. Allowed Claims in Classes 1, 2, and 3 are paid in the first instance by Homemakers under the Homemakers Plan, and One Million Dollars ($1,000,000.00) of the Allowed Class 4 Claim is satisfied by the issuance of equity, in each case as provided in Article IV.**

**2. Management, Control, and Operations of the Debtor.**

(a) On and after the Effective Date the Reorganized Debtor shall be wholly owned by Horton S. Johnson. Horton S. Johnson shall serve as President of the Reorganized Debtor and Baylor Johnson shall serve as its Secretary, and the administration and control of the Reorganized Debtor shall be vested in them. The affiliations of each and the compensation, if any, to be paid to each shall be disclosed in the Disclosure Statement and in the Plan Supplement, as required by § 1129(a)(5) of the Code. (b) The Reorganized Debtor may retain counsel and other professionals without further order of the Court. (c) The Reorganized Debtor may pay all costs, expenses, and obligations incurred in the ordinary course without further order of the Court. (d) The Reorganized Debtor shall be responsible for making all Distributions required under the Plan.

**3. Funds Generated During the Chapter 11 Case.**

All Cash generated by the Debtor in excess of Operating Expenses from the Petition Date through the Effective Date shall be used to fund Plan Payments.

**4. Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and Interests. Entry of the Confirmation Order constitutes the Court's approval of such compromise and settlement as being in the best interests of the Debtor, the Estate, and holders of Claims and Interests, and as fair, equitable, and reasonable.

**5. Procedures for Resolving Disputed Claims.**

(a) Only the Reorganized Debtor may prosecute objections to Claims, which must be filed within ninety (90) days after the Confirmation Date, and the Reorganized Debtor reserves all Causes of Action and rights of setoff. (b) The Court may estimate any contingent or unliquidated Claim under § 502(c). (c) The remedies provided are cumulative. (d) Distributions on Disputed Claims shall be made from the Reorganized Debtor's Cash and Assets if and when such Claims become Allowed. (e) Claims shall be disallowed under § 502(d) to the extent required, and otherwise Allowed as provided herein. (f) Any controversy concerning the impairment or classification of a Claim or Interest shall be determined by the Court on or before the Confirmation Date; absent such determination, the Debtor's interpretation shall govern.

## ARTICLE VII — MISCELLANEOUS PROVISIONS

### A. Effect of Confirmation.

Upon the Confirmation Date, the Debtor is authorized to take all actions necessary or appropriate to effectuate the Plan, and the Confirmation Order shall be deemed to modify the Debtor's governing documents to the extent necessary. Within one hundred twenty (120) days after the Effective Date, the Reorganized Debtor shall file a post-confirmation status report. The Reorganized Debtor retains, and may prosecute, settle (under Rule 9019), or abandon, all Causes of Action.

### B. Conditions to Effectiveness.

The Effective Date shall not occur until (i) the Court has entered a Confirmation Order in form and substance acceptable to the Debtor, and (ii) the Confirmation Order has become a Final Order; provided, however, that if the Confirmation Order is appealed and no stay of the Confirmation Order is entered under Rule 3020(e), the Debtor may elect to cause the Effective Date to occur notwithstanding the pendency of such appeal.

### C. Exculpation from Liability.

The Debtor, the Reorganized Debtor, and their respective members, managers, officers, directors, and Professionals shall have no liability for any act or omission taken in good faith in connection with the Plan, the Disclosure Statement, or the Bankruptcy Case, except for liability arising from fraud, willful misconduct, or gross negligence. This exculpation applies only to liability arising on or before the Effective Date, does not release any preserved Cause of Action, and does not relieve the Reorganized Debtor of its obligation to make Plan Payments.

### D. Police Power.

Nothing in this Article VII impairs the ability of a governmental unit to enforce its police or regulatory power, except with respect to monetary Claims discharged under § 1141 of the Code.

### E. Retention of Jurisdiction.

The Court shall retain jurisdiction over the Bankruptcy Case for, among other things: (1) objections to Claims and Interests and approval of compromises; (2) applications for Professional compensation for services rendered before the Confirmation Date; (3) adversary proceedings and contested matters, including avoidance actions under §§ 544, 545, 547, 548, 549, and 550; (4) controversies arising under the Plan; (5) enforcement and interpretation of the Plan and the Confirmation Order; (6) entry of orders in aid of execution and consummation of

the Plan; (7) modification of the Plan under § 1127 and correction of any defect or omission; (8) determination of rejection-damage Claims; (9) other matters arising under the Code or the Plan; (10) protection of property of the Estate from adverse claims; and (11) ensuring that Distributions are made and resolving disputes regarding Distributions.

**F. Cramdown.**

If any impaired Class fails to accept the Plan, the Debtor reserves the right to request confirmation of the Plan under § 1129(b) of the Code.

**G. Modification of Plan.**

The Debtor may amend or modify the Plan in accordance with § 1127 of the Code, or remedy any defect or omission or reconcile any inconsistency in the Plan, as may be necessary to carry out the purposes and intent of the Plan.

**H. Discharge.**

Except as otherwise provided in the Plan or the Confirmation Order, and pursuant to § 1141(d) of the Code, entry of the Confirmation Order discharges the Debtor from any debt that arose before the Confirmation Date and any debt of a kind specified in §§ 502(g), 502(h), or 502(i) of the Code, whether or not (1) a proof of Claim is filed or deemed filed, (2) such Claim is Allowed, or (3) the holder of such Claim has accepted the Plan.

**I. Notices; Manner of Payment; Unclaimed Property; Transfer Taxes.**

Notices under the Plan shall be given to the Debtor and its counsel at the addresses set forth in the signature block. Distributions may be made by check, wire, or ACH. Any Distribution that remains unclaimed for six (6) months after it is made shall be forfeited, and the funds shall revest in the Reorganized Debtor (except that unclaimed Class 8 Distributions shall be redistributed Pro Rata to the remaining holders of Allowed Class 8 Claims). The issuance, transfer, or exchange of any security, or the making or delivery of any instrument of transfer under the Plan, shall be exempt from transfer, stamp, or similar taxes to the fullest extent permitted by § 1146(a) of the Code.

**J. Revocation; Retention of Professionals; Consummation.**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. The Reorganized Debtor may retain and compensate Professionals for post-Effective-Date services in the ordinary course without further order of the Court. The Debtor and the Reorganized Debtor are authorized to execute and deliver all documents and take all actions necessary to consummate the transactions contemplated by the Plan.

Dated: September 15, 2026.

**CANAVERAL CROSSROADS, LLC,**
Debtor and Debtor in Possession

By: ______________________________
Ross Johnston
Chief Restructuring Officer

Respectfully submitted,

Fromang & Smith, P.A.

/s/ Christopher L. Smith
**Christopher L. Smith, Esq.**
Florida Bar No. 367461
4767 New Broad Street
Orlando, Florida 32814
Telephone: (407) 999-9739
Email: chris@fromangsmith.com
Counsel for Canaveral Crossroads, LLC

# EXHIBIT A

## SCHEDULE OF PLAN INCOME

Canaveral Crossroads, LLC — Case No. 6:26-bk-05426-GER

The following schedule summarizes the projected Plan Revenues of the Reorganized Debtor from the Retained Properties under Article VI of the Plan. All per-unit figures assume approximately eighty-two (82) units in total and approximately seventy (70) units engaged in commercial activity; aggregate figures scale proportionately with the final counts.

**Sources of Plan Revenues:**

| Income Source | Basis | Monthly | Annual |
|---|---|---|---|
| Property Use Agreement | $250.00 per unit per month for 30 years, across approx. 82 units | $20,500.00 | $246,000.00 |
| Common-Area Access Charge | $125.00 per unit per month, charged to the Master Association and passed through to each unit (approx. 82 units) | $10,250.00 | $123,000.00 |
| Lift Station Access Fee | $88.00 per unit per month, payable by the owner of each unit (approx. 82 units) | $7,216.00 | $86,592.00 |
| IP and Signage License Fee | Greater of 3% of gross revenues or $105.00 per month, for each unit engaged in commercial activity (approx. 70 units) — minimum component shown | $7,350.00 | $88,200.00 |
| Commercial Operator License Fee | $2,500.00 per month each — the restaurant and the two (2) marina operations (3 total); covers common-area and Lift Station access, including the 147 marina boat lifts, and the resort name, trade dress, marks and signage. The additional 3% royalty on each operator's gross revenues is not included. | $7,500.00 | $90,000.00 |
| **TOTAL PLAN REVENUES** | **Minimum; exclusive of the 3% royalty components of the IP and Signage License Fee and of the Commercial Operator License Fee, and exclusive of the 5% Reservation System Access Fee** | **$52,816.00** | **$633,792.00** |

**Application of Plan Revenues:**

| Application | Basis | Monthly | Annual |
|---|---|---|---|
| Classes 5 and 8 — Unsecured Creditor Share | 75% of Plan Revenues, distributed monthly Pro Rata | $39,612.00 | $475,344.00 |

| | | | |
|---|---|---|---|
| | among the Allowed Class 8 Claims and the Allowed Class 5 Claim, for 20 years, without interest | | |
| Retained by the Reorganized Debtor | 25% of Plan Revenues — Operating Expenses, escrows, U.S. Trustee fees, Administrative Claims (est. $125,000.00), Priority Tax Claims, and Class 7 | $13,204.00 | $158,448.00 |
| **TOTAL PLAN REVENUES** | **Minimum; exclusive of the 3% royalty components and of the 5% Reservation System Access Fee** | **$52,816.00** | **$633,792.00** |

Distribution of Plan Revenues. Seventy-five percent (75%) of Plan Revenues — $39,612.00 per month, or $475,344.00 per year at the minimum rate — constitutes the Unsecured Creditor Share. It is distributed monthly, Pro Rata and without interest, among the holders of Allowed Class 8 Claims and the holder of the Allowed Class 5 Claim, for twenty (20) years following the Effective Date, producing $9,506,880.00 in aggregate Distributions over that term at that minimum rate. No installment is due on the Allowed Class 5 Claim during the first twenty-four (24) months following the Effective Date. The remaining twenty-five percent (25%) of Plan Revenues — $13,204.00 per month, or $158,448.00 per year at the minimum rate — is retained by the Reorganized Debtor and applied as set forth below. The three percent (3%) royalty components of the IP and Signage License Fee and of the Commercial Operator License Fee, and the Reservation System Access Fee, are excluded from those minimum figures; as and when received they are Plan Revenues and are divided in the same seventy-five/twenty-five proportion.

Application of income. The twenty-five percent (25%) of Plan Revenues retained by the Reorganized Debtor — $13,204.00 per month, or $158,448.00 per year at the minimum rate — is applied in the following order: first, to Operating Expenses (including the Estimated Tax Escrow and Estimated Insurance Escrow); second, to United States Trustee's fees; third, to Allowed Administrative Claims, estimated at $125,000.00; fourth, to Allowed Priority Tax Claims; and fifth, to Plan Payments to Class 7 (quarterly). No payment on the Allowed Class 5 Claim is made from this retained share; that Claim is satisfied entirely out of the Unsecured Creditor Share, Pro Rata with Class 8. Allowed Claims in Classes 1, 2, and 3 are paid by Homemakers under the Homemakers Plan (Case No. 6:25-bk-05570), and the Reorganized Debtor makes payments on account of those Classes only upon an uncured default by Homemakers. One Million Dollars ($1,000,000.00) of the Allowed Class 4 Claim of Horton S. Johnson is satisfied by the issuance of one hundred percent (100%) of the newly issued equity and requires no cash payment; the $2,608,845.31 balance of that Claim is treated in Class 8. The Class 6 Claim of PEDIXON LLC is disputed and no payment is projected unless and until it is Allowed.

Estimated recovery for Classes 5 and 8. The Debtor's schedules list aggregate nonpriority unsecured Claims of $11,897,184.51. Adding the $2,608,845.31 balance of the Johnson First Note remaining after the $1,000,000.00 equity exchange, the Allowed Claim of the Pino Law Group in the amount of $138,485.00, the estimated unsecured deficiency of approximately

$991,507.32, and the $4,400,000.00 Claim of Sherwood Construction, Inc., yields an estimated Class 8 pool of $20,036,022.14. Adding the Allowed Class 5 Claim of $2,388,178.15, which shares Pro Rata with Class 8, yields a combined distribution pool of $22,424,200.29, exclusive of any Allowed Claim of the Cape Crossing associations arising from the construction-defect action. Against that pool, aggregate Distributions of $9,506,880.00 over twenty (20) years at the minimum rate produce a nominal recovery of approximately forty-two percent (42%), before the three percent (3%) royalty components, the Reservation System Access Fee, and the net proceeds of Causes of Action — which include the estimated $130,000.00 to $150,000.00 recovery from the restaurant and the marina operations for past use of the commercial areas and whatever is realized on the claims for past use of the resort name, trade dress, and marks described in Article VI(1)(h)(2). Because the Distributions run for twenty (20) years without interest, their present value is materially lower — approximately $4.7 million discounted at eight percent (8%) at the minimum rate.

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, I filed this Plan of Reorganization with the clerk of court through the CM/ECF system, which served it electronically on every party registered for electronic notice in this case.

/s/ Christopher L. Smith
Christopher L. Smith, Esq.