**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE:

Case No. 6:26-bk-05426-GER
Chapter 11

**CANAVERAL CROSSROADS, LLC,**

Debtor.
_______________________________/

**DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION**

**OF CANAVERAL CROSSROADS, LLC**

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT UNDER 11 U.S.C. § 1125. THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED TO DATE.**

## I. INTRODUCTION

Canaveral Crossroads, LLC (the "Debtor") submits this Disclosure Statement (the "Disclosure Statement") pursuant to § 1125 of Title 11 of the United States Code (the "Bankruptcy Code") in connection with its *Plan of Reorganization for Canaveral Crossroads, LLC* (the "Plan"). Capitalized terms used but not defined in this Disclosure Statement have the meanings given to them in the Plan.

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the holders of Claims and Interests to make an informed judgment about whether to accept or reject the Plan. All holders of Claims entitled to vote are encouraged to read this Disclosure Statement and the Plan in their entirety before voting.

The Court has not yet approved this Disclosure Statement. Following a hearing, the Court will determine whether this Disclosure Statement contains adequate information within the meaning of § 1125 of the Bankruptcy Code. Court approval of the Disclosure Statement does not constitute approval or endorsement of the Plan by the Court.

## II. DISCLAIMERS

The information contained in this Disclosure Statement is provided by the Debtor. No representations concerning the Debtor, its assets, or the value of its property are authorized other than as set forth herein. The Debtor's counsel has relied upon information provided by the Debtor and has not independently verified all such information. The financial information contained herein has not been audited unless otherwise expressly stated. Nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding

involving the Debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan on holders of Claims and Interests.

## III. VOTING PROCEDURES AND CONFIRMATION

### A. Who May Vote.

Each holder of an Allowed Claim in an impaired Class that is receiving or retaining property under the Plan is entitled to vote to accept or reject the Plan. Under the Plan, Classes 1 through 8 are impaired and entitled to vote. Class 9 (Equity Interests) is impaired, is not receiving or retaining any property on account of the existing Interests, and is deemed to have rejected the Plan; holders of Class 9 Interests are not entitled to vote. Holders of Allowed Class 8 Claims should note that approximately sixty percent (60%) of the scheduled Class 8 pool is held by insiders and affiliates of the Debtor — Martin C. Flynn, Jr. ($3,900,000.00), Cape Crossing Vacation Rentals, LLC ($1,768,158.73 combined), and the affiliate Sherwood Construction, Inc. ($4,400,000.00). The claim of Cape Crossing Resort in the amount of $3,174,507.14, scheduled in an earlier draft, has been removed as a duplicate of the Sherwood construction claim, and the figures in this Disclosure Statement reflect that correction. Section 1129(a)(10) of the Bankruptcy Code requires that at least one impaired Class accept the Plan determined without including any acceptance by an insider.

### B. Ballots and Voting Deadline.

A Ballot is enclosed with this Disclosure Statement for each holder of a Claim entitled to vote. To be counted, a properly completed Ballot must be actually received by the Debtor's counsel by the deadline established by the Court (the "Ballot Date"). Ballots received after the Ballot Date will not be counted absent order of the Court.

### C. Acceptance and Confirmation Standards.

A Class of Claims accepts the Plan if holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in that Class who actually vote, vote to accept. Even if all impaired Classes do not accept the Plan, the Court may confirm the Plan under § 1129(b) ("cramdown") if at least one impaired Class has accepted (excluding insider votes) and the Plan does not discriminate unfairly and is fair and equitable as to each non-accepting impaired Class. The Plan must also satisfy the "best interests of creditors" test under § 1129(a)(7), meaning each holder of an impaired Claim either accepts the Plan or receives at least as much as it would in a hypothetical Chapter 7 liquidation (see Article X below).

## IV. BACKGROUND OF THE DEBTOR

The Debtor, Canaveral Crossroads, LLC, is a Florida limited liability company (document no. L13000061486) with its principal place of business at 201 Ivory Coral Lane, Merritt Island, Florida 32953, a mailing address of 4409 Hoffner Avenue #348, Orlando, Florida 32812, and EIN 61-1711363. Its sole member and manager is Tiered Capital, Inc. Day-to-day authority is exercised by Ross Johnston as Chief Restructuring Officer of the Debtor in possession, appointed by written consent of Tiered Capital, Inc. under Operating Agreement § 4.7(g). The Debtor is the developer of, and holds real property within, the Cape Crossing Resort & Marina, a planned mixed-use community consisting of condominiums, townhomes, a marina, a restaurant, and related amenities located in Merritt Island (Brevard County), Florida.

The Debtor's principal assets consist of its real property in Brevard County, scheduled at $6,145,000.00, together with the clubhouse and common areas, the sewage lift station, the Debtor's signage, and its trademarks, trade names, and other intellectual property. The Debtor is presently a non-operating holding entity and reported no gross revenue for fiscal years 2024 and 2025 or for the period ending on the Petition Date; the revenue streams described in Article IX arise from agreements to be entered into after confirmation.

**Prepetition Capital Structure / Secured Creditors.**

The Debtor's real property is encumbered by six liens, scheduled in the aggregate amount of $10,745,352.63: Horton S. Johnson, First Note (construction-loan mortgage), $3,608,845.31 (Class 4); Horton S. Johnson, Second Note (judgment lien recorded May 13, 2025), $2,388,178.15 (Class 5); Paul Rene, Jr., as assignee of the Jetton Investments, Inc. first-lien mortgage note, Instrument No. 2018121113, $1,468,484.37 (Class 1); Tamamoi, LLC, $2,469,844.80 (Class 2); PEDIXON LLC (P.E. Dixon), $500,000.00 (Class 6); and the Carton Family Trust of 1992, $310,000.00, secured by a single unit valued at $550,000.00 (Class 3). The Debtor has scheduled the Tamamoi claim as disputed and the PEDIXON claim as contingent, unliquidated, and disputed, and reserves all objections to each; the Debtor does not dispute the Rene, Johnson, or Carton claims. Holders of tax certificates, if any are asserted, are treated in Class 7. The Debtor's scheduled real property value is $6,145,000.00.

## V. EVENTS LEADING TO THE BANKRUPTCY CASE

Prior to the Petition Date, the Debtor was a party to numerous litigation matters in the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida, and related fora, including: (a) an action by Horton S. Johnson that resulted in a consent final judgment (Brevard County Case No. 05-2025-CA-013106); (b) a mortgage foreclosure action styled Paul Rene, Jr. v. Canaveral Crossroads, LLC, et al. (Case No. 05-2025-CA-038877) concerning the first-lien mortgage note; (c) a construction-defect action by the Cape Crossing Townhomes Homeowners Association, Inc. and Cape Crossing Condominium Association, Inc. against the Debtor as developer (Case No. 05-2025-CA-022944-XXCA-BC); and (d) actions by secured creditors Tamamoi, LLC and the Carton Family Trust of 1992. The cumulative effect of this litigation, together with the Debtor's secured debt substantially exceeding the value of its real property, impaired the Debtor's ability to pay its obligations as they came due.

On July 20, 2026, certain creditors—Horton S. Johnson, Jetton Investments Incorporated, and Cape Crossing Vacation Rentals, LLC—commenced an involuntary case against the Debtor under Chapter 7 of the Bankruptcy Code, asserting aggregate claims of approximately $9,233,666.56. A summons was issued on July 24, 2026. Rather than litigate the involuntary petition, the Debtor determined that a reorganization under Chapter 11 would maximize value for all stakeholders, and the Debtor converted the case to Chapter 11 pursuant to 11 U.S.C. § 706(a).

## VI. THE CHAPTER 11 CASE

Significant events in the Bankruptcy Case include: (a) the commencement of the involuntary Chapter 7 case on July 20, 2026; (b) the entry of the order for relief and the conversion of the case to Chapter 11 under § 706(a); (c) the Debtor's operation of its business as a debtor-in-possession under §§ 1107 and 1108; and (d) the removal of the Rene foreclosure action (05-2025-CA-038877) and the Cape Crossing Townhomes/Condominium Association construction-

defect action (05-2025-CA-022944-XXCA-BC) to this Court so that the related claims and lien disputes may be adjudicated in a single forum.

## VII. ASSETS AND LIABILITIES

### A. Assets.

The Debtor's assets consist principally of (i) its real property within the Cape Crossing Resort & Marina in Brevard County, Florida, scheduled at $6,145,000.00; (ii) the common and public areas at the Property, the clubhouse, the sewage lift station (the "Lift Station"), and the Debtor's signage, trademarks, trade names, and other intellectual property, all of which the Debtor owns, other than those common-area parcels titled of record to the Cape Crossing Condominium Association, Inc. or the Cape Crossing Townhomes Homeowners Association, Inc.; and (iii) Causes of Action preserved under the Plan, including avoidance claims relating to pre-petition transfers of resort property disclosed in the Debtor's Statement of Financial Affairs and claims against the restaurant and the two marina operations for the reasonable value of their past use of the commercial common areas, estimated at $130,000.00 to $150,000.00, and claims against the unit owners and the Commercial Operators for the reasonable value of their past use of the Cape Crossing name, trade dress, trademarks, trade names, and signage, in each case as described in Article IX.

### B. Liabilities.

The Debtor's liabilities consist of: (i) secured Claims scheduled in the aggregate amount of $10,745,352.63, held by Horton S. Johnson (Classes 4 and 5, $5,997,023.46 combined), Tamamoi, LLC (Class 2, $2,469,844.80), Paul Rene, Jr. as assignee of the Jetton mortgage (Class 1, $1,468,484.37), PEDIXON LLC (Class 6, $500,000.00, disputed), and the Carton Family Trust of 1992 (Class 3, $310,000.00), together with any tax certificate Claims (Class 7); (ii) Priority Tax Claims; (iii) Administrative Claims, which the Debtor estimates at approximately $125,000.00 for the fees of Debtor's counsel in excess of the pre-petition retainer and the compensation of the Chief Restructuring Officer; and (iv) general unsecured Claims (Class 8), consisting of the $8,722,677.37 of nonpriority unsecured Claims scheduled by the Debtor, the $2,608,845.31 balance of the Johnson First Note remaining after the $1,000,000.00 equity exchange, the Allowed Claim of the Pino Law Group in the amount of $138,485.00 for prepetition legal services, the unsecured deficiency Claims of the secured creditors (estimated at approximately $991,507.32), the $4,400,000 Claim of Sherwood Construction, Inc. (subject to the settlement described in Article VIII), and any Allowed Claim of the Cape Crossing associations arising from the construction-defect action — an estimated Class 8 pool of approximately $16,861,515.00 exclusive of the construction-defect Claim.

## VIII. SUMMARY OF THE PLAN

The following table summarizes the classification and treatment of Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the full text of the Plan, which controls in the event of any inconsistency.

| Class | Description | Impaired? | Entitled to Vote? | Estimated Recovery |
|---|---|---|---|---|
| 1 | Secured Claim of Paul Rene, Jr., as | Yes | Yes | Lien retained; paid by |

| | | | | |
|---|---|---|---|---|
| | assignee of the Jetton Investments, Inc. mortgage — $1,468,484.37 | | | Homemakers under the Homemakers Plan (Case No. 6:25-bk-05570); Debtor pays monthly installments only upon uncured Homemakers default |
| 2 | Secured Claim of Tamamoi, LLC — $2,469,844.80 (disputed) | Yes | Yes | Lien retained; paid by Homemakers under the Homemakers Plan (Case No. 6:25-bk-05570); Debtor pays monthly installments only upon uncured Homemakers default |
| 3 | Secured Claim of Carton Family Trust of 1992 — $310,000.00 | Yes | Yes | Lien retained; paid by Homemakers under the Homemakers Plan (Case No. 6:25-bk-05570); Debtor pays monthly installments only upon uncured Homemakers default |
| 4 | Secured Claim of Horton S. Johnson — First Note (construction-loan mortgage) — $3,608,845.31 | Yes | Yes | Partial satisfaction: mortgage released to the extent of $1,000,000, which is exchanged for 100% of the newly issued equity; remaining Liens secure only the Debtor's performance to Class 8, are unenforceable absent an uncured default, are subordinated to permitted financing, and are released on the Class 8 Closing Date; $2,608,845.31 balance treated as a Class 8 general unsecured Claim; guarantors not released |
| 5 | Secured Claim of Horton S. Johnson — Second Note (May 13, 2025 judgment lien) — $2,388,178.15 | Yes | Yes | Judgment lien retained until the end of the 20-year term or payment in full, then released; no payment and no interest for 24 months after the Effective Date, then monthly installments consisting of a Pro Rata share of the Unsecured Creditor Share, shared Pro Rata with Class 8, without interest — by Mr. Johnson's written consent |

| | | | | |
|---|---|---|---|---|
| 6 | Secured Claim of PEDIXON LLC (P.E. Dixon) — $500,000.00 (contingent, unliquidated, disputed) | Yes | Yes | Debtor contends the obligation is unenforceable under Fla. Stat. § 687.071(7) as criminally usurious and will object to the Claim in its entirety; no distribution is projected. Lien retained pending determination, and § 544(a) rights reserved as to perfection. If Allowed as secured notwithstanding, 4.8% amortized over 30 years from allowance; any portion not Allowed as secured is treated in Class 8. |
| 7 | Tax Certificate Holders (secured) | Yes | Yes | Lien retained; quarterly at 6%; final payment no later than 5 years after the order for relief |
| 8 | General Unsecured Claims | Yes | Yes | Pro rata share of 75% of Plan Revenues, distributed monthly for 20 years without interest and shared with the Class 5 Claim, plus pro rata net Causes of Action proceeds; combined pool approx. $19,249,693.15; nominal recovery approx. 42% |
| 9 | Equity Interests | Yes | No (deemed to reject) | Existing Interests cancelled with no distribution; new equity issued to Horton S. Johnson for $1,000,000 of the Class 4 Claim |

Administrative Claims, United States Trustee fees, and Priority Tax Claims are not classified and are treated as set forth in Article III of the Plan: Allowed Administrative Claims are paid in Cash on or as soon as practicable after the Effective Date (or when Allowed); U.S. Trustee fees are paid in full on the Effective Date and until the case is closed; and Allowed Priority Tax Claims are paid, with interest at six percent (6%) per annum, over a period ending no later than five years after the order for relief, under § 1129(a)(9)(C).

**Treatment of the Claims of Horton S. Johnson.**

Horton S. Johnson holds two secured Claims, which the Plan classifies and treats separately. The Class 4 Claim, arising from the first construction-loan mortgage note in the scheduled amount of $3,608,845.31, is resolved in partial satisfaction: Mr. Johnson surrenders part of the Johnson First Note and releases the mortgage securing it to the extent of $1,000,000.00; that $1,000,000.00 is exchanged for one hundred percent (100%) of the newly issued membership interests in the Reorganized Debtor, issued to him on the Effective Date; and the remaining

balance of $2,608,845.31 is treated as an Allowed Class 8 general unsecured Claim, sharing Pro Rata with all other Class 8 creditors. The Class 5 Claim, arising from the second note reduced to judgment in Brevard County Case No. 05-2025-CA-013106 and secured by a judgment lien recorded on May 13, 2025, in the scheduled amount of $2,388,178.15, is paid in monthly installments consisting of its Pro Rata share of the Unsecured Creditor Share, shared Pro Rata with the holders of Allowed Class 8 Claims and on the same terms as those Claims, without interest. No payment is due and no interest accrues on that Claim for twenty-four (24) months following the Effective Date; the first installment is due in the twenty-fifth month. The Reorganized Debtor makes no separate payment on the Class 5 Claim out of the twenty-five percent (25%) of Plan Revenues it retains.

**The Liens securing the Johnson First Note are not released in full on the Effective Date. They remain of record until the Class 8 Closing Date — the earlier of the final Class 8 Distribution at the end of the twenty-year term or payment of all Allowed Class 8 Claims in full. Holders of Class 8 Claims should understand precisely what those retained Liens do and do not secure. From and after the Effective Date they secure only the Reorganized Debtor's performance of its obligations to Class 8. Mr. Johnson is not treated as the holder of a Secured Claim on account of the $2,608,845.31 balance, which is an Allowed Unsecured Claim in Class 8 for all purposes including voting, classification, and Distribution; he may not enforce the retained Liens except upon a Plan default that remains uncured for thirty days after written notice; he must subordinate them to any Lien securing financing approved by the Court or permitted under the Plan; and on the Class 8 Closing Date they are released without further order, with a recordable satisfaction to follow within thirty days of request. The retained Liens therefore operate as security for the Class 8 creditors' benefit rather than as a priority ahead of them.**

**Both treatments depend on Mr. Johnson's consent, and the Debtor discloses that plainly. A Secured Claim paid Pro Rata with general unsecured Claims does not satisfy § 1129(b)(2)(A) of the Bankruptcy Code; it is permissible because the holder has agreed to accept it under §§ 1129(a)(8) and 1123(a)(4). Mr. Johnson's consent to the treatment of both the Class 4 and the Class 5 Claims — including the partial release, the subordination and eventual release of the retained Liens, the twenty-four month interest-free deferral, and the payment of his secured Class 5 Claim Pro Rata with unsecured creditors — will be evidenced by a written stipulation executed by him and filed with the Court as part of the Plan Supplement, not later than seven days before the Confirmation hearing. Creditors should note that Mr. Johnson is at once a petitioning creditor, the holder of the Class 5 Claim, the holder of a $2,608,845.31 Class 8 Claim, and the person who will own the Reorganized Debtor. The Debtor has structured these provisions so that his consent operates to the benefit of the other Class 8 creditors rather than at their expense, and will address the point at confirmation.**

Neither the $1,000,000.00 equity exchange, the surrender of the Johnson First Note, the release of the mortgage securing it, nor the Confirmation Order releases, discharges, or impairs the liability of any guarantor or other non-debtor obligated to Mr. Johnson — including FBC Holdings, LLC and Michael McPhillips. Those guaranties remain in full force and effect outside this Bankruptcy Case, and Mr. Johnson retains all rights and remedies against those parties.

The $1,000,000.00 conversion is the consideration for the new equity, and the Debtor will present that exchange as satisfying the absolute priority rule at confirmation. Holders of Claims should read Articles IV(E), IV(F), and IV(K) of the Plan together with the risk factors in Article XI below.

**Treatment of the Disputed Claim of PEDIXON LLC.**

Treatment of the Disputed Claim of PEDIXON LLC, and the Debtor's contention that the obligation is unenforceable. PEDIXON LLC asserts a balloon mortgage against the Debtor's real property, scheduled in the disputed amount of $500,000.00. The Debtor disputes the Claim in its entirety, and holders of Claims should understand the ground on which it does so, because the Debtor does not expect to pay it.

The Debtor contends that the obligation is not an enforceable debt in the courts of this State. On August 18, 2026, Gary A. Moll, MBA, CPA, ASA, of Ferguson-Moll Consulting, LLC, rendered an expert report in PEDIXON LLC and ZPD LLC v. Martin C. Flynn, Jr., Case No. 2025-CA-002359 CI, in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida, computing the effective annual rate of interest on eleven extensions of credit made between January 2022 and September 2023 by PEDIXON LLC, ZPD LLC, and Parke Financial Limited Partnership, which in September 2023 were aggregated and cross-collateralized. Mr. Moll applied the computation prescribed by § 687.03(3) of the Florida Statutes, which the Florida Supreme Court held controls in St. Petersburg Bank & Trust Co. v. Hamm, 414 So. 2d 1071 (Fla. 1982), using values taken from the lenders' own closing reconciliation, loan schedule, and billing records. Because every extension of credit exceeds $500,000.00 in amount or value, the eighteen percent civil ceiling does not apply and the operative threshold is twenty-five percent (25%) under § 687.071(2).

The rates Mr. Moll computes are these. On the Holly Bluff extension of credit, 82.94 percent — and above twenty-five percent at any stated term shorter than 13.6 months, so that the conclusion does not depend on which term is adopted and no valuation dispute affects it. On the aggregate loan of $11,075,000.00 over an eighteen-month term, 69.13 percent. On the Tiered loan of September 2023, 47.53 percent. On the River Fly In loan, 82.04 percent on the amount the lender retained and 101.11 percent on the lender's own recital of what it kept. On the renewal fees charged in April and July 2024 alone, 26.77 percent; and on the Homemakers forbearance fee, 106.10 percent at the recited consideration and 87.26 percent at book value. Mr. Moll further computes that the lenders advanced $11,225,000.00 across the eleven loans and received approximately $26,970,988.00 — roughly two dollars and forty cents for every dollar advanced — and that on any valuation in the record the aggregate principal was extinguished no later than February 1, 2024, after which the lenders billed $2,997,242.00 in interest and charges against a principal balance of zero.

Section 687.071(7) of the Florida Statutes provides that no extension of credit made in violation of any provision of that section shall be an enforceable debt in the courts of this State, and § 687.071(3) grades a rate above forty-five percent as a felony of the third degree. The Debtor contends that the Class 6 Claim is the seventh of the eleven cross-collateralized extensions of credit analyzed in that report — the $500,000.00 "Resorts Common Area Loan" dated February 27, 2023, the mortgage securing which was recorded March 3, 2023 as CFN 2023043479, O.R. Book 9731, Page 1341 — that the effective rate exceeds the twenty-five percent threshold, and

that the obligation is therefore unenforceable and the Claim should be disallowed in its entirety. The Debtor further contends, and counsel in the Osceola County action has advised, that no evidence has been produced that the security interests securing these obligations were perfected, and the Reorganized Debtor reserves all rights under § 544(a) of the Bankruptcy Code with respect to the Lien asserted by PEDIXON LLC.

The Debtor states the limits of that contention as plainly as it states the contention itself. Mr. Moll expressly declines to opine on any question of law, states no opinion on whether the computed rates carry legal consequence, and states no opinion on the "willfully and knowingly" element of § 687.071, which he identifies as a question of intent for the trier of fact. His report was prepared for the defendants in a State-court action to which the Debtor is not a party, on documents he accepted without independent verification and without any appraisal of his own. PEDIXON LLC will contest each of these conclusions. The Debtor has not yet filed an objection to the Class 6 Claim and no court has ruled upon it.

Pending that determination the Plan preserves the status quo without paying anything. The Class 6 Claim is placed in its own Class: the Lien is retained pending determination of the Claim, and if and to the extent the Claim is Allowed as a Secured Claim by Final Order notwithstanding the foregoing, it will be paid with interest at four and eight-tenths percent (4.8%) per annum in equal monthly installments amortized over thirty (30) years, commencing the first day of the first full month after allowance. Any portion not Allowed as secured is treated as a Class 8 general unsecured Claim. The Debtor projects no payment on account of Class 6, no amount for Class 6 is included in the feasibility analysis in Article IX, and the liquidation analysis in Article X does not depend upon the Claim: excluding the PEDIXON Claim entirely, scheduled secured debt of $10,245,352.63 still exceeds the $6,145,000.00 scheduled value of the real property by more than four million dollars, and the Chapter 7 dividend to Classes 5 and 8 remains zero.

**The Claim of Sherwood Construction, Inc.**

Sherwood Construction, Inc., an affiliate of the Debtor and the debtor in Case No. 6:26-bk-05428, holds a general unsecured Claim against the Debtor in the amount of $4,400,000, inclusive of interest as of the Petition Date. The Plan places that Claim in Class 8 and pays it Pro Rata with, and on the same terms as, every other Allowed Class 8 Claim. The prior proposal to compromise the Claim under Bankruptcy Rule 9019 — under which Sherwood would have accepted one-third of its Claim, a litigation fund would have been established, Sherwood's own general unsecured creditors would have been folded into Class 8, and fifty percent of any excess recovered by the Sherwood estate would have been shared — has been withdrawn and forms no part of this Plan.

**Allowed Claim of the Pino Law Group.**

The Plan provides that the Pino Law Group holds an Allowed Class 8 general unsecured Claim in the amount of $138,485.00 on account of prepetition legal services rendered to the Debtor, which Claim will share Pro Rata in Distributions to Class 8 on the same terms as every other Allowed Class 8 Claim, without interest.

## IX. MEANS OF IMPLEMENTATION AND FEASIBILITY

Confirmed unit counts. The Debtor confirms that there are eighty-two (82) units at the Property and that seventy (70) of those units are engaged in commercial activity. Every per-unit and

aggregate figure in this Disclosure Statement and in Exhibit A to the Plan is calculated on those two counts.

The recorded covenants: what they require, and what they do not. The Plan Revenues described below rest on the Debtor's ownership of the clubhouse, the swimming pool, the public and common areas, the Lift Station, and the resort's name, trade dress, trademarks, trade names, and signage, and on the absence of any recorded obligation requiring the Debtor to convey those assets or to make them available without charge. The Debtor has obtained and reviewed the recorded instruments from the Public Records of Brevard County. They are: the Declaration of Covenants, Conditions and Restrictions for Cape Crossing Resort and Marina Living (the "Master Declaration"), CFN 2016102579, O.R. Book 7626, Page 1609, recorded May 31, 2016, as amended by the First Amendment thereto, CFN 2022030749, O.R. Book 9407, Page 1645, recorded February 7, 2022, under which Cape Crossing Resort Management, Inc. is the Master Association; the Declaration of Covenants, Conditions and Restrictions for Cape Crossing Townhomes (the "Townhome Declaration"), CFN 2016102623, O.R. Book 7626, Page 1747, recorded May 31, 2016, as amended at O.R. Book 7735, Page 928 and O.R. Book 8894, Page 127; the Declaration of Condominium of Cape Crossing, a Condominium (the "Condominium Declaration"), CFN 2019082417, O.R. Book 8418, Page 1832, recorded April 19, 2019, as amended at O.R. Book 8802, Page 1136; and an Easement from the Debtor to both associations, CFN 2015233219, O.R. Book 7502, Page 1471, recorded December 1, 2015 (the "Access Easement"), which is described separately below. Canaveral Crossroads, LLC is the Developer and declarant under each of the three declarations and is the Grantor under the Access Easement.

Nothing requires turnover of anything further; the 2015 Easement is the single exception. The Debtor asks holders of Claims to note this point above all others in this Article, because every unit-owner revenue stream in the Plan depends upon it. Canaveral Crossroads has turned over exactly one thing to the associations, and it did so voluntarily and by recorded instrument: the Access Easement of December 1, 2015, described below, which conveys a right of way and a utility right and nothing more. Apart from that single conveyance, no recorded instrument obligates the Debtor to convey, dedicate, or turn over to the Master Association, to the Condominium Association, to the Cape Crossing Townhomes Homeowners Association, or to the unit owners the clubhouse, the swimming pool, any fitness facility, the public and common areas, the Lift Station, or the resort's name, trademarks, trade names, or signage. The Debtor has reviewed all two hundred thirty-three recorded pages for any such obligation and has found none. Article VII of the Master Declaration, captioned General Provisions, addresses the duration of the covenants, notices, enforcement, an easement reserved to the Developer, severability, the subdivision of lots, amendment, and indemnification. It contains no turnover provision, and neither does any other article of that instrument or of either sub-association declaration. The Master Declaration defines "Common Property" as the real property, including the improvements thereto, "owned by the Association" — that is, property the Master Association has in fact acquired — and not as property the Developer is obliged to convey to it. The Townhome Declaration is to the same effect: it defines "Common Property" as property owned by that association within Cape Crossing Townhomes, and in Article IV speaks of that association's interest in Common Property "as may be hereafter acquired." The Condominium Declaration defines the common elements as the real property, improvements, and facilities "of the Condominium" other than the units and the limited common elements, and submits no clubhouse, pool, fitness facility, marina, restaurant, or lift station to the condominium. Where the

draftsman intended the Developer to be able to hand something over, he said so and made it optional: the Condominium Declaration provides that the Developer "may convey the Commercial Unit, without consideration, to the Association," and that the Association must accept it. That is an option reserved to the Developer, not a duty imposed on it, and it is the only conveyance provision of its kind in the recorded set.

The provisions of the Townhome Declaration and the Condominium Declaration captioned Transfer of Control, and the related provisions governing the Developer's relinquishment of control, are provisions of corporate governance. They fix the point at which owners other than the Developer become entitled to elect a majority of the board of the townhome association or of the condominium association, consistent with §§ 720.307 and 718.301 of the Florida Statutes. They transfer control of those two associations, and control of the Condominium Association has in fact passed to its members, who amended its By-Laws and Articles of Incorporation at a special meeting held January 27, 2023. But those provisions transfer no property, and they require the Developer to transfer none. They say nothing about the Master Association, whose governing documents contain no turnover mechanism of any kind. Article III of the Master Declaration provides to the contrary, and the First Amendment sharpened it: as amended, it provides that the Condominium Association, the Townhomes Homeowners Association "and the Owners shall not be members of Cape Crossing Resort Management, Inc., the Master Association, and therefore shall have no voting rights" in it, and that the members of the two sub-associations are not entitled to attend its regular meetings.

What the covenants do provide for the unit owners. What the recorded declarations give the owners is the machinery of a master-assessment structure, not a grant of free access to the Debtor's amenities. Article IV of the Master Declaration creates a covenant for maintenance assessments, fixes them at a uniform per-unit rate, makes them a continuing lien on each lot or unit and the personal obligation of its owner, imposes interest at eighteen percent (18%) per annum upon delinquency, and — the point that matters most to the Plan — directs that the Master Association "shall bill all assessments, including special assessments, to the Homeowners' Association and Condominium Association, and each association shall pay the assessments when due to the Association." The First Amendment tightened that machinery further, requiring each sub-association to collect from its members and to remit "to the Association within five (5) days of receipt." Article V, Section 2(q) of the Townhome Declaration correspondingly lists "[p]ayment of assessments to the Master Association" among the purposes for which townhome assessments are levied. The Common-Area Access Charge described below is collected through precisely that mechanism.

The Access Easement, and what it does grant. On December 1, 2015 — before either declaration was recorded — the Debtor granted and recorded the Access Easement in favor of the Cape Crossing Townhomes Homeowners Association and the Cape Crossing Condominium Association, their successors and assigns, and their guests and invitees. The burdened land is the resort property described as Parcels One and Two, the same legal description that is Exhibit "A" to the Master Declaration. For ten dollars and other consideration, and with a covenant to warrant and forever defend, the Debtor granted perpetual, non-exclusive easements of two kinds and no others. The first is a right of way for ingress and egress, by vehicle or on foot, over the streets, roadways, driveways, and walks on the burdened land as they exist or may be relocated, between the public right of way at Tingley Drive and the benefitted land. The second is a right — expressly a right and not an obligation — to install, maintain, and use utilities on the

burdened land, including water, sewer, electric, stormwater, gas, telephone, cable, conduits, sewer lines, and lift stations, with the cost of any such installation to be borne by the grantee. The instrument states that the rights created are restricted solely to the grantees and create no rights in the general public.

The Debtor discloses the consequences of that grant plainly, because two of them are adverse to it. First, the Reorganized Debtor does not charge, and under the Plan will not charge, the associations or the unit owners for vehicular or pedestrian ingress and egress over the resort's streets, roadways, driveways, and walks. That access was conveyed in 2015, is perpetual, and is not revocable. The Common-Area Access Charge of $125.00 per unit per month described below is consideration for the use of the clubhouse, the swimming pool, any fitness facility, and the other public and common areas and amenities of the resort — not for the right of way. Second, because the associations hold a recorded right to install and use their own lift station on the Debtor's land at their own expense, the Lift Station Access Fee is constrained as a practical matter by the cost to the associations of exercising that right; the Debtor has set the fee with that constraint in mind. Neither consequence disturbs the balance of the analysis. The Access Easement conveys a right of way and a utility right. It conveys no interest in the clubhouse, the swimming pool, any fitness facility, the Lift Station itself, or the resort's name or marks, and it imposes no obligation on the Debtor to convey anything. One further feature of the instrument works in the Debtor's favour and should be noted. The easement identifies Tingley Drive as the public right of way and runs from it over the Debtor's internal streets, driveways, and walks to the benefitted land. And it states in terms that the rights created are "restricted solely to Grantee, their successors or assigns," and are "not intended nor shall … be construed as creating any rights in or for the benefit of the general public or any rights in or to any portion of the property or the Grantor's property other than as set forth herein." The Commercial Operators are not grantees and hold no rights under the Access Easement. To state the matter as plainly as the Debtor can: the Access Easement is the exception, and it is the only exception. What was granted in 2015 was granted, is perpetual, and the Debtor does not seek to charge for it or to take it back. Everything else — the clubhouse, the swimming pool, any fitness facility, the other public and common areas and amenities, the Lift Station, and the name, trade dress, trademarks, trade names, and signage — was neither conveyed then nor required to be conveyed since, and remains the Debtor's property, available to the owners on the terms the Reorganized Debtor sets.

The only reference in any of the three declarations to the clubhouse or the pool is a recital in the Master Declaration that the Developer "intends to create thereon a planned community consisting of a condominium development, a townhome development, a clubhouse and swimming pool, and other amenities." That is a recital of intent. It is not a conveyance, an easement, a dedication, or a covenant to furnish the use of those facilities without charge, and no operative provision of any of the three declarations grants the owners a right of access to them. No fitness facility, marina, restaurant, boat lift, or lift station is mentioned anywhere in any of the three declarations. The easement of enjoyment that Article IV of the Townhome Declaration confers on townhome owners runs only to "Common Property," which that instrument defines as property owned by the townhome association within Cape Crossing Townhomes; Article VII, Section 4 of that declaration identifies those Common Properties as the retention and common areas shown on the plot plan of Cape Crossing Townhomes. It does not reach the Debtor's resort amenities. The Access Easement makes the point plainer still. These parties knew how to create an easement over the Debtor's land in favor of the associations, and in 2015 they did exactly that

— for access and for utilities. They did not grant an easement over the clubhouse, the pool, or any fitness facility, then or at any time since.

The basis for the charges. The Debtor's position, which it will present at Confirmation, is therefore this. Subject to the right of way conveyed by the Access Easement, the owners' historical use of the clubhouse, the swimming pool, any fitness facility, and the other amenities of the resort has been permissive — a revocable license extended by the Developer — and not the exercise of a covenant right. The Reorganized Debtor may lawfully condition continued use of those amenities upon payment, and the Common-Area Access Charge described below is the charge for that use. Article VII, Section 7 of the Master Declaration permits the Developer, so long as it owns one lot, condominium unit, or other parcel of land within Cape Crossing Resort and Marina Living, to amend the Master Declaration "without the consent, approval or joinder of any other person or Owner," by an instrument signed by the Developer alone and recorded in the Public Records of Brevard County. That power is not theoretical. The Debtor exercised it on February 7, 2022, when it recorded the First Amendment to the Master Declaration, reciting that it "continues to own condominium units and other parcels in Cape Crossing Resort and Marina Living." It still owns them. The Reorganized Debtor accordingly intends, in addition to entering into the Property Use Agreement and the license agreements described below, to record a further amendment to the Master Declaration implementing the Common-Area Access Charge, the Lift Station Access Fee, and the License Fees as assessments collectible through the Master Association under Article IV of that instrument. Article 4, Section 9 of the Master Association's By-Laws confirms that this structure was contemplated from the outset: it requires the annual budget to set out separately "all fees or charges for recreational amenities, whether owned by the Association, or another person."

The Commercial Operators, and a concentration the Debtor discloses. The three Commercial Operators are the restaurant and the two marina operations. The two marinas together account for one hundred forty-seven (147) boat slips and lifts: thirty-one (31) at the marina conducted upon the Canaveral Port Authority leasehold described above, and one hundred sixteen (116) at the second marina, which is not conducted upon that leasehold. The restaurant is conducted upon the same Port Authority leasehold as the thirty-one-slip marina.

The Debtor takes the conservative course as to the assigned leasehold. Because the Debtor assigned its interest in the Canaveral Port Authority lease in 2022, and because the recovery of that leasehold is the subject of an avoidance claim that has not yet been commenced or adjudicated, the Plan seeks no payment whatever on account of those leases. The Commercial Operator License Fee of $2,500.00 per month payable by the restaurant and by the thirty-one-slip marina is a charge for access to and use of the Debtor's public and common areas and of the Lift Station, and for the right to use the resort's name, trade dress, trademarks, trade names, and signage on and after the Effective Date. It is not rent, it is not consideration for the leased premises, and no part of the projected Plan Revenues assumes that the Debtor holds or will recover any interest in the Port Authority leasehold. If and to the extent those leases are avoided and recovered for the Estate, the Reorganized Debtor reserves the right to charge rent or the fair value of use in addition to the Commercial Operator License Fee; but the Plan is not premised upon that outcome and its feasibility does not depend upon it.

A concentration the Debtor discloses. Both of the operations conducted upon that leasehold — the restaurant and the thirty-one-slip marina — are conducted by or under Michael McPhillips,

who is also the Manager of Cape Crossing Marina, LLC, the entity to which the Debtor assigned the leasehold for stated consideration of ten dollars. Two of the three Commercial Operator License Fees — $5,000.00 per month, or $60,000.00 of the $90,000.00 annual total, together with the three percent (3%) royalty on the gross revenues of both operations — are therefore payable by a single counterparty. Holders of Claims should weigh that concentration in assessing feasibility.

Mr. McPhillips's position, and the Debtor's claims against him. Mr. McPhillips is one of the guarantors of the obligations owed to Horton S. Johnson. That guaranty remains in full force and effect, is unaffected by the Plan and by the Confirmation Order, and continues separately from this Bankruptcy Case. Separately, the Reorganized Debtor preserves and intends to prosecute avoidance claims against Mr. McPhillips and entities under his control, including claims to avoid and recover a transfer made in 2021 in the amount of $2,145,000.00 and claims to avoid and recover the assignments of the Canaveral Port Authority leases. If either recovery is obtained, Mr. McPhillips's liability to the Reorganized Debtor will be adjusted accordingly; his separate obligations to Mr. Johnson under the guaranty are unaffected either way. The Debtor is aware that Mr. Johnson is pursuing his own actions against Mr. McPhillips, and discloses that to the extent Mr. Johnson obtains control of the Port Authority leases or of other property through those actions, the Reorganized Debtor may seek to acquire those interests from Mr. Johnson. The Debtor recognizes that the Reorganized Debtor will therefore be pursuing Mr. McPhillips while also licensing two of his operations, and that Mr. Johnson will own the Reorganized Debtor while holding a guaranty claim against the same person. It discloses these relationships rather than leaving them to be discovered, and submits that the charges the Plan imposes are supported by value given and stand independently of the litigation.

Limitations, and the Debtor's position on tolling. The 2021 transfer and the 2022 lease assignments are, on their face, outside the two-year reach-back of § 548 of the Bankruptcy Code and outside the four-year period of § 726.110 of the Florida Statutes measured from the dates appearing of record. The Debtor's position is that those periods were tolled by concealment, and the Reorganized Debtor anticipates commencing an action to avoid and recover the leases and the 2021 transfer. Holders of Claims should understand that the defendants will contest tolling, that the outcome cannot be predicted, and that no recovery from any of these claims is included in Plan Revenues, in Exhibit A to the Plan, or in the feasibility analysis in this Article.

Limitations upon this analysis. The Debtor discloses the following qualifications, which holders of Claims should weigh. First, the recorded declarations may not be the only documents bearing on the owners' rights. The Condominium Declaration carries a legend identifying it as an exhibit to a prospectus. The Debtor has searched its records and has not located any such prospectus, has no record of one having been prepared or delivered, and is not aware of any representation to any owner that the clubhouse, the swimming pool, any fitness facility, or any other amenity would be furnished without charge or conveyed to any association. If offering materials or purchase contracts containing such a representation are produced, they could give rise to contract or statutory claims notwithstanding the recorded covenants, and the Cape Crossing associations are already adverse to the Debtor in the construction-defect action described in Article V. Second, the covenants of the Master Declaration run for thirty (30) years from recording and therefore expire on May 31, 2046 unless preserved under the Marketable Record Title Act, Chapter 712, Florida Statutes. That date falls within the twenty-year term of the Plan and roughly a decade before the end of the thirty-year term of the Property Use Agreement, and the Reorganized

Debtor will take the steps necessary to preserve the covenants for the full term of each. The Access Easement, by contrast, is perpetual. Third, the apparent difference between the eighty-two (82) units on which the Plan is calculated and the eighty-three (83) described in the Master Declaration is reconciled as follows. The Master Declaration describes thirty-five (35) residential condominium units, one (1) commercial condominium unit, and forty-seven (47) townhome lots. The thirty-five residential condominium units and the forty-seven townhome lots together are the eighty-two (82) units subject to the per-unit charges under the Plan. The eighty-third is the single commercial condominium unit, which is not a residence, is not subject to the per-unit charges, and is dealt with separately under the Condominium Declaration. The two figures are therefore consistent, and Exhibit A to the Plan requires no adjustment on that account. Fourth, the Master Declaration contemplates a single commercial condominium unit, whereas the Plan charges the IP and Signage License Fee against the seventy (70) units engaged in commercial activity. The two usages are different — the Plan refers to units used for short-term rental or other revenue-producing activity, not to units designated commercial in the Condominium Declaration — and the license agreements filed with the Plan Supplement will define the term. Fifth, on February 7, 2022 the Debtor recorded two assignments of its leasehold interest under a December 9, 2014 lease from the Canaveral Port Authority to Cape Crossing Marina, LLC, for stated consideration of ten dollars, with an effective date of February 24, 2021. The marina operations therefore occupy land held under a lease the Debtor no longer holds, and the Commercial Operator License Fee payable by those operations is consideration for access to and use of the Debtor's common areas, the Lift Station, and the resort's name and marks, and not for the marina premises themselves. The Reorganized Debtor reserves all Causes of Action arising from those assignments.

The six components of Plan Revenue. Revenue under the Plan is generated by six components, each of which is a charge for use on and after the Effective Date. Four are payable by or on behalf of the unit owners: (i) the land lease payable under the Property Use Agreement; (ii) the access fee for the clubhouse, the swimming pool, and the other public and common areas and amenities; (iii) the royalty for use of the Debtor's trade names, trademarks, and signage under the IP and Signage License Fee; and (iv) the Lift Station use charge. The fifth is the Commercial Operator License Fee payable by the restaurant and the two marina operations, together with each Commercial Operator's share of the cost of maintaining the commercial areas and a royalty of three percent (3%) of that operator's gross revenues. The sixth is the Reservation System Access Fee, payable by every person who uses the Reorganized Debtor's reservation system, equal to five percent (5%) of all revenues generated through it. Holders of Claims should keep the following distinction firmly in mind, because the Plan depends on it. These six components are charges for FUTURE use — use on and after the Effective Date — and they recur for as long as the use continues. They are entirely separate from, and are not satisfied or reduced by, the one-time charges for PAST use described later in this Article, which are Causes of Action and are not Plan Revenues. A person who resolves a past-use claim acquires no licence to use the resort's name, marks, amenities, Lift Station, or reservation system going forward; to do that, the person must enter into the applicable agreement and pay the scheduled charge. One further point of construction. The three percent (3%) royalty components and the five percent (5%) Reservation System Access Fee are cumulative, not alternative. A unit engaged in commercial activity that books through the Reorganized Debtor's reservation system pays both — an aggregate of eight percent (8%) of the gross revenues derived from that activity — in addition to the fixed monthly charges under the Property Use Agreement, the Common-Area Access

Charge, and the Lift Station Access Fee. The Debtor intends that result, and the license agreements filed with the Plan Supplement will say so expressly rather than leaving it to be argued.

On the Effective Date, the Reorganized Debtor will retain all real and personal property it then owns (the "Retained Properties"). The Debtor owns the common and public areas at the Property, the clubhouse, the sewage lift station (the "Lift Station"), and its signage, trademarks, and trade names, other than those common-area parcels titled of record to the Cape Crossing Condominium Association, Inc. or the Cape Crossing Townhomes Homeowners Association, Inc., and the Reorganized Debtor will continue to own them on and after the Effective Date. The Plan will be funded from the following revenue streams of the Reorganized Debtor (collectively, the "Plan Revenues"): (a) a Property Use Agreement with the owners of the units and/or the Master Association providing for $250.00 per unit per month for thirty (30) years, or approximately $20,500.00 per month ($246,000.00 per year) across approximately eighty-two (82) units; (b) a common-area access charge to the Master Association of $125.00 per unit per month, or approximately $10,250.00 per month ($123,000.00 per year), which the Master Association may pass through to each unit; (c) a Lift Station Access Fee of $88.00 per unit per month payable by the owner of each unit, or approximately $7,216.00 per month ($86,592.00 per year); (d) an IP and Signage License Fee payable by each unit engaged in commercial activity, equal to the greater of three percent (3%) of the gross revenues derived from that commercial activity or $105.00 per month, which across approximately seventy (70) commercially active units yields a minimum of approximately $7,350.00 per month ($88,200.00 per year), exclusive of the 3% royalty; (e) a Commercial Operator License Fee of $2,500.00 per month payable by each of the three (3) Commercial Operators — the restaurant and the two (2) marina operations — or $7,500.00 per month ($90,000.00 per year), for access to and use of the public and common areas and the Lift Station, including the Lift Station capacity serving the one hundred forty-seven (147) boat slips and lifts at the two marina operations in the aggregate — thirty-one (31) at the marina operated on the Canaveral Port Authority leasehold and one hundred sixteen (116) at the other, and for the right to use the name, trade dress, trademarks, trade names, and signage of the resort, together with a royalty of three percent (3%) of each Commercial Operator's gross revenues, which is additional to that fee and is not included in the minimum; and (f) a Reservation System Access Fee equal to five percent (5%) of all revenues generated through the Reorganized Debtor's reservation system, payable by each person who accesses or uses that system, which is likewise not included in the minimum; together with the net proceeds of Causes of Action. Total minimum Plan Revenues are projected at approximately $52,816.00 per month ($633,792.00 per year), as detailed in the Schedule of Plan Income attached to the Plan as Exhibit A. That minimum excludes the 3% royalty components and the Reservation System Access Fee, each of which is a percentage of revenues the Debtor cannot presently estimate. None of the payors is obligated to make these payments today; each obligation arises from an agreement to be entered into after Confirmation or, as to the assessment-based charges, from the amendment to the Master Declaration described above.

*Seventy-five percent (75%) of Plan Revenues — $39,612.00 per month, or $475,344.00 per year — is distributed monthly, Pro Rata and without interest, among the holders of Allowed Class 8 Claims and the holder of the Allowed Class 5 Claim, for twenty (20) years following the Effective Date. The remaining twenty-five percent (25%) — $13,204.00 per month, or $158,448.00 per year — is retained by the Reorganized Debtor and applied to Operating*

*Expenses, the tax and insurance escrows, United States Trustee fees, Administrative Claims of approximately $125,000.00, Priority Tax Claims, and payments to Class 7. Those figures are minimums; the 3% royalty components and the Reservation System Access Fee are divided in the same seventy-five/twenty-five proportion as and when received. Allowed Claims in Classes 1, 2, and 3 are paid in the first instance by Homemakers Real Estate, LLC under its plan of reorganization in Case No. 6:25-bk-05570, and the Reorganized Debtor makes payments on account of those Classes only upon an uncured default by Homemakers. One Million Dollars ($1,000,000.00) of the Allowed Class 4 Claim is satisfied by the issuance of equity and requires no cash payment; the $2,608,845.31 balance is treated in Class 8. On and after the Effective Date the Reorganized Debtor is wholly owned by Horton S. Johnson.*

Post-confirmation management. On and after the Effective Date the Reorganized Debtor will be wholly owned by Horton S. Johnson. Horton S. Johnson will serve as President and Baylor Johnson will serve as Secretary, and administration and control of the Reorganized Debtor will be vested in them. Section 1129(a)(5) of the Bankruptcy Code requires the Debtor to disclose the identity and affiliations of each proposed officer and director, to state that the appointment is consistent with the interests of creditors and with public policy, and to disclose the identity and compensation of any insider to be employed or retained. The affiliations of Horton S. Johnson and Baylor Johnson, the relationship between them, and the compensation to be paid to each will be set out in the Plan Supplement filed not later than seven days before the Confirmation hearing. The Debtor submits that vesting management in the Reorganized Debtor's sole equity holder — who is also its largest creditor, who has agreed to accept treatment of both of his secured Claims on terms the Bankruptcy Code would not otherwise permit, and who therefore bears the consequences of the Reorganized Debtor's performance more directly than any other party — is consistent with the interests of creditors and with public policy.

Feasibility. The Debtor must satisfy § 1129(a)(11), which requires that Confirmation is not likely to be followed by liquidation or the need for further reorganization. Because the Allowed Class 5 Claim is satisfied entirely out of the Unsecured Creditor Share rather than from the Reorganized Debtor's retained share, the full twenty-five percent (25%) of Plan Revenues — $13,204.00 per month, or $158,448.00 per year — remains available throughout the term of the Plan to fund Operating Expenses, the tax and insurance escrows, United States Trustee fees, the approximately $125,000.00 of Administrative Claims, Priority Tax Claims, and Class 7 payments. Holders of Claims should understand that this margin is thin, and that the Debtor's feasibility case does not rest on the minimum alone. It rests as well on the three percent (3%) royalty component of the IP and Signage License Fee, on the three percent (3%) royalty payable by each Commercial Operator, and on the five percent (5%) Reservation System Access Fee, none of which is included in the $52,816.00 monthly minimum and each of which is expected to be substantial. By way of illustration, and not as a projection, an aggregate of $1,000,000.00 of annual gross revenue subject to the 3% royalty would yield $30,000.00 per year, and $1,000,000.00 of annual bookings through the reservation system would yield $50,000.00 per year. The Debtor believes that the retained share, together with those percentage components, is sufficient to meet all obligations under the Plan, and that the Plan is therefore feasible. Twenty-year cash-flow projections supporting this conclusion are attached as an exhibit to this Disclosure Statement.

Recovery for past use of the commercial areas. For approximately five (5) years before the Petition Date, the cost of maintaining the commercial common areas outside the areas

maintained by the homeowners associations — particularly the areas used by the restaurant and the two marina operations — was borne by the Debtor and was never reimbursed by the parties that used and benefited from them. Going forward, each Commercial Operator will pay its proportionate share of those costs under its license agreement. As to the past, the Reorganized Debtor will preserve and pursue claims against the restaurant and the marina operations for the reasonable value of that use and of the services rendered. The Debtor recognizes that the earlier portion of those claims may be barred by the applicable statute of limitations or defeated by laches, repose, or other defenses, and that the more recent portion is likely recoverable; on that basis the Debtor estimates a net recovery of $130,000.00 to $150,000.00, which will be distributed as net proceeds of Causes of Action.

Past use of the resort name, trade dress, and marks — a one-time charge. Separately from the past-use claims just described, and separately from every recurring charge described earlier in this Article, the Reorganized Debtor will assert claims against each person who has used the Cape Crossing name, trade dress, trademarks, trade names, or signage without a license, for the reasonable value of that use before the Effective Date. To resolve those claims the Reorganized Debtor will extend to each such person a one-time offer of Three Thousand Dollars ($3,000.00), which will be made to the owner of each of the eighty-two (82) units and to each of the three (3) Commercial Operators and will remain open for a period fixed in the Plan Supplement. If every offeree accepted, the aggregate would be $255,000.00. Any person who declines will be pursued in quantum meruit for the reasonable value of the use made, together with such interest, costs, attorney fees, and other relief as may be recoverable. Amounts collected, whether by acceptance of the offer or by judgment, are net proceeds of Causes of Action and are distributed Pro Rata to the holders of Allowed Class 8 Claims and to the holder of the Allowed Class 5 Claim in the same manner as other such proceeds. No part of this charge is included in Plan Revenues, in the minimum set forth in Exhibit A to the Plan, or in the feasibility analysis above; the Debtor treats it as contingent litigation recovery and nothing more.

The one-time charge buys peace as to the past and nothing else. The $3,000.00 offer resolves the claim for use made before the Effective Date. It is not a licence, and it confers no right to use the Cape Crossing name, trade dress, trademarks, trade names, or signage on or after the Effective Date. A person who intends to continue that use must enter into the applicable license agreement and pay the scheduled recurring charge — the IP and Signage License Fee for a unit engaged in commercial activity, being the greater of three percent (3%) of the gross revenues derived from that activity or $105.00 per month; or, for a Commercial Operator, the Commercial Operator License Fee of $2,500.00 per month together with the three percent (3%) royalty on that operator's gross revenues. Continued use of the reservation system is charged separately under the Reservation System Access Fee at five percent (5%) of revenues generated through it. Accepting the one-time offer neither reduces nor satisfies any of those charges, and declining it neither creates nor enlarges any right to use the marks going forward.

The Debtor discloses two qualifications concerning the one-time charge. The first is legal. A claim for past use of the resort name is strongest against a person who used the name commercially — in rental listings, in advertising, on signage, or in the conduct of a business — and is weakest, and may not exist at all, against an owner who has done no more than use the name of the community to identify where the owner lives. The Reorganized Debtor will evaluate each offeree accordingly, and the $255,000.00 aggregate should not be read as an assumption that every offeree is liable. The second is practical. The Plan depends upon the unit owners

entering into the Property Use Agreement, and the waiver described immediately below is the consideration offered for doing so. The Debtor has therefore structured that waiver to release the past-use claims — both those relating to the commercial common areas and those relating to the name and marks — of any owner who executes the Property Use Agreement or does not object to Confirmation, so that no owner is asked both to sign the agreement and to pay the one-time charge. The waiver reaches past use only. It does not waive, reduce, or defer any recurring charge payable under the Property Use Agreement or under any license agreement on or after the Effective Date.

Waiver as to individual unit owners — past use only. The Plan waives and releases, on the Effective Date, any claim of the Debtor, the Estate, or the Reorganized Debtor against an individual unit owner (i) for the reasonable value of that owner's use of the commercial common areas before the Effective Date, and (ii) for the reasonable value of that owner's use of the Cape Crossing name, trade dress, trademarks, trade names, or signage before the Effective Date, in each case as to every owner who either executes the Property Use Agreement or does not file an objection to Confirmation of the Plan. An owner who neither executes the Property Use Agreement nor refrains from objecting remains subject to the one-time $3,000.00 offer and, failing acceptance, to an action in quantum meruit. The waiver does not extend to the restaurant or to either marina operation. The waiver operates only upon claims for use before the Effective Date. Every charge described earlier in this Article — the Property Use Agreement payment, the Common-Area Access Charge, the Lift Station Access Fee, the IP and Signage License Fee, the Commercial Operator License Fee and royalty, and the Reservation System Access Fee — is payable for use on and after the Effective Date and is unaffected by the waiver.

## X. LIQUIDATION ANALYSIS (BEST INTERESTS OF CREDITORS)

Section 1129(a)(7) requires that each holder of an impaired Claim either accept the Plan or receive at least as much under the Plan as it would receive if the Debtor were liquidated under Chapter 7. In a hypothetical Chapter 7 liquidation, a trustee would sell the Debtor's real property and other assets, and the net proceeds (after the costs of liquidation, trustee compensation, and professional fees) would be distributed first to secured creditors to the extent of their collateral, then to administrative and priority claimants, and only thereafter to general unsecured creditors. Because the Debtor's scheduled secured debt of $10,745,352.63 substantially exceeds the $6,145,000.00 scheduled value of its real property, a Chapter 7 liquidation would yield no recovery for general unsecured creditors and no recovery for equity. Under the Plan, the holders of Allowed Class 8 Claims and the holder of the Allowed Class 5 Claim share Pro Rata in seventy-five percent (75%) of Plan Revenues for twenty (20) years — $475,344.00 per year, or $9,506,880.00 in the aggregate at the minimum rate — plus the net proceeds of Causes of Action, including the estimated $130,000.00 to $150,000.00 recovery from the restaurant and marina operations and whatever is realized on the claims for past use of the resort name. Measured against a combined pool of $19,249,693.15 (scheduled unsecured Claims of $8,722,677.37, the $2,608,845.31 balance of the Johnson First Note, the Pino Law Group Claim of $138,485.00, estimated deficiency Claims of approximately $991,507.32, the $4,400,000.00 Sherwood Claim, and the $2,388,178.15 Class 5 Claim, exclusive of any Allowed construction-defect Claim), that is a nominal recovery of approximately forty-nine percent (49%) before any royalty, Reservation System, or Cause of Action proceeds, and more thereafter. Because the Distributions run for twenty (20) years without interest, their present value is materially lower — approximately $4.7 million discounted at eight percent (8%). Even so, that exceeds the $0

Chapter 7 dividend, and the Debtor submits that the Plan satisfies the best-interests test. The Debtor asks that the comparison be kept in view. Section 1129(a)(7) does not require a particular percentage; it requires only that each impaired holder receive at least as much under the Plan as in a Chapter 7 liquidation. Here the Chapter 7 dividend to Classes 5 and 8 is zero, because the scheduled secured debt of $10,745,352.63 exceeds the $6,145,000.00 scheduled value of the real property by more than four and a half million dollars before any cost of liquidation is taken into account. Every dollar distributed under the Plan is therefore a dollar more than Chapter 7 would produce. On the minimum Plan Revenues alone the Plan distributes $9,506,880.00 over the term, a nominal recovery of approximately forty-nine percent (49%) and a present value of approximately $4,735,785.00, or roughly twenty-five percent (25%) of the combined pool measured in present-value terms. The three percent (3%) royalty components and the five percent (5%) Reservation System Access Fee, which are excluded from that minimum, are expected to raise both figures materially. Applying the stacked eight percent (8%) to the revenues actually generated in the 2024 calendar year by the twenty-six units at the Property operated by the Debtor and its affiliate, together with five additional inventory units at the same average, would add approximately $116,500.00 per year of Plan Revenues, which over the twenty-year term would carry the present-value recovery to approximately twenty-nine percent (29%) and the nominal recovery to approximately fifty-eight percent (58%). If participation reached the seventy (70) units engaged in commercial activity, the present-value recovery would approach thirty-five percent (35%) and the nominal recovery seventy percent (70%). Those figures are illustrations drawn from actual historical revenue and are not guaranteed; but they show the direction and the magnitude of what the percentage components contribute.

## XI. RISK FACTORS

Holders of Claims should consider the following risks, among others: (a) the Debtor is presently a non-operating holding entity with no revenue, and every Plan Revenue stream depends on agreements that do not yet exist and on payors who are not yet obligated to sign them; (b) although the Debtor owns the common areas, the clubhouse, the Lift Station, and its trademarks and trade names, those intangibles are carried at an undetermined value pending appraisal, and any successful challenge to the Debtor's title to the assets on which the Plan Revenues depend would materially impair the Plan; (c) the actual Allowed amounts of Claims — including the secured Claims, the disputed Tamamoi and PEDIXON Claims, the tax certificate Claims, and the construction-defect Claims — may differ materially from the Debtor's estimates, and any increase in the Class 8 pool reduces every other creditor's recovery proportionately; (d) the value of the Debtor's real property may be less than estimated; (e) the Plan may not be confirmed, or may be confirmed only through cramdown under § 1129(b), and a substantial portion of the scheduled Class 8 pool is insider-held, so § 1129(a)(10) may be difficult to satisfy through Class 8; (f) Distributions are payable over a twenty (20) year term without interest, so their present value is materially less than their nominal aggregate amount, and the Reorganized Debtor's performance over that term cannot be assured; (g) upon the Effective Date the Reorganized Debtor is wholly owned by Horton S. Johnson, who is at the same time a petitioning creditor, the holder of the Class 5 Claim that shares in the same distribution pool as Class 8, and the holder of a $2,608,845.31 Class 8 Claim, and whose Liens on the Debtor's property remain of record until the Class 8 Closing Date — and although those Liens secure only the Reorganized Debtor's performance to Class 8, are unenforceable absent an uncured Plan default, and are subordinated to permitted financing, their continued existence may complicate any refinancing or sale of the

Retained Properties during the twenty-year term; (h) the treatment of the Class 4 and Class 5 Claims depends on Mr. Johnson's written consent, and if that stipulation is not executed and filed the Plan cannot be confirmed in its present form as to those Classes; (i) the recovery from the restaurant and marina operations for past use of the commercial areas is subject to limitations, laches, and repose defenses and may be materially less than the $130,000.00 to $150,000.00 estimated, or nothing at all; (j) although the Debtor has obtained the recorded declarations and confirmed that none of them requires turnover of the amenities, the prospectus and offering materials for the condominium and the individual purchase contracts have not been reviewed, and representations about amenity access contained in them could support claims by owners or by the associations — who are already adverse to the Debtor in the construction-defect action — notwithstanding the recorded covenants; (k) the Access Easement recorded December 1, 2015 conveys to both associations, their successors, assigns, guests, and invitees a perpetual right of way over the resort's streets, roadways, driveways, and walks, and a perpetual right to install and use their own utilities, including a lift station, on the Debtor's land at their own cost; the Reorganized Debtor cannot charge for that right of way, and the associations' ability to install a competing lift station constrains the Lift Station Access Fee; (l) the covenants of the Master Declaration expire May 31, 2046 unless preserved under Chapter 712 of the Florida Statutes, a date that falls within the twenty-year term of the Plan and well before the end of the thirty-year term of the Property Use Agreement; (m) the three percent (3%) royalty components and the five percent (5%) Reservation System Access Fee are excluded from the $52,816.00 monthly minimum because the Debtor cannot presently estimate the revenues on which they are computed, and they are accordingly upside to the Plan rather than a component of it; (n) the claims for past use of the resort name, trade dress, and marks are unliquidated, are subject to the same limitations and laches defenses as the other past-use claims, may be weak or non-existent as against owners who made no commercial use of the name, and are not relied upon in the feasibility analysis; and (o) on February 7, 2022 the Debtor recorded two assignments of its leasehold interest under a December 9, 2014 Canaveral Port Authority lease to Cape Crossing Marina, LLC for stated consideration of ten dollars, effective February 24, 2021, so that the marina operations occupy land the Debtor no longer holds; any Cause of Action arising from those assignments is unliquidated and may be barred by limitations; and (p) two of the three Commercial Operator License Fees, being $60,000.00 of the $90,000.00 annual total together with the three percent (3%) royalty on both of those operations, are payable by operations conducted by or under Michael McPhillips, who is the Manager of the entity that took the Canaveral Port Authority leasehold from the Debtor for ten dollars, is a guarantor to Mr. Johnson whom the Plan does not release, and is the principal target of the past-use claims — a concentration of counterparty, adversary, and guarantor in one person that could impair collection of those fees; and (q) the Debtor's contention that the PEDIXON obligation is unenforceable under Fla. Stat. § 687.071(7) rests on an expert computation prepared for other parties in a State-court action to which the Debtor is not a party, on a statute whose criminal-usury provisions require a finding of willful and knowing conduct that the expert expressly does not address, and no court has yet ruled on it; if the Claim is Allowed as a Secured Claim in full, the Reorganized Debtor must service it at 4.8% over thirty years out of its retained twenty-five percent (25%) share, which the Debtor has not budgeted for.

## XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the Plan are complex and may vary depending on a holder's particular circumstances. This Disclosure Statement does not constitute tax advice. Each holder of a Claim or Interest is strongly urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

## XIII. ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, the alternatives include (a) conversion of the case to a liquidation under Chapter 7, (b) dismissal of the case, or (c) the formulation of an alternative Chapter 11 plan. The Debtor believes that each of these alternatives would result in delay, additional expense, and, in the case of a Chapter 7 liquidation, a lower recovery for unsecured creditors than the Plan, for the reasons described in Article X.

## XIV. RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan provides the best available recovery to holders of Claims and is in the best interests of the Debtor's estate and its creditors. The Debtor therefore recommends that all holders of Claims entitled to vote cast their Ballots to ACCEPT the Plan.

Dated: September 15, 2026.

**CANAVERAL CROSSROADS, LLC,**
Debtor and Debtor in Possession

By: ______________________________
Ross Johnston
Chief Restructuring Officer

Respectfully submitted,

Fromang & Smith, P.A.

/s/ Christopher L. Smith
**Christopher L. Smith, Esq.**
Florida Bar No. 367461
4767 New Broad Street
Orlando, Florida 32814
Telephone: (407) 999-9739 | Email: chris@fromangsmith.com
Counsel for Canaveral Crossroads, LLC

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, I filed this Disclosure Statement with the clerk of court through the CM/ECF system, which served it electronically on every party registered for electronic notice in this case.

/s/ Christopher L. Smith
Christopher L. Smith, Esq.