# EXHIBIT 7

**This instrument Prepared By:**
**Record & Return to:**
**CURTIS R. MOSLEY, ESQUIRE**
**MOSLEY & WALLIS, P.A.**
**1221 East New Haven Avenue**
**Melbourne, FL 32901**

# INDEX TO

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

# FOR

# CAPE CROSSING TOWNHOMES

| | | PAGE |
|---|---|---|
| I. | DEFINITIONS | 2 |
| II. | PROPERTY SUBJECT TO THIS DECLARATION, PHASE DEVELOPMENT | 3 |
| III. | MEMBERSHIP AND VOTING RIGHTS OF THE ASSOCIATION | 4 |
| IV. | PROPERTY RIGHTS IN THE COMMON PROPERTY | 4 |
| V. | COVENANT FOR MAINTENANCE ASSESSMENTS | 5 |
| VI. | GENERAL USE RESTRICTIONS AND CONSTRUCTION REQUIREMENTS | 13 |
| VII. | SPECIAL RESTRICTIONS AFFECTING OPEN SPACE AREAS AND COMMON PROPERTIES | 16 |
| VIII. | GENERAL PROVISIONS | 17 |
| IX. | FINES | 20 |
| X. | MANDATORY MEDIATION AND LITIGATION | 21 |

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

# FOR

# CAPE CROSSING TOWNHOMES

**THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS** made and entered into by CANAVERAL CROSSROADS, LLC, a Florida limited liability company, hereinafter referred to as "Developer".

## WITNESSETH:

**WHEREAS,** CANAVERAL CROSSROADS, LLC, a Florida corporation, is the Developer of CAPE CROSSING TOWNHOMES and the owner of lands described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

**WHEREAS,** the above described real property shall hereinafter be referred to as the "Property"; and

**WHEREAS,** it is contemplated that the Property is to be developed into forty-seven (47) townhome residences; and

**WHEREAS,** Developer desires to create a residential community with open space green belt areas and such other common facilities as may be specifically designated on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES for the benefit of said community; and

**WHEREAS,** Developer desires to provide for the preservation of the values and amenities in said community and for the maintenance of open space green belt areas and other common facilities as may be specifically designated on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES, and to this end, desires to subject the Property to the covenants, restrictions, easements, charges and liens, hereinafter set forth, each and all of which is and are for the benefit of the Property and each Owner thereof; and

**WHEREAS,** Developer has deemed it desirable, for the efficient preservation of the values and amenities in said community, to create an Association to which should be delegated and assigned the powers of maintaining and administering the community properties and facilities; administering and enforcing the covenants and restrictions; collecting and disbursing the assessments and charges hereinafter created; and

**WHEREAS,** Developer will incorporate the Association referred to in Article I (as a non-profit corporation) under the Laws of the State of Florida for the purpose of exercising the functions aforesaid;

**NOW THEREFORE,** the Developer declares that the property is and shall be held, transferred, sold, conveyed and occupied subject to the covenants, restrictions, easements, charges and liens of the covenants, (sometimes referred to as "covenants and restrictions") herein set forth.

## ARTICLE I.
## DEFINITIONS

**SECTION 1.** The foregoing words when used in this Declaration (unless the context shall prohibit) shall have the following meanings:

a. "Association" shall mean and refer to CAPE CROSSING TOWNHOMES HOMEOWNERS ASSOCIATION, INC., a Florida corporation not for profit. The Articles and By-Laws are attached hereto as Exhibit "B" and "C" respectively.

b. "Common Property" or "Common Properties" shall mean all real property (including the improvements thereto) owned by the Association for the common use and enjoyment of the Owners as shown on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES.

c. "Developer" or "Declarant" shall mean CANAVERAL CROSSROADS, LLC, a Florida limited liability company.

d. "Lot" shall mean and refer to any of Lots 1 – 47 as shown upon the Plot Plan or Survey, with the exception of Common Properties, as heretofore defined.

e. "Master Association" shall mean Cape Crossing Resort Management, Inc., a Florida not for profit corporation.

f. "Member" shall mean and refer to all those Owners who are members of the Association as provided in Article III, Section 1, hereof.

g. "Owner" shall mean and refer to the record Owner, whether one or more persons or entities, of the fee simple title to any Lot. Owner shall not mean or refer to any mortgagee unless and until such mortgagee has acquired title pursuant to foreclosure or any proceeding in lieu of foreclosure.

h. Property" shall mean and refer to the real property described in the Plot Plan or Survey of CAPE CROSSING TOWNHOMES.

i. "Surface Water or Stormwater Management System" means a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use or reuse water to prevent or reduce flooding, overdrainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges.

j. "Townhome" shall mean and refer to any portion of a building situated upon the Property designed and intended for use and occupancy as a residence by a single family.

## ARTICLE II.
## PROPERTY SUBJECT TO THIS DECLARATION
## PHASE DEVELOPMENT

**SECTION 1. Property.** The real property which is and shall be held, transferred, sold, conveyed, and occupied subject to this Declaration is located in Brevard County, Florida, and is more particularly described in the Plot Plan or Survey of CAPE CROSSING TOWNHOMES. CAPE CROSSING TOWNHOMES is located in the CAPE CROSSING RESORT AND MARINA LIVING development and is subject to the Declaration of Covenants, Conditions and Restrictions of Cape Crossing Resort and Marina Living Recorded in Official Records Book 7626, Page 1609, Public Records of Brevard County, Florida

**SECTION 2. Additional Property.** The Developer may add such additional property or Lots, as Developer, its successors or assigns, may from time to time designate as being subject to this Declaration by the placing of record an instrument executed with formalities of a deed, making such designation.

## ARTICLE III.
## MEMBERSHIP AND VOTING RIGHTS OF THE ASSOCIATION

**SECTION 1. Membership.** Every person or entity who is the Owner of a fee simple or undivided fee simple interest in any Lot subject to assessment, and any Buyer who acquires title to a Lot, shall be Members of the Association. Any person or entity who holds an interest merely as a security for the performance of an obligation shall not be a Member. Membership shall be appurtenant to and may not be separated from Ownership of any Lot which is subject to assessment.



e/

**SECTION 2. Voting Rights.** The Association shall have one class of voting membership. Each Owner of a lot or lots evidenced by a deed duly recorded in the Public Records of Brevard County, Florida shall be entitled to one (1) vote for each lot he owns.

**SECTION 3. Transfer of Control.** With respect to the Association:

a. Members other than the Developer are entitled to elect at least a majority of the members of the Board of Directors of the Association, when the earlier of the following events occurs:

(1) Three months after ninety (90%) percent of the lots in all Phases have been conveyed to members; or

(2) Fifteen (15) years from the date of the closing of the first sale of a lot to a third party, whichever shall occur first.

b. The Developer is entitled to appoint at least one member of the Board of Directors of the Association as long as the Developer holds for sale in the ordinary course of business at least one of the lots in CAPE CROSSING TOWNHOMES. After the Developer relinquishes control of the Association, the Developer may exercise the right to vote any Developer owned voting interest in the same manner as any other member, except for purposes of reacquiring control of the Association or selecting a majority of the members of the Board of Directors.

## ARTICLE IV. PROPERTY RIGHTS IN THE COMMON PROPERTY

**SECTION 1. Members' Easements of Enjoyment, Common Property.** Every Member shall have a right and easement of enjoyment in and to the Common Property and such easement shall be appurtenant to and shall pass with the title to every Lot.

**SECTION 2. Extent of Members' Easement.** The easement and right of enjoyment created hereby shall be subject to the following:

a. The right of the Association to take such steps as are reasonably necessary to protect the Common Properties against foreclosure; and

b. If a Member is more than ninety (90) days delinquent in paying a monetary obligation due to the Association, the Association may suspend the rights of the Member, or the Member's tenants, guests or invitees to use Common Properties and Facilities until the monetary obligation is paid in full. The suspension does not apply to that portion of Common Properties used to provide access or utilities services to the lot. The suspension does not impair the right of an owner or tenant of a lot to have vehicular and pedestrian ingress/egress to and from their lot, including, but not limited to, the right to park. The notice and hearing requirements under Chapter 720, Florida Statutes, do not apply to a suspension imposed under this subsection; and

c. After turnover of control of the Association to Owners other than the Developer, the right of the Association to transfer all or any part of its interest in the Common Property as may be hereafter acquired to any public agency, authority, or utility for such purposes and subject to such conditions as may be agreed to by the Members, provided that no such dedication or transfer, determination as to the purposes or as to the conditions hereof, shall be effective unless an instrument signed by Members entitled to cast three-fourths (3/4) of the votes (as defined in Article III, Section 2) has been recorded, agreeing to such dedication, transfer, purpose or condition, and unless written notice of the proposed agreement and action thereunder is sent to every Member at least ninety (90) days in advance of any action taken.

**SECTION 3. Construction and Sales.** There is hereby reserved to the Developer, its

designers, successors and assigns, (including without limitation, its agents, sales agents and representatives, and prospective purchasers of Lots), easements over the Common Property, for construction, utility lines, display, maintenance and exhibit purposes in connection with the erection of improvements and sale of Lots within the Property and for ingress and egress to and from construction sites at reasonable times; provided, however, that such use shall terminate upon the sale of all Lots by the Developer and its express successors and assigns and provided, further, that no such use by the Developer and others shall otherwise restrict the Owners in the reasonable use and enjoyment of the Common Property. Nothing herein shall prohibit the Developer, its successors and assigns, from maintaining a sales office on the Property so long as the Developer own at least one lot.

## ARTICLE V.
## COVENANT FOR MAINTENANCE ASSESSMENTS

**SECTION 1. Creation of the Lien and Personal Obligation of Assessments.** Each Owner of any Lot by acceptance of a deed therefore, whether or not it shall be so expressed in any such deed or other conveyance including any purchaser at a judicial sale, shall be deemed to covenant and agree to pay to the Association (1) annual assessments or charges; and (2) special assessments for capital improvements, such assessments to be fixed, established, and collected from time to time as hereinafter provided. The annual and special assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the Lot and shall be a continuing lien upon the Lot against which such assessment, together with such interest thereon and the cost of collection thereof as hereinafter provided, is owing and shall also be the personal obligation of the person who was the Owner of such Lot at the time when the assessment fell due. Assessments levied pursuant to the annual budget or special assessments shall be in the lot owner's proportional share of expenses which is a fraction, the numerator of which is one (1) and the denominator of which is the total number of Townhomes subject to the Declaration of Covenants, Conditions and Restrictions of Cape Crossing Townhomes.

**SECTION 2. Purpose of Assessments.** The assessments levied by the Association shall be used exclusively for the purpose of promoting the recreation, health, safety and welfare of the residents in CAPE CROSSING TOWNHOMES, including, but not limited to:

a. Payment of operating expenses of the Association including, but not limited to, professional management fees;

b. Maintenance, landscaping, improvement and operation of Common Property, open space, easement areas, streets, parking spaces, sidewalks, driveways and greenbelt areas;

c. Maintenance, landscaping, and improvement of entrance areas to the Common Property;

d. Maintenance, landscaping, and improvement of lands dedicated to the public which are located within or adjacent to the Property such as landscape berms along any dedicated right-of-way.

e. Maintenance, landscaping, and improvement of screening walls and fences, if any, located within or adjacent to the Property;

f. Maintenance, repair and replacement of townhouse roofs, exterior townhouse and building surfaces, excluding garage doors, but including painting and/or sealant of exterior walls, security lighting, signage and street lighting **(Owners are responsible for interior maintenance, repair and replacement of their townhomes and windows and garage doors);**

g. Payment of taxes, hazard and general liability insurance for the Common Property, and errors and omissions insurance for Directors and Officers, labor and equipment for the Common Properties;

h. Payment of insurance including public liability, hazard, windstorm and flood insurance, if applicable, on townhomes, electric and utility bills for the Common Properties **(Owners are responsible for providing liability insurance and hazard insurance for the interior and contents of their townhomes)**;

i. Repayment of funds and interest thereon that have been or may be borrowed by the Association for any of the aforesaid purposes;

j. Establishment of reserve funds for capital expenditures and deferred maintenance, to maintain, replace or repair any portion of the townhomes and Common Properties, including painting, fencing, masonery walls, street and driveway resurfacing and any other items as designated by the Board. The Developer may waive establishing reserves until transfer of control of the Association to owners other than the Developer;

k. The Association shall have a perpetual non-exclusive easement over all areas of the surface water or stormwater management system for access to operate, maintain or repair the system. By this easement, the Association shall have the right to enter upon any portion of any lot which is a part of the surface water or stormwater management system, at a reasonable time and in a reasonable manner, to operation, maintain or repair.

l. Assessments shall also be used for the maintenance and repair of the surface water or stormwater management systems including but not limited to work within retention areas, drainage structures and drainage easements.

m. Doing any other thing necessary or desirable in the judgment of said Association (acting through its Board of Directors), to keep the subdivision neat and attractive or to preserve or enhance the value of the properties therein, or to eliminate fire, health or safety hazards.

n. Maintenance, landscaping, and improvements of all lands outside of the building pads, including townhouse lots;

o. Maintenance and repairs required for the reuse water system central irrigation systems, if any.

p. The Association shall be responsible for the maintenance, operation and repair of the surface water or stormwater management system. Maintenance of the surface water or stormwater system(s) shall mean the exercise of practices which allow the systems to provide drainage, water storage, conveyance or other surface water or stormwater management capabilities. The Association shall be responsible for such maintenance and operation.

q. Payment of assessments to the Master Association as provided in the Declaration of Covenants, Conditions and Restrictions of Cape Crossing Resort and Marina Living.

**SECTION 3.** **Initial Assessment.** The Initial Assessment for each Lot shall be Three Hundred Thirty One & 63/100 Dollars (\$331.63) payable at the time of closing. The Initial Assessment shall be a one-time assessment, and shall be due in addition to the Annual Assessments as provided herein.

**SECTION 4.** **Basis and Maximum of Annual Assessments.** The Annual Assessment shall be established each year by the Board of Directors. Each Lot's liability for the payment of assessments, regular or special, is determined by a fraction, the numerator of which is one and the denominator of which is the total number of Lots in CAPE CROSSING TOWNHOMES. There are a total of forty seven (47) Lots as shown on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES. The annual assessment may be increased each year by the Board of Directors of the Association to an amount not more than twenty percent (20%) above the maximum assessment for the previous year without a vote of approval by a majority of the membership. The Board of Directors of the Association may, after consideration of current maintenance costs and future needs of the Association, fix the actual assessment for any year at a lesser amount. The Board of Directors

of the Association may fix the annual assessment without notice or meeting of Members provided such assessment does not exceed the maximum increase set forth above.

**SECTION 5.** **Special Assessments for Capital Improvements.** In addition to the annual assessments authorized by Section 1 hereof, the Association may levy in any assessment year, a special assessment, applicable to that year only, for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair or replacement of a described capital improvement upon the Property including the necessary fixtures and personal property related to the Common Properties provided that such assessment shall have the assent of a majority of the votes (as defined in Article III, Section 2) of Members who are present in person or by proxy at a meeting duly called for that purpose, at which a quorum is present, written notice of which shall be sent to all Members at least ten (10) days in advance and shall set forth the purpose of the meeting. Notwithstanding any other provision in this Declaration the Association may levy a special assessment not exceeding One Thousand and No/100 ($1,000.00) Dollars per lot at anytime for the purposes stated herein without the approval of the Owners or Members.

**SECTION 6.** **Change in Basis and Maximum of Annual Assessments.** Subject to the limitations of Section 4 hereof, and the periods therein specified, the Association may change the maximum and basis of the assessments fixed by Section 4 hereof prospectively for any such period provided that any such change shall have the assent of the majority of the votes (as defined in Article III, Section 2) of the Members who are present in person or by proxy, at a meeting duly called for that purpose, at which a quorum is present, written notice of which shall be sent to all Members at least fifteen (15) days and not more than sixty (60) days in advance and shall set forth the purpose of the meeting.

**SECTION 7.** **Quorum for any Action Authorized Under Sections 5 and 6.** The Quorum required for an action authorized by Sections 5 and 6 hereof shall be as follows:

The presence of a majority of the members entitled to vote, in person or by proxy, at a duly called meeting of the members shall constitute a quorum. If the required quorum is not forthcoming at any meeting, another meeting may be called, subject to the notice requirement set forth in Sections 5 and 6, and the required quorum at any such subsequent meeting shall be thirty percent (30%) of all the votes of the membership, provided that no such subsequent meeting shall be held more than fifteen (15) days following the preceding meeting.

**SECTION 8.** **Date of Commencement of Annual Assessments; Due Dates.** The annual assessments provided for herein shall commence on that date (which shall be the first day of the month) fixed by the Board of Directors of the Association to be the date of commencement. One-twelfth (1/12) of the annual assessment is due and payable on the first day of each month.

The due date of any special assessment under Section 5 hereof shall be fixed in the resolution authorizing such assessment.

**SECTION 9.** **Duties of the Board of Directors.** In addition to such other duties vested in the Board of Directors of the Association in the Articles of Incorporation and the By-Laws of the Association, the Board of Directors of the Association shall fix the date of commencement and the amount of the assessment against each Lot for each assessment period at least thirty (30) days in advance of such date or period and shall, at that time, prepare a roster of the properties and assessments applicable thereto which shall be kept in the office of the Association and shall be open to inspection by any Owner.

Written notice of the assessment shall thereupon be sent to every Owner subject thereto.

The Association shall, upon demand at any time, furnish to any Owner liable for said assessment, a certificate in writing signed by an officer of the Association, setting forth whether said assessment has been paid. Such certificate shall be conclusive evidence of payment of any assessment therein stated to have been paid.

**SECTION 10.** **Effect of Nonpayment of Assessment: The Personal Obligation of the Owner; The Lien; Remedies of Association.** If an assessment is not paid on the date when due

(being the dates specified in Section 8 hereof), then such assessment shall become delinquent and shall, together with such interest thereon, late charges and cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the Lot to which such assessment relates.

If the assessment is not paid within thirty (30) days after the delinquency date, the assessment shall bear interest from the date of delinquency at the rate of eighteen percent (18%) per annum.

The Association has a lien on each lot to secure the payment of assessments and other amounts provided for in this section. Except as otherwise set forth in this section, the lien is effective from and shall relate back to the date on which the original Declaration of Cape Crossing Townhomes was recorded. However, as to first mortgagees of record, the lien is effective from and after recording of a claim of lien in the Public Records of Brevard County. This paragraph does not bestow upon any lien, mortgage or certified judgment of record on July 1, 2008, including the liens unpaid assessments created in this section, a priority that by law, the lien, mortgage or judgment did not have before July 1, 2008.

To be valid, a claim of lien must state the description of the lot, the name of the record owner, the name and address of the Association, which is Cape Crossing Townhomes Homeowner's Association, Inc. and whose address is the mailing address set forth in the annual report of the Association filed with the Florida Department of State Division of Corporations, which is available to all members on Sunbiz, the assessment amount due and the due date. The claim of lien shall secure all unpaid assessments that are due and that may accrue subsequent to the recording of the claim of lien and before entry of a certificate of title, as well as interest, late charges and reasonable costs and attorney fees incurred by the Association incident to the collection process. The person making the payment is entitled to a satisfaction of lien upon payment in full.

By recording a notice in substantially the following form, the lot owner or the lot owner's agent or attorney may require the Association to enforce the recorded claim of lien against his or her lot:

**Notice of Contest of Lien**

To: Cape Crossing Townhomes Homeowner's Association, Inc.
2750 Tingley Drive
Merritt Island, FL 32953

You are notified that the undersigned contest the claim of lien filed by you on ______, 20__, and recorded in Official Records Book _____, Page _____ of the Public Records of Brevard County, Florida and that the time within which you may file suit to enforce the lien is limited to ninety (90) days following the date of service of this notice.

Executed this ___ day of ____________________, 20___.

Signed :_________________________
Owner or Attorney

After the Notice of Contest of Lien has been recorded, the clerk of the circuit court shall mail a copy of the recorded notice to the Association by certified mail, return receipt requested, at the address shown in the claim of lien or most recent amendment to it and shall certify to the service on the face of the notice. Service is complete upon mailing. After service, the Association has ninety (90) days in which to file an action to enforce the lien and, if the action is not filed within the ninety (90) day period the lien is void. However, the ninety (90) day period shall be extended for any length of time that the Association is prevented from filing its action because of an automatic stay resulting from the filing of a bankruptcy petition by the lot owner or by any other person claiming interest in the lot.

The Association may bring an action in its name to foreclose a lien for assessments in the same manner in which a mortgage of real property is foreclosed and may also bring an action to recover a money judgment for the unpaid assessments without waiving any claim of lien. The Association is entitled to recover its reasonable attorney fees incurred in the action to foreclose the liens or an action to recover a money judgment for unpaid assessments.

A lot owner, regardless of how his or her title to property has been acquired, including by purchase at a foreclosure sale or by deed in lieu of foreclosure is liable for all assessments that come due while he or she is the lot owner. The lot owner's liability for assessments may not be avoided by waiver or suspension of the use or enjoyment of any common areas or by abandonment of the lot upon which the assessments are made.

A lot owner is jointly and severally liable with the previous lot owner for all unpaid assessments that came due up to the time of transfer. This liability is without prejudice to any right the present lot owner may have to recover any amounts paid by the present owner from the previous owner.

The liability of the first mortgagee, or its successor or assignee as a subsequent holder of the first mortgage who acquires title to a lot by foreclosure or by deed in lieu of foreclosure for the unpaid assessments that became due before the mortgagee's acquisition of title, shall be the lesser of:

1. The lot's unpaid common expenses and regular periodic or special assessments that accrued or came due during the twelve (12) months immediately preceding the acquisition of title and for which payment in full has not been received by the Association;

2. One (1%) percent of the original mortgage debt.

The limitations on first mortgagee liability provided by this paragraph apply only if the first mortgagee filed suit against the lot owner and initially joined the Association as a defendant in the mortgage foreclosure action. Joinder of the Association is not required if, on the date the complaint is filed, the Association was dissolved or did not maintain an office or agent for service of process at a location that was known to or reasonably discoverable by the mortgagee.

The Association may charge an administrative late fee in an amount not to exceed the greater of $25.00 or five (5%) percent of the amount of each installment if paid past the due date.

Any payment received by the Association and accepted shall be applied first to any interest accrued, then to any administrative late fees, then to any costs and reasonable attorney fees incurred in collection, and then to the delinquent assessments. This paragraph applies notwithstanding any restrictive endorsement, designation, or instruction placed on or accompanying payment. A late fee is not subject to provisions of Chapter 687, Florida Statutes, and is not a fine.

The Association may not file a lien against the lot for unpaid assessments unless a written notice or demand for past due assessments as well as any other amounts owed to the Association has been made by the Association. The written notice or demand must:

a. Provide the owner with forty-five (45) days following the date the notice is deposited into the mail to make payment for all amounts due, including, but not limited to, any attorney fees and actual costs associated with the preparation and delivery of the written demand.

b. Be sent by registered or certified mail, return receipt requested, and by first class United States mail to the lot owner at his or her last address as reflected in the records of the Association, if the address is within the United States, and to the lot owner subject to the demand at the address of the lot if the owner's address is reflected in the records of the Association is not the lot address. If the address reflected in the records is outside the United States, then sending the notice to that address and to the lot address by first class United States mail is sufficient.

The Association may bring an action in its name to foreclosure a lien for unpaid assessments secured by a lien in the same manner that a mortgage of real property is foreclosed and may also bring an action to recover a money judgment for the unpaid assessments without waiving any claim of lien. The action to foreclose the lien may not be brought until forty-five (45) days after the lot owner has been provided notice of the Association's intent to foreclose and collect the unpaid amount. The notice must be given in the manner provided in the paragraph above, and the notice may not be provided until the passage of the forty-five (45) days required for the written notice or demand for payment has occurred.

The Association may recover any interest, late charges, costs and reasonable attorney fees incurred in a lien foreclosure action or in an action to recover a money judgment for the unpaid assessments.

The time limitations in this Section 9 do not apply if the lot is subject to a foreclosure action or forced sale of another party, or if an owner of the lot is a debtor in a bankruptcy proceeding.

If the lot is occupied by a tenant and the lot owner is delinquent is paying any monetary obligation due to the Association, the Association may demand that the tenant pay to the Association the subsequent rental payments and continue to pay such payments until all the monetary obligations of the lot owner related to the lot have been paid in full to the Association and the Association releases the tenant or until the tenant discontinues tenancy in the lot.

The Association must provide the tenant a notice, by hand delivery or United States mail, in substantially the following form:

> Pursuant to Section 720.3085(8), Florida Statutes, we demand that you make your rent payment directly to the Homeowner's Association and continue doing so until the Association notifies you otherwise.
>
> Payment due the Homeowners Association may be in the same form as you paid your landlord and must be sent by United States mail or hand delivery to Cape Crossing Townhomes Homeowner's Association, Inc., 2750 Tingley Drive, Merritt Island, FL 32953 payable to the President.
>
> Your obligation to pay your rent to the Association begins immediately, unless you have already paid rent to your landlord for the current period before receiving this notice. In that case, you must provide written proof of your payment within fourteen (14) days after receiving this notice and your obligation to pay rent to the Association will then begin with the next rental period.
>
> Pursuant to Section 720.3085(8), Florida Statutes, your payment of rent to the Association gives you complete immunity from any claim for the rent by your landlord.

The tenant is immune from any claim by the lot owner related to the rent timely paid to the Association after the Association has made written demand.

If the tenant paid rent to the landlord or lot owner for a given rental period before receiving the demand from the Association and provides written evidence to the Association of having paid the rent within fourteen (14) days after receiving the demand, the tenant shall begin making rental payments to the Association for the following rental period and shall continue making rental payments to the Association to be credited against the monetary obligations of the lot owner until the Association releases the tenant or the tenant discontinues tenancy in the unit. The Association shall, upon request, provide the tenant with written receipts for payments made. The Association shall mail written notice to the lot owner of the Association's demand that the tenant pay monetary obligation to the Association.

The liability of the tenant may not exceed the amount due from the tenant to the tenant's landlord. The tenant shall be given a credit against rents due to the landlord in the amount of assessments paid to the Association.

The Association may issue notice under Section 83.56, Florida Statutes, and sue for eviction under Sections 83.59 – 83.625, Florida Statutes, as if the Association were a landlord under Part II of Chapter 83, Florida Statutes, if the tenant fails to pay a monetary obligation. However, the Association is not otherwise considered a landlord under Chapter 83, Florida Statutes and specifically has no obligations under Section 83.51, Florida Statutes.

The tenant does not, by virtue of payment of monetary obligations, have any of the rights of a lot owner to vote in any election or to examine the books and records of the

Association.

The Court may supersede the effect of this Section by appointing a receiver.

In any action by a homeowner's association for unpaid assessments, the lot owner shall pay into the court registry the amount alleged in the complaint as unpaid, or if such amount is contested, such amount as is determined by the court, plus any assessments accruing during the pendency of the action, when due, unless the owner has interposed the defense of payment or satisfaction of the assessments in the amount the complaint alleges as unpaid. However, even if the defense of payment or satisfaction has been asserted, the court may order the owner to pay into the court registry the assessments accruing during the pendency of the action. If the owner does not dispute the amount of accrued assessments, the owner must pay the amount alleged in the complaint into the court registry on or before the date on which his or her answer to the claim for unpaid assessments is due. If the owner contests the amount of accrued assessments, the owner must pay the amount determined by the court into the court registry on the day that the court makes its determination. The court may, however, extend these time periods to allow for later payment upon good cause shown.

If the owner contests the amount of money to be placed into the court registry, any hearing regarding such dispute shall be limited to only the factual or legal issues concerning;

(a) Whether the owner has been properly credited by the Association with any assessment payments made; and

(b) What properly constitutes assessments under the governing documents.

The court, on its own motion, shall notify the owner that assessments must be paid into the court registry by order, which shall be issued immediately upon filing the owner's initial pleading, motion, or other paper.

The filing of a counterclaim for money damages does not relieve the owner from depositing assessments due into the registry of the court.

Failure of the owner to pay the assessments into the court registry pursuant to court order is an absolute waiver of the owner's defenses. In such case, the Association is entitled to an immediate default without further notice or hearing thereon.

If the Association is suffering hardship resulting from the loss of assessment income from the unit, the Association may apply to the court for disbursement of all or part of the funds held in the court registry.

**SECTION 11.** **<u>Exempt Property.</u>** The following property subject to this Declaration shall be exempted from the assessments, charges and liens created herein:

a. All properties to the extent of any easement or other interest therein dedicated and accepted by the local public authority and devoted to public use.

b. All Common Properties as defined in Article I.

c. All properties exempted from taxation by the laws of the State of Florida, upon the terms and to the extent of such legal exemption.

d. The Developer shall be excused from the payment of Assessments for lots owned by the Developer until the Developer transfers control of the Association to lot Owners other than the Developer; provided the Developer shall pay any operating expenses that are incurred by the Association and not produced by the assessments levied against lot Owners other than the Developer.

Notwithstanding any provisions herein, no townhouse lot shall be exempt from said easements, charges or liens.

**SECTION 12. Uniform Rate of Assessment.** Both annual and special assessments must be fixed at a uniform rate for all Lots (regardless of size or location). Assessments may be paid monthly, quarterly, semi-annually or annually at the sole discretion of the Board.

**SECTION 13. Developer's Guaranty of Operating Expenses and Assessments.** The Developer shall be excused from the payment of its share of operating expenses or common expenses and assessments related thereto on the lot its owns in CAPE CROSSING TOWNHOMES for the period of time commencing with the recording of the Declaration of Covenants, Conditions and Restrictions until turnover of control of the Association to Owners other than the Developer, during which period of time Developer has obligated itself to pay any operating expenses or common expenses incurred by the Association that exceeds the assessments receivable from the other members and other income of the Association. The Developer guarantees that the assessments for operating expenses or common expenses of CAPE CROSSING TOWNHOMES imposed upon the Owners shall not increase over the stated amount of $331.63 for the year beginning with the recording of the Declaration of Covenants, Conditions and Restrictions, $365.00 for the second year from the recording date of the Declaration of Covenants, Conditions and Restrictions and $395.00 for the third year from the recording date of the Declaration of Covenants, Conditions and Restrictions and obligates itself to pay any amount of operating expenses or common expenses incurred during said periods of time not produced by the assessments at the guaranteed level. Thereafter, the monthly assessment per lot shall not exceed $412.32 per month for one additional year. The Developer's guaranty of the budget shall terminate upon transfer of control of the Association to unit owners other than the Developer .

**SECTION 14. Reserves for capital improvements and deferred maintenance.** In additional to the annual operating expenses, the budget may include reserve accounts for capital expenditures and deferred maintenance for which the Association is responsible. Reserve accounts shall be established for roof replacement and repainting of the townhomes. The amount to be reserved shall be computed by means of a formula that is based upon estimating remaining useful life and estimated replacement costs or deferred maintenance expense of each reserve item. The Association may adjust the replacement reserve assessments annually to take into account any changes in estimates of costs or useful life of the reserve item. After transfer of control of the Association to Owners other than the Developer, on a majority vote at a meeting at which a quorum is present, the Association may provide for no reserves or less reserves as required by the HOA Act. After turnover, the Developer may vote its voting interest to waive or reduce the funding of reserves. Any vote taken to waive or reduce reserves is applicable only to one budget year. The amount of the contribution to each reserve account is the sum of the following two calculations:

a. The total amount necessary, if any, to bring a negative component balance to zero.

b. Total estimated deferred maintenance expense or estimated replacement cost of the reserve component less the estimated balance of the reserve component as of the beginning of the period the budget will be in effect. The remainder, if greater than zero, shall be divided by the estimated remaining useful life of the component. The formula may be adjusted each year for changes in estimates and deferred maintenance performed during the year and may include factors such as inflation and earnings on invested funds. The reserve account may be terminated upon approval of a majority of the total voting interest of the Association. Upon such approval, the terminated reserve account shall be removed from the budget.

## ARTICLE VI.
## GENERAL USE RESTRICTIONS AND CONSTRUCTION REQUIREMENTS

**SECTION 1. General Lot Use Restrictions.**

a. All garage doors must be maintained in a reasonable well maintained condition by the townhouse owner. No garage shall be converted to living quarters. Garage doors must be kept closed except when the garage is in use.

b. Private swimming pools may not be constructed. Above ground pools are

prohibited.

c. No fence shall be constructed or maintained on any Lot except with the prior written consent of the Association.

d. No townhouse or any part thereof shall be used for any purpose except as a private dwelling, nor shall any business of any kind be conducted therein. No business or trade of any kind, including transient rentals, or noxious or offensive activity shall be carried on upon any Lot within or without the dwelling, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood. No trailer, tent, shack or other such structure shall be located, erected or used on any Lot, temporarily or permanently, except that building contractors may erect and maintain temporary structures, including trailers, during the period of residential construction in the subdivision and as incident thereto. Nothing may be attached to or placed on the common property without prior approval. Nothing shall be affixed permanently or temporarily to the building without approval. No hoses are to be stored where visible from the road or neighboring lots.

e. Air conditioning units, pumps, and other apparatus must be screened with landscaping or appropriate fencing.

f. There are private parking spaces located in front of each Townhome as shown on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES for the exclusive use of the Owner of the Townhome. Parking is not allowed on any driveway or road right of ways. No resident shall park any boat, motor home, trailer, commercial van or other commercial vehicle in any driveway or on any part of a Lot. Commercial vehicles include trucks with more than four tires or over 3/4 ton, and/or vehicles with temporary or permanent signage affixed. No non-operating or non-functioning vehicle of any kind shall be permitted to be parked in the yard or in the driveway of any Lot or on any street in the Property. The parking of commercial vehicles, which description shall include, but not be limited to trucks, truck-tractors, semi-trailers and commercial trailers as well as the parking of any travel or recreation trailers, including self-propelled or those towed, as well as any mobile homes, at any time on driveways or otherwise on said premises is prohibited except for loading or unloading purposes or when parked entirely within a garage. There shall be no repair, except emergency repair, performed on any motor vehicle or boat on or adjacent to any lot in this subdivision. It is acknowledged and agreed by all Owners of lots in this subdivision by purchasing said property that a violation of any of the provisions of this paragraph shall impose irreparable harm to the other Owners in this subdivision. Said Owners further agree that a reasonable assessment of such damages would be $100.00 for each day that such violation persists after an Owner of a Lot is notified, in writing, of such violation by either the Developer or a duly elected representative of the Association.

**SECTION 2. Animals.** No reptiles, animals, livestock or poultry of any kind shall be raised, bred or kept on any Lot, except for dogs, cats, birds or other usual and customary household pets, provided that the same are not kept, raised or maintained for business or commercial purposes or in numbers deemed unreasonable by the Developer or Association in the exercise of their reasonable discretion. Numbers in excess of two (2) of each such type of household pets (excluding aquarium-kept tropical fish) shall prima facie be considered unreasonable. All domestic pets shall either be kept on a leash and be within the control of the pet's Owner or be kept within an enclosed area on the respective Owner's Lot at all times. Owners must clean up after their pets, including their body wastes. Pets shall not create a nuisance.

**SECTION 3. Garbage.** Garbage or rubbish shall not be dumped or allowed to remain on any Lot. Garbage, rubbish or other debris, properly contained in a metal or plastic receptacle, shall be placed outside the dwelling for collection on the day, or after sunset on the day before scheduled collection, in accordance with the regulations of the collecting agency. At all other times, such receptacles shall be placed on the Lot so as not to be visible from the road.

**SECTION 4. Easements.**

a. Perpetual easements for the installation, construction, reconstruction,



a

maintenance, repair, operation and inspection of sewer, water and drainage facilities, for the benefit of the adjoining land Owners and/or Developer, authority, commission, municipality or other agency, supplying sewer, water and/or drainage facilities, are reserved as shown on the aforesaid subdivision plot plan or survey; also, easements in general in and over each Lot for the installation of water, sewer, cable television, electrical, gas and telephone facilities. No building or structure shall be erected nor any paving laid nor any filling or excavation done within the easement areas occupied by or reserved for such facilities. The easements described herein shall be shown on the recorded plot plan or survey as described above.

b. Developer and their successors and assigns shall at all times have the right of ingress and egress in, over, under and across the aforesaid easements, and a right-of-way easement for the purpose of installing, constructing, reconstructing, maintaining, repairing, operating and inspecting any such sewer, water, drainage, electric, gas and telephone facilities within such easements and right-of-way areas, along the lines designated for such purposes on the aforesaid plot plan or survey and shall also have an easement and right-of-way in general in and over each Lot for access to such easement areas and the facilities located therein, and for installing, operating, maintaining, repairing, inspecting and reading any meters appurtenant to such facilities. No foil shall be placed in windows. Owners shall be responsible for removing oil stains on driveway. No vehicles of any type shall be parked on grass.

c. The Developer and Association and its successors and assigns shall have at all times perpetual easements of ingress and egress in, over, under and across all lots to maintain and/or replace all landscaping, including grass, located outside of the building pads, if the owner fails to maintain his or her lot.

**SECTION 5. Billboards.** No billboards, signboards or advertising devices shall be maintained on any Lot except that this clause shall not limit the right of the homeowners to advertise their home for sale. Signs may not exceed six (6) square feet in size and must be approved by the Board of Directors in advance. Nothing herein contained shall limit the right of individual homeowners from placing on their own Lot one "For Sale" sign however, the sign must look professionally made and have Board of Directors approval. Political signs are prohibited. Signs in windows are prohibited, except security system warning labels not to exceed 10 square inches each.

**SECTION 6. Outside Installations.** No radio or television signals nor any other form of electromagnetic radiation shall be permitted to originate from any Lot which interferes with the reception of television or radio received upon any other Lot. No outside antenna for radio or television shall be constructed, erected or maintained at anytime on any Lot. Television satellite dishes may not be installed without specific prior written approval of the Board of Directors. However, the Board of Directors must conform to any and all Federal regulations regarding satellite dishes. Small satellite dishes that do not exceed 18" in diameter are permitted to be installed by Owners in locations approved by the Association.

**SECTION 7. No Offensive Activity.** No noxious or offensive activity shall occur on any Lot. Nothing contained herein shall prohibit or impair the business of Developer and Builders in developing all of the Lots as townhomes.

**SECTION 8. Insurance.** No Owner shall do or keep on a Lot anything which would increase the rate of insurance relating thereto without the prior written consent of the Board of Directors, and no Owner shall permit anything to be done or kept on his Lot which would result in the cancellation of insurance on any residence or which would be in violation of any law.

**SECTION 9. Window Air-Conditioning Units.** No window air conditioning units shall be permitted.

**SECTION 10. Recreational Facilities.** Skateboard ramps and devices of a similar nature shall not be permitted in the front yards, driveways, sidewalks or streets.

**SECTION 11. Solar Systems.** No solar heating system or any solar system shall be installed on a roof or otherwise without the prior written consent of the Association.

**SECTION 12.** **Burning.** No burning of leaves, trash, rubbish, garbage or other waste materials of any type shall be permitted or conducted on the Property. Nothing herein contained, however, shall be deemed to prohibit the burning of wood, logs or charcoal in properly constructed or installed fireplaces, barbecue cookers or the like, whether inside or outside of any building or other structure located on a Lot.

**SECTION 13.** **Storage Tanks** No storage tank, including but not limited to, those for water, oil, propane gas, or other liquid, fuels or chemicals, including those used for swimming pools or the like, shall be permitted outside of a Building on a Lot unless the same shall be underground or placed inside of walls, fences, landscaping screens or similar type enclosures. In no event shall any of the same be visible from any adjacent or neighboring Lots and Board of Directors approval must be obtained prior to installation.

**SECTION 14.** **Changes Affecting Drainage.** No Lot Owner, without the express prior written consent of the Board of Directors or Developer, shall construct any improvements or make any changes to a Lot which shall have the result of changing, altering or affecting the natural or artificial water courses, canals, ditches, swales, ponds or drainage of the Property, and all construction, grading and landscaping shall conform to the drainage swale requirements set forth on the plot plan or survey of the Property.

**SECTION 15.** **Rules and Regulations** In addition to the forgoing restrictions on the use of Lots, the Association shall have the right, power and authority, to promulgate and impose reasonable rules and regulations governing and/or restricting the use of a Lot and to thereafter change, modify, alter, amend, rescind and augment any of the same; provided, however, that no rules or regulations so promulgated shall be in conflict with the provisions of this Declaration. Any such rules and regulations so promulgated by the Association shall be deemed promulgated when adopted by the Board of Directors of the Association and shall be applicable to and binding upon all Lots and the Owners thereof and their successors and assigns, as well as all guests or invitees of and all parties claiming by, through or under such Owners.

**SECTION 16.** **Developer Rights.** Nothing contained in these Covenants and Restrictions shall be interpreted or construed to prevent the Developer, its successors or assigns, or the Developer's contractors or subcontractors, from going or performing on all or any part of the Property owned or controlled by the Developer whatever the Developer deems reasonably necessary in connection with the completion of the development, including without limitation:

a. erecting, constructing, maintaining thereon, such structures as may be reasonably necessary for the conduct of the Developer's business of completing the development and establishing the Property as a townhome community and disposing of the same in Lots and Townhomes by sale, lease or otherwise;

b. conducting thereon its or their business;

c. maintaining a sales office on any Lot or on the Property;

d. placing signs on lots and/or Common Properties; or

**SECTION 17.** **Waiver of Minor Violations.** Where an improvement has been erected or the construction thereof is substantially advanced and it is situated on any lot in such a manner that same constitutes a violation or violations of any of this Declaration, the Association, its successors and/or assigns shall have the right at any time to release such lot or portions thereof from such part of the provisions of said Declaration as are violated, provided, however, that said Association, its successors and/or assigns, shall not release a violation or violations of any of said Declaration except as to violations it determines to be minor, in its sole discretion, and the power to release any such lot or portions thereof from such a violation or violations shall be dependent on a determination by the Association that such violation or violations are minor.

**SECTION 18.** **Underground Utilities.** Underground utilities must be installed; above ground utility lines are prohibited.

SECTION 19. **Landscaping.** No Owner is permitted to alter the landscaping outside of the building pad on any lot. No plants may be planted or removed by the Owner. Owners wishing to alter landscaping must submit a plan to the Board of Directors and receive written approval before making any changes.

SECTION 20. **Rentals.** The Townhome may be rented provided the occupancy is only by one (1) lessee and members of his immediate family and guests. There is no minimum rental period and rentals are unrestricted. The unrestricted rental periods shall not be amended without the approval of at least ninety (90%) percent of the Townhome Owners (i.e. at least –forty -three (43) of the forty-seven (47) Townhome Owners must vote for the modification or amendment) at a duly called meeting of the Association for the purpose of amending the rental restrictions. No lease of a unit shall release or discharge the owner thereof of compliance with this Section X or any of his other duties as a Townhome Owner. Time sharing of Townhomes is prohibited. Subleasing of units is prohibited. All leases shall be in writing and shall be subject to this Declaration, the Articles of Incorporation, By-Laws, and the Rules and Regulations of the Association and shall be approved by the Association, in its sole discretion.

## ARTICLE VII.
## SPECIAL RESTRICTIONS AFFECTING OPEN SPACE AREAS AND COMMON PROPERTIES

SECTION 1. **General Intent.** It shall be the intent and purpose of these special restrictions and covenants to maintain and enhance certain areas designated and shown on the Plot Plan or Survey hereafter filed for record in the Office of the Clerk of the Court of Brevard County, Florida with respect to the Property as open space areas or Common Properties.

SECTION 2. **Buildings.** It is expressly understood and agreed that no building, tent, trailer or other structure, either temporary or permanent, except as noted elsewhere herein and except as may be approved by the Board of Directors of the Association, shall be erected or caused to be placed on any lands shown and set aside on the recorded subdivision Plot Plan or Survey as a Common Property hereafter filed for record in the Office of the Clerk of the Court of Brevard County, Florida with respect to the Property.

SECTION 3. **Trash.** No dumping of trash, garbage, sewage, sawdust or any unsightly or offensive material shall be placed upon Common Properties.

SECTION 4. **Association Maintenance of Retention and Common Areas.** The Areas shown as retention areas and common areas, on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES, are Common Properties as defined in Section 1 (hereinafter collectively referred to as "Water Management Areas"). The Water Management Areas shall be the perpetual responsibility of the Association and may in no way be altered from its natural state. Activities prohibited within Conservation Areas and Retention Areas include, but are not limited to, (i) construction or placing of buildings on or above ground; (ii) dumping or placing of soil or other substances such as trash; (iii) removal or destruction of trees, shrubs or other vegetation with the exception of exotic vegetation removal; (iv) excavation, dredging or removal of soil material; (v) diking or fencing except as authorized by the appropriate governmental agencies.

SECTION 5. **Retention and Common Areas Easement.** There is hereby reserved and granted to the Developer and the Association, their agents, employees, successors and assigns, the right and privilege to enter over, upon and across those areas designated as retention areas and common areas ("Common Areas" and "Retention Areas") on the Plot Plan or Survey of CAPE CROSSING TOWNHOMES for the purpose of maintenance of said Areas. The rights, privileges and easements granted by this Section may be assigned by the Developer of the Association to the County of Brevard, Florida, in the event a Municipal Service Taxing Unit (MSTU) is established to provide for the operation and maintenance of the Retention Area. The rights, privileges and easements granted by this Section shall not be exercised in a manner inconsistent to the establishment and operation of an MSTU.

SECTION 6. **Swale Areas.** The Association shall be responsible for the maintenance,

operation, and repair of the swales on the homeowner's property. Maintenance, operation, and repair shall mean the exercise of practices, such as mowing and erosion repair, which allow the swales to provide drainage, water storage, conveyance or other stormwater management capabilities as permitted by the St. Johns River Water Management District. Filling, excavating, or other obstructing of the surface water flow in the swales is prohibited.

## ARTICLE VIII.
## GENERAL PROVISIONS

**SECTION 1. Duration.** The covenants and restrictions of this Declaration shall run with and bind the land, and shall inure to the benefit of and be enforceable by the Association, or the Owner of any Lot subject to this Declaration, their representatives, legal representatives, heirs, successors and assigns, for a term of thirty (30) years from the date this Declaration is recorded, after which time the covenants may be extended as provided by the Marketable Record Title Act, Chapter 712, Florida Statutes, and the Homeowner's Act, Chapter 720, Florida Statutes.

**SECTION 2. Notices.** Any notice required to be sent to any Member or Owner under the provisions of this Declaration shall be deemed to have been properly sent when mailed, postpaid, to the last known address of the person who appears as Member or Owner on the records of the Association at the time of such mailing.

**SECTION 3. Enforcement.**

a. In the event of a violation of or failure to comply with the provisions of the Declaration of Covenants, Conditions and Restrictions, and the failure of the Owner of the affected Lot, within ten (10) days following written notice by the Association of such violation or non-compliance and the nature thereof, to cure or remedy such violation, then the Developer, its successors or assigns and licensees, and/or the Association (acting through its Board of Directors) or its duly appointed employees, agents or contractors, shall have and are specifically granted the right and privilege of an easement and license to enter upon the affected Lot or any portion or portions thereof or Improvements thereon, without being guilty of any trespass therefor, for the purpose of undertaking such acts or actions as may be reasonably necessary to cure or eliminate such violation, including injunctive relief; all at the sole cost and expense of the Owner of the affected Lot. Such costs and expenses, together with an overhead expense to the Association of fifteen percent (15%) of the total amount thereof shall be assessed by the Association as an Individual Lot Assessment as provided in this Declaration to the affected Lot and the Owner thereof. Any such Individual Lot Assessment shall be payable by the Owner of the affected Lot to the Association within ten (10) days after written notice of the amount thereof. Any such Individual Assessment not paid within said ten (10) day period shall become a lien on the affected Lot in accordance with the provisions of this Declaration. Reasonable fines in accordance with laws governing Associations, may be established by the Board of Directors and some fines are established herein.

b. The Association, acting through its Board of Directors, and/or the Developer shall have the right to enforce, by a proceeding at law or in equity, all restrictions, conditions, covenants, reservations, liens, and other changes now or hereinafter imposed by the provisions of this Declaration. Failure by the Association to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter. If the Association shall fail to enforce any covenant or restriction herein contained, then, after giving sixty (60) days, written notice to the Association, any Lot Owner may proceed if the Association has not done so within said sixty (60) day period.

**SECTION 4. Easement Reserved Unto Developer Over Lots.** The Developer hereby reserves unto itself an easement of ingress and egress over, upon, under and across all Lots as shown on any recorded subdivision plot plan or survey of the Property and such easement shall include, but shall not be limited to the right to use the said Common Property area to erect, maintain and use electric and telephone poles, wires, cables, conduits, sewers, water mains and other suitable equipment for the conveyance and use of electricity, telephone equipment, gas, sewer, water or other public conveniences or utilities and the right to cut any trees, bushes or shrubbery, make any

gradings of the soil, or take any other similar action reasonably necessary to provide economical and safe utility installation and to maintain reasonable standards of health, safety and appearance and the right to locate wells, pumping stations and tanks; provided, however, that said reservation and right shall not be considered an obligation of the Developer to provide or maintain any such utility or service.

**SECTION 5.** **Severability.** Invalidation of any one of these covenants or restrictions by Judgment or Court Order shall in no wise affect any other provisions which shall remain in full force and effect.

**SECTION 6.** **Subdivision of Lots.** No Lot shall be subdivided, or boundaries changed except with the written consent of the Association and as provided by rules, ordinances and regulations of applicable governmental agencies.

**SECTION 7.** **Amendment by Developer.**

a. So long as the Developer owns one lot in CAPE CROSSING TOWNHOMES notwithstanding anything to the contrary contained herein, Developer shall have the right to amend this Declaration without the consent, approval or joinder of any other person or Owner subject to (b) below.

b. The amendment of this Declaration, the Articles of Incorporation or Bylaws of the Association need be signed and acknowledged only by the Developer and need not be approved by the Association or Lot Owners or lienors or mortgagees of Lots, whether or not elsewhere required for an amendment.

c. All amendments hereto will be recorded in the Public Records of Brevard County, Florida.

**SECTION 8.** **Amendments by Association.** After turnover of control of the Association by the Developer, this Declaration of Covenants and Restrictions may be altered by a majority vote of the Board of Directors of the Association and the Owners and any such amendment shall thereafter be recorded in the Public Records of Brevard County, Florida, and shall thereupon become a part of this Declaration of Covenants, Conditions and Restrictions as though the same were first set out herein, unless otherwise specified in this document.

**SECTION 9.** **Indemnification.** Every Board member and every officer of the Corporation, including Board members and/or officers appointed by the Developer, shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed upon him in connection with any proceeding to which he may be a party, or in which he may become involved by reason of his being or having been a Board member of officer of the Corporation, whether or not he is a Board member or officer of the Corporation at the time such expenses are incurred, except in such cases wherein the Board member of officer is adjudged guilty of willful misfeasance or malfeasance in the performance of his duties.

**SECTION 10.** **Party Wall.** The Townhomes situated upon the Property are designed so that adjacent townhomes share a common wall. This common wall is a Party Wall and the Owners acknowledge and agree that their townhomes are subject to the covenants, restrictions, easements, charges and liens hereinafter set forth:

a. It is hereby declared that the Party Wall, and any extensions of it, shall be legally deemed to be a party wall in all respects and shall be subject to the Covenants and Restrictions set forth in this Section 10.

b. Both Owners sharing a party wall acknowledge that they have physically examined the Party Wall prior to taking title to their townhome or will do so prior to occupying the townhome and it is agreed that both Owners waive any and all claims, damages, demands, actions, proceedings, rights, or remedies that each may have as against the other arising out of or relating to the Party Wall or any extension or addition thereto or appurtenance thereto as constructed.

c. In the event of damage or destruction of the Party Wall from any causes, other than the negligence of either Owner, the then Owners shall, at joint and equal expense, repair or rebuild the Party Wall on the same spot and on the same line, and of the same size, and of the same or similar material and of like quality with the present wall, and each Owner, his heirs, successors, and assigns shall have the right to the use of the Party Wall so repaired or rebuilt. The parties agree that repairs and reconstruction of the Party Wall shall be undertaken wherever a condition exists which may result in damage or injury to the person or property if repair or reconstruction work is not undertaken. Either Owner, upon discovering the possibility of damage or destruction, shall notify the other of the nature of the damage, the work required to remedy the situation, and the estimated cost of the repair or reconstruction. The other Owner shall then have twenty days from the receipt of the notice either to object to the repairs or reconstruction or to pay the Owner's share of the cost of the work. However, in the event of an emergency (i.e., a condition that is immediately threatening to the safety of persons or property) the other Owner shall then have five days from the receipt of the notice, which notice shall state than an emergency exists, either to object to the repairs or reconstruction or to pay the Owner's share of the cost of the work.

If either Owner's negligence shall cause damage to or destruction of the Party Wall, the negligent Owner shall bear the entire cost of repair or construction.

If either Owner shall neglect or refuse to pay the Owner's share, or all of the cost in case of negligence, the other Owner may have the wall repaired or restored and shall be entitled to have a construction lien, lis pendens on the property of the Owner failing to pay for the amount of such defaulting Owner's share of the repair or replacement cost shall be entitled to foreclose its lien in the same manner as the Association if the Association is entitled to foreclose its assessment liens as provided in the Declaration and By-Laws of the Association. In the event of a foreclosure of a lien for repair or replacement costs, the prevailing party shall be entitled to reasonable attorney fees and costs.

d. Each Owner and their respective successors, heirs, or assigns shall have an easement in that part of the land of the other on which the Party Wall is located, as may be necessary or desirable to carry out the terms of this Section 10.

Each Owner and their respective successors, heirs, assigns, contractors, licensees, agents, and employees shall have an easement in that part of the Property of the other necessary or desirable to repair, restore, or extend the Party Wall.

Each Owner shall permit the other Owner and the other Owner's contractors, licensees, agents and employees to enter their Property for the purpose of repairing, restoring and/or extending the Party Wall and shall secure the permission of the tenants, if any, occupying the townhome for such entrance.

e. Any notice or report required under this Section 10, shall be sent to the Owners at the addresses maintained by the Association, unless the address is changed by written notice to the other Owner, in which event the new address given shall be used for the sending of the notice or report. In addition, any notice or report shall be sent by certified mail, properly addressed and postage paid.

f. Each Owner shall be required to obtain, and maintain, "All Risk" insurance for the interior of his/her respective townhome. Owners shall not do or permit any act or thing to be done in or to the Townhome or Party Wall which is contrary to law or which invalidates or is in conflict with the Owner's policy of insurance. An Owner who fails to comply with the provisions of this paragraph shall pay all costs, expenses, liens, penalties, or damages which may be imposed upon the Owners by reason thereof.

g. Each Owner agrees to indemnify the other Owner against the Owner's share of the liability for injury or personal or property damage, when such injury or damage shall result from, arise out of, or be attributable to any maintenance or repair undertaken by the Owner pursuant to this Section 10.

h. Upon any transfer of title to the Property, the Owner (Grantor) and the Purchaser (Grantee) of such property shall be jointly and severally liable for all unpaid amounts pertaining to the Party Wall accrued up to the date of the conveyance without prejudice to the rights of the Grantee but the Grantee shall be exclusively liable for those accruing after the conveyance. In the event that an Owner shall place a mortgage on the Lot, the lien of the mortgage shall be deemed to attach to the Owner's rights, privileges, and obligations under this Section 10, so that if the Owner should be in default of any of the terms of the mortgage and the default shall result in foreclosure of the mortgage, all of the rights, privileges, and obligations shall inure to the mortgagee and its assigns.

i. The Owners understand, agree, and consent that any controversy or difference arising between the Owners with respect to any of the provisions of this Section 10 shall be resolved as provided in the By-laws of the Association.

j. Either Owner shall have the right to use the side of the Party Wall facing the Owner's Lot in any lawful manner, including attaching structural or finishing materials to it; however, a party shall not create windows or doors or place air conditioning equipment in the Party Wall without the consent of the other Owner.

## ARTICLE IX.
## FINES

The Association may levy reasonable fines and suspensions as follows:

a. The Association may levy reasonable fines of up to One Hundred & 00/100 Dollars ($100.00) per violation against any member or member's tenant, guest or invitee for the failure of the owner of the lot or its occupant, licensee or invitee to comply with any provision of the Declaration, the Association By-Laws or reasonable rules of the Association. A fine may be levied for each day of a continuing violation with a single notice and opportunity for hearing, except that the fine may not exceed One Thousand & 00/100 Dollars ($1,000.00) in the aggregate unless otherwise provided in the governing documents. A fine of less than One Thousand & 00/100 Dollars ($1,000.00) may not become a lien against a lot. However, fines in excess of One Thousand & 00/100 Dollars ($1,000.00) may become liens against the lot. In any action to recover a fine, the prevailing party is entitled to reasonable attorney fees and costs from the non-prevailing party as determined by the court. The maximum fine that may be levied by the Association is unlimited.

b. An Association may suspend, for a reasonable period of time, the right of a member, or member's tenants, guests, or invitees to use the common areas and facilities for the failure of the owner of the lot or its occupants, licensees or invitees to comply with any provision of the Declaration, the Association By-laws, or reasonable rules of the Association.

c. A fine or suspension may be not be imposed without at least fourteen (14) days notice to the person sought to be fined or suspended and an opportunity for a hearing before a committee of at least three (3) members appointed by the Board who are not officers, directors, or employees of the Association, or the spouse, parent, child, brother or sister of an officer, director or employee. If the committee, by a majority vote does not approve a proposed fine or suspension, it may not be imposed. If the Association imposes a fine or suspension, the Association must provide written notice of such fine or suspension by mail or hand delivery to the lot owner and, if applicable, to any tenant, licensee or invitee of the lot owner.

d. If a member is more than ninety (90) days delinquent in paying a monetary obligation due to the Association, the Association may suspend the rights of the member or the members tenants, guests or invitees, to use common areas and facilities until the monetary obligation is paid in full. This subsection does not apply to that portion of common areas used to provide access or utility services to the lot. Suspension does not impair the right of an owner or tenant of a lot to have vehicular and pedestrian ingress to and egress from the lot, including, but not limited to, the right to park. The

notice and hearing requirements under subsection (c) do not apply to a suspension imposed under this subsection.

e. An Association may suspend the voting rights of a lot or member for the non-payment of any monetary obligation due to the Association that is more than ninety (90) days delinquent. A voting interest or consent right allocated to a lot or member which has been suspended by the Association may not be counted toward the total number of voting interests for any purpose, including, but not limited to, the number of voting interests necessary to constitute a quorum, the number of voting interests required to conduct an election, or the number of voting interests required to approve an action under the Homeowners Act or pursuant to the governing documents. The notice and hearing requirements under subsection (c) do not apply to a suspension imposed under this subsection. The suspension ends upon payment of all obligations currently due or overdue to the Association.

e. All suspensions imposed pursuant to subsections d. and e. must be approved at a properly noticed Board meeting. Upon approval, the Association must notify the lot owner and, if applicable, the lot's occupant, licensee or invitee by mail or hand delivery.

**ARTICLE X.**
**MANDATORY MEDIATION AND LITIGATION**

In the event of a dispute between the Association and/or the Board of Directors and/or one or more lot Owners arising from or regarding the Declaration of Covenants and Restrictions, the Articles of Incorporation, the By-Laws, the Rules and Regulations of the Association, Chapter 720, Florida Statutes, as amended from time to time, or the Florida Administrative Code, or any other matter, of whatever nature, involving the Association, such dispute shall be submitted to mandatory non-binding mediation prior to the institution of any litigation or administrative proceeding by the Association or any Lot Owner.

**IN WITNESS WHEREOF,** the undersigned, being the Developer herein, has hereunto set its hand and seal the 27 day of May, 2016.

Signed, Sealed and Delivered
In the Presence of:

CANAVERAL CROSSINGS, LLC, a Florida limited liability company

BY: HOMEMAKERS MANAGEMENT CORPORATION, a Florida corporation, its Manager

BY: ______________________
Martin C. Flynn, Jr., President

______________________
Print Name: J. McPhillips

______________________
Print Name: Beth Draques

STATE OF FLORIDA
COUNTY OF BREVARD

The foregoing instrument was acknowledged before me this 27th day of May, 2016, by **Martin C. Flynn, Jr., President of Homemakers Management Corporation, a Florida corporation, as Manager of Canaveral Crossroads, LLC, a Florida limited liability company,** on behalf of the company, who are personally known to me or have produced ______________ as identification.

______________________
NOTARY PUBLIC
My commission expires: 4/14/18

Notary Public State of Florida
Jessica McPhillips
My Commission FF 102354
Expires 04/14/2018

**Exhibit "A" (24 pages)**

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING #1 UNIT 101

(104 PARROTFISH LANE, UNIT 101)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 156.50 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE S79° 58'00"W, A DISTANCE OF 8.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 21.00 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1319.8 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-101

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1




ABBREVIATIONS:

R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE

a

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING #1 UNIT 102

(104 PARROTFISH LANE, UNIT 102)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79°58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 135.83 FEET; THENCE S10°02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10°02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79°58'00"W, A DISTANCE OF 8.33 FEET; THENCE S10°02'00"E, A DISTANCE OF 17.33 FEET; THENCE S79°58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10°02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79°58'00"E, A DISTANCE OF 20.67 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-102

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1




ABBREVIATIONS:

| | |
|---|---|
| R/W | RIGHT-OF-WAY LINE |
| P.O. | POST OFFICE |
| POB | POINT-OF-BEGINNING |
| POC | POINT-OF-COMMENCEMENT |
| FL. | FLORIDA |
| MEAS | MEASURED |
| P.U.E. | PUBLIC UTILITIES EASEMENT |
| U.S. | UNITED STATES |
| C.O.E. | CORPS. OF ENGINEERS |
| O.R.B. | OFFICIAL RECORDS BOOK |
| PG. | PAGE |

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING #1 UNIT 103

(104 PARROTFISH LANE, UNIT 103)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 115.16 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE S79° 58'00"W, A DISTANCE OF 8.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 20.67 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-103

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1




ABBREVIATIONS:

R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

BUILDING #1 UNIT 104
(104 PARROTFISH LANE, UNIT 104)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 94.50 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79° 58'00"W, A DISTANCE OF 8.33 FEET; THENCE S10° 02'00"E, A DISTANCE OF 17.33 FEET; THENCE S79° 58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79° 58'00"E, A DISTANCE OF 20.67 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-104

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1



# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING #1 UNIT 105

(104 PARROTFISH LANE, UNIT 105)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 73.83 FEET; THENCES10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE S79° 58'00"W, A DISTANCE OF 8.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 20.67 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-105


LEGAL DESCRIPTION
SHEET 2 OF 2
SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1
U.S. ARMY C.O.E. NORTH
BUILDING #1 UNIT 105
(104 PARROTFISH LANE, UNIT 105)
GRAPHIC SCALE
0
20
1 INCH = 20 FEET
POINT-OF-COMMENCEMENT
LANDS AS DESCRIBED IN OFFICIAL
RECORDS BOOK 6212, PAGE 2393
WESTERLY RIGHT-OF-WAY LINE
NORTH COURTENAY PARKWAY
(PUBLIC RIGHT-OF-WAY VARIES)
THE SOUTH PROPERTY
LINE OF THE CANAVERAL PORT AUTHORITY
S79° 58'00"W (BEARING BASIS)
73.83
S10° 02'00"E 10.00
20.67
N79° 58'00"E
R/W TAKING
(O.R.B. 1218, PG. 924)
POINT-OF-BEGINNING
BUILDING # 1 UNIT 105
TINGLEY DRIVE
CAPE CROSSING RESORT MANAGEMENT, INC.
104 PARROTFISH LANE
UNIT 104
N10° 02'00"W 52.67
TOWNHOME SITE
104 PARROTFISH LANE
UNIT 105
S10° 02'00"E 70.00
UNIT 106
104 PARROTFISH LANE
S79° 58'00"W
8.33
N10° 02'00"W
17.33
12.33
S79° 58'00"W
CAPE CROSSING RESORT MANAGEMENT, INC.
PARROTFISH LANE
ABBREVIATIONS:
R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING #1 UNIT 106

(104 PARROTFISH LANE, UNIT 106)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 52.83; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 10.00 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79° 58'00"W, A DISTANCE OF 8.67 FEET; THENCE S10° 02'00"E, A DISTANCE OF 17.33 FEET; THENCE S79° 58'00"W, A DISTANCE OF 12.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79° 58'00"E, A DISTANCE OF 21.00 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1319.8 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE, FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG1-106

## LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1



# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING # 2 UNIT 1Ø1

(103 PARROTFISH LANE, UNIT 101)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79°58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 58.85 FEET; THENCE S10°02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 121.30 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10°02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79°58'00"W, A DISTANCE OF 21.00 FEET; THENCE N10°02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79°58'00"E, A DISTANCE OF 12.33 FEET; THENCE S10°02'00"E, A DISTANCE OF 17.33 FEET; THENCE N79°58'00"E, A DISTANCE OF 8.67 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1319.8 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-101

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1

## BUILDING # 2 UNIT 101
(103 PARROTFISH LANE, UNIT 101)




ABBREVIATIONS:

R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE

CAPE CROSSING RESORT MANAGEMENT, INC.

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

BUILDING # 2 UNIT 102

(103 PARROTFISH LANE, UNIT 102)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 79.85 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 103.97 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 20.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 8.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE N79° 58'00"E, A DISTANCE OF 12.33 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-102

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

THIS IS A GRAPHIC DEPICITION OF THE LEGAL DESCRIPTION ON SHEET 1

BUILDING # 2 UNIT 102
(103 PARROTFISH LANE, UNIT 102)




ABBREVIATIONS:

| | |
|---|---|
| R/W | RIGHT-OF-WAY LINE |
| P.O. | POST OFFICE |
| POB | POINT-OF-BEGINNING |
| POC | POINT-OF-COMMENCEMENT |
| FL. | FLORIDA |
| MEAS | MEASURED |
| P.U.E. | PUBLIC UTILITIES EASEMENT |
| U.S. | UNITED STATES |
| C.O.E. | CORPS. OF ENGINEERS |
| O.R.B. | OFFICIAL RECORDS BOOK |
| PG. | PAGE |

CAPE CROSSING RESORT MANAGEMENT, INC.

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING # 2 UNIT 1Ø3

(103 PARROTFISH LANE, UNIT 103)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 100.52 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 121.30 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79° 58'00"W, A DISTANCE OF 20.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79° 58'00"E, A DISTANCE OF 12.33 FEET; THENCE S10° 02'00"E, A DISTANCE OF 17.33 FEET; THENCE N79° 58'00"E, A DISTANCE OF 8.33 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-103

# LEGAL DESCRIPTION

SHEET 2 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1




ABBREVIATIONS:

R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE

CAPE CROSSING RESORT MANAGEMENT, INC.

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING # 2 UNIT 1Ø4

(103 PARROTFISH LANE, UNIT 104)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 121.19 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 103.97 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 20.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 8.33 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE N79° 58'00"E, A DISTANCE OF 12.33 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-104


LEGAL DESCRIPTION
SHEET 2 OF 2
SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1
U.S. ARMY C.O.E. NORTH
BUILDING # 2 UNIT 104
(103 PARROTFISH LANE, UNIT 104)
POINT-OF-COMMENCEMENT
LANDS AS DESCRIBED IN OFFICIAL
RECORDS BOOK 6212, PAGE 2393
WESTERLY RIGHT-OF-WAY LINE
NORTH COURTENAY PARKWAY
(PUBLIC RIGHT-OF-WAY VARIES)
GRAPHIC SCALE
0
20
1 INCH = 20 FEET
THE SOUTH PROPERTY
LINE OF THE CANAVERAL PORT AUTHORITY
(BEARING BASIS)
S79° 58'00"W
121.19
103.97
R/W TAKING
(O.R.B. 1218, PG. 924)
S10° 02'00"E
PARROTFISH LANE
TINGLEY DRIVE
CAPE CROSSING RESORT MANAGEMENT, INC.
N79° 58'00"E
12.33
N10° 02'00"W
17.33
POINT-OF-BEGINNING
BUILDING # 2 . UNIT 104
8.33
N79° 58'00"E
S10° 02'00"E
70.00
103 PARROTFISH LANE
UNIT 103
103 PARROTFISH LANE
UNIT 104
TOWNHOME SITE
N10° 02'00"W
52.67
103 PARROTFISH LANE
UNIT 105
S79° 58'00"W
20.67
ABBREVIATIONS:
R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE
CAPE CROSSING RESORT MANAGEMENT, INC.

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING # 2 UNIT 105

(103 PARROTFISH LANE, UNIT 105)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 141.87 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 121.30 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 52.67 FEET; THENCE S79° 58'00"W, A DISTANCE OF 20.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 70.00 FEET; THENCE N79° 58'00"E, A DISTANCE OF 12.33 FEET; THENCE S10° 02'00"E, A DISTANCE OF 17.33 FEET; THENCE N79° 58'00"E, A DISTANCE OF 8.33 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1302.4 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212. PAGE 2393. PARCEL TWO. BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-105


LEGAL DESCRIPTION
SHEET 2 OF 2
SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1
BUILDING # 2 UNIT 105
(103 PARROTFISH LANE, UNIT 105)
U.S. ARMY C.O.E. NORTH
GRAPHIC SCALE
0
20
1 INCH = 20 FEET
POINT-OF-COMMENCEMENT
LANDS AS DESCRIBED IN OFFICIAL
RECORDS BOOK 6212, PAGE 2393
WESTERLY RIGHT-OF-WAY LINE
NORTH COURTENAY PARKWAY
(PUBLIC RIGHT-OF-WAY VARIES)
THE SOUTH PROPERTY
LINE OF THE CANAVERAL PORT AUTHORITY
(BEARING BASIS)
S79° 58'00"W
141.87
R/W TAKING
(O.R.B. 1218, PG. 924)
S10° 02'00"E
121.30
PARROTFISH LANE
TINGLEY DRIVE
N79° 58'00"E
12.33
S10° 02'00"E
17.33
N79° 58'00"E
8.33
POINT-OF-BEGINNING
BUILDING # 2 UNIT 105
103 PARROTFISH LANE
UNIT 106
N10° 02'00"W
70.00
TOWNHOME SITE
103 PARROTFISH LANE
UNIT 105
S10° 02'00"E
52.67
103 PARROTFISH LANE
UNIT 104
S79° 58'00"W
20.67
ABBREVIATIONS:
R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE
CAPE CROSSING RESORT MANAGEMENT, INC.

# LEGAL DESCRIPTION

SHEET 1 OF 2

SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST

## BUILDING # 2 UNIT 106

(103 PARROTFISH LANE, UNIT 106)

## LEGAL DESCRIPTION:

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, BEING A PART OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6890, PAGE 2520, PUBLIC RECORDS OF BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF NORTH COURTENAY PARKWAY AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY (DESCRIBED AS THE POINT-OF-BEGINNING IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, AFORESAID PUBLIC RECORDS); THENCE S79° 58'00"W, ALONG THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 162.53 FEET; THENCE S10° 02'00"E, PERPENDICULAR TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 103.97 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S10° 02'00"E, A DISTANCE OF 70.00 FEET; THENCE S79° 58'00"W, A DISTANCE OF 21.00 FEET; THENCE N10° 02'00"W, A DISTANCE OF 52.67 FEET; THENCE N79° 58'00"E, A DISTANCE OF 8.67 FEET; THENCE N10° 02'00"W, A DISTANCE OF 17.33 FEET; THENCE N79° 58'00"E, A DISTANCE OF 12.33 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 1319.8 SQUARE FEET, MORE OR LESS, AND BEING SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

SURVEYOR'S NOTES:

1. THIS IS NOT A BOUNDARY SURVEY.
2. BEARINGS DEPICTED HEREON ARE BASED ON THE UNITED STATES ARMY CORPS. OF ENGINNERS BEARING STRUCTURE FOR THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY LANDS AS DESCRIBED IN OFFICIAL RECORDS BOOK 6212, PAGE 2393, PARCEL TWO, BEING S79°58'00"W.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.

FILE: CROSSINGBLDG2-106


LEGAL DESCRIPTION
SHEET 2 OF 2
SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST
THIS IS A GRAPHIC DEPICITION OF
THE LEGAL DESCRIPTION ON SHEET 1
BUILDING # 2 UNIT 1Ø6
(103 PARROTFISH LANE, UNIT 106)
U.S. ARMY C.O.E. NORTH
GRAPHIC SCALE
0
20
1 INCH = 20 FEET
POINT-OF-COMMENCEMENT
LANDS AS DESCRIBED IN OFFICIAL
RECORDS BOOK 6212, PAGE 2393
WESTERLY RIGHT-OF-WAY LINE
NORTH COURTENAY PARKWAY
(PUBLIC RIGHT-OF-WAY VARIES)
THE SOUTH PROPERTY
LINE OF THE CANAVERAL PORT AUTHORITY
(BEARING BASIS)
S79° 58'00"W
162.53
103.97
R/W TAKING
(O.R.B. 1218, PG. 924)
PARROTFISH LANE
S10° 02'00"E
TINGLEY DRIVE
CAPE CROSSING RESORT MANAGEMENT, INC.
N79° 58'00"E
12.33
N10° 02'00"W
17.33
POINT-OF-BEGINNING
BUILDING # 2 UNIT 106
8.67
N79° 58'00"E
103 PARROTFISH LANE
UNIT 106
TOWNHOME SITE
S10° 02'00"E 70.00
103 PARROTFISH LANE
UNIT 105
N10° 02'00"W 52.67
S79° 58'00"W
21.00
ABBREVIATIONS:
R/W RIGHT-OF-WAY LINE
P.O. POST OFFICE
POB POINT-OF-BEGINNING
POC POINT-OF-COMMENCEMENT
FL. FLORIDA
MEAS MEASURED
P.U.E. PUBLIC UTILITIES EASEMENT
U.S. UNITED STATES
C.O.E. CORPS. OF ENGINEERS
O.R.B. OFFICIAL RECORDS BOOK
PG. PAGE
CAPE CROSSING RESORT MANAGEMENT, INC.