# EXHIBIT 8

This instrument prepared by and return to:
CURTIS R. MOSLEY, ESQ.
MOSLEY & WALLIS, P.A.
1221 E. New Haven Avenue
Melbourne, Florida 32901

# INDEX TO DECLARATION OF CONDOMINIUM

# OF

# CAPE CROSSING, A CONDOMINIUM


| | | PAGE |
|---|---|---|
| I. | ESTABLISHMENT OF CONDOMINIUM | 2 |
| II. | DEFINITIONS | 3 |
| III. | SURVEY AND DESCRIPTION OF IMPROVEMENTS | |
| IV. | OWNERSHIP OF UNITS AND APPURTENANT SHARE IN COMMON ELEMENTS AND COMMON SURPLUS, AND SHARE OF COMMON EXPENSES | 5<br>6 |
| V. | UNIT BOUNDARIES, COMMON ELEMENTS AND LIMITED COMMON ELEMENTS | 7 |
| VI. | ADMINISTRATION OF CONDOMINIUM BY CAPE CROSSING CONDOMINIUM ASSOCIATION, INC. | 8 |
| VII. | MEMBERSHIP AND VOTING RIGHTS | 8 |
| VIII. | COMMON EXPENSES, ASSESSMENTS, COLLECTION, LIEN AND ENFORCEMENT LIMITATIONS | 9 |
| IX. | INSURANCE COVERAGE, USE AND DISTRIBUTION OF PROCEEDS, REPAIR OR RECONSTRUCTION AFTER CASUALTY, CONDEMNATION | 14 |
| X. | RESPONSIBILITY FOR MAINTENANCE AND REPAIRS | 19 |
| XI. | USE RESTRICTIONS | 20 |
| XII. | LIMITATIONS UPON RIGHT OF OWNER TO ALTER OR MODIFY UNIT | 23 |
| XIII. | ADDITIONS, ALTERATIONS OR IMPROVEMENTS BY ASSOCIATION | 24 |
| XIV. | AMENDMENT OF DECLARATION | 25 |
| XV. | TERMINATION OF CONDOMINIUM | 27 |
| XVI. | ENCROACHMENTS | 37 |
| XVII. | ASSOCIATION TO MAINTAIN REGISTER OF OWNERS AND MORTGAGEES | 37 |
| XVIII. | REAL PROPERTY TAXES DURING INITIAL YEAR OF CONDOMINIUM | 37 |
| XIX. | RESPONSIBILITY OF UNIT OWNERS | 38 |
| XX. | WAIVER | 38 |
| XXI. | CONSTRUCTION | 38 |
| XXII. | GENDER | 38 |
| XXIII. | CAPTIONS | 39 |
| XXIV. | REMEDIES FOR VIOLATIONS | 39 |
| XXV. | TIMESHARE RESERVATION | 39 |
| XXVI. | FINES | 39 |
| XXVII. | SIGNAGE | 40 |
| XXVIII. | INSTITUTIONAL MORTGAGEE | 40 |
| XXIX. | RIGHTS RESERVED UNTO INSTITUTIONAL MORTGAGEES | 41 |
| XXX. | NOTICE TO INSTITUTIONAL MORTGAGEES | 41 |
| XXXI. | CABLE TV AND SATELLITE DISH | 41 |
| XXXII. | ST. JOHNS RIVER WATER MANAGEMENT DISTRICT | 42 |
| XXXIII. | MITIGATION OF MOLD, DAMPNESS, HUMIDITY AND LIMITATION OF LIABILITY | 43 |
| XXXIV. | MOLD AND MILDEW AWARENESS, PREVENTION AND LIMITATION OF LIABILITY | 44 |
| XXXV. | MANDATORY NON-BINDING ARBITRATION AND MEDIATION OF DISPUTES BETWEEN THE ASSOCIATION AND UNIT OWNER | 46 |
| XXXVI. | COMMERCIAL UNIT | 46 |

# DECLARATION OF CONDOMINIUM

# OF

# CAPE CROSSING, A CONDOMINIUM

CANAVERAL CROSSROADS, LLC, a Florida Limited Liability Company, hereinafter called "Developer", does hereby make, declare, and establish this Declaration of Condominium (hereinafter sometimes called "this Declaration"), as and for a plan of Condominium Unit Ownership for CAPE CROSSING, A CONDOMINIUM, consisting of real property and improvements thereon as hereinafter described ("Condominium").

All restrictions, reservations, covenants, conditions and easements contained herein shall constitute covenants running with the land or equitable servitudes upon the land, as the case may be, and shall rule perpetually unless terminated as provided herein and shall be binding upon all parties or persons subsequently owning property in said Condominium, and in consideration of receiving and by acceptance of a conveyance, grant, devise, lease, or mortgage, all grantees, devisees, leasees, and assigns and all parties claiming by, through or under such persons, agree to be bound by all provisions hereof. Both the burdens imposed and the benefits shall run with each unit and the interests in the common property as herein defined.

## I

## ESTABLISHMENT OF CONDOMINIUM

The Developer is the owner of the fee simple title to that certain real property situated in Merritt Island, County of Brevard, and State of Florida, which property is more particularly described as follows; to-wit:

SEE SHEET _5__ OF EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF FOR LEGAL DESCRIPTION.

CAPE CROSSING, A CONDOMINIUM, is located at the intersection of State Road 528 (Beachline) and State Road 3 (Courtney Parkway) in Merritt Island, Florida The Condominium consists of one (1) building containing a total of thirty-six (36) units and other appurtenant improvements as hereinafter described. The Building is a six (6) story building containing thirty-five (35) residential units and one (1) commercial unit, thirty-two (32) garage parking spaces, including one (1) handicapped parking space and thirty-five (35) storage spaces. In addition, there are nine (9) parking spaces, including one (1) handicapped parking space, located on the Condominium Property. The garage parking spaces and the commercial unit are located on the first floor of the Building. Floors 2, 3, 4, 5 and 6 contain seven (7) units each per floors. Units 101, 201, 301, 401, and 501 each have four (4) bedrooms, three (3) baths and contains approximately 1,896 square feet with a balcony area containing approximately 216 square feet. Units 102, 202, 302, 402, 502, 103, 203, 303, 403, 503, 104, 204, 304, 404, 504, 105, 205, 305, 405, and 505 each have three (3) bedrooms, two (2) baths and contains approximately 1,266 square feet with a balcony of 97 square feet. Units 106, 206, 306, 406 and 506 have three (3) bedrooms, two (2) baths and contain approximately 1,451 square feet with a balcony of approximately 117 square feet. Units 107, 207, 307, 407 and 507 have three (3) bedrooms and two (2) baths and contains approximately 1,169 square feet with a balcony of 95 square feet. All square footage measurements are provided by the architects using methods common to the industry. The square footage for units shown in Exhibit "A" was determined by the engineering firm. The graphic description of each floor is shown on Sheets 7 and 9 through 13, inclusive, of Exhibit "A" to the Declaration of Condominium. The Developer, CANAVERAL CROSSROADS, LLC has designated the garage parking spaces on Sheet 7 of Exhibit "A" and outside parking spaces on Sheet 3 of Exhibit "A". The storage spaces have been designated for the exclusive use of the unit owners on Sheets 14 through 20, inclusive of Exhibit "A" to the Declaration of the Condominium. The designated garage parking spaces, outside parking spaces and storage spaces are limited common elements for the exclusive use of the owners of the designated units. For legal description, survey and plot plan of the Condominium see Exhibit A to the Declaration of Condominium. The Developer estimates the Condominium will be completed during the fall of 2016 but time is not of the essence. The Developer does hereby submit the above described real

property, together with the improvements thereon, to condominium ownership pursuant to the Florida Condominium Act, and hereby declares the same to be known and identified as CAPE CROSSING, A CONDOMINIUM, hereinafter referred to as the "Condominium".

The provisions of the Florida Condominium Act, as amended from time to time, are hereby adopted herein by express reference and shall govern the Condominium and the rights, duties and responsibilities of Unit Owners hereof, except where permissive variances therefrom appear in the Declaration and the By-Laws and Articles of Incorporation of CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., a Florida corporation not for profit ("Association").

The definitions contained in the Florida Condominium Act, as amended, shall be the definitions of like terms as used in this Declaration and exhibits hereto unless other definitions are specifically set forth.

## II

## DEFINITIONS

(1) "Assessment" means a share of the funds which are required for the payment of common expenses, which from time to time is assessed against the unit owner.

(2) "Association" means, in addition to any entity responsible for the operation of common elements owned in undivided shares by unit owners, any entity which operates or maintains other real property in which unit owners have use rights, where membership in the entity is composed exclusively of unit owners or their elected or appointed representatives and is a required condition of unit ownership.

(3) "Association property" means that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the association for the use and benefit of its members.

(4) "Board of administration" or "board" means the board of directors or other representative body which is responsible for administration of the association.

(5) "Buyer" means a person who purchases a condominium unit. The term "purchaser" may be used interchangeably with the term "buyer."

(6) "Bylaws" means the bylaws of the association as they are amended from time to time.

(7) "Committee" means a group of board members, unit owners, or board members and unit owners appointed by the board or a member of the board to make recommendations to the board regarding the proposed annual budget or to take action on behalf of the board.

(8) "Common elements" means the portions of the condominium property not included in the units.

(9) "Common expenses" means all expenses properly incurred by the association in the performance of its duties, including expenses specified in s. 718.115.

(10) "Common surplus" means the amount of all receipts or revenues, including assessments, rents, or profits, collected by a condominium association which exceeds common expenses.

(11) "Condominium" means that form of ownership of real property created pursuant to this chapter, which is comprised entirely of units that may be owned by one or more persons, and in which there is, appurtenant to each unit, an undivided share in common elements.

(12) "Condominium parcel" means a unit, together with the undivided share in the common elements appurtenant to the unit.

(13) "Condominium property" means the lands, leaseholds, and personal property that are subjected to condominium ownership, whether or not contiguous, and all improvements thereon and all easements and rights appurtenant thereto intended for use in connection with the condominium.

(14) "Conspicuous type" means bold type in capital letters no smaller than the largest type, exclusive of headings, on the page on which it appears and, in all cases, at least 10-point type. Where conspicuous type is required, it must be separated on all sides from other type and print. Conspicuous type may be used in a contract for purchase and sale of a unit, a lease of a unit for more than 5 years, or a prospectus or offering circular only where required by law.

(15) "Declaration" or "declaration of condominium" means the instrument or instruments by which a condominium is created, as they are from time to time amended.

(16) "Developer" means a person who creates a condominium or offers condominium parcels for sale or lease in the ordinary course of business, but does not include:

(a) An owner or lessee of a condominium or cooperative unit who has acquired the unit for his or her own occupancy;

(b) A cooperative association that creates a condominium by conversion of an existing residential cooperative after control of the association has been transferred to the unit owners if, following the conversion, the unit owners are the same persons who were unit owners of the cooperative and no units are offered for sale or lease to the public as part of the plan of conversion;

(c) A bulk assignee or bulk buyer as defined in s. 718.703; or

(d) A state, county, or municipal entity acting as a lessor and not otherwise named as a developer in the declaration of condominium.

(17) "Division" means the Division of Florida Condominiums, Timeshares, and Mobile Homes of the Department of Business and Professional Regulation.

(18) "Land" means the surface of a legally described parcel of real property and includes, unless otherwise specified in the declaration and whether separate from or including such surface, airspace lying above and subterranean space lying below such surface. However, if so defined in the declaration, the term "land" may mean all or any portion of the airspace or subterranean space between two legally identifiable elevations and may exclude the surface of a parcel of real property and may mean any combination of the foregoing, whether or not contiguous, or may mean a condominium unit.

(19) "Limited common elements" means those common elements which are reserved for the use of a certain unit or units to the exclusion of all other units, as specified in the declaration.

(20) "Multicondominium" means a real estate development containing two or more condominiums, all of which are operated by the same association.

(21) "Operation" or "operation of the condominium" includes the administration and management of the condominium property.

(22) "Rental agreement" means any written agreement, or oral agreement if for less duration than 1 year, providing for use and occupancy of premises.

(23) "Residential condominium" means a condominium consisting of two or more units, any of which are intended for use as a private temporary or permanent residence, except that a condominium is not a residential condominium if the use for which the units are intended is primarily commercial or industrial and not more than three units are intended to be used for private residence, and are intended to be used as housing for maintenance, managerial, janitorial, or other operational staff of the condominium. With respect to a condominium that is not a timeshare condominium, a residential unit includes a unit intended as a private temporary or permanent residence as well as a unit not intended for commercial or industrial use. With respect to a timeshare condominium, the timeshare instrument as defined in s. 721.05(35) shall govern the intended use of each unit in the condominium. If a condominium is a residential condominium but contains units intended to be used for commercial or industrial purposes, then, with respect to those units which are not intended for or used as private residences, the condominium is not a

residential condominium. A condominium which contains both commercial and residential units is a mixed-use condominium and is subject to the requirements of s. 718.404.

(24) "Special assessment" means any assessment levied against a unit owner other than the assessment required by a budget adopted annually.

(25) "Timeshare estate" means any interest in a unit under which the exclusive right of use, possession, or occupancy of the unit circulates among the various purchasers of a timeshare plan pursuant to chapter 721 on a recurring basis for a period of time.

(26) "Timeshare unit" means a unit in which timeshare estates have been created.

(27) "Unit" means a part of the condominium property which is subject to exclusive ownership. A unit may be in improvements, land, or land and improvements together, as specified in the declaration.

(28) "Unit owner" or "owner of a unit" means a record owner of legal title to a condominium parcel.

(29) "Voting certificate" means a document which designates one of the record title owners, or the corporate, partnership, or entity representative, who is authorized to vote on behalf of a condominium unit that is owned by more than one owner or by any entity.

(30) "Voting interests" means the voting rights distributed to the association members pursuant to s. 718.104(4)(j). In a multicondominium association, the voting interests of the association are the voting rights distributed to the unit owners in all condominiums operated by the association. On matters related to a specific condominium in a multicondominium association, the voting interests of the condominium are the voting rights distributed to the unit owners in that condominium.

## III.

## SURVEY AND DESCRIPTION OF IMPROVEMENTS

Attached hereto and made a part hereof, and marked Exhibit A consisting of twenty (20) Sheets are boundary surveys of the entire premises, a graphic plot plan of the overall planned improvements, and graphic descriptions of the improvements in which units are located, and plot plans thereof, identifying the units, the common elements and the limited common elements, and their respective locations and dimensions.

Said surveys, graphic descriptions and plot plans were prepared by:

Kugelmann Land Surveying, Inc.
By: David J. Kugelmann
Professional Land Surveyor
No. 6575, State of Florida

and have been certified in the manner required by the Florida Condominium Act. Each unit is identified and designated by a specific number. No unit bears the same numerical designation as any other unit. The specific numbers identifying each unit are listed on Sheets 7 and 9 through 13, inclusive, of Exhibit "A" attached to this Declaration of Condominium.

The units to be located on the lands described in Exhibit "A" are not substantially completed.

Timeshare interests shall not be created with respect to any unit in the Condominium.

## IV

## OWNERSHIP OF UNITS AND APPURTENANT SHARE IN COMMON ELEMENTS AND COMMON SURPLUS, AND SHARE OF COMMON EXPENSES

Each unit shall be conveyed as an individual property capable of independent use and fee simple ownership and the owner or owners of each unit shall own, as an appurtenance to the ownership of each said unit, an undivided one thirty-sixth (1/36) share of all common elements of the Condominium, which includes, but is not limited to, ground support area, walkways, yard area, parking areas, foundations, etc., and substantial portions of the exterior walls, floors, ceiling and walls between units. The space within any of the units and common elements shall not be further subdivided. Any undivided interest in the common property is hereby declared to be appurtenant to each unit and such undivided interest shall not be separate from the unit and such interest shall be deemed conveyed, devised, encumbered or otherwise included with the unit even though such interest is not expressly mentioned or described in the conveyance, or other instrument. Any instrument, whether a conveyance, mortgage or otherwise, which describes only a portion of the space within any unit shall be deemed to describe the entire unit owned by the person executing such instrument and an undivided one thirty-sixth (1/36) interest in all common elements of the Condominium.

The Developer hereby, and each subsequent owner of any interest in a unit and in the common elements, by acceptance of a conveyance or any instrument transferring an interest, waives the right of partition of any interest in the common elements under the laws of the State of Florida as it exists now or hereafter until this Condominium unit project is terminated according to the provisions hereof or by law. Any owner may freely convey an interest in a unit together with an undivided interest in the common elements subject to the provisions of this Declaration. The Developer hereby reserves the right to remove any party walls between any Condominium units owned by the Developer in order that the said units may be used together as one (1) integral unit. All assessments and voting rights, however, shall be calculated as if such units were as originally designated on the exhibits attached to this Declaration, notwithstanding the fact that the several units are used as one.

All owners of units shall have as an appurtenance to their units a perpetual easement of ingress to and egress from their units over streets, walks, terraces and other common elements from and to the public highways bounding the Condominium complex, and a perpetual right or easement, in common with all persons owning an interest in any unit in the Condominium complex, to the use and enjoyment of all public portions of the buildings and to other common facilities (including but not limited to facilities as they now exist) located in the common elements.

All property covered by the exhibits hereto shall be subject to a perpetual easement for encroachments which now exist or hereafter may exist caused by settlement or movement of the buildings, and such encroachments shall be permitted to remain undisturbed and such easement shall continue until such encroachment no longer exists.

All units and the common elements shall be subject to a perpetual easement in gross granted to the Association , and its successors, for ingress and egress for the purpose of having its employees and agents perform all obligations and duties of the Association set forth herein. The Association shall have the right to grant utility easements under, through or over the common elements and such other easements as the Board, in its sole discretion, shall decide. The consent of the Unit Owners to the granting of any such easement shall not be required.

The common expenses shall be shared and the common surplus shall be owned in the same proportion as each such Unit Owner's share of the ownership of the common elements, that is one thirty- sixth (1/36).

V

**UNIT BOUNDARIES, COMMON ELEMENTS,**
**<u>AND LIMITED COMMON ELEMENTS</u>**

The units of the Condominium consist of that volume of space which is contained within the decorated or finished exposed interior surfaces of the perimeter walls, floors (excluding carpeting and other floor coverings) and ceilings of the units. The boundaries of the units are more specifically shown in Exhibit "A", attached hereto. The dark solid lines on the floor plans hereinabove mentioned represent the perimetrical boundaries of the units, while the upper and lower boundaries of the units, relating to the elevations of the units, are shown in notes on said plan. "Unit" means a part of the Condominium Property which is subject to exclusive ownership. A unit in this Condominium shall mean a unit which has been substantially completed as evidenced by the issuance of a Certificate of Occupancy or its equivalent by the appropriate governmental agency.

There are limited common elements appurtenant to each of the units in this Condominium, as shown and reflected by the floor and plot plans. These limited common elements are reserved for the use of the units appurtenant thereto, to the exclusion of other units, and there shall pass with a unit, as an appurtenance thereto, the exclusive right to use the limited common elements so appurtenant. In addition, there are thirty-one (31) numbered garage parking spaces and one (1) handicap space located on the first floor of the Building as shown on Sheet _7_ of Exhibit "A". In addition, there are nine (9) outside parking spaces including four (4) numbered spaces and one (1) handicap space. There thirty-five (35) storage spaces as shown on Sheets 14 through 20, inclusive, of Exhibit "A". These garage parking spaces, numbered open parking spaces and the storage spaces are common elements for which the Developer has designated the unit which shall be entitled to exclusive use of the designated garage parking spaces, numbered open parking spaces and storage spaces. After such designation, the garage parking spaces, numbered open parking spaces and storage spaces shall be appurtenant to the unit and shall become a limited common element. The developer may charge a fee for the assignment of these garage parking spaces, numbered open parking spaces and storage spaces in its sole discretion.

Unit owners have the right to transfer assigned garage parking spaces, numbered open parking spaces and storage spaces to other units or unit owners pursuant to Section 718.106(2)(b), Florida Statutes. Any transfer of assigned garage parking spaces, numbered open parking spaces and storage spaces shall be subject to rules promulgated by the Association.

Any air conditioning and/or heating equipment which exclusively services a Unit shall be a Limited Common Element appurtenant to the Unit it services.

The common elements of the Condominium unit consist of all of the real property, improvements and facilities of the Condominium other than the units and the limited common elements as the same are hereinabove defined, and shall include easements through the units for conduits, pipes, ducts, plumbing, wiring and other facilities for the furnishing of utility services to the units, limited common elements and common elements and easements of support in every portion of a unit which contributes to the support of improvements and shall further include all personal property held and maintained for the joint use and enjoyment of all the owners of the units.

There are located on the common elements of the Condominium property swale areas for the purpose of water retention and these areas are to be perpetually maintained by the Association so that they will continue to function as water retention areas.

## VI.

## ADMINISTRATION OF CONDOMINIUM BY CAPE CROSSING CONDOMINIUM ASSOCIATION, INC.

The operation and management of the Condominium shall be administered by the Association.

The Association shall make available to Unit Owners, lenders and the holders and insurers of the first mortgage on any unit, current copies of the items set forth in Section 718.111.(12), Florida Statutes. The Association also shall be required to make available to prospective purchasers current copies of the Declaration, By-Laws, other rules governing the Condominium, and the most recent annual audited financial statement, if such is prepared. "Available" shall at least mean available for inspection upon request, during normal business hours or under other reasonable circumstances.

The Association, upon written request from any institutional lenders which have an interest or prospective interest in the Condominium, shall furnish within a reasonable time the financial report of the Association required by Section 718.111(13), Florida Statutes, for the immediately preceding fiscal year.

The Association shall have all of the powers and duties set forth in the Florida Condominium Act and, where not inconsistent therewith, those powers and duties set forth in this Declaration, Articles of Incorporation and By-Laws of the Association. True and correct copies of the Articles of Incorporation and the By-Laws are attached hereto, made a part hereof, and marked Exhibit "B" and Exhibit "C", respectively.

## VII.

## MEMBERSHIP AND VOTING RIGHTS

The Developer and all persons hereafter owning a vested present interest in the fee title to any one of the units shown on the exhibits hereto and which interest is evidenced by recordation of a proper instrument in the Public Records of Brevard County, Florida, shall automatically be members and their memberships shall automatically terminate when they no longer own such interest.

There shall be a total of thirty-six (36) votes to be cast by the owners of the Condominium units. Such votes shall be apportioned and cast as follows: The owner of each Condominium unit (designated as such on the exhibits attached to this Declaration) shall be entitled to cast one (1) vote. Where a Condominium unit is owned by a corporation, partnership or other legal entity or by more than one (1) person, all the owners thereof shall be collectively entitled to the vote assigned to such unit and such owners shall, in writing, designate an individual who shall be entitled to cast the vote on behalf of the owners of such Condominium unit of which he is a part until such authorization shall have been changed in writing. The term, "owner," as used herein, shall be deemed to include the Developer.

All of the affairs, policies, regulations and property of the Association shall be controlled and governed by the Board of Administration of the Association who are all to be elected annually by the members entitled to vote, as provided in the By-Laws of the Association. Each director shall be the owner of a Condominium unit (or a partial owner of a Condominium unit where such unit is owned by more than one (1) individual, or if a unit is owned by a limited liability company, corporation, or other legal entity, including the Developer, any authorized member of a limited liability company, duly elected officer or officers of an owner corporation or authorized member of any other legal entity may be elected a director or directors).

The owners shall place members on the Board of Administration in accordance with the schedule as follows: when Unit Owners other than the Developer own fifteen percent (15%) or more of the units in a Condominium that will be operated ultimately by an Association, the Unit Owners shall be entitled to elect not less than one-third (1/3) of the members of the Board of Administration of the Association. Unit Owners other than the Developer are entitled to elect not less than a majority of the members of the Board of Administration of the Association: (a) three

years (3) after fifty (50%) percent of the units that will be operated ultimately by the Association have been conveyed to purchasers; (b) three (3) months after ninety (90%) percent of the units that will be operated ultimately by the Association have been conveyed to purchasers; (c) when all the units that will be operated ultimately by the Association have been completed, some of them have been conveyed to purchasers, and none of the others are being offered for sale by the Developer in the ordinary course of business; (d) when some of the units have been conveyed to purchasers and none of the others are being constructed or offered for sale by the Developer in the ordinary course of business; (e) when the Developer files a petition seeking protection in bankruptcy; (f) when a receiver for the Developer is appointed by a circuit court and is not discharged within thirty (30) days after such appointment; or (g) seven (7) years after recordation of the Declaration of Condominium. The Developer is entitled to elect or appoint at least one member of the Board of Administration of an association as long as the Developer holds for sale in the ordinary course of business at least five (5%) percent of the units in the Condominium operated by the Association. Following the time the Developer relinquishes control of the Association, the Developer may exercise the right to vote any Developer-owned units in the same manner as any other Unit Owner except for purposes of re-acquiring control of the Association or selecting the majority members of the Board of Administration.

The Developer reserves the right to transfer control of the Association to Unit Owners other than the Developer at any time, in its sole discretion. The Unit Owners shall take control of the Association if the Developer so elects prior to the time stated in the above schedule.

The Owners of the Residential Units shall be entitled to vote for a majority of the seats on the Board of Administration.

## VIII.

## COMMON EXPENSES, ASSESSMENTS, COLLECTION <u>LIEN AND ENFORCEMENT, LIMITATIONS</u>

The Board of Administration of the Association shall propose annual budgets in advance for each fiscal year which shall contain estimates of the cost of performing the functions of the Association, including but not limited to the common expense budget, which shall include, but not be limited to, the estimated amounts necessary for maintenance and operation of common elements and limited common elements, landscaping, streets and walkways, office expenses, utility services, replacement and operating reserve, casualty insurance, liability insurance, administration and salaries. Failure of the Board to include any item in the annual budget shall not preclude the Board from levying an additional assessment in any calendar year for which the budget has been projected. Each Unit Owner shall be liable for the payment to the Association of one thirty- sixth (1/36) of the common expenses as determined in said budget.

Common expenses include the expenses of the operation, maintenance, repair, or replacement of the common elements, costs of carrying out the powers and duties of the Association and any other expenses designated as common expense by the Condominium Act, the Declaration, the Articles of Incorporation, or the By-Laws of the Association. Common expenses also include reasonable transportation services, insurance for directors and officers, road maintenance and operation expenses, in-house communications and security services, which are reasonably related to the general benefit of the Unit Owners, even if such expenses do not attach to the common elements or property of the Condominium. However, such common expenses must either have been services or items provided from the date the control of the Board of Administration of the Association was transferred from the Developer to the Unit Owners or must be services or items provided for in the Condominium documents or By-Laws.

After adoption of the budget and determination of the annual assessment per unit, as provided in the By-Laws, the Association shall assess such sum by promptly notifying all owners by delivering or mailing notice thereof to the voting member representing each unit at such member's most recent address as shown by the books and records of the Association. One-twelfth (1/12) of the annual assessment shall be due and payable in advance to the Association on the first (1st) day of each month.

Each initial Unit Owner other than the Developer shall pay at closing a contribution in an amount at least equal to two monthly assessments for common expenses to the Condominium

Working Capital Fund. The present monthly assessment is $359.00 per month, therefore, the current contribution is $718.00. This contribution shall not be credited as advance maintenance payments for the unit.

Special assessments may be made by the Board of Administration from time to time to meet other needs or requirements of the Association in the operation and management of the Condominium and to provide for emergencies, repairs or replacements, and infrequently recurring items of maintenance. However, any special assessment in excess of one thousand dollars ($1,000) which is not connected with an actual operating, managerial or maintenance expense of the Condominium shall not be levied without the prior approval of the members owning a majority of the units in the Condominium.

The specific purpose or purposes of any special assessment approved in accordance with the Condominium documents shall be set forth in a written notice of such assessment sent or delivered to each Unit Owner. The funds collected pursuant to a special assessment shall be used only for the specific purpose or purposes set forth in such notice. However, upon completion of such specific purpose or purposes, any excess funds will be considered common surplus, and may, at the discretion of the Board, either be returned to the Unit Owners or applied as a credit towards future assessments.

The liability for any assessment or portion thereof may not be avoided by a Unit Owner or waived by reason of such Unit Owner's waiver of the use and enjoyment of any of the common elements of the Condominium or by abandonment of the unit for which the assessments are made.

The record owners of each unit shall be personally liable, jointly and severally, to the Association for the payment of all assessments, regular or special, made by the Association and for all costs of collection of delinquent assessments. In the event assessments against a unit are not paid within thirty (30) days after their due date, the Association shall have the right to foreclose its lien for such assessments.

Assessments and installments on them that are unpaid for over thirty (30) days after due date shall bear interest at the maximum rate permitted by law per annum from the due date until paid. If a payment is more than ten (10) days late, the Association may charge an administrative late fee in addition to such interest, in an amount not to exceed the greater of $25.00 or five percent of each installment of the assessment for each delinquent installment that the payment is late. Any payment received by the Association shall be applied first to any interest accrued by the Association, then to any administrative late fee, then to any costs and reasonable attorney's fees incurred in collection, and then to the delinquent assessment. The foregoing shall be applicable notwithstanding any restrictive endorsement, designation, or instruction placed on or accompanying a payment. A late fee shall not be subject to the provisions in Chapter 687 or Section 718.303(3), Florida Statutes.

The Association is authorized to approve or disapprove a proposed lease of a unit. The grounds for disapproval may include, but are not limited to, a unit owner being delinquent in the payment of an assessment at the time approval is sought. All disapprovals of leases by the Association must be reasonable and not arbitrary.

The Association has a lien on each condominium parcel to secure the payment of assessments, except as otherwise provided in this Article VII and as set forth below. "Condominium Parcel" or "Parcel" means a unit, together with the undivided share in the common elements appurtenant to the unit. The lien is effective from and shall relate back to the recording of the original Declaration of Condominium. However, as to first mortgages of record, the lien is effective from and after recording of a claim of lien in the Public Records of Brevard County in which the condominium parcel is located.

A claim of lien must state the description of the condominium unit, the name of the record owner, the name and address of the Association which is **CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., 2750 Tingley Drive, Merritt Island, Florida 32953,** the amount due and the due dates. A claim of lien must be signed and acknowledged by an officer or agent of the Association. The lien is not effective longer than one (1) year after the claim of lien was recorded unless, within that time, an action to enforce the lien is commenced. The one (1) year period is automatically extended for any length of time during which the Association is prevented from

filing a foreclosure action by an automatic stay resulting from a bankruptcy petition filed by the Unit Owner or any other person claiming any interest in the Unit. The claim of lien secures all unpaid assessments that are due and that may accrue after the claim of lien is recorded and through the entry of a final judgment, as well as interest and all reasonable costs and attorney's fees incurred by the Association incident to the collection process. Upon payment in full, the person making the payment is entitled to a satisfaction of the lien. By recording a notice in substantially the following form, a unit owner or his agent or attorney may require the Association to enforce a recorded claim of lien against his condominium parcel:

**Notice of Contest of Lien**

TO: CAPE CROSSING CONDOMINIUM ASSOCIATION, INC.
2750 Tingley Drive
Merritt Island, FL 32953

You are notified that the undersigned contests the claim of lien filed by you on _________, 20______, and recorded in Official Records Book _____ at Page _____ of the Public Records of Brevard County, Florida, and that the time within which you may file suit to enforce your lien is limited to ninety (90) days from the date of service of this notice.

Executed this ___ day of __________, 20___.

Signed:______________________________
Owner, Agent or Attorney

After the Notice of Contest of Lien has been recorded, the Clerk of the Circuit Court shall mail a copy of the recorded Notice to the Association by certified mail, return receipt requested, at the address shown in the Claim of Lien or most recent amendment to it and shall certify to the service on the face of the Notice. The service is complete upon mailing. After service, the Association has ninety (90) days in which to file an action to enforce the lien; and, if the action is not filed within the ninety (90) day period, the lien is void. However, the ninety (90) days period shall be extended for any length of time that the Association is prevented from filing its action because an automatic stay resulting from the filing of a bankruptcy petition by the unit owner or by any other person claiming an interest in the parcel.

The Association may bring an action in its name to foreclose a lien for assessments in the manner a mortgage on real property is foreclosed and may also bring an action to recover a money judgment for the unpaid assessments without waiving any claim of lien. The Association is entitled to recover its reasonable attorney's fees incurred in either a lien foreclosure action or any action to recover a money judgment for unpaid assessments.

Except as otherwise provided in Chapter 718, Florida Statutes, no lien may be filed by the Association against a condominium unit until thirty (30) days after the date on which a notice of intent to file a lien has been delivered to the owner by certified mail, return receipt requested, and by first class United States mail to the owner at his or her last known address as reflected in the records of the Association. However, if the address reflected in the records is outside the United States, then a notice must be sent by first class United States mail to the unit and to the last known address by regular mail with international postage, which shall be deemed sufficient. Delivery of the notice shall be deemed given upon mailing as required by Section 718.121(4), Florida Statutes. Alternatively, notice shall be complete as served on the unit owner in the manner authorized by Chapter 48, Florida Statutes, and the Florida Rules of Civil Procedure.

No foreclosure judgment may be entered until at least thirty (30) days after the Association gives written notice to the Unit Owner of its intention to foreclose its lien to collect the unpaid assessments. If this notice is not given at least thirty (30) days before the foreclosure action is filed, and if the unpaid assessments, including those coming due after the claim of lien is recorded, are paid before the entry of a final judgment of foreclosure, the Association shall not recover attorney's fees or costs. The notice must be given by delivery of a copy of it to the Unit Owner or by certified or registered mail, return receipt requested, addressed to the Unit Owner at his last known address; and upon such mailing, the notice shall be deemed to have been given, and the court shall proceed with the foreclosure action and may award attorney's fees and costs as

permitted by law. The notice requirements of this subsection are satisfied if the Unit Owner records a Notice of Contest of Lien as provided above. The notice requirements of this subsection do not apply if an action to foreclose a mortgage on the Condominium unit is pending before any court; if the rights of the Association would be affected by such foreclosure; and if actual, constructive, or substitute service of process has been made on the Unit Owner.

The Association, or its successor or assignee, that acquires title to a Unit through foreclosure of its lien for assessments, is not liable for any unpaid assessments, late fees, interest, or reasonable attorney's fees and costs that came due before the Association's acquisition in title in favor of any other Association, as defined in Section 718.103(2) or Section 720.301(9), Florida Statutes, which holds a superior lien interest on the Unit.

If the Unit Owner remains in possession of the unit after a foreclosure judgment has been entered, the court, in its discretion, may require the Unit Owner to pay a reasonable rental for the unit. If the unit is rented or leased during the pendency of the foreclosure action, the Association is entitled to the appointment of a receiver to collect the rent. The expenses of the receiver shall be paid by the party which does not prevail in the foreclosure action.

The Association has the power to purchase the Condominium Parcel at the foreclosure sale and to hold, lease, mortgage or convey it.

A first mortgagee acquiring title to a Condominium Parcel as a result of foreclosure, or a deed in lieu of foreclosure, may not during the period of its ownership of such parcel, whether or not such parcel is unoccupied, be excused from the payment of some or all of the common expenses, regular or special, coming due during the period of such ownership.

Within fifteen (15) days after receiving a written request therefor from a Unit Owner or his or her designee, or a unit mortgagee or his or her designee, the Association shall provide a certificate signed by an officer or agent of the Association stating all assessments and other monies owed to the Association by the Unit Owner with respect to the Condominium Parcel. Any person other than the owner who relies upon such certificate shall be protected thereby.

Any Unit Owner has the right to require from the Association a certificate showing the amount of unpaid assessments against him with respect to his Condominium Parcel . The holder of a mortgage or other lien of record has the same right as to any Condominium Parcel upon which he has a lien.

Any first mortgagee may make use of any unit acquired as may facilitate its sale including, but not limited to, the showing of the property and the display of "For Sale" signs and neither the other Unit Owners nor the association shall interfere with the sale of such units .

As to priority between the lien of a recorded mortgage and the lien for any assessment, the lien for assessment shall be subordinate and inferior to any recorded mortgage, unless the assessment is secured by a claim of lien which is recorded prior to the recording date of the mortgage.

Any person purchasing or encumbering a unit shall have the right to rely upon any statement made in writing by an officer of the Association regarding assessments against units which have already been made and which are due and payable to the Association, and the Association and the members shall be bound thereby.

In addition the Association may accelerate assessments of an owner delinquent in payment of common expenses. Accelerated assessments shall be due and payable on the date the claim of lien is filed. Such accelerated assessments shall include the amounts due for the remainder of the budget year in which the claim of lien was filed.

A Unit Owner, regardless of how his or her title has been acquired, including by purchase at a foreclosure sale or by deed-in-lieu of foreclosure, is liable for all assessments which come due while he or she is the Unit Owner. Additionally, a unit owner is jointly and severally liable with the previous owner for all unpaid assessments that came due up to the time of transfer of title. This liability is without prejudice to any right the owner may have to recover from the previous owner, the amounts paid by the owner. The grantee is jointly and severally liable with the grantor

for all unpaid assessments against the grantor for his share of the common expenses up to the time of the transfer of title, without prejudice to any right the grantee may have to recover from the grantor the amounts paid by the grantee.

The liability of a first mortgagee or its successor or assignees who acquire title to a unit by foreclosure or by deed in lieu of foreclosure for the unpaid assessments that became due prior to the mortgagee's acquisition of title is limited to the lesser of the unit's unpaid common expenses and regular periodic assessments which accrued or came due during the twelve (12) months immediately preceding the acquisition of title and for which payment in full has not been received by the Association or one percent (1%) of the original mortgage debt. The provisions of this paragraph apply only if the first mortgagee joined the Association as a defendant in the foreclosure action.

Joinder of the Association is not required if, on the date the complaint is filed, the association was dissolved or did not maintain an office or agent for service of process at a location which was known to or recently discoverable by the mortgagee.

If the Unit is occupied by a tenant and the Unit Owner is delinquent in paying any monetary obligation due to the Association, the Association may make a written demand that the tenant pay to the Association the subsequent rental payments and continue to make such payments until all monetary obligations of the Unit Owner related to the Unit have been paid in full to the Association. The tenant must pay the monetary obligations to the Association until the Association releases the tenant or the tenant discontinues tenancy in the Unit.

The Association must provide the tenant a notice, by hand delivery or United States mail, in substantially the following form:

> Pursuant to Section 718.116(11), Florida Statutes, the Association demands that you pay your rent directly to the Condominium Association and continue doing so until the Association notifies you otherwise.
>
> Payment due to the Condominium Association may be in the same form as you paid your landlord and must be sent by United States mail or hand delivery to CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., 2750 Tingley Drive, Merritt Island, Florida 32953, payable to the Association.
>
> Your obligation to pay your rent to the Association begins immediately, unless you have already paid rent to your landlord for the current period before receiving this notice. In that case you must provide the Association written proof of your payment within fourteen (14) days after receiving this notice and your obligation to pay rent to the Association would then begin with the next rental period.
>
> Pursuant to Section 718.116(11), Florida Statutes, your payment of rent to the Association gives you complete immunity from any claim for the rent by your landlord for all amounts timely paid to the Association.

The Association must mail written notice to the unit owner of the Association's demand that the tenant make payments to the Association.

The Association shall, upon request, provide the tenant with written receipts for payments made.

A tenant is immune from any claim by the landlord or unit owner related to the rent timely paid to the Association after the Association has made written demand.

If a tenant paid rent to the landlord or unit owner for a given rental period before receiving the demand from the Association and provides written evidence to the Association of having paid the rent within fourteen (14) days after receiving the demand, the tenant shall begin making rental payments to the Association for the following rental period and shall continue making rental payments to the Association to be credited against the monetary obligations of the unit owner until the Association releases the tenant or the tenant discontinues tenancy in the unit.

The liability of the tenant may not exceed the amount due from the tenant to the tenant's landlord. The tenant's landlord shall provide the tenant a credit against rents due to the landlord in the amount of monies paid to the Association.

The Association may issue notice under Section 83.56, Florida Statutes, and sue for eviction under Section 83.59-83.625, Florida Statutes, as if the Association were a landlord under part II of Chapter 83, Florida Statutes, if the tenant fails to pay a required payment to the Association after written demand has been made to the tenant. However, the Association is not otherwise considered a landlord under Chapter 83, Florida Statutes, and specifically has no obligations under Section 83.51, Florida Statutes.

The tenant does not by virtue of payment of monetary obligations to the Association have any rights of a unit owner to vote in any election or to examine the books and records of the Association.

A court may supercede the effect of the preceding eight (8) paragraphs of this Article by appointing a receiver.

## IX

## INSURANCE COVERAGE, USE AND DISTRIBUTION OF PROCEEDS, REPAIR OR RECONSTRUCTION AFTER CASUALTY, CONDEMNATION

Type and Scope of Insurance Coverage Required

1. Property Insurance

Adequate property insurance, regardless of any requirement in the Declaration of Condominium for coverage by the Association for full insurable value, replacement cost, or similar coverage, must be based on a replacement cost of the Property to be insured as determined by an independent insurance appraisal or update of a prior appraisal. The replacement cost must be determined at least once every thirty-six (36) months.

When determining the adequate amount of property insurance coverage, the Association may consider deductibles as determined by Section 718.111(11), Florida Statutes, and amendments thereto.

If the Association is Developer-controlled, the Association shall exercise its best efforts to obtain and maintain insurance as described above. Failure to obtain and maintain adequate property insurance during any period of Developer control constitutes a breach of fiduciary responsibility by the Developer-appointed members of the board of directors of the Association, unless the members can show that despite such failure, they have made their best efforts to maintain the required coverage.

Policies may include deductibles as determined by the Board as follows:

a. The deductibles shall be consistent with industry standards and prevailing practice for communities of similar size and age, and having similar construction and facilities in Brevard County, Florida.

b. The deductibles may be based upon available funds, including reserve accounts, or predetermined assessment authority at the time the insurance is obtained.

c. The board shall establish the amount of deductibles based upon the level of available funds and predetermined assessment authority at a meeting of the board in the manner set forth in Section 718.112(2)(e), Florida Statutes.

Upon transfer of control of the Association by the Developer to Unit Owners other than the Developer, the Association shall use its best efforts to obtain and maintain adequate property insurance to protect the Association, the Association property, the common

elements, and the Condominium property that is required to be insured by the Association as provided herein.

Every property insurance policy issued or renewed for the purpose of protecting the Condominium must provide primary coverage:

a. All portions of the condominium property as originally installed or replacement of like kind and quality, in accordance with the original plans and specifications.

b. All alterations or additions made to the Condominium property or Association property pursuant to Section 718.113(2), Florida Statutes.

c. The coverage shall exclude all personal property within the unit or limited common elements, and floor, wall, and ceiling coverings, electrical and plumbing, fixtures, appliances, water heaters, water filters, built-in cabinets and countertops, and window treatments, including curtains, drapes, blinds, hardware, and similar window treatment components, or replacements of any of the foregoing which are located within the boundaries of the unit and serve only such Unit. Such property and any insurance thereupon is the responsibility of the Unit Owner.

A Condominium Unit Owner's policy must conform to the requirements of Section 627.714, Florida Statutes.

All reconstruction work after a property loss must be undertaken by the Association except as otherwise authorized in this Section. A Unit Owner may undertake reconstruction work on portions of the Unit with the prior written consent of the board of administration. However, such work may be conditioned upon the approval of the repair methods, the qualifications of the proposed contractor, or the contract that is used for that purpose. A Unit Owner shall obtain all required governmental permits and approvals prior to commencing reconstruction.

Unit Owners are responsible for the costs of reconstruction of any portions of the condominium property for which the Unit Owners are required to carry property insurance, and any such reconstruction work undertaken by the Association is chargeable to the Unit Owner and enforceable as an assessment pursuant to Section 718.116, Florida Statutes.

2. Liability Insurance

The Association shall maintain commercial general liability insurance coverage covering all of the common elements, commercial space owned and leased by the Association, if any, and public ways such as driveways and walkways of the Condominium project. Coverage limits shall be for at least $1,000,000.00 for bodily injury, including deaths of persons and property damage arising out of a single occurrence. Coverage under this policy shall include, without limitation, legal liability of the insureds for property damage, bodily injuries and deaths of persons in connection with the operation, maintenance or use of the common elements, and legal liability arising out of lawsuits related to employment contracts of the Association, if available at a reasonable cost. Such policies shall provide that they may not be canceled or substantially modified, by any party, without at least thirty (30) days prior written notice to the Association and to each holder of a first mortgage on any unit in the Condominium which is listed as a scheduled holder of a first mortgage in the insurance policy. The Association shall provide, if required by the holder of first mortgages on individual units, such coverage to include protection against such other risks as are customarily covered with respect to condominiums similar in construction, location and use, including but not limited to, host liquor liability, workers compensation and employers liability insurance, and commercial automobile liability insurance.

The Association's liability insurance policies do not provide coverage for the units. Each Unit Owner shall purchase liability insurance in the minimum amount of Three Hundred Thousand & 00/100 Dollars ($300,000.00) for their units.

3. Flood Insurance

If the Condominium is located within an area which has been officially identified by the Secretary of Housing and Urban Development as having special flood hazards and for which flood insurance has been made available under the National Flood Insurance Program (NFIP), the Association shall obtain and pay the premiums upon, as a common expense, a "master" or "blanket" policy of flood insurance on the buildings and any other property covered by the required form of policy (herein insurable property), in an amount deemed appropriate by the Association, as follows:

The lesser of: (a) the maximum coverage available under the NFIP for all buildings and other insurable property within the Condominium to the extent that such buildings and other insurable property are within an area having special flood hazards; or (b) one hundred (100%) percent of current "replacement cost" of all buildings and other insurable property within such area.

Such policy may be in a form which meets the criteria set forth in the most current guidelines on the subject issued by the Federal Insurance Administrator.

Each unit owner shall obtain, maintain and pay their premiums upon a policy of flood insurance covering the improvements of his/her unit, if applicable.

4. Fidelity Bonds

The Association shall maintain insurance or fidelity bonding of all persons who control or disburse funds of the association. The insurance policy or fidelity bond must cover the maximum funds that will be in the custody of the Association or its management agent at any one time. As used in this paragraph, the term "persons who control or disburse funds of the association" includes, but is not limited to, those individuals authorized to sign checks on behalf of the Association, and the president, secretary, and treasurer of the Association. The Association shall bear the cost of any such bonding. If a management agent has the responsibility for handling or administering funds of the Association, the insurance or fidelity bonding of the management agent shall include the management company, its officers, employees and agents, handling or responsible for funds of, or administered on behalf of, the Association. However, the cost of bonding the officers, employees and agents of the management company may be reimbursed to the Association by the management company. Such fidelity bonds shall name the Association as an obligee. The bonds shall provide that they may not be canceled or substantially modified (including cancellation for non-payment of premium) without at least thirty (30) days prior written notice to the Association, insurance trustee and the Federal National Mortgage Association, if applicable. Under no circumstances shall the principal sum of the bonds be less than the amount required by the Florida Condominium Act.

5. Errors and Omissions Insurance

The Association shall obtain and maintain for the benefit of the Officers and Directors of the Association a policy or policies of insurance insuring the Association, its officers and directors against liability resulting from the errors and/or omissions of the officers and/or directors in the amount of no less than $1,000,000.00. All renewal or replacement policies of said policy shall have a retroactive date that coincides with the retroactive date included on the initial directors and officers liability policy.

6. Insurance Trustees; Power of Attorney

The Association may name as an insured, on behalf of the Association, the Association's authorized representative, including any trustee with whom the Association may enter into any insurance trust agreement or any successor to such trustee (each of whom shall be referred to herein as "insurance trustee"), who shall have exclusive authority to negotiate losses under any policy providing such property or liability insurance and to perform such other functions as are necessary to accomplish this purpose.

Each Unit Owner by acceptance of a deed conveying a unit in the Condominium to the Unit Owner hereby appoints the Association, or any insurance trustee or substitute insurance trustee designated by the Association, as attorney-in-fact for the purpose of purchasing and maintaining such insurance, including: the collection and appropriate disposition of the proceeds thereof; the negotiation of losses and execution of releases of liability; the execution of all documents; and the performance of all other acts necessary to accomplish such purpose.

7. Qualifications of Insurance Carriers

The Association shall use generally acceptable insurance carriers. Only those carriers meeting the specific requirements regarding the qualifications of insurance carriers as set forth in the Federal National Mortgage Association Conventional Home Mortgage Selling Contract Supplements and the FHLMC Sellers Guide shall be used.

The Association may amend the Declaration of Condominium without regard to any requirement for approval by mortgagees of amendments affecting insurance requirements for the purpose of conforming the Declaration of Condominium to the coverage requirements of the Florida Condominium Act.

Any restoration, repair or reconstruction made necessary through a casualty shall be commenced and completed as expeditiously as reasonably possible, and must substantially be in accordance with the plans and specifications for the construction of the original building. In no event shall any reconstruction or repair change the relative locations and approximate dimensions of the common elements and of any unit, unless an appropriate amendment be made to this Declaration.

Any portion of the Condominium property required to be insured by the Association against property loss pursuant to Article IX which is damaged shall be reconstructed, repaired, or replaced as necessary by the Association as a common expense. All property insurance deductibles, uninsured losses, and other damages in excess of property insurance coverage under the property insurance policies maintained by the Association are a common expense of the Condominium, except that:

a. A unit owner is responsible for the costs of repair or replacement of any portion of the condominium property not paid by insurance proceeds, if such damage is caused by intentional conduct, negligence, or failure to comply with the terms of the declaration or the rules of the association by a unit owner, the members of his or her family, unit occupants, tenants, guests, or invitees, without compromise of the subrogation rights of any insurer.

b. The provisions of the subparagraph immediately above regarding the financial responsibility of a unit owner for the costs of repairing or replacing other portions of the condominium property also apply to the costs of repair or replacement of personal property of other Unit Owners or the Association, as well as other property, whether real or personal, which the Unit Owners are required to insure under the Florida Condominium Act.

c. To the extent the cost of repair or reconstruction for which the unit owner is responsible under this paragraph is reimbursed to the Association by insurance proceeds, and, to the extent the Association has collected the cost of such repair or reconstruction from the unit owner, the Association shall reimburse the unit owner without the waiver of any rights of subrogation.

d. The Association is not obligated to pay for repair or reconstruction or repairs of property losses as a common expense if the property losses were known or should have been known to a unit owner and were not reported to the Association until after the insurance claim of the Association for that property was settled or resolved with finality, or denied on the basis that it was untimely filed.

The Association may, upon the approval of a majority of the total voting interests in the Association, opt out of the provisions of subparagraphs a, b, c and d, immediately above,

for the allocation of repair or reconstruction expenses and allocate repair or reconstruction expenses in the manner provided in the declaration as originally recorded or as amended. Such vote may be approved by the voting interests of the Association without regard to any mortgagee consent requirements.

The Association, subsequent to voting to opt out of the guidelines for repair or reconstruction expenses as described in subparagraphs a, b, c, and d above must record a notice setting forth the date of the opt-out vote and the page of the Public Records of Brevard County, Florida on which the declaration is recorded. The decision to opt out is effective upon the date of recording of the notice in the public records by the Association. An association that has voted to opt out of subparagraphs a, b, c, and d above may reverse that decision by a majority vote of the total voting interests in the Association and notice thereof shall be recorded in the Public Records of Brevard County, Florida.

The Association is not obligated to pay for any reconstruction or repair expenses due to property loss to any improvements installed by a current or former owner of the unit or by the Developer if the improvement benefits only the unit for which it was installed and is not part of the standard improvements installed by the Developer on all units as part of original construction, whether or not such improvement is located within the unit. This paragraph does not relieve any party of its obligations regarding recovery due under any insurance implemented specifically for any such improvements.

8. Condemnation and Total or Partial Loss or Destruction

The Association shall represent the Unit Owners in the condemnation proceedings or in negotiations, settlements and agreements with the condemning authority for acquisition of the common elements, or part thereof, by the condemning authority. Each Unit Owner hereby appoints the Association as attorney-in-fact for such purpose.

The Association may appoint a trustee to act on behalf of the Unit Owners, in carrying out the above functions, in lieu of the Association.

In the event of a taking or acquisition of part or all of the common elements by a condemning authority, the award or proceeds of settlement shall be payable to the Association, or any trustee, to be held in trust for the Unit Owners .

In the event any loss, damage or destruction to the insured premises is not substantial (as such term "substantial" is hereinafter defined), and such loss, damage or destruction is replaced, repaired or restored with the Association's funds any repair and restoration on account of physical damage shall restore the improvements to substantially the same condition as existed prior to the casualty.

Substantial loss, damage or destruction as the term is herein used, shall mean any loss, damage or destruction sustained to the insured improvements which would require an expenditure of sums in excess of ten (10%) percent of the amount of coverage under the Association's casualty insurance policy or policies then existing, in order to restore, repair or reconstruct the loss, damage or destruction sustained.

In the event the Association chooses not to appoint an insurance trustee, any casualty insurance proceeds becoming due by reason of substantial loss, damage or destruction sustained to the Condominium improvements shall be payable to the Association, which proceeds shall be held in a construction fund to provide for the payment for all work, labor and materials to be furnished for the reconstruction, restoration and repair of the Condominium Property which means the lands, leaseholds and personal property that are subjected to Condominium ownership and all improvements thereon. Disbursements from such construction fund shall be by usual and customary construction loan procedures. Any sums remaining in the construction loan fund after the completion of the restoration, reconstruction and repair of the improvements and full payment therefor, shall be paid over to the Association and held for, and/or distributed to the Unit Owners in proportion to each Unit Owner's share of common surplus. If the insurance proceeds payable as the result of such casualty are not sufficient to pay the estimated costs of such restoration, repair and reconstruction, which estimate shall be made prior to proceeding with restoration, repair or

reconstruction, the Association shall levy a special assessment against the Unit Owners for the amount of such insufficiency, and shall pay said sum into the aforesaid construction loan fund.

If substantial loss, damage or destruction shall be sustained to the Condominium improvements, and at a special members' meeting called for such purpose, the owners of a majority of the units in the Condominium vote and agree in writing that the damaged property will not be repaired or reconstructed, the Condominium shall be terminated as provided in Article XIV of this Declaration.

## X

## RESPONSIBILITY FOR MAINTENANCE AND REPAIRS

A. Except as provided for in Article IX, Section 7, subsections a, b, c and d, each Unit Owner shall bear the cost and be responsible for the maintenance, repair and replacement, as the case may be, of all personal property within the unit or limited common elements, air conditioning and heating equipment, electrical and plumbing fixtures, kitchen and bathroom fixtures, and all other appliances or equipment, including any fixtures and/or their connections required to provide water, light, power, telephone, sewage and sanitary service to their unit and which may now or hereafter be affixed or contained within their unit. Such owner shall further be responsible for maintenance, repair and replacement of all floor, wall and ceiling coverings, electrical fixtures, appliances, air conditioner or heating equipment servicing his/her unit, although such equipment may not be located in the unit, water heaters, water filters, built-in cabinets and countertops and window treatments including curtains, drapes, blinds, hardware and similar window treatment components or replacements or any of the foregoing which are located within the boundaries of a unit and serve only one (1) unit and all air conditioning, compressors that service only an individual unit whether or not located within the unit boundaries and painting, decorating and furnishings and all other accessories which such Unit Owner may desire to place or maintain therein or any replacement thereof. Unit Owners are responsible for the maintenance, including cleaning, repair or replacement of windows and any screening thereon, screen doors and fixed and sliding glass doors. Air conditioning and heating equipment servicing individual units is a limited common element appurtenant to such units. The maintenance, repair or replacement of the interior surfaces of the storage spaces, any floor coverings on the exterior surface of the balconies or patios installed by owner and permitted by the Association and any storm protection shutters installed by the Developer or owner as provided herein shall be the responsibility of the Unit Owner at their expense.

B. The Association, at its expense, shall be responsible for the maintenance, repair and replacement of all the common elements, including those portions thereof which contribute to the support of the building, and all conduits, ducts, plumbing, sprinkler systems, wiring and other facilities located in the common elements, for the furnishing of utility services to the units, including artesian wells, pumps and piping. Painting and cleaning of all exterior portions of the building, including all exterior doors opening into walkways, shall also be the Association's responsibility. Sliding glass doors, screen doors, storm protection shutters on balconies or patios and windows, windows and screens on windows, shall not be the Association's responsibility, but shall be the responsibility of the Unit Owner. Should any damage be caused to any unit by reason of any work which may be done by the Association in the maintenance, repair or replacement of the common elements, the Association shall bear the expense of repairing such damage.

C. Where loss, damage or destruction is sustained by casualty to any part of the building, and such loss, damage or destruction is insured for such casualty under the terms of the Association's casualty insurance policy or policies, but the insurance proceeds payable on account of such loss, damage or destruction are insufficient for restoration, repair or reconstruction, all the Unit Owners shall be specially assessed to make up the deficiency, irrespective of a determination as to whether the loss, damage or destruction is to a part of the building, or to fixtures or equipment which it is a Unit Owner's responsibility to maintain.

No Unit Owner shall do anything within his unit or on the common elements which would adversely affect the safety or soundness of the common elements or any portion of the Association property or Condominium Property which is to be maintained by the Association.

D. In the event owners of a unit make any structural addition or alteration without the required written consent, the Association or an owner with an interest in any unit shall have the right to proceed in a court of equity to seek compliance with the provisions hereof. The Association has the irrevocable right of access to each unit during reasonable hours, when necessary for the maintenance, repair, or replacement of any common elements or as necessary to prevent damage to the common elements or to a unit or units. Unit Owners shall provide the Association with a copy of all keys to their unit. The Association shall maintain the keys to the units in a safe secure location that is accessible only to the Board of Directors or their designee.

Maintenance of the common elements is the responsibility of the Association. All limited common elements shall be maintained by the Association except for air conditioning and heating equipment servicing individual units, the interior surfaces of the storage spaces and any permitted floor coverings on balconies or patios. In the event the Association shall grant an owner permission to cover the exterior surface of the balcony floors then, in the event the floor covering is damaged or destroyed by the Association in making repairs to the balconies or patios it shall be the responsibility of the owner and not the Association to pay for the repair or replacement of the floor covering. The owner of the unit to which a storage space is appurtenant shall pay the expenses of maintaining, repairing or replacing the doors, locks and hardware, and the interior walls of the storage space. If the record owner of the unit has been granted permission to install a DSS Satellite Dish which has a maximum diameter of eighteen (18) inches and can be mounted or affixed to the Condominium building at a location approved by the Association in writing, in advance of the installation, then the record owner of each such unit shall bear the costs and shall be responsible for the maintenance, repair and replacement, of the satellite dish. The Unit Owner shall maintain the air conditioning and heating equipment servicing his unit, and the DSS satellite dish, at the Unit Owner's expense.

E. The Board of Administration of the Association may enter into a contract with any firm, person or corporation for the maintenance and repair of the common elements and limited common elements and may join with other Condominium corporations in contracting with the same firm, person or corporation for maintenance and repair.

F. The Association shall determine the exterior color scheme of all buildings and shall be responsible for the maintenance thereof, and no owner shall paint an exterior wall, door, window, patio or any exterior surface, etc., at any time without the written consent of the Association

## XI

## USE RESTRICTIONS

A. Each unit is hereby restricted to residential use by the owner or owners thereof, their immediate families, lessees, guests and invitees. Each unit is restricted to no more than six (6) occupants, without the Association's consent. There are no restrictions upon children.

B. The unit may be rented provided the occupancy is only by one (1) lessee and members of his immediate family and guests. There is no minimum rental period and rentals are unrestricted. The unrestricted rental periods shall not be amended without the approval of at least eighty (80%) percent of the Unit Owners in the Condominium (i.e. at least –twenty-nine (29) of the thirty-six (36) Unit Owners must vote for the modification or amendment) at a duly called meeting of the Association for the purpose of amending the rental restrictions. No lease of a unit shall release or discharge the owner thereof of compliance with this Section X or any of his other duties as a Unit Owner. Time sharing of units is prohibited. Subleasing of units is prohibited. All leases shall be in writing and shall be subject to this Declaration, the Articles of Incorporation, By-Laws, and the Rules and

Regulations of the Association and shall be approved by the Association, in its sole discretion.

C. No nuisances shall be allowed to be committed or maintained upon the Condominium Property, nor any use or practice that is the source of annoyance to residents or which interferes with the peaceful possession and proper use of the property by its residents. All parts of the property shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage allowed to accumulate, nor any fire hazard allowed to exist. No Unit Owner shall permit any use of his unit or use of the common elements that will increase the cost of insurance upon the Condominium Property.

D. No immoral, improper, or offensive use shall be made of the Condominium Property nor any part thereof, and all laws, zoning ordinances and regulations of all governmental authorities having jurisdiction of the Condominium shall be observed.

E. Reasonable rules and regulations concerning the use of the Condominium Property may be made and amended from time to time by the Board of Administration of the Association as provided by its Articles of Incorporation and By-Laws.

F. The Association has the irrevocable right of access to each unit during reasonable hours, when necessary for the maintenance, repair, or replacement of any common elements or of any portion of a unit to be maintained by the Association pursuant to the Declaration or as necessary to prevent damage to the common elements or to a unit or units.

G. No sign, advertisement or notice of any type shall be shown on the common elements or any unit. This restriction on signs, advertising and notices shall not apply to the Developer. No exterior antennas or aerials shall be erected on the Condominium Property. The Developer or the Association after transfer of control of the Association to Unit Owners other than the Developer, may grant permission to record Unit Owners to install DSS satellite dishes which are approximately eighteen (18) inches in diameter. The Developer or the Association after turnover may grant written permission to the record Unit Owner and, if granted, shall designate the location of the DSS satellite dish in writing prior to the installation of the satellite dish. The record Unit Owner shall be responsible for all costs related to the installation, maintenance, repair and replacement of the DSS satellite dish and shall indemnify, defend and hold the Association harmless therefor. Upon the sale of the unit by the record owner of the unit the DSS satellite dish may be removed, at the owner's expense, or it may be transferred to the purchaser as part of the sale and purchase. In the event the DSS satellite dish is not removed by the record Unit Owner at closing then, by acceptance of the deed of conveyance by the purchaser, the purchaser shall be deemed to have assumed the responsibility for the maintenance, repair and replacement of the DSS satellite dish, together with the costs and expenses thereof, including the obligation to indemnify, defend and hold the Association harmless therefor. The installation of the DSS satellite dish does not relieve the Unit Owner from payment of the fee for the installed cable television connection provided by the Association as part of the Association's common expenses. This provision shall be deemed a covenant running with the land and shall be binding upon each successive owner of any Condominium unit utilizing a DSS satellite dish.

H. An owner shall not place or cause to be placed in the walkways or in or on any other common elements and facilities, stairs, or stairwells, any furniture, packages or objects of any kind. Such areas shall be used for no other reason than for normal transit through them. The Association may permit a Unit Owner to place small potted plants or small decorative items near the front doors of the unit so long as the potted plants or decorative items do not protrude into or block access to the common walkways. The Association reserves the right to restrict or prohibit the placement of potted plants or decorative items on the common elements.

I. Any Unit Owner may display one portable, removable United States flag in a respectful way and on Armed Forces Day, Memorial Day, Flag Day, Independence Day and Veterans Day may display in a respectful way portable, removable official flags, not larger than 4 ½ feet by 6 feet, that represent the United States Army, Navy, Air Force, Marine Corps, or Coast Guard, regardless of any declaration rules or requirements dealing with flags.

J. It is prohibited to dust rugs, etc., from windows, patios or balconies or to clean rugs, etc., by beating on the exterior of the building. It is prohibited to hang garments, rugs, etc., from the windows, patios, balconies or from any of the facades of the buildings.

K. There are no special parking or storage facilities located on the Condominium Property. All owners must utilize their assigned garage parking spaces for their vehicle. No boats, utility trailers, recreational vehicles or special purpose vehicles shall be parked on the Condominium Property. No motorhome, trailer, camper, watercraft, or commercial vehicle may be parked on the Condominium Property. Any vehicle with visible advertising on the vehicle may be deemed a commercial vehicle, in the sole discretion of the Board of Administration. However, trucks with one (1) ton capacity or less and sport utility vehicles will not be deemed to be commercial vehicles unless the Board of Administration deems the vehicle to be a commercial vehicle as set forth above. Any vehicle may be temporarily parked on the streets when loading and unloading. Prior written approval of the Association to temporarily park a commercial vehicle is required and may not exceed four (4) forty-eight (48) hour periods in any year. No non-operating or non-functioning vehicle of any kind shall be permitted to be parked on the Condominium Property. There shall be no repair, except emergency repair, performed on any permitted motor vehicle on the Condominium Property. It is acknowledged and agreed by all Unit Owners that a violation of any of the provisions of this paragraph shall impose irreparable harm to the other Owners in this Condominium and that levying of fines by the Association for violations is appropriate. See Article XXVI Fines for procedures for levying fines by the Association. No parking space shall be used by any other person other than an occupant of the Condominium who is an actual resident or by a guest or visitor and by such guest or visitor only when such guest or visitor is, in fact, visiting and upon the premises. All owners and residents of the Condominium are restricted to two (2) permitted vehicles per unit without the Association's consent to bring additional vehicles on the premises. All vehicles shall be parked in the open parking spaces except when loading or unloading vehicles. The storage spaces are not air-conditioned. As a result mildew and rust may form on any items placed or stored in the storage spaces. The Unit Owner shall be responsible for any damage caused to stored items by mildew or rust and the Unit Owner hereby releases Developer and the Association of any and all liability for same.

L. Until the Developer has closed the sales of all of the units in the Condominium, neither the other Unit Owners nor the Association shall interfere with the sale of such units. The Developer may make such use of the unsold units and common elements as may facilitate its sales, including but not limited to maintenance of a sales office, model units, the showing of the property, and the display of signs. The Developer may not be restricted in the use of the other common elements or areas.

M. Two household pets not exceeding forty (40) pounds each which shall mean cats or dogs unless otherwise approved by the Board of Administration shall be allowed to be kept in the owner's unit. All pets must be kept on a leash when outside the owner's unit. Each pet owner shall be responsible for cleaning up after his pets in the common elements. Pets shall not create a nuisance. Notwithstanding any provision to the contrary contained herein, certified guide dogs, service animals and signal dogs (as defined herein below) (hereinafter collectively referred to as "specially trained animals") shall be permitted at the Condominium subject to the following restrictions:

i. such specially trained animals shall not be kept, bred, or used at the Condominium for any commercial purpose; and

ii. such specially trained animals shall be on a leash while on the common elements.

Any pet as described above and any specially trained animal causing a nuisance or unreasonable disturbance to any other occupant of the Condominium shall be promptly and permanently removed from the Condominium upon notice given by the Board or Managing Agent; provided, however, that any such notice given with respect to a specially trained animal shall provide that before such animal must be removed, its owner shall have a reasonable time to acquire a replacement specially trained animal unless the Board

determines that such animal poses an imminent serious threat of physical harm to other occupants at the Condominium. The Board may from time to time promulgate such rules and regulations regarding the continued keeping of such pets and specially trained animals as the circumstances may then require or the Board may deem advisable.

The term "guide dog" shall mean "any dog individually trained by a licensed guide dog trainer for guiding a blind person by means of a harness attached to the dog and a rigid handle grasped by the person".

The term "service animal" shall mean "any animal that is trained to provide those life activities limited by the disability of the person".

The term "signal dog" shall mean "any dog that is trained to alert a deaf person to intruders or sounds".

N. No Unit Owner shall allow anything whatsoever to fall from the window, patio, balcony, terrace, porch, or doors of the premises, nor shall he sweep or throw from the premises any dirt or other substance into any of the corridors, halls, patios, balconies, terraces or porches, elevators, ventilators, or elsewhere in the building or upon the grounds. A Unit Owner shall not place, store or use any item, upon any patio, balcony, terrace or porch without the approval of the Association, other than standard patio chairs, tables and furnishings and potted plants. Charcoal grills are prohibited.

O. When a unit is leased, a tenant shall have all use rights in the Association property and those common elements otherwise readily available for use generally by Unit Owners and the Unit Owner shall not have such rights except as a guest. Nothing in this subsection shall interfere with the access rights of the Unit Owner as a landlord pursuant to Chapter 83, Florida Statutes. The Association shall have the right to adopt rules to prohibit dual usage by a Unit Owner and a tenant of Association property and common elements otherwise readily available for use generally by Unit Owners.

P. The garage doors shall be kept closed at all times except when parking or removing cars from the Building.

Q. The Association reserves the right to levy a charge to any Unit Owner using the enclosed storage space to store appliances, dehumidifiers, table saws or any other type of devices that use electricity.

R. No Unit Owner shall make any changes to the existing landscaping of the Condominium without the Association's prior written consent.

S. Carpeting of any type on individual unit balconies or patios or walkways is prohibited and the Association shall not grant permission to install carpet on the individual unit balconies or patios.

## XII

## LIMITATIONS UPON RIGHT OF OWNER TO ALTER OR MODIFY UNIT

No owner of a unit shall make any structural modifications or alterations of the unit. Further, no owner shall cause any improvements or changes to be made on or to the exterior of the building, including painting or other decoration, the installation of awnings, electrical wiring, air conditioning units and other things which might protrude through or be attached to the walls of the building; further, no owner shall in any manner change the appearance of any portion of the buildings not wholly within the boundaries of the unit. The Association has adopted storm protection shutter specifications for the building which include color, style and other factors deemed relevant by the Board and will permit the installation of storm protection shutters for the balconies, patio doors and windows. The maintenance, repair or replacement of the storm protection shutters shall be the responsibility of the owner at the owner's expense. The installation, repair, replacement and maintenance of the storm protection shutters, including color, shall be approved by the Association prior to installation, repair, replacement or maintenance and such

installation, repair, replacement or maintenance shall comply with applicable building codes. The installation, repair, replacement, and maintenance of such shutters in accordance with the procedures set forth herein shall not be deemed material alterations to the common elements within the meaning of the Condominium Act.

The floors of each Unit above the first habitable floor shall either be covered with wall to wall carpeting installed over high quality padding, or for any hard-surface floor covering (e.g. marble, slate, tile parquet or hardwood), a sound absorbent under layer material with a Sound Transmission Class (STC), "Field" Sound Transmission Class (FSTC), Impact Insulation Class (IIC), and "Field" Impact Insulation Class (FIIC) rating greater than the Florida Building Code. Except for original installation by the Developer, any Owner wishing to install any hard surface floor covering (or wishing to have no floor covering) must install such sound absorbent under layer, and must obtain written approval of the Board prior to any work being done. If the installation is made without prior approval the Board may, in addition to exercising all the other remedies provided in this Declaration, require the Owner to cover all such hard-surface flooring at the expense of the offending Owner. Applicable warranties of the Developer, if any, shall be voided by violations of these restrictions and requirements. Each Owner agrees that sound transmission in a multi-story building such as the Condominium is very difficult to control, and that noise from adjoining or nearby Units and/or mechanical equipment can often be heard in another Unit. The Developer does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and each Unit Owner shall be deemed to waive and expressly release any such warranty and claim for loss or damages resulting from sound transmission.

Notwithstanding anything herein contained to the contrary, the installation of insulation under hard surface floor coverings shall not be required for any Unit that is not located above another Unit or above Common Elements that may reasonably be considered by the Board to be areas of general circulation (for example: lobbies, hallways, recreation room, if any etc.), and/or recreational areas. Accordingly, if a Unit has no Improvements below it, or a acoustical room below it, it shall not be required to install insulation under hard surface floor coverings.

Any Unit Owner desiring to replace the flooring in the permitted areas described above with hard surface flooring shall submit the proposed changes to the Board of Directors who shall ensure that the installation of the hard surface flooring shall be in accordance with this Article XI as determined by the Board in its sole discretion.

## XIII

## ADDITIONS, ALTERATIONS OR IMPROVEMENTS BY ASSOCIATION

Whenever in the judgment of the Board of Administration the Condominium Property shall require additions, material alterations or substantial improvements (in excess of the usual items of maintenance), and the making of such additions, material alterations or substantial improvements shall have been approved by a majority of the Unit Owners, the Board of Administration shall proceed with such additions, alterations or improvements and shall specially assess all Unit Owners for the cost thereof as a common expense.

Except as otherwise provided in Section 718.113, Florida Statutes, there shall be no material alterations or substantial additions to the common elements or to real property which is Association property, except in a manner provided in the Declaration as originally recorded or as amended under the procedures set forth herein. A majority of the total voting interests of the Association must approve the alterations or additions.

An Association may not refuse a request of a unit owner for a reasonable accommodation for the attachment to the mantel or frame of the door of the unit owner a religious object not to exceed three (3") inches wide, six (6") inches high and one point five (1.5") inches deep.

## XIV

## AMENDMENT OF DECLARATION

These restrictions, reservations, covenants, conditions and easements may be modified or amended by recording such modifications in the Public Records of Brevard County, Florida, only after approval by the owners of at least eighty (80%) percent of the total units in the Condominium (i.e. at least twenty-nine (29) of the thirty-six (36) Unit Owners must vote for the modification or amendment). No amendment to this Declaration shall be adopted which would operate to materially affect the validity or priority of any mortgage held by an institutional first mortgagee or which would alter, amend or modify, in any manner whatsoever, the rights, powers, interests or privileges granted in favor of any institutional first mortgagee or in favor of the Developer without the consent of all such mortgagees or the Developer, as the case may be, or as otherwise required by the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation which consent may not be unreasonably withheld. There shall be no amendment adopted altering the share of ownership in the common elements or surplus, or altering the share of common expenses, except by the unanimous vote of all members in the Association and by the respective institutional first mortgagees.

Notwithstanding anything to the contrary contained in this Declaration, the Developer expressly reserves the right to amend the Declaration so as to correct any legal description contained herein, which legal description or descriptions may have been incorrect by reason of a scrivener's or surveyor's error. The Developer may amend this Declaration as aforedescribed by filing an amended legal description (or descriptions) as an amendment to the Declaration among the Public Records of Brevard County, Florida, which amendment (or amendments) shall expressly describe that legal description which is being corrected (by reference to the exhibit containing said legal description or otherwise), in addition to the corrected legal description. Such amendments need be executed and acknowledged only by the Developer and need not be approved by the Association, Unit Owners, lienors or mortgagees of units of the Condominium whether or not elsewhere required for amendments. As part and parcel of any such amendment as provided for in this subparagraph, however, there shall be attached thereto an affidavit of the individual or individuals responsible for the original incorrect legal description, whether he be scrivener or surveyor, which affidavit shall set forth (1) that said individual made an error in the legal description, (2) that the error is corrected by the description contained in the amendment, and (3) that it was the intent at the time of the incorrect original legal description to make that description such as is contained in the new amendment. In the event the party responsible for the original incorrect legal description has died, or is not available, then in that event, any other party having personal knowledge of the incorrect legal description by reason of the scrivener's or surveyor's error may execute the required affidavit for the amendment provided herein. Any amendment subject to Section 718.110(4), Florida Statutes shall be approved by a majority of the voting interests of the Condominium and all record owners of liens on the unit.

Pursuant to Section 718.110(2), Florida Statutes, the Developer may make amendments to this Declaration without consent of the Unit Owners which shall be limited to matters other than those under Sections 718.110(4) and (8), Florida Statutes.

The Association may amend the Declaration of Condominium without regard to any requirement for approval by mortgagees of amendments affecting insurance requirements for the purpose of conforming the Declaration of Condominium to the coverage requirements of the Florida Condominium Act.

In the event it shall appear that there is an error or omission in this Declaration or exhibits thereto, then and in that event the Association may correct such error and/or omission by an amendment to this Declaration in the manner hereinafter described to effectuate an amendment for the purpose of curing defects, errors or omissions. Such an amendment shall not require a vote of approval as provided above but shall require a vote in the following manner:

(a) Notice of the subject matter of a proposed amendment to cure a defect, error or omission shall be included in the notice of any meeting at which such proposed amendment is to be considered.

(b) A resolution for the adoption of such a proposed amendment may be proposed by either the Board of Administration of the Association or by the members of the Association. Unit owners may not vote by general proxy, but may vote limited proxies substantially conforming to a limited proxy form, adopted by the Division. Limited proxies and general proxies may be used to establish a quorum. Limited proxies shall be used for votes on the matters listed in Section 718.112(2)(b)2, Florida Statutes. Except as elsewhere provided, such approvals must be either by:

(i) Not less than thirty-three and one-third (33 1/3%) percent of the Board of Directors and by not less than ten (10%) percent of the votes of the entire membership of the Condominium; or

(ii) Not less than twenty-five (25%) percent of the votes of the entire membership of the Association; or

(iii) In the alternative, an amendment may be made by an agreement signed and acknowledged by eighty (80%) percent of the Unit Owners in the manner required for the execution of a deed, and such amendment shall be effective when recorded in the Public Records of Brevard County, Florida.

(c) The foregoing provisions relative to amendments for defects, errors or omissions are in accordance with and pursuant to Sections 718.110(1) and (5), Florida Statutes.

(d) That the amendment made pursuant to this paragraph need only be executed and acknowledged by the Developer or the Association and by no other parties whatsoever.

(e) Any amendment pursuant to Section 718.110(5), Florida Statutes, may be approved by the Board of Administration or a majority of the voting interests.

Notwithstanding anything to the contrary contained in this Declaration, the Developer reserves the right to change the interior designs and arrangement of all units and to alter the boundaries between units, as long as the Developer owns the units so altered; however, no such change shall increase the number of units nor alter the boundaries of the common elements, except the party wall between any units, without amendment of this Declaration in the manner hereinbefore set forth. If the Developer shall make any changes in units, as provided in this paragraph, such changes shall be reflected by an amendment to this Declaration with a survey attached reflecting such authorized alteration of units, and said amendment need only be executed and acknowledged by the Developer, any holders of institutional mortgages encumbering the altered units and if the amendment is subject to Section 718.110(4) , Florida Statutes, it shall be approved by a majority of the voting interests of the Condominium. The survey shall be certified in the manner required by the Condominium Act. If more than one (1) unit is concerned, the Developer shall not apportion between the units the shares in the common elements, common expenses and common surplus of the units concerned and such shares of common elements, common expenses and common surplus shall remain unchanged in the amendment of this Declaration unless all Unit Owners approve the amendment changing the shares.

The provisions in this Declaration for mandatory arbitration and the Home Builder's Limited Warranty of Developer in this Declaration may not be amended in any way without the prior written consent of the Developer.

No provision of the Declaration shall be revised or amended by reference to its title or number only. Proposals to amend existing provisions of the Declaration shall contain the full text of the provision to be amended; new words shall be inserted in the text underlined; and words to be deleted shall be lined through with hyphens. However, if the proposed change is so extensive that this procedure would hinder, rather than assist, the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but, instead, a notation must be inserted immediately preceding the proposed amendment in substantially the following language:

Substantial rewording of Declaration. "See provision... for present text." Non-material errors or omissions in the amendment process shall not invalidate an otherwise properly promulgated amendment.

Invalidation of any one (1) or more of these restrictions, reservations, covenants, conditions and easements, or any provision contained in this Declaration, or in a conveyance of unit by the Developer, by judgment, court order, or law, shall in no way affect any of the other provisions which shall remain in full force and effect.

In the event that any court should hereafter determine that any provision, as originally drafted herein, violates the rule against perpetuities or any other rule of law because of the duration of the period involved, the period specified in this Declaration shall not thereby become invalid, but instead shall be reduced to the maximum period allowed under such rule of law, and for such purpose, the measuring life shall be that of the youngest incorporator of the Association.

These restrictions, reservations, covenants, conditions and easements shall be binding upon and inure to the benefit of all property owners and their grantees, heirs, personal representatives, successors and assigns, and all parties claiming by, through or under any member.

## XV

## TERMINATION OF CONDOMINIUM

(1) LEGISLATIVE FINDINGS — The Legislature finds that:

(a) Condominiums are created as authorized by statute and are subject to covenants that encumber the land and restrict the use of real property.

(b) In some circumstances, the continued enforcement of those covenants may create economic waste and areas of disrepair which threaten the safety and welfare of the public or cause obsolescence of the property for its intended use and thereby lower property tax values, and it is the public policy of this state to provide by statute a method to preserve the value of the property interests and the rights of alienation thereof that owners have in the condominium property before and after termination.

(c) It is contrary to the public policy of this state to require the continued operation of a condominium when to do so constitutes economic waste or when the ability to do so is made impossible by law or regulation.

(d) It is in the best interest of the state to provide for termination of the covenants of a declaration of condominium in certain circumstances in order to:

1. Ensure the continued maintenance, management, and repair of stormwater management systems, conservation areas, and conservation easements.

2. Avoid transferring the expense of maintaining infrastructure serving the condominium property, including, but not limited to, stormwater systems and conservation areas, to the general tax bases of the state and local governments.

3. Prevent covenants from impairing the continued productive use of the property.

4. Protect state residents from health and safety hazards created by derelict, damaged, obsolete, or abandoned condominium properties.

5. Provide fair treatment and just compensation for individuals and preserve property values and the local property tax base.

6. Preserve the state's long history of protecting homestead property and homestead property rights by ensuring that such protection is extended to homestead

property owners in the context of a termination of the covenants of a declaration of condominium.

(2) TERMINATION BECAUSE OF ECONOMIC WASTE OR IMPOSSIBILITY

(a) Notwithstanding any provision in the declaration, the condominium form of ownership of a property may be terminated by a plan of termination approved by the lesser of the lowest percentage of voting interests necessary to amend the declaration or as otherwise provided in the declaration for approval of termination if:

1. The total estimated cost of construction or repairs necessary to construct the intended improvements or restore the improvements to their former condition or bring them into compliance with applicable laws or regulations exceeds the combined fair market value of the units in the condominium after completion of the construction or repairs; or

2. It becomes impossible to operate or reconstruct a condominium to its prior physical configuration because of land use laws or regulations.

(b) Notwithstanding paragraph (a), a condominium in which 75 percent or more of the units are timeshare units may be terminated only pursuant to a plan of termination approved by 80 percent of the total voting interests of the association and the holders of 80 percent of the original principal amount of outstanding recorded mortgage liens of timeshare estates in the condominium, unless the declaration provides for a lower voting percentage.

(c) Notwithstanding paragraph (a), a condominium that includes units and timeshare estates where the improvements have been totally destroyed or demolished may be terminated pursuant to a plan of termination proposed by a unit owner upon the filing of a petition in court seeking equitable relief. Within 10 days after the filing of a petition as provided in this paragraph and in lieu of the requirements of paragraph (15)(a), the petitioner shall record the proposed plan of termination and mail a copy of the proposed plan and a copy of the petition to:

1. If the association has not been dissolved as a matter of law, each member of the board of directors of the association identified in the most recent annual report filed with the Department of State and the registered agent of the association;

2. The managing entity as defined in s. 721.05(22);

3. Each unit owner and each timeshare estate owner at the address reflected in the official records of the association, or, if the association records cannot be obtained by the petitioner, each unit owner and each timeshare estate owner at the address listed in the office of the tax collector for tax notices; and

4. Each holder of a recorded mortgage lien affecting a unit or timeshare estate at the address appearing on the recorded mortgage or any recorded assignment thereof.

The association, if it has not been dissolved as a matter of law, acting as class representative, or the managing entity as defined in s. 721.05(22), any unit owner, any timeshare estate owner, or any holder of a recorded mortgage lien affecting a unit or timeshare estate may intervene in the proceedings to contest the proposed plan of termination brought pursuant to this paragraph. The provisions of subsection (9), to the extent inconsistent with this paragraph, and subsection (16) are not applicable to a party contesting a plan of termination under this paragraph. If no party intervenes to contest the proposed plan within 45 days after the filing of the petition, the petitioner may move the court to enter a final judgment to authorize implementation of the plan of termination. If a party timely intervenes to contest the proposed plan, the plan may not be implemented until a final judgment has been entered by the court finding that the proposed plan of termination is fair and reasonable and authorizing implementation of the plan.

(3) OPTIONAL TERMINATION

The condominium form of ownership may be terminated for all or a portion of the condominium property pursuant to a plan of termination meeting the requirements of this section and approved by the division. Before a residential association submits a plan to the division, the

plan must be approved by at least 80 percent of the total voting interests of the condominium. However, if 5 percent or more of the total voting interests of the condominium have rejected the plan of termination by negative vote or by providing written objections, the plan of termination may not proceed.

(a) The termination of the condominium form of ownership is subject to the following conditions:

1. The total voting interests of the condominium must include all voting interests for the purpose of considering a plan of termination. A voting interest of the condominium may not be suspended for any reason when voting on termination pursuant to this subsection.

2. If 5 percent or more of the total voting interests of the condominium reject a plan of termination, a subsequent plan of termination pursuant to this subsection may not be considered for 24 months after the date of the rejection.

(b) This subsection does not apply to any condominium created pursuant to part VI of this chapter until 5 years after the recording of the declaration of condominium, unless there is no objection to the plan of termination.

(c) For purposes of this subsection, the term "bulk owner" means the single holder of such voting interests or an owner together with a related entity or entities that would be considered an insider, as defined in s. 726.102, holding such voting interests. If the condominium association is a residential association proposed for termination pursuant to this section and, at the time of recording the plan of termination, at least 80 percent of the total voting interests are owned by a bulk owner, the plan of termination is subject to the following conditions and limitations:

1. If the former condominium units are offered for lease to the public after the termination, each unit owner in occupancy immediately before the date of recording of the plan of termination may lease his or her former unit and remain in possession of the unit for 12 months after the effective date of the termination on the same terms as similar unit types within the property are being offered to the public. In order to obtain a lease and exercise the right to retain exclusive possession of the unit owner's former unit, the unit owner must make a written request to the termination trustee to rent the former unit within 90 days after the date the plan of termination is recorded. Any unit owner who fails to timely make such written request and sign a lease within 15 days after being presented with a lease is deemed to have waived his or her right to retain possession of his or her former unit and shall be required to vacate the former unit upon the effective date of the termination, unless otherwise provided in the plan of termination.

2. Any former unit owner whose unit was granted homestead exemption status by the applicable county property appraiser as of the date of the recording of the plan of termination shall be paid a relocation payment in an amount equal to 1 percent of the termination proceeds allocated to the owner's former unit. Any relocation payment payable under this subparagraph shall be paid by the single entity or related entities owning at least 80 percent of the total voting interests. Such relocation payment shall be in addition to the termination proceeds for such owner's former unit and shall be paid no later than 10 days after the former unit owner vacates his or her former unit.

3. For their respective units, all unit owners other than the bulk owner must be compensated at least 100 percent of the fair market value of their units. The fair market value shall be determined as of a date that is no earlier than 90 days before the date that the plan of termination is recorded and shall be determined by an independent appraiser selected by the termination trustee. For a person whose unit was granted homestead exemption status by the applicable county property appraiser, or was an owner-occupied operating business, as of the date that the plan of termination is recorded and who is current in payment of both assessments and other monetary obligations to the association as of the date the plan of termination is recorded, the fair market value shall be at least the original purchase price paid for the unit. For purposes of this subparagraph, the term "fair market value" means the price of a unit that a seller is willing to accept and a buyer is willing to pay on the open market in an arms-length transaction based on similar units sold in other

condominiums, including units sold in bulk purchases but excluding units sold at wholesale or distressed prices. The purchase price of units acquired in bulk following a bankruptcy or foreclosure shall not be considered for purposes of determining fair market value.

4. The plan of termination must provide for payment of a first mortgage encumbering a unit to the extent necessary to satisfy the lien, but the payment may not exceed the unit's share of the proceeds of termination under the plan. If the unit owner is current in payment of both assessments and other monetary obligations to the association and any mortgage encumbering the unit as of the date the plan of termination is recorded, the receipt by the holder of the unit's share of the proceeds of termination under the plan or the outstanding balance of the mortgage, whichever is less, shall be deemed to have satisfied the first mortgage in full.

5. Before a plan of termination is presented to the unit owners for consideration pursuant to this paragraph, the plan must include the following written disclosures in a sworn statement:

a. The identity of any person or entity that owns or controls 25 percent or more of the units in the condominium and, if the units are owned by an artificial entity or entities, a disclosure of the natural person or persons who, directly or indirectly, manage or control the entity or entities and the natural person or persons who, directly or indirectly, own or control 10 percent or more of the artificial entity or entities that constitute the bulk owner.

b. The units acquired by any bulk owner, the date each unit was acquired, and the total amount of compensation paid to each prior unit owner by the bulk owner, regardless of whether attributed to the purchase price of the unit.

c. The relationship of any board member to the bulk owner or any person or entity affiliated with the bulk owner subject to disclosure pursuant to this subparagraph.

d. The factual circumstances that show that the plan complies with the requirements of this section and that the plan supports the expressed public policies of this section.

(d) If the members of the board of administration are elected by the bulk owner, unit owners other than the bulk owner may elect at least one-third of the members of the board of administration before the approval of any plan of termination.

(e) The division shall examine the plan of termination to determine its procedural sufficiency and, within 45 days after receipt of the initial filing, the division shall notify the association by mail of any procedural deficiencies or that the filing is accepted. If the notice is not given within 45 days after the receipt of the filing, the plan of termination is presumed to be accepted. If the division determines that the conditions required by this section have been met and that the plan complies with the procedural requirements of this section, the division shall authorize the termination, and the termination may proceed pursuant to this section.

(f) Subsection (2) does not apply to optional termination pursuant to this subsection.

(4) <u>EXEMPTION</u>

A plan of termination is not an amendment subject to s. <u>718.110</u>(4). In a partial termination, a plan of termination is not an amendment subject to s. <u>718.110</u>(4) if the ownership share of the common elements of a surviving unit in the condominium remains in the same proportion to the surviving units as it was before the partial termination.

(5) <u>MORTGAGE LIENHOLDERS</u>

Notwithstanding any provision to the contrary in the declaration or this chapter, approval of a plan of termination by the holder of a recorded mortgage lien affecting a condominium parcel in which fewer than 75 percent of the units are timeshare units is not required unless the plan of termination will result in less than the full satisfaction of the mortgage lien affecting the condominium parcel. If such approval is required and not given, a holder of a recorded mortgage lien who objects to the plan of termination may contest the plan as provided in subsection (16). At

the time of sale, the lien shall be transferred to the proportionate share of the proceeds assigned to the condominium parcel in the plan of termination or as subsequently modified by the court.

(6) <u>POWERS IN CONNECTION WITH TERMINATION</u>

The approval of the plan of termination does not terminate the association. It shall continue in existence following approval of the plan of termination with all powers and duties it had before approval of the plan. Notwithstanding any provision to the contrary in the declaration or bylaws, after approval of the plan the board shall:

(a) Employ directors, agents, attorneys, and other professionals to liquidate or conclude its affairs.

(b) Conduct the affairs of the association as necessary for the liquidation or termination.

(c) Carry out contracts and collect, pay, and settle debts and claims for and against the association.

(d) Defend suits brought against the association.

(e) Sue in the name of the association for all sums due or owed to the association or to recover any of its property.

(f) Perform any act necessary to maintain, repair, or demolish unsafe or uninhabitable improvements or other condominium property in compliance with applicable codes.

(g) Sell at public or private sale or exchange, convey, or otherwise dispose of assets of the association for an amount deemed to be in the best interests of the association, and execute bills of sale and deeds of conveyance in the name of the association.

(h) Collect and receive rents, profits, accounts receivable, income, maintenance fees, special assessments, or insurance proceeds for the association.

(i) Contract and do anything in the name of the association which is proper or convenient to terminate the affairs of the association.

(7) <u>NATURAL DISASTERS</u>

(a) If, after a natural disaster, the identity of the directors or their right to hold office is in doubt, if they are deceased or unable to act, if they fail or refuse to act, or if they cannot be located, any interested person may petition the circuit court to determine the identity of the directors or, if found to be in the best interests of the unit owners, to appoint a receiver to conclude the affairs of the association after a hearing following notice to such persons as the court directs. Lienholders shall be given notice of the petition and have the right to propose persons for the consideration by the court as receiver. If a receiver is appointed, the court shall direct the receiver to provide to all unit owners written notice of his or her appointment as receiver. Such notice shall be mailed or delivered within 10 days after the appointment. Notice by mail to a unit owner shall be sent to the address used by the county property appraiser for notice to the unit owner.

(b) The receiver shall have all powers given to the board pursuant to the declaration, bylaws, and subsection (6), and any other powers that are necessary to conclude the affairs of the association and are set forth in the order of appointment. The appointment of the receiver is subject to the bonding requirements of such order. The order shall also provide for the payment of a reasonable fee to the receiver from the sources identified in the order, which may include rents, profits, incomes, maintenance fees, or special assessments collected from the condominium property.

(8) <u>REPORTS AND REPLACEMENT OF RECEIVER</u>

(a) The association, receiver, or termination trustee shall prepare reports each quarter following the approval of the plan of termination setting forth the status and progress of the termination, costs and fees incurred, the date the termination is expected to be completed, and the

current financial condition of the association, receivership, or trusteeship and provide copies of the report by regular mail to the unit owners and lienors at the mailing address provided to the association by the unit owners and the lienors.

(b) The unit owners of an association in termination may recall or remove members of the board of administration with or without cause at any time as provided in s. 718.112(2)(j).

(c) The lienors of an association in termination representing at least 50 percent of the outstanding amount of liens may petition the court for the appointment of a termination trustee, which shall be granted upon good cause shown.

(9) PLAN OF TERMINATION

The plan of termination must be a written document executed in the same manner as a deed by unit owners having the requisite percentage of voting interests to approve the plan and by the termination trustee. A copy of the proposed plan of termination shall be given to all unit owners, in the same manner as for notice of an annual meeting, at least 14 days prior to the meeting at which the plan of termination is to be voted upon or prior to or simultaneously with the distribution of the solicitation seeking execution of the plan of termination or written consent to or joinder in the plan. A unit owner may document assent to the plan by executing the plan or by consent to or joinder in the plan in the manner of a deed. A plan of termination and the consents or joinders of unit owners must be recorded in the public records of each county in which any portion of the condominium is located. The plan is effective only upon recordation or at a later date specified in the plan. If the plan of termination fails to receive the required approval, the plan shall not be recorded and a new attempt to terminate the condominium may not be proposed at a meeting or by solicitation for joinder and consent for 18 months after the date that such failed plan of termination was first given to all unit owners in the manner as provided in this subsection.

(a) If the plan of termination is voted on at a meeting of the unit owners called in accordance with this subsection, any unit owner desiring to reject the plan must do so by either voting to reject the plan in person or by proxy, or by delivering a written rejection to the association before or at the meeting.

(b) If the plan of termination is approved by written consent or joinder without a meeting of the unit owners, any unit owner desiring to object to the plan must deliver a written objection to the association within 20 days after the date that the association notifies the nonconsenting owners, in the manner provided in paragraph (15)(a), that the plan of termination has been approved by written action in lieu of a unit owner meeting.

(10) PLAN OF TERMINATION; REQUIRED PROVISIONS

The plan of termination must specify:

(a) The name, address, and powers of the termination trustee.

(b) A date after which the plan of termination is void if it has not been recorded.

(c) The interests of the respective unit owners in the association property, common surplus, and other assets of the association, which shall be the same as the respective interests of the unit owners in the common elements immediately before the termination, unless otherwise provided in the declaration.

(d) The interests of the respective unit owners in any proceeds from the sale of the condominium property. The plan of termination may apportion those proceeds pursuant to any method prescribed in subsection (12). If, pursuant to the plan of termination, condominium property or real property owned by the association is to be sold following termination, the plan must provide for the sale and may establish any minimum sale terms.

(e) Any interests of the respective unit owners in insurance proceeds or condemnation proceeds that are not used for repair or reconstruction at the time of termination. Unless the declaration expressly addresses the distribution of insurance proceeds or condemnation proceeds,

the plan of termination may apportion those proceeds pursuant to any method prescribed in subsection (12).

(11) PLAN OF TERMINATION; OPTIONAL PROVISIONS; CONDITIONAL TERMINATION; WITHDRAWAL; ERRORS

(a) Unless the plan of termination expressly authorizes a unit owner or other person to retain the exclusive right to possess that portion of the real estate which formerly constituted the unit after termination or to use the common elements of the condominium after termination, all such rights in the unit and common elements automatically terminate on the effective date of termination. Unless the plan expressly provides otherwise, all leases, occupancy agreements, subleases, licenses, or other agreements for the use or occupancy of any unit or common elements of the condominium automatically terminate on the effective date of termination. If the plan expressly authorizes a unit owner or other person to retain exclusive right of possession for that portion of the real estate that formerly constituted the unit or to use the common elements of the condominium after termination, the plan must specify the terms and conditions of possession. In a partial termination, the plan of termination as specified in subsection (10) must also identify the units that survive the partial termination and provide that such units remain in the condominium form of ownership pursuant to an amendment to the declaration of condominium or an amended and restated declaration. In a partial termination, title to the surviving units and common elements that remain part of the condominium property specified in the plan of termination remain vested in the ownership shown in the public records and do not vest in the termination trustee.

(b) In a conditional termination, the plan must specify the conditions for termination. A conditional plan does not vest title in the termination trustee until the plan and a certificate executed by the association with the formalities of a deed, confirming that the conditions in the conditional plan have been satisfied or waived by the requisite percentage of the voting interests, have been recorded. In a partial termination, the plan does not vest title to the surviving units or common elements that remain part of the condominium property in the termination trustee.

(c) Unless otherwise provided in the plan of termination, at any time before the sale of the condominium property, a plan may be withdrawn or modified by the affirmative vote or written agreement of at least the same percentage of voting interests in the condominium as that which was required for the initial approval of the plan.

(d) Upon the discovery of a scrivener's error in the plan of termination, the termination trustee may record an amended plan or an amendment to the plan for the purpose of correcting the error, and the amended plan or amendment to the plan must be executed by the termination trustee in the same manner as required for the execution of a deed.

(12) ALLOCATION OF PROCEEDS OF SALE OF CONDOMINIUM PROPERTY

(a) Unless the declaration expressly provides for the allocation of the proceeds of sale of condominium property, the plan of termination may require separate valuations for the common elements. However, in the absence of such provision, it is presumed that the common elements have no independent value but rather that their value is incorporated into the valuation of the units. In a partial termination, the aggregate values of the units and common elements that are being terminated must be separately determined, and the plan of termination must specify the allocation of the proceeds of sale for the units and common elements being terminated.

(b) The portion of proceeds allocated to the units shall be apportioned among the individual units. The apportionment is deemed fair and reasonable if it is determined by any of the following methods:

1. The respective values of the units based on the fair market values of the units immediately before the termination, as determined by one or more independent appraisers selected by the association or termination trustee;

2. The respective values of the units based on the most recent market value of the units before the termination, as provided in the county property appraiser's records; or

3. The respective interests of the units in the common elements specified in the declaration immediately before the termination.

(c) The methods of apportionment in paragraph (b) do not prohibit any other method of apportioning the proceeds of sale allocated to the units or any other method of valuing the units agreed upon in the plan of termination. Any portion of the proceeds separately allocated to the common elements shall be apportioned among the units based upon their respective interests in the common elements as provided in the declaration.

(d) Liens that encumber a unit shall, unless otherwise provided in the plan of termination, be transferred to the proceeds of sale of the condominium property and the proceeds of sale or other distribution of association property, common surplus, or other association assets attributable to such unit in their same priority. In a partial termination, liens that encumber a unit being terminated must be transferred to the proceeds of sale of that portion of the condominium property being terminated which are attributable to such unit. The proceeds of any sale of condominium property pursuant to a plan of termination may not be deemed to be common surplus or association property. The holder of a lien that encumbers a unit at the time of recording a plan must, within 30 days after the written request from the termination trustee, deliver a statement to the termination trustee confirming the outstanding amount of any obligations of the unit owner secured by the lien.

(e) The termination trustee may setoff against, and reduce the share of, the termination proceeds allocated to a unit by the following amounts, which may include attorney fees and costs:

1. All unpaid assessments, taxes, late fees, interest, fines, charges, and other amounts due and owing to the association associated with the unit, its owner, or the owner's family members, guests, tenants, occupants, licensees, invitees, or other persons.

2. All costs of clearing title to the owner's unit, including, but not limited to, locating lienors, obtaining statements from such lienors confirming the outstanding amount of any obligations of the unit owner, and paying all mortgages and other liens, judgments, and encumbrances and filing suit to quiet title or remove title defects.

3. All costs of removing the owner or the owner's family members, guests, tenants, occupants, licensees, invitees, or other persons from the unit in the event such persons fail to vacate a unit as required by the plan.

4. All costs arising from, or related to, any breach of the plan by the owner or the owner's family members, guests, tenants, occupants, licensees, invitees, or other persons.

5. All costs arising out of, or related to, the removal and storage of all personal property remaining in a unit, other than personal property owned by the association, so that the unit may be delivered vacant and clear of the owner or the owner's family members, guests, tenants, occupants, licensees, invitees, or other persons as required by the plan.

6. All costs arising out of, or related to, the appointment and activities of a receiver or attorney ad litem acting for the owner in the event that the owner is unable to be located.

(13) <u>TERMINATION TRUSTEE</u>

The association shall serve as termination trustee unless another person is appointed in the plan of termination. If the association is unable, unwilling, or fails to act as trustee, any unit owner may petition the court to appoint a trustee. Upon the date of the recording or at a later date specified in the plan, title to the condominium property vests in the trustee. Unless prohibited by the plan, the termination trustee shall be vested with the powers given to the board pursuant to the declaration, bylaws, and subsection (6). If the association is not the termination trustee, the trustee's powers shall be coextensive with those of the association to the extent not prohibited in the plan of termination or the order of appointment. If the association is not the termination trustee, the association shall transfer any association property to the trustee. If the association is dissolved, the trustee shall also have such other powers necessary to conclude the affairs of the association.

(14) TITLE VESTED IN TERMINATION TRUSTEE

If termination is pursuant to a plan of termination under subsection (2) or subsection (3), title to the condominium property being terminated vests in the termination trustee when the plan is recorded or at a later date specified in the plan. The unit owners thereafter become the beneficiaries of the proceeds realized from the plan of termination as set forth in the plan. The termination trustee may deal with the condominium property being terminated or any interest therein if the plan confers on the trustee the authority to protect, conserve, manage, sell, or dispose of the condominium property. The trustee, on behalf of the unit owners, may contract for the sale of real property being terminated, but the contract is not binding on the unit owners until the plan is approved pursuant to subsection (2) or subsection (3).

(15) NOTICE

(a) Within 30 days after a plan of termination has been recorded, the termination trustee shall deliver by certified mail, return receipt requested, notice to all unit owners, lienors of the condominium property, and lienors of all units at their last known addresses that a plan of termination has been recorded. The notice must include the book and page number of the public records in which the plan was recorded, notice that a copy of the plan shall be furnished upon written request, and notice that the unit owner or lienor has the right to contest the fairness of the plan.

(b) The trustee, within 90 days after the effective date of the plan, shall provide to the division a certified copy of the recorded plan, the date the plan was recorded, and the county, book, and page number of the public records in which the plan is recorded.

(16) RIGHT TO CONTEST

A unit owner or lienor may contest a plan of termination by initiating a petition for mandatory nonbinding arbitration pursuant to s. 718.1255 within 90 days after the date the plan is recorded. A unit owner or lienor may only contest the fairness and reasonableness of the apportionment of the proceeds from the sale among the unit owners, that the liens of the first mortgages of unit owners other than the bulk owner have not or will not be satisfied to the extent required by subsection (3), or that the required vote to approve the plan was not obtained. A unit owner or lienor who does not contest the plan within the 90-day period is barred from asserting or prosecuting a claim against the association, the termination trustee, any unit owner, or any successor in interest to the condominium property. In an action contesting a plan of termination, the person contesting the plan has the burden of pleading and proving that the apportionment of the proceeds from the sale among the unit owners was not fair and reasonable or that the required vote was not obtained. The apportionment of sale proceeds is presumed fair and reasonable if it was determined pursuant to the methods prescribed in subsection (12). The arbitrator shall determine the rights and interests of the parties in the apportionment of the sale proceeds. If the arbitrator determines that the apportionment of sales proceeds is not fair and reasonable, the arbitrator may void the plan or may modify the plan to apportion the proceeds in a fair and reasonable manner pursuant to this section based upon the proceedings and order the modified plan of termination to be implemented. If the arbitrator determines that the plan was not properly approved, or that the procedures to adopt the plan were not properly followed, the arbitrator may void the plan or grant other relief it deems just and proper. The arbitrator shall automatically void the plan upon a finding that any of the disclosures required in subparagraph (3)(c)5. are omitted, misleading, incomplete, or inaccurate. Any challenge to a plan, other than a challenge that the required vote was not obtained, does not affect title to the condominium property or the vesting of the condominium property in the trustee, but shall only be a claim against the proceeds of the plan. In any such action, the prevailing party shall recover reasonable attorney fees and costs.

(17) DISTRIBUTION

(a) Following termination of the condominium, the condominium property, association property, common surplus, and other assets of the association shall be held by the termination trustee pursuant to the plan of termination, as trustee for unit owners and holders of liens on the units, in their order of priority unless otherwise set forth in the plan of termination.

(b) Not less than 30 days before the first distribution, the termination trustee shall deliver by certified mail, return receipt requested, a notice of the estimated distribution to all unit owners, lienors of the condominium property, and lienors of each unit at their last known addresses stating a good faith estimate of the amount of the distributions to each class and the procedures and deadline for notifying the termination trustee of any objections to the amount. The deadline must be at least 15 days after the date the notice was mailed. The notice may be sent with or after the notice required by subsection (15). If a unit owner or lienor files a timely objection with the termination trustee, the trustee need not distribute the funds and property allocated to the respective unit owner or lienor until the trustee has had a reasonable time to determine the validity of the adverse claim. In the alternative, the trustee may interplead the unit owner, lienor, and any other person claiming an interest in the unit and deposit the funds allocated to the unit in the court registry, at which time the condominium property, association property, common surplus, and other assets of the association are free of all claims and liens of the parties to the suit. In an interpleader action, the trustee and prevailing party may recover reasonable attorney's fees and costs.

(c) The proceeds from any sale of condominium property or association property and any remaining condominium property or association property, common surplus, and other assets shall be distributed in the following priority:

1. To pay the reasonable termination trustee's fees and costs and accounting fees and costs.

2. To lienholders of liens recorded prior to the recording of the declaration.

3. To purchase-money lienholders on units to the extent necessary to satisfy their liens; however, the distribution may not exceed a unit owner's share of the proceeds.

4. To lienholders of liens of the association which have been consented to under s. 718.121(1).

5. To creditors of the association, as their interests appear.

6. To unit owners, the proceeds of any sale of condominium property subject to satisfaction of liens on each unit in their order of priority, in shares specified in the plan of termination, unless objected to by a unit owner or lienor as provided in paragraph (b).

7. To unit owners, the remaining condominium property, subject to satisfaction of liens on each unit in their order of priority, in shares specified in the plan of termination, unless objected to by a unit owner or a lienor as provided in paragraph (b).

8. To unit owners, the proceeds of any sale of association property, the remaining association property, common surplus, and other assets of the association, subject to satisfaction of liens on each unit in their order of priority, in shares specified in the plan of termination, unless objected to by a unit owner or a lienor as provided in paragraph (b).

(d) After determining that all known debts and liabilities of an association in the process of termination have been paid or adequately provided for, the termination trustee shall distribute the remaining assets pursuant to the plan of termination. If the termination is by court proceeding or subject to court supervision, the distribution may not be made until any period for the presentation of claims ordered by the court has elapsed.

(e) Assets held by an association upon a valid condition requiring return, transfer, or conveyance, which condition has occurred or will occur, shall be returned, transferred, or conveyed in accordance with the condition. The remaining association assets shall be distributed pursuant to paragraph (c).

(f) Distribution may be made in money, property, or securities and in installments or as a lump sum, if it can be done fairly and ratably and in conformity with the plan of termination. Distribution shall be made as soon as is reasonably consistent with the beneficial liquidation of the assets.

(18) ASSOCIATION STATUS

The termination of a condominium does not change the corporate status of the association that operated the condominium property. The association continues to exist to conclude its affairs, prosecute and defend actions by or against it, collect and discharge obligations, dispose of and convey its property, and collect and divide its assets, but not to act except as necessary to conclude its affairs. In a partial termination, the association may continue as the condominium association for the property that remains subject to the declaration of condominium.

(19) CREATION OF ANOTHER CONDOMINIUM

The termination or partial termination of a condominium does not bar the filing of a new declaration of condominium by the termination trustee, or the trustee's successor in interest, for the terminated property or any portion thereof. The partial termination of a condominium may provide for the simultaneous filing of an amendment to the declaration of condominium or an amended and restated declaration of condominium by the condominium association for any portion of the property not terminated from the condominium form of ownership.

(20) EXCLUSION

This section does not apply to the termination of a condominium incident to a merger of that condominium with one or more other condominiums under s. 718.110(7).

(21) APPLICABILITY

This section applies to all condominiums in this state in existence on or after July 1, 2007.

## XVI

## ENCROACHMENTS

If any portion of the common elements now encroaches upon any unit, or if any unit now encroaches upon any other unit or upon any portion of the common elements, or if any encroachment shall hereafter occur as the result of settling of the building, or alteration to the common elements made pursuant to the provisions herein, or as the result of repair and restoration, a valid easement shall exist for the continuance of such encroachment for so long as the same shall exist.

## XVII

## ASSOCIATION TO MAINTAIN REGISTER OF OWNERS AND MORTGAGEES

The Association shall at all times maintain a register setting forth the names of all owners of units in the Condominium, and any purchaser or transferee of an unit shall notify the Association of the names of any party holding a mortgage upon any unit and the name of all lessees in order that the Association may keep a record of same.

## XVIII

## REAL PROPERTY TAXES DURING INITIAL YEAR OF CONDOMINIUM

In the event that during the year in which this Condominium is established, real property taxes are assessed against the Condominium Property as a whole, and are paid by the Association such taxes will be a common expense.

## XIX

## RESPONSIBILITY OF UNIT OWNERS

Each Unit Owner shall be governed by and shall comply with the provisions of this Declaration as well as the By-Laws and Articles of Incorporation of the Association. Any Unit Owner shall be liable for the expense of any maintenance, repair or replacement made necessary by his act, neglect or carelessness, or by that of any members of their family, or their guests, employees, invitees, agents or lessees; provided if however, the Unit Owner does not promptly perform their obligations under this Article XIV the Association's insurance carrier shall be liable for such loss or damage and shall promptly pay for same. Nothing herein contained, however, shall be construed so as to modify any waiver of rights or subrogation by insurance companies.

In any action brought against a Unit Owner by the Association for damages, or injunctive relief due to such Unit Owner's failure to comply with the provisions of this Declaration or By-Laws of the Association, the prevailing party shall be entitled to court costs, reasonable attorney's fees and expenses incurred by it in connection with the prosecution of such action.

## XX

## WAIVER

The failure of the Association, a Unit Owner or institutional first mortgagee to enforce any right, provision, covenant or condition which may be granted herein, or in the By-Laws and Articles of Incorporation of the Association, or the failure to insist upon the compliance with same, shall not constitute a waiver by the Association, such Unit Owner or institutional first mortgagee to enforce such right, provision, covenant or condition, or insist upon the compliance with same, in the future.

No breach of any of the provisions contained herein shall defeat or adversely affect the lien of any mortgage at any time made in good faith and for a valuable consideration upon said property, or any part thereof, and made by a bank, savings and loan association, or insurance company authorized to transact business in the State of Florida and engage in the business of making loans constituting a first lien upon real property, but the rights and remedies herein granted to the Developer, the Association, and the owner or owners of any part of said Condominium, may be enforced against the owner of said property subject to such mortgage, notwithstanding such mortgage.

## XXI

## CONSTRUCTION

The provisions of this Declaration shall be liberally construed so as to effectuate its purposes. The invalidity of any provision herein shall not be deemed to impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration.

## XXII

## GENDER

The use of the masculine gender in this Declaration shall be deemed to refer to the feminine or neuter gender, and the use of the singular or plural shall be taken to mean the other whenever the context may require.

## XXIII

## CAPTIONS

The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Declaration nor the intent of any provisions hereof.

## XXIV

## REMEDIES FOR VIOLATIONS

Each Unit Owner, each tenant and other invitee, and each association shall be governed by, and shall comply with the provisions of the Florida Condominium Act, the declaration, the documents creating the Association, and the Association By-Laws and the provisions thereof shall be deemed expressly incorporated into any lease of a unit. Actions for damages for injunctive relief, or both, for failure to comply with these provisions may be brought by the Association or by a Unit Owner against:

a. The Association.

b. A Unit Owner.

c. Directors designated by the Developer, for actions taken by them prior to the time control of the Association is assumed by Unit Owners other than the Developer.

d. Any director who willfully and knowingly fails to comply with these provisions.

e. Any tenant leasing a unit and any other invitee occupying a Unit.

The prevailing party in any such action or in any action in which the purchaser claims a right of voidability based upon contractual provisions as required in Section 718.503(1)(a), Florida Statutes, is entitled to recover reasonable attorney's fees. A Unit Owner prevailing in an action between the Association and the Unit Owner under this section, in addition to recovering his reasonable attorney's fees, may recover additional amounts as determined by the Court to be necessary to reimburse the Unit Owner for his share of assessments levied by the Association to fund its expenses of the litigation. This relief does not exclude other remedies provided by law. Actions arising under this section may not be deemed to be actions for specific performance.

## XXV

## TIMESHARE RESERVATION

No reservation is made pursuant to Section 718.1045, Florida Statutes, for the creation of timeshare estates. Timeshare estates are prohibited.

## XXVI

## FINES

The Association may levy reasonable fines and suspensions as follows:

a. The Association may levy reasonable fines for the failure of the owner of a unit or its occupants, licensees or invitees to comply with any provision of the Declaration, the Association By-Laws or reasonable rules of the Association. A fine may not become a lien against a unit. A fine may be levied on the basis of each day of a continuing violation, with a single notice and opportunity for hearing. However, the fine may not exceed $100 per violation, or $1,000 in the aggregate.

b. An Association may suspend for reasonable period of time, the right of a Unit Owner, or Unit Owner's tenants, guests, or invitees to use the common elements, common facilities, or any other Association property for failure to comply with any

provision of the Declaration, the Association's By-laws, or reasonable rules of the Association.

c. A fine or suspension may be not be imposed unless the Association first provides at least fourteen (14) days written notice and an opportunity for a hearing to the unit owner and, if applicable, its occupant, licensee or invitee. The hearing must be held before a committee of other unit owners who are neither board members nor persons residing in the board members household. If the committee does not agree the fine or suspension may not be imposed.

d. If a Unit Owner is more than ninety (90) days delinquent in paying a monetary obligation to the Association, the Association may suspend the right of the Unit Owner or the Units occupants, licensees, or invitee to use common elements, common facilities, or any other Association property until the monetary obligation is paid in full. This right does not apply to limited common elements intended to be used only by that Unit, common elements needed to access the Unit, utility services provided to the Unit, parking spaces or elevators. Notice or hearing requirements set forth above do not apply to suspensions imposed under this paragraph.

e. An Association may suspend the voting rights of a unit or member due to non-payment of any monetary obligation due to the Association which is more than ninety (90) days delinquent. A voting interest or consent right allocated to a Unit or member which has been suspended by the Association may not be counted toward the total number of voting interests necessary to constitute a quorum, the number of voting interests required to conduct an election, or the number of voting interests required to approve an action under the Florida Condominium Act or pursuant to the Declaration, Articles of Incorporation, or By-laws. The suspension ends upon full payment of all obligations currently due or over due the Association. The notice and hearing requirements enforced in this section do not apply to a suspension imposed under this paragraph.

## XXVII

## SIGNAGE

After the Developer has completed its sales program, the Association, through its Board of Administration, shall have the right to determine the type, style and location of all signage associated with the condominium property. Prior to completion of its sales program the Developer shall control signage for the Condominium.

## XXVIII

## INSTITUTIONAL MORTGAGEE

An institutional mortgagee means the owner and holder of a mortgage encumbering a Condominium Parcel, which owner and holder of said mortgage is either a bank or life insurance company or a federal or state savings and loan association, or a mortgage or real estate investment trust, or a pension and profit sharing fund, or a credit union, or an agency of the United States Government, or the Federal National Mortgage Association, or the Federal Home Loan Mortgage Corporation, or any entity controlling, controlled by or under common control with any of the foregoing, or a lender generally recognized in the community as an institutional lender or the Developer, or assignee, nominee, or designee of the Developer.

An institutional mortgage means a mortgage owned or held by an institutional mortgagee.

An insurance trustee means that Florida bank having trust powers, designated by the Board to receive proceeds on behalf of the Association, which proceeds are paid as a result of casualty or fire loss covered by insurance policies.

## XXIX

## RIGHTS RESERVED UNTO INSTITUTIONAL MORTGAGEES

The rights and privileges in this Declaration of Condominium and the exhibits hereto in favor of the Developer are freely assignable, in whole or in part, by the Developer to any party who may be hereafter designated by the Developer to have and exercise such rights including an institutional mortgagee in the event of a foreclosure against the Developer or deed in lieu thereof by the Developer. Such rights may be exercised by the nominee, assignee or designee of the Developer and/or exercised by the successor or successors in trust of the Developer and/or exercised by the successor or successors in interest or the nominees, assignees or designees of the nominees, assignees or designees of the Developer.

An institutional mortgagee's rights herein are limited and can only be exercised with regard to units owned by the institutional mortgagee.

## XXX

## NOTICE TO INSTITUTIONAL MORTGAGEES

The Association shall provide a holder, insurer or guarantor of a first mortgagee, upon written request (such request to state the name and address of such holder, insurer or guarantor and the unit number) timely notice of:

A. Any proposed amendment of the Condominium instruments effecting a change in (i) the boundaries of any unit or the exclusive easement rights appertaining thereto, (ii) the interests in the general or limited common elements appertaining to any unit or the liability for common expenses appertaining thereto, (iii) the number of votes in the owners Association appertaining to any unit; or (iv) the purposes to which any unit or the common elements are restricted;

B. Any proposed termination of the Condominium regime;

C. Any condemnation loss or any casualty loss which affects a material portion of the Condominium or which affects any unit on which there is a first mortgage held, insured or guaranteed by such eligible holder;

D. Any delinquency in the payment of assessments or charges owed by an owner of a unit subject to the mortgage of such eligible holder, insurer or guarantor, where such delinquency has continued for a period of sixty (60) days;

E. Any lapse, cancellation or material modification of any insurance policy maintained by the Association.

## XXXI

## CABLE TELEVISION AND SATELLITE DISH

The cost of a master antenna television system or duly franchised cable television service obtained pursuant to a bulk contract shall be deemed a common expense, and if not, such cost shall be considered common expense if it is designated as such in a written contract between the Board of Administration and the company providing the master television antenna system or the cable television service. The contract shall be for a term of not less than two years.

A. Any contract made by the Board of Administration for a community antenna system or duly franchised cable television service may be canceled by a majority of the voting interests present at the next regular or special meeting of the Association. Any member may make a motion to cancel said contract, but if no motion is made or if such motion fails to obtain the required majority at the next regular or special meeting, whichever is sooner, following the making of the contract, then such contract shall be deemed ratified for the term therein expressed.

B. Any such contract shall provide, and shall be deemed to provide if not expressly set forth, that any hearing impaired or legally blind Unit Owner who does not occupy the unit with a nonhearing impaired or sighted person or any unit owner receiving supplemental security income under Title XVI of the Social Security Act or food assistance as administered by the Department of Children and Family Services pursuant to Section 414.31, Florida Statutes, may discontinue the cable or video service without incurring disconnect fees, penalties, or subsequent service charges, and as to such units, the owners shall not be required to pay any common expenses charge related to such service. If fewer than all members of an association share the expenses of cable television, the expense shall be shared equally by all participating Unit Owners. The Association may use the provisions of Section 718.116, Florida Statutes, to enforce payment of the shares of such costs by the Unit Owners receiving cable television.

C. The Association has approved the installation of DSS type satellite dishes for the Condominium Property. The approved satellite dish is approximately eighteen (18) inches in diameter and may be installed upon the designated area of the building. The Association shall determine the location of the satellite dish, in its sole discretion. All costs of installation, maintenance or repair of the satellite dish shall be the responsibility of the record owner of the Condominium unit and the owner shall indemnify and hold the Association harmless therefor.

D. Pursuant to Section 718.1232, Florida Statutes, no resident of any condominium dwelling unit, whether a tenant or owner, shall be denied access to any available franchised or licensed cable television service, nor shall such resident or cable television service be required to pay anything of value in order to obtain or provide such service except those charges normally paid for like services by residents of, or providers of such services to, single-family homes within the same franchised or licensed area and except for installation charges as such charges may be agreed to between such resident and the provider of such services.

## XXXII.

## ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

The rules of the St. Johns River Water Management District require the following provisions to be included in this Declaration of Condominium:

A. Property Description: Property encompassed by the permit granted by the St. Johns River Water Management District (where the surface water management system will be located) is included in the legal description of the parent tract located on Sheet 5 of Exhibit "A" attached hereto and made a part hereof.

B. Definitions: "Surface Water or Stormwater Management System" means a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use or reuse water to prevent or reduce flooding, overdrainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges.

C. Duties of Association: The Association shall be responsible for the maintenance, operation and repair of the surface water or stormwater management system. Maintenance of the surface water or stormwater management system(s) shall mean the exercise of practices which allow the systems to provide drainage, water storage, conveyance or other surface water or stormwater management capabilities as permitted by the St. Johns River Water Management District. Any repair or reconstruction of the surface water or stormwater management system shall be as permitted or, if modified, as approved by the St. Johns River Water Management District.

D. Covenant for Maintenance assessments for Association: Assessments shall also be used for the maintenance and repair of the surface water or stormwater

management systems including, but not limited to, work within retention areas, drainage structures and drainage easements.

E. Easement for Access and Drainage: The Association shall have a perpetual non-exclusive easement over all areas of the surface water or stormwater management system for access to operate, maintain or repair the system. By this easement, the Association shall have the right to enter upon any portion of the common elements which is a part of the surface water or stormwater management system, at a reasonable time and in a reasonable manner, to operate, maintain or repair the surface water or stormwater management system as required by the St. Johns River Water Management District permit. Additionally, the Association shall have a perpetual non-exclusive easement for drainage over the entire surface water or stormwater management system. No person shall alter the drainage flow of the surface water or stormwater management system, including buffer areas or swales, without prior written approval of the St. Johns River Water Management District.

F. Amendment: Any amendment to the Declaration of Condominium which alter any provision relating to the surface water or stormwater management system, beyond maintenance in its original condition, including the water management portions of the common elements must have the prior approval of the St. Johns River Water Management District.

G. Enforcement: The St. Johns River Water Management District shall have the right to enforce, by a proceeding at law or in equity, the provisions contained in the Declaration of Condominium which relate to the maintenance, operation and repair of the surface water or stormwater management system.

H. Swale Maintenance: If required the Developer will construct a Drainage Swale upon the common elements for the purpose of managing and containing the flow of excess surface water, if any, found upon such common elements from time to time. The Association shall be responsible for the maintenance, operation and repair of the swales on the common elements. Maintenance, operation and repair shall mean the exercise of practices, such as mowing and erosion repair, which allow the swales to provide drainage, water storage, conveyance or other stormwater management capabilities as permitted by the St. Johns River Water Management District. Filling, excavation, construction of fences or otherwise obstructing the surface water flow in the swales is prohibited. No alteration of the Drainage Swale shall be authorized and any damage to any Drainage Swale, whether caused by natural or human-induced phenomena, shall be repaired and the Drainage Swale returned to its former condition as soon as possible by the Association.

## XXXIII.

## MITIGATION OF MOLD, DAMPNESS, HUMIDITY AND LIMITATION OF LIABILITY

All Unit Owners, whether or not occupying the Unit, shall periodically run the air conditioning system to maintain the Unit temperature, whether or not occupied, at a maximum of 78 degrees Fahrenheit, and to keep the humidity in the Unit below sixty percent (60%). Leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores.

Each Unit Owner, by acceptance of a deed, or otherwise acquiring title to a Unit, shall be deemed to have agreed that Developer is not responsible, and hereby disclaims any responsibility for any illness, personal injury, death or allergic reactions which may be experienced by the Unit Owner, its family members and/or its or their guests, tenants and invitees and/or the pets of all of the aforementioned persons, as a result of mold, mildew, fungus or spores. It is the Unit Owner's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination. While the foregoing are intended to minimize the potential development of molds, fungi, mildew and other mycotoxins, each Unit Owner understands and agrees that there is no method for completely eliminating the development of molds or mycotoxins. The Developer does not make any

representations or warranties regarding the existence or development of molds or mycotoxins and each Unit Owner shall be deemed to waive and expressly release any such warranty and claim for loss or damages resulting from the existence and/or development of same. In furtherance of the rights of the Association as set forth in this Declaration, in the event that the Association reasonably believes that the provisions of this Section XXXIII are not being complied with, then, the Association shall have the right (but not the obligation) to enter the Unit (without requiring the consent of the Unit Owner or any other party) to turn on the air conditioning in an effort to cause the temperature of the Unit to be maintained as required hereby (with all utility consumption, costs to be paid and assumed by the Unit Owner). To the extent that electric service is not then available to the Unit, the Association shall have the further right, but not the obligation (without requiring the consent of the Unit Owner or any other party) to connect electric service to the Unit (with the costs thereof to be borne by the Unit Owner, or if advanced by the Association, to be promptly reimbursed by the Unit Owner to the Association, with all such costs to be deemed charges hereunder).

Each Unit Owner, by acceptance of a deed or other conveyance of a Unit, holds the Developer harmless and agrees to indemnify, hold harmless and defend the Developer from and against any and all claims made by the Unit Owner and the Unit Owner's guests, tenants and invitees on account of any illness, allergic reactions, personal injury and death to such persons and to any pets of such persons, including all expenses and costs associated with such claims including, without limitation, inconvenience, relocation and moving expenses, lost time, lost earning power, hotel and other accommodation expenses for room and board, all attorneys fees and other legal and associated expenses through and including all appellate proceedings with respect to all matters mentioned in this Section XXXIII.

Each Unit Owner acknowledges and agrees that neither the Developer, will be liable to the Unit Owner, its tenants, invitees, guests and licensees for any special, incidental or consequential damages based on any legal theory whatsoever, including but not limited to, strict liability, breach of express or implied warranty, negligence or any other legal theory with respect to the presence and/or existence of mold, mildew and/or microscopic spores located on, under, within or adjacent to the Unit Owner's unit, including, but not limited to, the common elements and limited common elements, unless caused by the sole negligence or willful misconduct of the Developer. Each Unit Owner, on behalf of itself and its tenants, guests, invitees and licensees hereby releases and agrees to indemnify, hold harmless and defend Developer and its officers, directors, partners, members, successors and assigns from the against any and all claims, actions, damages, causes of action, liabilities and expenses (including, without limitation, attorneys' fees and costs of enforcing this release, indemnity, hold harmless and defend agreement for property damage, injury or death resulting from the exposure to microscopic spores, mold and/or mildew and from any loss of resale value due to the presence and/or existence of mold, mildew and/or microscopic spores; provided, however, that in no event is the Unit Owner releasing or indemnifying Seller as a result of the presence and/or existence of mold, mildew and/or microscopic spores if caused by the sole negligence or willful misconduct of the Developer.

## XXXIV

## MOLD AND MILDEW AWARENESS, PREVENTION AND LIMITATION OF LIABILITY

As part of the Association's and the Board's responsibility for maintenance and repair of the Condominium property as set forth in Articles X and XXXIII of this Declaration and the Unit Owner's responsibility to maintain their unit, there are many ways; that the Association and the Board and Unit Owners can help to control moisture and mold located on, under, within or adjacent to the Condominium Property, including, but not limited to, the common elements and limited common elements. The following is a list of suggestions, which is not meant to be all inclusive:

- Keep indoor humidity levels as low as possible by running the air conditioning unit at a comfortable level. Remember, the cooler the air is, the less humidity it will hold, thereby limiting the growth of mold and mildew.

- Use of a dehumidifier is a great way to keep the humidity levels lower than normal when needed.

- The addition of a humidistat to existing air conditioning control systems is also an excellent way to keep the humidity levels lower when an indoor space is left unoccupied for extended periods of time.

- There are numerous brands of moisture absorbent chemicals available to help keep the humidity inside at a proper level while indoor space is unoccupied for short periods of time.

- Do not run air conditioners with windows open. The air conditioning system is not designed to keep up with the moisture and heat loan this condition will generate when windows are left open, there is a risk of saturating everything inside the indoor space (walls, furniture, carpeting, etc.) With more moisture than the air conditioning system is designed to remove. Remember mold needs moisture to survive. The drier the indoor space, the better off the indoor space will be.

- Repair leaking plumbing and any other source of unwanted water immediately.

- Maintain proper indoor humidity. Equipment that conditions the air, such as air conditioners, dehumidifiers and ventilation systems should be operated year round.

- Have major appliances and equipment, such as heating, ventilating and air conditioning systems inspected, cleaned and serviced regularly by a qualified professional.

- Clean and dry refrigerator, air conditioner and dehumidifier drip pans and filters regularly.

- The Association and/or the Board should respond promptly when they see or have called to their attention signs of moisture or mold.

- Do not allow moisture to stand or make contact with carpet, furniture and cellulose-based materials, such as wood, drywall or other non-tile, non-plastic or non-metal materials.

- Dry all water damaged areas and items immediately to prevent mold growth.

- If mold develops, clean up the mold by washing off hard surfaces with a commercial strength cleaner and mold/mildew inhibitor (such as "Tile Air II" or "Miltrol" from the Marinize Product Corporation) or equal, making sure to follow directions as specified.

- Depending upon the nature and extent of the mold infestation, trained professionals may be needed to assist in the remediation effort.

- Mold that is not properly and adequately removed may reappear.

The Association acknowledges and agrees that the Developer will not be liable to the Association for any special, incidental or consequential damages based on any legal theory whatsoever, including but not limited to, strict liability, breach of express or implied warranty, negligence or any other legal theory with respect to the presence and/or existence of mold, mildew and/or microscopic spores located on, under, within or adjacent to the Condominium Property, including, but not limited to, the common elements and limited common elements, unless caused by the sole negligence or willful misconduct of the Developer. The Association, on behalf of itself and its members, tenants, invitees and licensees hereby releases and agrees to indemnify, hold harmless and defend Developer and its officers, directors, partners, members, successors and assigns from the against any and all claims, actions, damages, causes of action, liabilities and expenses (including, without limitation, attorneys' fees and costs of enforcing this release, indemnity, hold harmless and defend agreement for property damage, injury or death resulting from the exposure to microscopic spores, mold and/or mildew and from any loss of resale value due to the presence and/or existence of mold, mildew and/or microscopic spores; provided, however, that in no event is the Association releasing or indemnifying Seller as a result of the

presence and/or existence of mold, mildew and/or microscopic spores if caused by the sole negligence or willful misconduct of the Developer.

## XXXV

## MANDATORY NON-BINDING ARBITRATION AND MEDIATION OF DISPUTES BETWEEN THE ASSOCIATION AND UNIT OWNER

Pursuant to the provisions of Sections 718.112(2)(k) and 718.1255, Florida Statutes, in the event of a dispute between the Association and a Unit Owner, such dispute shall be submitted to mandatory non-binding arbitration and/or mediation prior to institution of any litigation or administrative proceeding by the Association or any Unit Owner. For purposes herein, "dispute" shall mean any disagreement between two or more parties that involves:

A. the failure of a governing body, under Chapter 718, Florida Statute, or Association document to:

   1. require any owner to take an action, or not to take an action, involving the owner's unit or appurtenances thereto;
   2. or alter or add to a common area or element.

B. the failure of a governing body, when required by Chapter 718 Florida Statutes, or Association document, to:

   1. properly conduct elections.
   2. give adequate notice of meetings or other actions.
   3. properly conduct meetings.
   4. allow inspection of books and records.

## XXXVI

## COMMERCIAL UNIT

The Commercial Unit Owner is entitled to all of the rights and benefits otherwise provided to Owners under this Declaration including the right to vote at any meeting of the Association as provided in Article VI of this Declaration. The Commercial Unit shall share in the common expenses and the common surplus in accordance with Article VII of this Declaration. Notwithstanding the right to conduct commercial activities in the Commercial Unit, the Commercial Unit Owner has the right, in its sole discretion, to not engage in any commercial activity.

In addition to all appurtenances, easements and other benefits passing with units as provided in this Declaration, the Commercial Unit shall have as an appurtenance thereto the following perpetual non-exclusive easements for the use and benefit of the Commercial Unit Owner, its successors and assigns, lessees, licensees and invitees:

A. an easement for ingress and egress over all common elements, as the same may exist from time to time, for such purposes as permitted by law, including such commercial activities that the Commercial Unit Owner may engage in from time to time;

B. an easement for maintenance, repair, replacement, removal and relocation of any items necessary for use of the Commercial Unit as permitted in this Declaration;

C. an easement for placing, maintaining, and repairing signage for the Commercial Unit in the limited common elements appurtenant to the Commercial Unit.

The Developer may convey the Commercial Unit, without consideration, to the Association without the consent of any other Owner or the Association and the Association shall be obligated to accept such conveyance.

The Owner of the Commercial Unit may make changes to the interior design and arrangement of the Commercial Unit or limited common elements appurtenant to the Commercial Unit without an amendment to this Declaration, without approval of the Board or other Owners.

The owner of the Commercial Unit may convey any portion or number or all of the limited common elements appurtenant to such Commercial Unit to the Association. Any such conveyance of limited common elements permitted by this Section must be by a deed executed with the formalities of a deed conveying real property that describes such limited common element(s) by reference to a graphical depiction of the limited common element(s) and is recorded among the Public Records.

The Commercial Unit may be utilized for commercial operations as the Owner of the Commercial Unit, in its sole discretion, deems appropriate, including use of offices, laundry facilities, and any other commercial resort, club, or other facilities as operated by the Commercial Unit Owner.

The Condominium is a mixed use condominium and will contain thirty-five (35) residential units and one (1) commercial unit. By acceptance of title to or possession of their units, all Owners understand and acknowledge that the Commercial Unit may generate an unpredictable amount of visible, audible and odorous impacts and disturbances from activities relating to the operation of business in the Commercial Unit. In addition, the Owners of the Commercial Unit have the right, in their sole discretion, to remove, relocate, discontinue operation of, or otherwise deal with the unit in their sole discretion without regard to any prior use of or benefit to any resident of the Condominium.

The Owner and Operator of commercial operations in the Commercial Unit and respective employees, agents, contractors, invitees, licensees, concessionaires, and designees shall at all times have a right and non-exclusive easement of access and use over all roadways located in the Condominium Property to travel from and to the entrance within the Condominium Property to and from the Commercial Unit and further over those portions of the common elements and limited common elements (excluding the balcony and patio portions of the limited common elements) necessary for the use, operation, maintenance, repair and replacement of the Commercial Unit and the improvements located thereon, together with the easements as set forth in Article III of this Declaration.

The Developer and the Owner of the Commercial Unit shall have all enforcement powers afforded by this Declaration and at law to enforce this Article on behalf of the Commercial Unit Owner. This shall not be deemed to limit the right of the Developer, the Association or the Commercial Unit Owner to enforce any other rights which the Commercial Unit Owner may have under the terms and conditions of this Declaration, the Articles, By-Laws or Rules and Regulations of the Association.

The Developer, Commercial Unit Owner and the Association may enforce any of the provisions of this Article by injunction or other equitable remedy or by an action at law for damages or both, and the prevailing party shall be entitled to recover its attorneys' fees and expenses.

Under no circumstances may this Declaration or any of the Condominium documents be amended in a manner that negatively discriminates against or impacts upon any commercial operation conducted in the Commercial Unit unless the Commercial Unit Owner votes in favor of such amendment at a duly called and constituted meeting of the Association or all of the Residential Unit Owners vote in favor of such amendment at a duly called and constituted meeting of the Association.

The Owner of the Commercial Unit shall not have the authority to veto amendments to this Declaration, Articles of Incorporation, By-Laws or Rules or Regulations of the Association.

IN WITNESS WHEREOF, the above-stated Developer has caused these presents to be signed and sealed on this ___ day of ________, 20__.

SIGNED AND DELIVERED
IN THE PRESENCE OF:

DEVELOPER:

CANAVERAL CROSSROAD, LLC, a Florida limited Liability Company

By: Homemakers Management Corporation, a Florida corporation, its Manager

By:____________________________
Martin C. Flynn, Jr., President

Print Name: Beth Pulichene

Print Name: Lynne Gowins

CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., a Florida not-for-profit corporation

By:____________________________
Martin Flynn, President

Print Name: Beth Pulichene

Print Name: Lynne Gowins

STATE OF FLORIDA )
COUNTY OF BREVARD )

The foregoing instrument was acknowledged before me this 19th day of April, 2019 by Martin C. Flynn, Jr., President of Homemakers Management Corporation, a Florida corporation, its Manager of CANAVERAL CROSSROADS, LLC, a Florida Limited Liability Company, on behalf of the Company. He is personally known to me or produced ____________________ as identification.

BETH PULICHENE MY COMMISSION EXPIRES APRIL 21, 2021 #GG 072490 Bonded thru Notary Public Underwriters NOTARY PUBLIC, STATE OF FLORIDA

NOTARY PUBLIC
My Commission Expires: 4-21-2021

STATE OF FLORIDA )
COUNTY OF BREVARD )

The foregoing instrument was acknowledged before me this 19th day of April, 2019 by Martin Flynn, President of CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., on behalf of the Corporation. He is personally known to me or produced ____________________ as identification.

NOTARY PUBLIC
My Commission Expires:

BETH PULICHENE MY COMMISSION EXPIRES APRIL 21, 2021 #GG 072490 Bonded thru Notary Public Underwriters NOTARY PUBLIC, STATE OF FLORIDA

Exhibit "A"

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

## SURVEYOR'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF BREVARD

BEFORE ME, THE UNDERSIGNED AUTHORITY DULY AUTHORIZED TO ADMINISTER OATHS AND TAKE ACKNOWLEDGEMENTS, PERSONALLY APPEARED "DAVID J. KUGELMANN", BY ME WELL KNOWN, AND KNOWN TO ME TO BE THE PERSON HEREINAFTER DESCRIBED, WHO, AFTER BEING BY ME FIRST DULY CAUTIONED AND SWORN, DEPOSED AND SAYS ON OATH AS FOLLOWS, TO WIT:

I HEREBY CERTIFY THAT THE PROPOSED CONSTRUCTION OF THE IMPROVEMENTS SHOWN AND DESCRIBED ON THE ATTACHED EXHIBIT "A" ARE SUBSTANTIALLY AND SUFFICIENTLY DETAILED SO THAT THE MATERIAL DESCRIBED AND SHOWN ON THE ATTACHED EXHIBIT, TOGETHER WITH THE PROVISIONS OF THE DECLARATION OF CONDOMINIUM ESTABLISHING CAPE CROSSING CONDOMINIUM, A CONDOMINIUM, IS AN ACCURATE REPRESENTATION OF THE LOCATION AND DIMENSIONS OF THE PROPOSED IMPROVEMENTS AND THAT THE IDENTIFICATION, LOCATIONS AND DIMENSIONS OF THE COMMON ELEMENTS, LIMITED COMMON ELEMENTS AND OF EACH UNIT CAN BE DETERMINED FROM THESE MATERIALS.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND OFFICIAL SEAL, THIS THE 19 DAY OF May, 2015.

BY:

David J. Kugelmann 5/19/15
DAVID J. KUGELMANN
FLORIDA CERTIFICATE NO. 5117
KUGELMANN LAND SURVEYING, INC.

SWORN TO AND SUBSCRIBED BEFORE ME AS TO "DAVID J. KUGELMANN" THIS THE 19 DAY OF May, 2015.

Tammy L Foye
NOTARY PUBLIC OF FLORIDA AT LARGE
MY COMMISSION EXPIRES___________

TAMMY L. FOYE
Commission # FF 120263
Expires July 29, 2018
Bonded Thru Troy Fain Insurance 800-385-7019

KUGELMANN LAND SURVEYING, INC.
) NORTH TROPICAL TRAIL
SUITE B
'RRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

SHEET 1

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS



ARTIST'S RENDERING

## "SURVEYOR'S NOTES CONCERNING THE GRAPHIC PLOT PLAN"

1. CAPE CROSSING CONDOMINIUM, A CONDOMINIUM, SHALL CONSIST OF ONE SIX STORY BUILDING WITH FIRST FLOOR PARKING CONTAINING THIRTY ONE (31) ASSIGNED PARKING SPACES AND ONE HANDICAP SPACE TOGETHER WITH THIRTY-FIVE (35) RESIDENTIAL UNITS AND ONE COMMERCIAL UNIT AND ASSOCIATED OUTSIDE PARKING.

2. ALL AREAS AND IMPROVEMENTS, EXCLUSIVE OF THE UNITS AND LIMITED COMMON ELEMENTS, ARE COMMON ELEMENTS OF THE CONDOMINIUM.

3. DESIGNATED PARKING SPACES THAT ARE ASSIGNED ARE LIMITED COMMON ELEMENTS OF THE CONDOMINIUM, AS SET FORTH IN THE DECLARATION.

4. PARKING SPACES THAT ARE NOT DESIGNATED ARE COMMON ELEMENTS OF THE CONDOMINIUM AS SET FORTH IN THE DECLARATION.

5. AIR HANDLER UNITS ARE LIMITED COMMON ELEMENTS ASSIGNED TO THE USE OF INDIVIDUAL UNITS, THE ROOF MOUNTED AIR CONDITIONING COMPRESSORS ARE LIMITED COMMON ELEMENTS OF THE CONDOMINIUM, AS SET FORTH IN THE DECLARATION.

6. ROOFING SYSTEM IS A COMMON ELEMENT OF THE CONDOMINIUM, AS SET FORTH IN THE DECLARATION.

7. ADJACENT BALCONIES AND/OR PATIOS ARE LIMITED COMMON ELEMENTS OF THE CONDOMINIUM, ASSIGNED TO CONTIGUOUS UNIT.

8. THE GRAPHIC PLOT PLAN AS DEPICTED ON SHEET 3 IS BASED ON AN ENGINEERING SITE PLAN PREPARED BY PLATA ENGINEERING, INC. AND ARCHITECTURAL DRAWINGS PREPARED BY JACKSON KIRSCHNER ARCHITECTS, P.A..

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

GRAPHIC PLOT PLAN




KUGELMANN LAND SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

(104) INDICATES UNIT NUMBER ASSIGNMENT

SEE SHEET 2 FOR NOTES CONCERNING THIS PLAN

DATE : 04/09/15
JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

BOUNDARY SURVEY







SEE SHEET 5 FOR SURVEYOR'S NOTES AND LEGAL DESCRIPTION

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15
JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

## BOUNDARY SURVEY LEGAL DESCRIPTION

A PARCEL OF LAND LYING IN SECTION 11, TOWNSHIP 24 SOUTH, RANGE 36 EAST, TALLAHASSEE BASE MERIDIAN, BREVARD COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT A 5/8 INCH IRON BAR MARKING THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF TINGLEY DRIVE (A 50 FOOT RIGHT-OF-WAY, AS PRESENTLY LOCATED) AND THE SOUTH PROPERTY LINE OF THE CANAVERAL PORT AUTHORITY; THENCE S82° 14'00"W, ALONG SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 32.64 FEET TO THE POINT-OF-BEGINNING; THENCE CONTINUE S82° 14'00"W, ALONG SAID LINE, A DISTANCE OF 221.00 FEET; THENCE S07° 46'00"W, A DISTANCE OF 106.78 FEET; THENCE N82° 14'00"E, PARALLEL TO SAID SOUTH LINE OF THE CANAVERAL PORT AUTHORITY, A DISTANCE OF 157.33 FEET; THENCE N07° 46'00"E, A DISTANCE OF 18.50 FEET; THENCE N82° 14'00"E, A DISTANCE OF 63.67 FEET; THENCE N07° 46'00"E, A DISTANCE OF 88.28 FEET TO THE POINT-OF-BEGINNING.

CONTAINING 22,419.8 SQUARE FEET, MORE OR LESS.

## SURVEYOR'S NOTES

1. THIS SITE LIES IN FLOOD ZONE "X" ACCORDING TO F.E.M.A. FLOOD INSURANCE RATE MAP NO. 12009C0340 G, COMMUNITY NO. 125092, DATED MARCH 17, 2014.
2. NO ENCROACHMENTS EXIST ON THIS SITE.
3. SUBJECT TO ANY EASEMENTS AND/OR RIGHTS-OF-WAY OF RECORD.
4. BEARINGS REFER TO THE UNITED STATES ARMY CORPS. OF ENGINEERS BEARING STRUCTURE WITH THE SOUTH LINE OF THE CANAVERAL PORT AUTHORITY PROPERTY BEARING S 82° 14'00" W (CANAVERAL HARBOR LAYOUT PLAN DRAWING NO. 11-15.648, DATED MARCH, 1950.
5. MASTER BENCH MARK: UNITED STATES ARMY CORPS. OF ENGINEERS, JACKSONVILLE DISTRICT, STANDARD BRONZE DISC SET IN 6" X 6" CONCRETE POST ABD STAMPED CH - 17 HAVING A PUBLISHED ELEVATION OF 8.923 FEET BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
6. FIELD SURVEY PERFORMED APRIL 09, 2015.

KUGELMANN LAND SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

FIRST FLOOR (GARAGE PARKING LEVEL) PLAN




SCALE: 1" = 20'

TYPICAL PARKING SPACE: 20.0' X 9.5'

(501) INDICATES UNIT NUMBER ASSIGNMENT

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

FOR NOTES CONCERNING THIS PLAN SEE SHEET 7

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

"SURVEYOR'S NOTES CONCERNING THE FIRST FLOOR GARAGE PARKING PLAN"

1. THE FIRST FLOOR (GARAGE PARKING LEVEL) FINISHED FLOOR ELEVATION SHALL BE 11.00 FEET.

2. THE FIRST FLOOR (GARAGE PARKING LEVEL) FINISHED CEILING ELEVATION SHALL BE 19.67 FEET.

3. STATED ELEVATIONS REFER TO NATIONAL GEODETIC VERTICAL DATUM OF 1929.

4. NO RESIDENTIAL UNITS ARE LOCATED ON THE FIRST FLOOR (GARAGE PARKING LEVEL).

5. COMMERCIAL UNIT NO. 100, AS DEPICTED ON SHEET 8, CONSISTS OF THE UNIT TOGETHER WITH THE FOUR LIMITED COMMON ELEMENTS AS SHOWN, AND DOES NOT CONSTITUTE LIVING SPACE, AS SET FORTH IN THE DECLARATION.

6. THE GARAGE PARKING SPACES SHOWN ARE LIMITED COMMON ELEMENTS ASSIGNED TO THE UNIT NUMBERS DEPICTED AS SET FORTH IN THE DECLARATION.

7. ALL AREAS AND IMPROVEMENTS, EXCLUSIVE OF COMMERCIAL UNIT NO. 100 AND THE FOUR LIMITED COMMON ELEMENTS ASSIGNED TO UNIT 100 AND ALL ASSIGNED PARKING SPACES, ARE COMMON ELEMENTS OF THE CONDOMINIUM.

8. THE HANDICAP PARKING SPACE, AS DEPICTED, IS A COMMON ELEMENT OF THE CONDOMINIUM.

(501) INDICATES UNIT NUMBER ASSIGNMENT




SCALE: 1" = 30'

KUGELMANN LAND SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15
JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 101, 201, 301, 401 AND 501

4-BEDROOM, 3 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,896 SQUARE FEET

BALCONY AREA: 216 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

**A CONDOMINIUM**

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 102, 202, 302, 402 AND 502

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,266 SQUARE FEET

BALCONY AREA: 97 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 103, 203, 303, 403 AND 503

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,266 SQUARE FEET

BALCONY AREA: 97 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

SHEET 16

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 104, 204, 304, 404 AND 504

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,266 SQUARE FEET

BALCONY AREA: 97 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ——— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 105, 205, 305, 405 AND 505

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,266 SQUARE FEET

BALCONY AREA: 97 SQUARE FEET




COMMON ELEMENT BALCONY



"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 106, 206, 306, 406 AND 506

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,451 SQUARE FEET

BALCONY AREA: 117 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

SHEET 19

# CAPE CROSSING CONDOMINIUM

**A CONDOMINIUM**

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## COMMERCIAL UNIT NO. 100







"SURVEYOR'S NOTES CONCERNING COMMERCIAL UNIT NO. 100"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT AND LIMITED COMMON ELEMENTS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
3. SEE FIRST FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING
4. COMMERCIAL UNIT NO. 100 IS NOT A RESIDENTIAL UNIT..
5. ——— INDICATES THE LIMITS OF THE UNIT.

(100) INDICATES LIMITED COMMON ELEMENT ASSIGNED TO COMMERCIAL UNIT NO. 100

L.C.E. : LIMITED COMMON ELEMENT

TOTAL AREA OF UNIT NO. 100: 392 SQUARE FEET




KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SCALE: 1" = 10'

## TYPICAL UNITS 107, 207, 307, 407 AND 507

3-BEDROOM, 2 BATH UNIT

TOTAL AIR CONDITIONED AREA: 1,169 SQUARE FEET

BALCONY AREA: 95 SQUARE FEET




"SURVEYOR'S NOTES CONCERNING TYPICAL UNIT"

1. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNIT ARE COMMON ELEMENTS OF THE CONDOMINIUM.
2. THE BALCONIES/PATIOS ARE LIMITED COMMON ELEMENTS FOR THE USE OF CONTIGUOUS UNIT.
3. THE STORAGE AREA, AS DEPICTED, IS A LIMITED COMMON ELEMENT FOR THE USE OF THE TYPICAL UNIT.
4. THIS UNIT PLAN AS DEPICTED IS REPRESENTATIONAL AND THE ACTUAL DIMENSIONS MAY VARY.
5. SEE FLOOR PLAN FOR THE LOCATION OF THIS UNIT WITHIN THE BULIDING.
6. ———— INDICATES THE LIMITS OF THE UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

JOB NAME: CROSSROADSCONDO

SHEET 20

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

SECOND FLOOR PLAN




1. THE SECOND FLOOR FINISHED FLOOR ELEVATION SHALL BE 20.33 FEET.
2. THE SECOND FLOOR FINISHED CEILING ELEVATION SHALL BE 29.00 FEET.
3. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
4. PROPOSED ELEVATIONS AS DEPICTED ARE BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
5. THE BALCONIES ARE LIMITED COMMON ELEMENTS FOR THE USE OF ADJACENT UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

THIRD FLOOR PLAN




1. THE THIRD FLOOR FINISHED FLOOR ELEVATION SHALL BE 29.67 FEET.
2. THE THIRD FLOOR FINISHED CEILING ELEVATION SHALL BE 38.33 FEET.
3. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
4. PROPOSED ELEVATIONS AS DEPICTED ARE BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
5. THE BALCONIES ARE LIMITED COMMON ELEMENTS FOR THE USE OF ADJACENT UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

## FOURTH FLOOR PLAN




1. THE FOURTH FLOOR FINISHED FLOOR ELEVATION SHALL BE 39.00 FEET.
2. THE FOURTH FLOOR FINISHED CEILING ELEVATION SHALL BE 47.67 FEET.
3. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
4. PROPOSED ELEVATIONS AS DEPICTED ARE BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
5. THE BALCONIES ARE LIMITED COMMON ELEMENTS FOR THE USE OF ADJACENT UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

SHEET 11

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

FIFTH FLOOR PLAN




101 INDICATES UNIT NUMBER

INDICATES THE UNIT LIMITS

1. THE FIFTH FLOOR FINISHED FLOOR ELEVATION SHALL BE 48.33 FEET.
2. THE FIFTH FLOOR FINISHED CEILING ELEVATION SHALL BE 57.00 FEET.
3. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
4. PROPOSED ELEVATIONS AS DEPICTED ARE BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
5. THE BALCONIES ARE LIMITED COMMON ELEMENTS FOR THE USE OF ADJACENT UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

# CAPE CROSSING CONDOMINIUM

## A CONDOMINIUM

PRELIMINARY DOCUMENTS

## SIXTH FLOOR PLAN




1. THE SIXTH FLOOR FINISHED FLOOR ELEVATION SHALL BE 57.67 FEET.
2. THE SIXTH FLOOR FINISHED CEILING ELEVATION SHALL BE 66.33 FEET.
3. ALL AREAS AND IMPROVEMENTS EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.
4. PROPOSED ELEVATIONS AS DEPICTED ARE BASED ON NATIONAL GEODETIC VERTICAL DATUM OF 1929.
5. THE BALCONIES ARE LIMITED COMMON ELEMENTS FOR THE USE OF ADJACENT UNIT.

KUGELMANN LAND
SURVEYING, INC.
30 NORTH TROPICAL TRAIL
SUITE B
MERRITT ISLAND, FL. 32953
(321) 459-0930
L.B. NO. 6575
e-mail: klsinc@cfl.rr.com

DATE : 04/09/15

INDEX

TO ARTICLES OF INCORPORATION

OF

CAPE CROSSING CONDOMINIUM ASSOCIATION . INC.


| | | | PAGE |
|---|---|---|---|
| ARTICLE | I. | NAME | 2 |
| ARTICLE | II. | PURPOSE | 2 |
| ARTICLE | III. | POWERS | 2 |
| ARTICLE | IV. | MEMBERS | 3 |
| ARTICLE | V. | EXISTENCE AND DURATION | 4 |
| ARTICLE | VI. | LOCATION | 4 |
| ARTICLE | VII. | DIRECTORS | 4 |
| ARTICLE | VIII. | OFFICERS | 5 |
| ARTICLE | IX. | SUBSCRIBERS | 5 |
| ARTICLE | X. | BY-LAWS | 6 |
| ARTICLE | XI. | INDEMNIFICATION | 6 |
| ARTICLE | XII. | AMENDMENTS | 6 |
| ARTICLE | XIII. | DISSOLUTION | 7 |


EXHIBIT B
EXHIBIT 2 TO THE PROSPECTUS

# ARTICLES OF INCORPORATION
# OF
# CAPE CROSSING CONDOMINIUM ASSOCIATION , INC.
(a corporation not for profit)

In order to form a corporation under and in accordance with the provisions of the laws of the State of Florida, for the formation of corporations not for profit, we, the undersigned, hereby associate ourselves into a corporation for the purpose and with the powers hereinafter mentioned; and to that end we do, by these Articles of Incorporation, set forth:

## ARTICLE I

## NAME

The name of the corporation shall be CAPE CROSSING CONDOMINIUM ASSOCIATION , INC. The corporation shall be hereinafter referred to as the "Association".

## ARTICLE II

## PURPOSE

The purposes and objects of the Association shall be to administer the operation and management of a condominium to be established by CANAVERAL CROSSROADS, LLC, a Florida Limited Liability Company, hereinafter called Developer, the condominium complex to be established in accordance with the laws of the State of Florida upon the following described property, situate, lying and being in Brevard County, Florida, to-wit:

SEE SHEET 5 OF EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF

and to undertake the performance of the acts and duties incident to the administration of the operation and management of said condominium and in accordance with the terms, provisions, conditions and authorizations contained in these articles and which may be contained in the Declaration of Condominium which will be recorded in the Public Records of Brevard County, Florida, at the time said property, and the improvements now or hereafter situate thereon are submitted to a plan of condominium ownership; and to own, operate, lease, sell, trade and otherwise deal with such property, whether real or personal, as may be necessary or convenient in the administration of said condominium. The Association shall be conducted as a non-profit organization for the benefit of its members.

## ARTICLE III

## POWERS

The Association shall have the following powers:

A. All of the powers and duties granted to corporations and corporations not for profit as set forth in Chapter 617 and Chapter 718, Florida Statutes, except as expressly limited or restricted by the Florida Condominium Act, and all of the powers and privileges which may be granted unto said Association or exercised by it under any other applicable laws of the State of Florida.

B. All of the powers reasonably necessary to implement and effectuate the purposes of the Association, including, but not limited to:

1. To make and establish reasonable rules and regulations governing the use of condominium units and the common elements in the condominium as said terms may be defined in the Declaration of Condominium.

2. To levy and collect assessments against members of the Association to defray the common expenses of the condominium as may be provided in the Declaration of Condominium and in the By-Laws of the Association which may be hereafter adopted, including the right to levy and collect assessments for the purposes of acquiring, operating, leasing, and otherwise trading and dealing with such property, whether real or personal, including the units in the condominium, which may be necessary or convenient in the operation and management of the condominium and in accomplishing the purposes set forth in the Declaration of Condominium.

3. To maintain, repair, replace, operate and manage the condominium and the property comprising same, including the right to reconstruct improvements after casualty and to make further improvement of the condominium property.

4. To contract for the management and maintenance of the condominium and to authorize a management agent to assist the Association in carrying out its powers and duties by performing such functions as the collection of assessments, preparation of records, enforcement of rules and maintenance of the common elements. The Association shall, however, retain at all times the powers and duties granted them by the Condominium Act, including, but not limited to the making of assessments, promulgation of rules and execution of contracts on behalf of the Association.

5. To enforce the provisions of the Declaration of Condominium, these Articles of Incorporation, the By-Laws of the Association which may be hereafter adopted, and the rules and regulations governing the use of the condominium as the same may be hereafter established.

6. To acquire title to property or otherwise hold, convey, lease, and mortgage association property for the use and benefit of its members. The power to acquire personal property shall be exercised by the Board of Administration. Except as otherwise permitted in subsections (8) and (9) of Section 718.111, Florida Statutes, and in Section 718.114, Florida Statutes, no association may acquire, convey, lease, or mortgage association real property except in the manner provided in the declaration, and if the declaration does not specify the procedure, then approval of seventy-five (75%) percent of the total voting interests shall be required.

7. To exercise, undertake and accomplish all of the rights, duties and obligations which may be granted to or imposed upon the Association pursuant to the Declaration of Condominium.

8. The Association shall operate, maintain and manage the surface water or stormwater management system(s) in a manner consistent with the St. Johns River Water Management District permit requirements and applicable District rules, and shall assist in the enforcement of the Declaration of Condominium which relate to the surface water or stormwater management system.

9. The Association shall levy and collect adequate assessments against members of the Association for the costs of maintenance and operation of the surface water or stormwater management system.

## ARTICLE IV

## MEMBERS

The qualification of the members, the manner of their admission to membership and termination of such membership, and voting by members shall be as follows:

A. The owners of all condominium units in the condominium shall be members of the Association, and no other persons or entities shall be entitled to membership, except as provided in item E of this Article IV.

B. Membership shall be established by the acquisition of fee title to a unit in the condominium or by acquisition of a fee ownership interest therein, whether by conveyance, devise, judicial decree or otherwise, and the membership of a party shall be automatically terminated upon his being divested of all title to or his entire fee ownership interest in all units in the condominium.

C. The interest of a member in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner, except as an appurtenance to his condominium unit. The funds and assets of the Association shall belong solely to the Association, subject to the limitation that the same be expended, held or used for the benefit of the membership and for the purposes authorized herein, in the Declaration of Condominium, and in the said By-Laws.

D. On all matters on which the membership shall be entitled to vote, there shall be only one (1) vote for each unit in the condominium, which vote shall be exercised or cast by the owner or owners of each unit in such manner as may be provided in the By-Laws hereafter adopted. Should any member own more than one (1) unit, such member shall be entitled to exercise or cast as many votes as he owns units, in the manner provided in said By-Laws.

E. Until such time as the property described in Article II hereof is submitted to a plan of condominium ownership by the recordation of said Declaration of Condominium, the membership of the Association shall be comprised of the subscribers of these Articles, each of which subscribers shall be entitled to cast one (1) vote on all matters on which that membership shall be entitled to vote.

## ARTICLE V

## EXISTENCE AND DURATION

Existence of the Association shall commence with the filing of these Articles of Incorporation with the Secretary of State, Tallahassee, Florida. The Association shall exist in perpetuity.

## ARTICLE VI

## LOCATION

The principal office of the Association shall be located at 2750 Tingley Drive, Merritt Island, Florida 32953, but the Association may maintain offices and transact business in such other places within or without the State of Florida as may from time to time be designated by the Board of Administration.

## ARTICLE VII

## DIRECTORS

The affairs of the Association shall be managed by the Board of Administration. The number of members of the Board of Administration of the Association shall be three (3). The members of the Board or Administration shall be elected as provided by the By-Laws of the Association. The Board of Administration shall be members of the Association or shall be authorized representatives, officers or employees of a corporate member of this Association. Notwithstanding the foregoing, the first election of directors will be held in accordance with Article VI of the Declaration of Condominium of CAPE CROSSING, A CONDOMINIUM. Any vacancies in the Board of Administration occurring before the first election will be filled by the remaining directors, unless the vacancy occurs when both the Developer and unit owners other than the Developer are entitled to representation in which event the vacancy shall be filled by an election as provided in Rule 61B.23.001(12) Florida Administrative Code. Any vacancies in the Board of Administration

created by the recall of members shall be controlled by the provisions set forth in the By-Laws of the Association.

The names and addresses of the members of the first Board of Administration who shall hold office until their successors are elected and have qualified, or until removed, are as follows:

| | |
|---|---|
| Martin Flynn | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |
| Horton Johnson | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |
| Michael McPhillips | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |

ARTICLE VIII

OFFICERS

The Board of Administration shall elect a President, a Secretary and a Treasurer and as many Vice Presidents, Assistant Secretaries and Assistant Treasurers as the Board of Administration shall determine. The President shall be elected from among the membership of the Board of Administration but no other officer needs to be a director. The same person may hold two (2) offices, the duties of which are not incompatible; provided, however, that the office of the President and Vice President shall not be held by the same person, nor shall the office of President, Secretary or Assistant Secretary be held by the same person.

The affairs of the Association shall be administered by the officers designated in the By-Laws of the Association. Said officers will be elected by the Board of Administration at its first meeting following the annual meeting of the members of the Association and with the approval of the Board of Administration, may employ a managing agent and/or such other managerial and supervisory personnel or entities to administer or assist in the administration of the operation and management of the condominium, and the affairs of the Association, and any such person or entity may be so employed without regard to whether such person or entity is a member of the Association or a director of the Association.

The names and addresses of the officers who will serve until their successors are designated are as follows:

| | |
|---|---|
| Martin Flynn<br>President | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |
| Horton Johnson<br>Vice-President | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |
| Michael McPhillips<br>Secretary | 2750 Tingley Drive<br>Merritt Island, Florida 32953 |

ARTICLE IX

SUBSCRIBERS

The names and addresses of the subscribers to these Articles of Incorporation are as follows:

| | |
|---|---|
| CURTIS R. MOSLEY, Esquire | 1221 East New Haven Avenue<br>Melbourne, FL 32901 |

## ARTICLE X

## BY-LAWS

The original By-Laws of the Association shall be adopted by the Board of Administration and thereafter, such By-Laws may be altered or rescinded by the Board of Administration only in such manner as said By-Laws may provide.

## ARTICLE XI

## INDEMNIFICATION

Every director and every officer of the Association shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed upon him in connection with any proceeding to which he/she may be a party, or in which/she he may become involved, by reason of his being or having been a director or officer of the Association, whether or not he/she is a director or officer at the time such expenses are incurred, except in such cases wherein the director or officer is adjudged guilty of willful misfeasance or malfeasance in the performance of his/her duties; provided, that in the event of any claim for reimbursement or indemnification hereunder based upon a settlement by the director or officer seeking such reimbursement or indemnification, the indemnification herein shall only apply if the Board of Administration approves such settlement and reimbursement as being in the best interests of the Association. The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such director or officer may be entitled. The intent of this indemnification is to afford protection to the Directors and Officers of the Association to the maximum extent allowed by law.

## ARTICLE XII

## AMENDMENTS

Any amendment or amendments to these Articles of Incorporation may be proposed by the Board of Administration of the Association acting upon a vote of the majority of the directors, or by the members of the Association owning a majority of the condominium units in the condominium, whether meeting as members or by instrument in writing signed by them. Upon any amendment or amendments to these Articles being proposed by said Board of Administration or members, such proposed amendment or amendments shall be transmitted to the President of the Association or other officer of the Association in the absence of the President, who shall thereupon call a special meeting of the members of the Association for a date not sooner than fourteen (14) days nor later than sixty (60) days from the receipt by him of the proposed amendment or amendments, and it shall be the duty of the Secretary to give to each member written or printed notice of such meeting, stating the time and place of the meeting and reciting the proposed amendment or amendments in reasonably detailed form, which notice shall be mailed or presented personally to each member not less than fourteen (14) days nor more than thirty (30) days before the date set for such meeting. If mailed, the notice of the membership meeting shall be sent by certified mail, return receipt requested, which mailing shall be deemed notice. Any member may, by written waiver of notice signed by such member, waive such notice, and such waiver when filed in the records of the Association, whether before or after the holding of the meeting, shall be deemed equivalent to the giving of such notice to such member. At such meeting, the amendment or amendments proposed must be approved by an affirmative vote of the Owners of at least eighty (80%) percent of the total number of units in the condominium (i.e. 29 of 36 of the Unit Owners must vote for the amendment) in order for such amendment or amendments to become effective. Thereupon, such amendment or amendments of these articles shall be transcribed and certified in such form as may be necessary to register the same in the office of the Secretary of State of Florida; and upon the registration of such amendment or amendments with said Secretary of State, a certified copy thereof shall be recorded in the Public Records of Brevard County, Florida, within ten (10) days from the date on which the same are so registered. No amendment is valid until it is recorded in the Public Records. At any meeting held to consider such amendment or amendments of these articles, a member of the Association shall not be

recognized, if such member is not in attendance or represented thereat by proxy. The written vote of any member of the Association shall be recognized if such member is not in attendance at such meeting or represented thereat by proxy, provided such written vote is delivered to the Secretary of the Association at or prior to such meeting.

Notwithstanding the foregoing provisions of this Article XII, no amendment or amendments to these articles which shall abridge, amend or alter the right of the Developer to designate and select members of each Board of Administration of the Association, as provided in Article VII hereof, may be adopted or become effective without the prior consent of the Developer.

## ARTICLE XIII

## DISSOLUTION

In the event of termination, dissolution or final liquidation of the Association, the responsibility for the operation and maintenance of the surface water or stormwater management system must be transferred to and accepted by an entity which would comply with Section 62-330.310 of the Florida Administrative Code (operation and maintenance), and be approved by the St. Johns River Water Management District prior to such termination, dissolution or liquidation.

IN WITNESS WHEREOF, the subscribers have hereunto set their hands and seals this 18th day of April, 2019.

CURTIS R. MOSLEY

STATE OF FLORIDA
COUNTY OF BREVARD

BEFORE ME, the undersigned authority, personally appeared CURTIS R. MOSLEY, who being by me first duly sworn, acknowledged that he executed the foregoing Articles of Incorporation for the purposes therein expressed on this 18th day of April, 2019.

NOTARY PUBLIC
My Commission Expires: 4-21-2021

BETH PULICHENE
MY COMMISSION EXPIRES APRIL 21, 2021
#GG 072490
Bonded thru Notary Public Underwriters
NOTARY PUBLIC, STATE OF FLORIDA

CERTIFICATE OF REGISTERED AGENT

Pursuant to Chapter 48.091, Florida Statutes, the following is submitted in compliance with said Act.

CAPE CROSSING CONDOMINIUM ASSOCIATION , INC., a corporation not for profit, desiring to organize under the laws of the State of Florida, with its principal office, as indicated in the Articles of Incorporation, in the City of Cape Canaveral, County of Brevard, State of Florida, has named CURTIS R. MOSLEY, ESQ., 1221 East New Haven Avenue, Melbourne, Florida 32901, as its agent to accept service of process for the above-stated corporation, at the place designated in this certificate, and he hereby accepts to act in this capacity and agrees to comply with the provisions of said Act relative to keeping open said office.

CURTIS R. MOSLEY

# INDEX

## TO BY-LAWS

## OF

## CAPE CROSSING CONDOMINIUM ASSOCIATION, INC.

| | | PAGE |
|---|---|---|
| 1. | IDENTITY | 2 |
| 2. | MEMBERSHIP, VOTING, QUORUM, PROXIES | 2 |
| 3. | ANNUAL AND SPECIAL MEETINGS OF MEMBERSHIP | 3 |
| 4. | BOARD OF ADMINISTRATION AND OFFICERS | 8 |
| 5. | OFFICERS | 13 |
| 6. | FISCAL MANAGEMENT | 14 |
| 7. | PARLIAMENTARY RULES | 17 |
| 8. | AMENDMENTS TO BY-LAWS | 17 |
| 9. | OFFICIAL RECORDS | 18 |

EXHIBIT C
EXHIBIT 3 TO THE PROSPECTUS

# BY-LAWS

# OF

# CAPE CROSSING CONDOMINIUM ASSOCIATION, INC.

1. IDENTITY

These are the By-Laws of the CAPE CROSSING CONDOMINIUM ASSOCIATION , INC., a corporation not for profit under the laws of the State of Florida, the Articles of Incorporation of which were filed in the office of the Secretary of State on the ___ day of __________, 20___. CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., hereinafter called the Association, has been organized for the purpose of administering the operation and management of CAPE CROSSING, A CONDOMINIUM, a condominium project established or to be established in accordance with the Condominium Act of the State of Florida upon the following described property situate, lying and being in Merritt Island, Brevard County, Florida, to-wit:

SEE SHEET _5_ OF EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF

A. The provisions of these By-Laws are applicable to said condominium, and the terms and provisions hereof are expressly subject to the effect of the terms, provisions, conditions and authorizations contained in the Articles of Incorporation and which may be contained in the Declaration of Condominium which will be recorded in the Public Records of Brevard County, Florida, at the time said property and improvements now or hereafter situate thereon are submitted to the plan of condominium ownership, the terms and provisions of said Articles of Incorporation and Declaration of Condominium to be controlling wherever the same may be in conflict herewith.

B. All present and future owners, tenants, future tenants, or their employees, or any other person that might use said condominium or any of the facilities thereof in any manner, are subject to the regulations set forth in these By-Laws and in said Articles of Incorporation and the Declaration of Condominium.

C. The mere acquisition or rental of any of the condominium units hereinafter referred to as "units" of the condominium or the mere act of occupancy of any said units will signify that these By-Laws, Charter provisions, and regulations in the Declaration are accepted, ratified and shall be complied with.

D. The fiscal year of the Association shall be the calendar year.

E. The seal of the Association shall bear the name of the Association, the word "Florida", the words "a corporation not for profit," and the year of the filing of the Articles an impression of which seal is as follows:

F. All provisions of Section 718.112(2)(a) through (m), Florida Statutes, are incorporated herein and made a part of these By-Laws.

2. MEMBERSHIP, VOTING, QUORUM, PROXIES

A. The qualifications of members, the manner of their admission to membership and termination of such membership, and voting by members, shall be as set forth in Article IV of the Articles of Incorporation of the Association, the provisions of which Article IV of the Articles of Incorporation are incorporated herein by reference.

B. A quorum of membership meetings shall consist of persons entitled to cast a majority of the voting interests of the entire membership of the Association. The joining of a member in the action of a meeting by signing and concurring in the minutes thereof shall not constitute the presence of such person for the purpose of concurring. A member may vote in

person or by proxy on any action taken at a meeting of the Association except that no proxy, limited or general, shall be used in the election of Board Members.

C. The vote of the owners of a condominium unit owned by more than one (1) person or by a corporation, limited liability company, partnership or other legal entity shall be cast by the person named in the voting certificate duly authorized by the owner and filed with the Secretary of the Association, and such voting certificate shall be valid until revoked by a subsequent voting certificate. If such voting certificate is not on file or not produced at the meeting, the vote of such owners shall not be considered in determining the requirements for a quorum, nor for any other purpose.

D. Except as specifically otherwise provided herein, Unit Owners may not vote by general proxy, but may vote by limited proxies substantially conforming to a limited proxy form adopted by the Division of Condominiums, Timeshares and Mobile Homes. A voting interest or consent right allocated to a unit owned by the Association may not be exercised or considered for any purpose, whether for a quorum, an election, or otherwise. Limited proxies and general proxies may be used to establish a quorum. Limited proxies shall be used for votes taken to waive or reduce reserves in accordance with Florida Statutes, Section 718.112(2)(f)2.; for votes taken to waive the financial reporting requirements of Section 718.111(13), Florida Statutes,; for votes taken to amend the Declaration pursuant to Section 718.110, Florida Statutes; for votes taken to amend the Articles of Incorporation or By-Laws pursuant to this subparagraph; and for any other matter for which the Condominium Act requires or permits a vote of the Unit Owners. Except as provided in Section 718.112(2)(d), Florida Statutes, no proxy, limited or general, may be used in the election of Board Members. General proxies may be used for other matters for which limited proxies are not required, and may also be used in voting for non-substantive changes to items for which a limited proxy is required and given. Notwithstanding the provisions of this subparagraph, Unit Owners may vote in person at unit owner meetings. Any proxy given shall be effective only for the specific meeting for which originally given and any lawfully adjourned meetings thereof. A proxy is not valid longer than ninety (90) days after the date of the first meeting for which is was given. Every proxy is revocable at anytime at the pleasure of the unit owner executing it.

E. Approval or disapproval of a condominium Unit Owner upon any matters, whether or not the subject of an Association meeting, shall be by the same person who would cast the vote of such owner if at an Association meeting.

F. Except where otherwise required under the provisions of the Articles of Incorporation of the Association, these By-Laws, the Declaration of Condominium, or where the same may otherwise be required by law, the affirmative vote of the owners of a majority of the voting interests represented at any duly called membership meeting at which a quorum is present shall be binding upon the members.

G. "Voting interest" means the voting rights distributed to the Association members pursuant to Section 718.104(4)(j), Florida Statutes.

3. <u>ANNUAL AND SPECIAL MEETINGS OF MEMBERSHIP</u>

A. The annual membership meeting shall be held in March on a date, time and place to be designated each year by the Board of Directors for the purpose of electing directors or transacting any other business authorized to be transacted by the members; provided, however, that if the day is a legal holiday, the meeting shall be held at the same hour on the succeeding Tuesday or at such other time and place as the Board of Administration shall select.

B. Special membership meetings shall be held whenever called by the President or by a majority of the Board of Administration, and must be called by officers upon receipt of a written request from members of the Association owning a majority of the voting interests of the membership. The notice of any special meeting shall state the time and place of such meeting and the purposes thereof. No business shall be transacted at a special meeting except as stated in the notice unless by consent of four-fifths (4/5) of the votes present, either in person or by proxy. See paragraphs 6.F and 4.A of these By-laws for special meeting requirements and procedures for budget meetings and recall of Board members. An item not included on the notice may be taken up on an emergency basis by a vote of at least a majority plus one (1) of the Board members. Such emergency action must be noticed and ratified at the next regular board meeting.

Where a unit is owned by more than one person, the Association shall provide notice, for meetings and all other purposes, to that one address which the Developer initially identifies for that purpose and thereafter as one or more of the owners of the unit shall so advise the Association in writing, or if no address is given or the owners of the unit do not agree, to the address provided on the deed of record. An officer of the Association, or the manager or other person providing notice of the Association meeting, shall provide an Affidavit or United States Postal Service certificate of mailing, to be included in the official records of the Association affirming that the notice was mailed or hand delivered, in accordance with this provision, to each Unit Owner at the address last furnished to the Association.

C. Notice of all membership meetings, regular or special, shall be given by the President, Secretary or Treasurer of the Association, or other officer of the Association in the absence of said officers. Written notice, which notice must include an agenda, must be mailed, hand-delivered or electronically transmitted to each unit owner at least fourteen (14) days prior to the annual meeting and must be posted in a conspicuous place on the condominium property at least fourteen (14) continuous days before the annual meeting. Upon notice to the Unit Owners, the Board shall by adopted rule, designate a specific location on the condominium property or Association property where all notices of Unit Owners meetings shall be posted. This requirement does not apply if there is no Condominium property or Association property for posting notices. In lieu of or in addition to the physical posting of meeting notices of any meeting of the Unit Owners on the condominium property the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and the agenda on a closed circuit cable television system serving the condominium Association. However, if broadcast notice is used, the notice and agenda must be broadcast at least four (4) times every broadcast hour of each day that a posted notice is otherwise required under this Section. If broadcast notice is provided, the notice and agenda must be broadcast in a manner and for a sufficient continuous length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda. Unless a unit owner waives in writing the right to receive notice of the annual meeting, such notice must be hand-delivered, mailed or electronically transmitted to each unit owner. Notice for meetings and notice for all other purposes must be mailed to each unit owner at the address last furnished to the Association by the unit owner or hand-delivered to each unit owner. However, if a unit is owned by more than one person, the Association must provide notice to the address that the Developer identifies for that purpose and thereafter as one or more of the owners of the unit must so advise the Association in writing or if no address is given or the owners of the unit do not agree to the address provided on the deed of record. An officer of the Association or the manager or other person providing notice of the Association meeting, must provide an affidavit or United States postal service certificate of mailing, to be included in the official records of the Association affirming that the notice was mailed or hand delivered in accordance with this Section.

The Board of Administration shall be elected by written ballot or voting machine. Proxies shall in no event be used in electing the Board of Administration, either in general elections or elections to fill vacancies caused by recall, resignation, or otherwise except as provided in Rule 61B-23.0026(2)(d), Florida Administrative Code.

At least sixty (60) days before a scheduled election, the Association shall mail, deliver, or electronically transmit, by separate Association mailing or included in another Association mailing, delivery or transmission, including regularly published newspapers, to each unit owner entitled to a vote, a first notice of the date of the election. Any unit owner or other eligible person desiring to be a candidate for the Board must give written notice of his or her intent to be a candidate to the Association at least forty (40) days before a scheduled election. Together with a written notice and agenda as set forth herein, the Association shall mail, deliver or electronically transmit a second notice of the election to all unit owners entitled to vote, together with a ballot that lists all candidates. Upon request of a candidate, an information sheet, no larger than 8 ½ inches by 11 inches, which must be furnished by the candidates at least thirty-five (35) days before the election, must be included with the mailing, delivery, or transmission of the ballot, with the cost of mailing, delivery or electronic transmission and copying to be borne by the Association. The Association is not liable for the contents of the information sheets prepared by the candidates. In order to reduce costs, the Association may print or duplicate the information sheets on both sides of the paper. The division shall by rule establish voting procedures consistent with this paragraph, including rules establishing procedures for giving notice by electronic transmission and rules providing for the secrecy of ballots. Elections shall be decided by a plurality of ballots cast. There is no quorum requirement; however, at least

twenty (20%) percent of the eligible voters must cast a ballot in order to have a valid election. A unit owner may not permit any other person to vote his or her ballot, and any ballots improperly cast are invalid. A unit owner who violates this provision may be fined by the Association in accordance with Section 718.303, Florida Statutes. A unit owner who needs assistance in casting the ballot for the reason stated in Section 101.051, Florida Statutes, may obtain such assistance. The regular election must occur on the date of the annual meeting. Notwithstanding this paragraph, an election is not required unless more candidates file notices of intent to run or are nominating than Board vacancies exist.

Unit Owners have the right to participate in meetings of Unit Owners with reference to all designated agenda items. However, the Association may adopt reasonable rules governing the frequency, duration and manner of Unit Owner participation.

A Unit Owner may tape record or video tape a meeting of the Unit Owners subject to reasonable rules adopted by the Division.

Any approval by Unit Owners called for by the Condominium Act or the applicable Declaration or By-Laws, including, but not limited to, the approval requirement in Section 718.111(8), Florida Statutes, must be made at a duly noticed meeting of the Unit Owners and shall be subject to all requirements of the Condominium Act or the applicable condominium documents relating to unit owner decision making, except that Unit Owners may take action by written agreement, without meetings, on matters for which action by written agreement without meeting is expressly allowed by the applicable By-Laws or Declaration or any law that provides for such action.

Unit Owners may waive notice of specific meetings if allowed by the applicable By-Laws or Declaration or any law. Notice of meetings of the Board of Administration, Unit Owner meetings, except Unit Owner meetings called to recall Board Members as provided in the Florida Condominium Act, and Committee meetings may be given by electronic transmission to Unit Owners who consent to receive notice by electronic transmission or by written waiver of notice signed by such member when filed in the records of the Association whether before or after the holding of the meeting.

If any membership meeting cannot be organized because the quorum has not attended, or because a greater percentage of the membership to constitute a quorum may be required as set forth in the Articles of Incorporation, these By-Laws or the Declaration of Condominium, the members who are present, either in person or by proxy, may adjourn the meeting from time to time until a quorum is present. Adequate notice of all meetings, including adjourned meetings, shall be posted conspicuously on the condominium property at least 48 continuous hours in advance except in an emergency. Unit Owners may waive notice of specific meetings and may take action by written agreement without meetings provided there is strict compliance with the percentage of voting interest required to make decisions and to constitute a quorum as provided in the Declaration of Condominium, By-Laws and Articles of Incorporation of this condominium.

A vacancy on the Board caused by the expiration of a Director's term shall be filled by electing a new Board member and the election must be by secret ballot. An election is not required if the number of vacancies equals or exceeds the number of candidates. For purposes of this paragraph, the term "candidate" means an eligible person who has timely submitted the written notice, as described herein of his or her intention to become a candidate. If the terms of all Members of the Board expire but there are no candidates, the terms of all Board Members expire at the annual meeting and such Board Members may stand for re-election unless prohibited by the By-Laws. If the number of Board Members whose terms expire at the annual meeting equals or exceeds the number of candidates, the candidates become members of the Board effective upon the adjournment of the annual meeting. Any remaining vacancy shall be filled by the affirmative vote of the majority of the Directors making up the newly constituted Board even if the Directors constitute less than a quorum or there is only one Director. Co-owners of a unit may not serve as members of the Board of Directors at the same time unless they own more than one (1) unit or unless there are not enough eligible candidates to fill the vacancies on the Board at the time of the vacancy. Any unit owner desiring to be a candidate for Board membership must comply with the requirement of giving written notice to the secretary of the Association not less than forty (40) days before a scheduled election and must be eligible to serve on the Board of Directors at the time of the deadline for submitting a notice of intent to run in order to have his or her name listed as a proper candidate on the ballot or to serve on the

Board. A person who has been suspended or removed by the Division of Condominiums, Timeshares and Mobile Homes under the Florida Condominium Act or who is delinquent in the payment of any fee, fine or special or regular assessment as provided herein, is not eligible for Board membership. A person who has been convicted of any felony in this State or in the United States District or Territorial Court or who has been convicted of an offense in another jurisdiction which would be considered a felony if committed in Florida is not eligible for Board membership unless such felon's civil rights have been restored for at least five (5) years as of the date such person seeks election to the Board. The validity of an action by the Board is not affected if it is later determined that a Board Member is ineligible for Board membership due to having been convicted of a felony.

The members of the Board shall be elected by written ballot or voting machine. Proxies may not be used in electing the Board in general elections or elections to fill vacancies caused by recall, resignation or otherwise, unless otherwise provided in the Condominium Act.

Within ninety (90) days after being elected or appointed to the Board, each newly elected or appointed Director shall certify in writing to the Secretary of the Association that he or she has read the Association's Declaration of Condominium, Articles of Incorporation, By-Laws and current written policies; that he or she will work to uphold such documents and policies to the best of his or her ability; and that he or she will faithful discharge his or her fiduciary responsibility to the Association's members. In lieu of this written certification, within ninety (90) days after being elected or appointed to the Board, the newly elected or appointed Director may submit a certificate having satisfactorily completed the educational curriculum administered by a Division approved condominium education provider within one (1) year before or ninety (90) days after the date of election or appointment. The written certification or educational certificate if valid and does not have to be resubmitted as long as the Director serves on the Board without interruption. A Director who fails to timely file the written certification or education certificate is suspended from service on the Board until he or she complies with this requirement. The Board may temporary fill the vacancy during the period of suspension. The Secretary shall cause the Association to retain a Director's written certification or educational certificate for inspection by the members for five (5) years after a Director's election. Failure to have such written certification or education certificate on file does not affect the validity of any Board action.

A Director or Officer more than ninety (90) days delinquent in the payment on any monetary obligation due the Association shall be deemed to have abandoned the office, creating a vacancy in the office to be filled according to law.

A Director or Officer charged by information or indictment with a felony, theft or embezzlement offense involving the Association's funds or property must be removed from office, creating a vacancy in the office to be filled according to law until the end of the period of the suspension or the end of the Director's term of office whichever occurs first. While such Director or Officer has such criminal charge pending, he or she may not be appointed or elected to a position as a Director or Officer. However, if the charges are resolved without a finding of guilt, the Director or Officer shall be reinstated for the remainder of his or her term of office, if any.

A member of the Board of Administration or a committee may submit in writing his or her agreement or disagreement with any action taken at a meeting that the member did not attend. This agreement or disagreement may not be used as a vote for or against the action taken or to create a quorum.

If any of the Board or committee members meet by telephone conference, those Board or committee members may be counted toward obtaining a quorum and may vote by telephone. A telephone speaker must be used so that the conversation of those members attending by telephone may be heard by the Board or committee members attending in person as well as any Unit Owners present at a meeting.

Approval or disapproval of a condominium unit owner upon any matters, whether or not the subject of an Association meeting, shall be by the same person who would cast the vote of such owner if at an Association meeting.

Meetings of the Board of Administration at which a quorum is present are open to all Unit Owners. A Unit Owner may tape record or video tape the meetings. The right to attend

such meetings includes the right to speak at such meetings with reference to all designated agenda items. The Division shall adopt reasonable rules governing the tape recording and video taping of the meeting. The Association may adopt written reasonable rules governing the frequency, duration and manner of Unit Owner statements.

Adequate notice of all Board meetings which must specifically identify all agenda items, must be posted conspicuously on the Condominium property at least forty-eight (48) hours before the meeting except in an emergency. If twenty (20%) percent of the voting interests petition the Board to address an item of business, the Board at its next regular Board meeting or at a special meeting of the Board but not later than sixty (60) days after the receipt of the petition shall place the item on the agenda. Any item not included on the notice may be taken up on an emergency basis by at least a majority plus one of the Board Members. Such emergency action must be noticed and ratified at the next regular Board meeting. However, written notice of any meeting at which nonemergency special assessments, or at which amendment to rules regarding unit use will be considered must be mailed, delivered or electronically transmitted to the Unit Owners and posted conspicuously on the Condominium property at least fourteen (14) days before the meeting. Compliance with this fourteen (14) day notice requirement must be made by an affidavit executed by the person providing the notice and filed with the official records of the Association. On notice to the Unit Owners, the Board shall, by duly adopted rule, designate a specific location on the Condominium or Association property where all notices of Board meetings are to be posted. If there is no Condominium or Association property where notices can be posted, notices shall be mailed, delivered or electronically transmitted at least fourteen (14) days before the meeting to the Owner of each Unit. In lieu of or in addition to the physical posting of the notice on the Condominium property, the Association may, by reasonable rule, adopt a procedure for conspicuously posting and repeatedly broadcasting the notice in the agenda on a close circuit cable television system serving the Condominium Association. However, if broadcast notice is used in lieu of a notice physically posted on Condominium property, the notice and agenda must be broadcast at least four (4) times every broadcast hour of each day that a posted notice is otherwise required under the Condominium Act. If broadcast notice is provided, the notice and agenda must be broadcast in a manner and for sufficient continuance length of time so as to allow an average reader to observe the notice and read and comprehend the entire content of the notice and the agenda. Notice of any meeting in which regular or special assessments against Unit Owner are to be considered for any reason must specifically state that assessments will be considered and provide the nature estimated costs and description of the purposes for such assessments.

Notwithstanding any other law, the requirement that Board meetings and committee meetings be opened to the Unit Owners does not apply to: a) meetings between the Board or a committee and the Association's attorney, with respect to proposed or pending litigation if the meeting is held for the purpose of seeking or rendering legal advise; or b) Board meetings held for the purpose of discussing personnel matters.

D. At membership meetings, the President shall preside, or in his absence, the membership shall elect a chairman.

E. The order of business at annual membership meetings and, as far as practical at any other membership meetings, shall be:

(1) Collection of Election Ballots.
(2) Calling of the roll and certifying of proxies.
(3) Proof of notice of meeting or waiver of notice.
(4) Reading of minutes.
(5) Reports of officers.
(6) Reports of committees.
(7) Appointment of Chairman of Inspectors of Election.
(8) Election of Directors.
(9) Unfinished business.
(10) New business.
(11) Adjournment.

F. Meetings of the Association shall be held at the principal office of the project or such other suitable place convenient to the owners as may be designated by the Board of Administration.

G. Any approval by Unit Owners called for by The Florida Condominium Act or the applicable Declaration or By-Laws, including, but not limited to, the approval requirement in Section 718.111(8), Florida Statutes, shall be made at a duly noticed meeting of Unit Owners and shall be subject to all requirements of the Condominium Act or the applicable condominium documents relating to Unit Owner decision making, except that Unit Owners may take action by written agreement, without meetings, on matters for which action by written agreement without meetings is expressly allowed by the applicable By-Laws of declaration or any statute that provides for such action.

H. Unit Owners may waive notice of specific meetings if allowed by the applicable By-Laws or Declaration or any statute.

I. Unit Owners shall have the right to participate in meetings of unit owners with reference to all designated agenda items. However, the Association may adopt reasonable rules governing the frequency, duration, and manner of unit owner participation.

J. Any Unit Owner may tape record or videotape a meeting of the Unit Owners subject to any reasonable rules adopted by the division.

K. Unless otherwise provided in the By-Laws, any vacancy occurring on the Board before the expiration of a term may be filled by the affirmative vote of the majority of the remaining directors, even if the remaining directors constitute less than a quorum, or by the sole remaining director. In the alternative, a Board may hold an election to fill the vacancy, in which case the election procedures must conform to the requirements of Section 718.112(2)(d)3, Florida Statutes unless the Association has opted out of the statutory election process, in which case the By-Laws of the Association control. Unless otherwise provided in the By-Laws, a Board member appointed or elected under this section shall fill the vacancy for the unexpired term of the seat being filled. Filling vacancies created by recall is governed by Section 718.112(2)(j), Florida Statutes, and rules adopted by the division.

Notwithstanding Sections 718.112(2)(d) 2 and (d) 3, Florida Statutes, an Association may, by the affirmative vote of a majority of the total voting interests, provide for different voting and election procedures in its By-Laws, which vote may be by a proxy specifically delineating the different voting and election procedures. The different voting and election procedures may provide for elections to be conducted by limited or general proxy.

4. BOARD OF ADMINISTRATION AND OFFICERS

A. The Board of Administration shall consist of three (3) directors. Each director elected at the first annual meeting of the membership thereafter shall serve for the term of one (1) year or until his successor is duly elected.

Subject to the provisions of Section 718.301, Florida Statutes, any member of the Board of Administration may be recalled and removed from office with or without cause by the vote or agreement in writing by a majority of all the voting interests. A special meeting of the Unit Owners to recall a member or members of the Board of Administration may be called by ten (10%) percent of the voting interest giving notice of the meeting as required for a meeting of Unit Owners, and the notice shall state the purpose of the meeting.

(1) If the recall is approved by a majority of all voting interests by a vote at a meeting, the recall will be effective as provided herein. The Board shall duly notice and hold a Board meeting within five (5) full business days of the adjournment of the Unit Owner meeting to recall one or more Board members. At the meeting, the board shall either certify the recall, in which case such member or members shall be recalled effective immediately and shall turn over to the Board within five (5) full business days any and all records and property of the Association in their possession, or shall proceed as set forth in subparagraph (3).

(2) If the proposed recall is by an agreement in writing by a majority of all voting interests, the agreement in writing or a copy thereof shall be served on the Association by certified mail or by personal service in the manner authorized by Chapter 48 and the Florida Rules of Civil Procedure. The Board of Administration shall duly notice and hold a meeting of the Board within five (5) full business days after receipt of

the agreement in writing. At the meeting, the Board shall either certify the written agreement to recall a member or members of the Board, in which case such member or members shall be recalled effective immediately and shall turn over to the Board within five (5) full business days any and all records and property of the Association in their possession, or proceed as described in subparagraph (3).

(3) If the Board determines not to certify the written agreement to recall a member or members of the Board, or does not certify the recall by a vote at a meeting, the Board shall, within five (5) full business days after the meeting, file with the division a petition for arbitration pursuant to the procedure in Section 718.1255, Florida Statutes. For the purposes of this section, the Unit Owners who voted at the meeting or who executed the agreement in writing shall constitute one party under the petition for arbitration. If the arbitrator certifies the recall as to any member or members of the board, the recall will be effective upon mailing of the final order of arbitration to the Association. If the Association fails to comply with the order of the arbitrator, the division may take action pursuant to Section 718.501, Florida Statutes. Any member or members so recalled shall deliver to the board any and all records of the Association in their possession within five (5) full business days of the effective date of the recall.

(4) If the Board fails to duly notice and hold a Board meeting within five (5) full business days of service of an agreement in writing or within five (5) full business days of the adjournment of the Unit Owner recall meeting, the recall shall be deemed effective and the Board members so recalled shall immediately turn over to the Board any and all records and property of the Association.

(5) If a vacancy occurs on the Board as a result of a recall and less than a majority of the Board members are removed, the vacancy may be filled by the affirmative vote of a majority of the remaining directors, notwithstanding any provision to the contrary contained in this subsection. If vacancies occur on the Board as a result of a recall and a majority or more of the Board members are removed, the vacancies shall be filled in accordance with procedural rules to be adopted by the division, which rules need not be consistent with Section 718.112(2)(j), Florida Statutes. The rules must be provided procedures governing the conduct of the recall election as well as the operation of the Association during the period after a recall but prior to the recall election.

The Developer is entitled to elect or appoint at least one (1) member of the Board of Administration of the Association as long as the Developer holds for sale in the ordinary course of business five (5%) percent of the units in the condominium operated by the Association.

B. Election of directors shall be conducted in the following manner:

(1) Each member of the Board of Administration shall be elected by a plurality of the votes cast at the annual meeting of the members of the Association.

(2) Vacancies in the Board of Administration may be filled until the date of the next annual meeting by the majority vote of the remaining directors unless the vacancy occurs when both the Developer and Unit Owners other than the Developer are entitled to representation in which event the vacancy shall be filled by an election as provided in rule 61B-23.0026 Florida Administrative Code.

C. The organizational meeting of a newly elected Board of Administration shall be held within ten (10) days of their election, at such time and such place as shall be fixed by the directors at the meeting at which they were elected, and notice of the organizational meeting shall be conspicuously posted on the condominium property at least forty-eight (48) continuous hours in advance.

D. The officers of the Association shall be elected annually by the Board of Administration. Any officer may be removed, either with or without cause, and his successor elected at any regular meeting of the Board of Administration, or any special meeting of the Board called for such purpose.

E. Regular meetings of the Board of Administration may be held at such time and place as shall be determined from time to time by a majority of the directors, but at least two (2) such meetings shall be held during each fiscal year. Notice of regular meetings shall be given to

each director, personally or by mail, telephone or telegram at least ten (10) days prior to the day named for such meeting, unless notice is waived. These meetings shall be open to all Unit Owners and notice of the meeting shall be posted conspicuously on the condominium property forty-eight (48) continuous hours in advance, except in an emergency. Notice of any meeting where assessments against Unit Owners are to be considered for any reason, shall specifically contain a statement that assessments will be considered and the nature of any such assessments.

F. Special meetings of the directors may be called by the President, and must be called by the Secretary at the written request of any director. Not less than three (3) days notice of a meeting shall be given to each director, personally or by mail, telephone or telegram, which notice shall state the time, place and purpose of the meeting. Notice to Unit Owners shall be given in accordance with subparagraph E above.

G. Any director may waive notice of a meeting before or after the meeting, and such waiver shall be deemed equivalent to the giving of notice. Attendance by a director at any meeting of the Board shall be a waiver of notice by him of the time and place thereof. If all directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting. Notice to Unit Owners shall be given in accordance with subparagraph E above.

A director of the Association who is present at a meeting of its Board at which action is taken on any corporate matter shall be presumed to have assented to the action taken, unless he votes against such action or abstains from voting in respect thereto because of an asserted conflict of interest. Directors may not vote by proxy or by secret ballot at Board Meetings. A vote or abstention for each member present shall be recorded in the minutes.

A unit owner does not have authority to act for the Association by reason of being a unit owner.

H. A quorum of a directors' meeting shall consist of the directors entitled to cast a majority of the votes of the entire Board. The acts of the Board approved by a majority of the votes present at the meeting at which a quorum is present shall constitute the act of the Board of Directors, except as specifically otherwise provided in the Articles of Incorporation, these By-Laws or the Declaration of Condominium. If any directors' meeting cannot be organized because a quorum has not attended, or because the greater percentage has not attended, whenever the latter percentage of attendance may be required, the directors who are present may adjourn the meeting from time to time until a quorum or the required percentage attendance, if greater than a quorum, is present. Meetings of the Board of Administration and any committee thereof at which a quorum of the members of that committee are present shall be open to all Unit Owners except that meetings of a committee that does not take final action on behalf of the Board or make recommendations to the Board regarding the Association budget shall not be open to all Unit Owners and does not require notice to the Unit Owners as provided in Section 718.112 (2)(c), Florida Statutes. Any Unit Owner may tape record or videotape meetings of the Board of Administration. The right to attend such meetings includes the right to speak at such meetings with reference to all designated agenda items. The Division of Florida Condominiums, Timeshares and Mobile Homes shall adopt reasonable rules governing the tape recording and videotaping of the meeting. The Association may adopt reasonable rules governing the frequency, duration, and manner of Unit Owner statements. Adequate notice of all meetings, which notice shall specifically incorporate an identification of agenda items, shall be posted conspicuously on the condominium property at least forty-eight (48) continuous hours preceding the meeting except in an emergency. However, written notice of any meeting at which nonemergency special assessments, or at which amendment to rules regarding unit use will be proposed, discussed, or approved, shall be mailed or delivered to the Unit Owners and posted conspicuously on the condominium property not less than fourteen (14) continuous days prior to the meeting. Evidence of compliance with this fourteen (14) day notice shall be made by an affidavit executed by the secretary and filed among the official records of the Association. Upon notice to the Unit Owners, the Board shall by duly adopted rule designate a specific location on the condominium property upon which all notices of Board meetings shall be posted. Notice of any meeting in which regular assessments against Unit Owners are to be considered for any reason shall specifically contain a statement that assessments will be considered and the nature of any such assessments. At any adjourned meeting, any business which might have been transacted at the meeting as originally called may be transacted. A member of the Board of Administration or a committee may submit in writing his or her agreement or disagreement with any action taken at a meeting that the member did not attend. This agreement or disagreement

may not be used as a vote for or against the action taken and may not be used for the purposes of creating a quorum.

I. The presiding officer of directors' meetings shall be the President. In the absence of the President, the Vice President shall preside.

J. The directors' fees, if any, shall be determined by the members.

K. The operation of the condominium shall be by the Association. The Board of Administration shall exercise those powers and duties permitted by the common law and statutes, the Articles of Incorporation of the Association, these By-Laws and the Declaration of Condominium. Such powers and duties shall be exercised in accordance with the Articles of Incorporation, these By-Laws and the Declaration of Condominium, and shall include, without limiting the generality of the foregoing, the following:

(1) To make, levy and collect assessments against members and members' units to defray the costs of the condominium, and to use the proceeds of said assessments in the exercise of the powers and duties granted unto the Association. Assessments shall be made against units annually.

(2) The maintenance, repair, replacement, operation and management of the condominium wherever the same is required to be done and accomplished by the Association for the benefit of its members.

(3) The reconstruction of improvements after casualty, and further improvement of the property, real and personal.

(4) To make and amend regulations governing the use of the property, real and personal, and the common elements of the condominium, so long as such regulations or amendments thereto do not conflict with the restrictions and limitations which may be placed upon the use of such property under the terms of the Declaration of Condominium.

(5) To acquire, operate, lease, manage and otherwise trade and deal with property, real and personal, including condominium units in the condominium, as may be necessary or convenient in the operation and management of the condominium, and in accomplishing the purposes set forth in the Declaration of Condominium.

(6) To contract for the maintenance and management of the condominium and to authorize the management agent to assist the Association in carrying out its powers and duties by performing such functions as the collection of assessments, preparation of the records, enforcement of rules, and maintenance of the common elements. The Association shall, however, retain at all times the powers and duties granted them by the Condominium Act, including, but not limited to, the making of assessments, promulgation of rules, and execution of contracts on behalf of the Association.

(7) To enforce by legal means the provisions of the Articles of Incorporation and By-Laws of the Association, the Declaration of Condominium and any regulations hereinafter promulgated governing use of the property in the condominium.

(8) To pay all assessments and taxes from governmental agencies which are liens against any part of the Condominium property other than Condominium Units and the appurtenants thereto, and to assess the same against the members and their respective Condominium Units subject to such liens.

(9) To carry insurance for the protection of the members and the Association against casualty and liability.

(a) The Association shall use its best efforts to obtain and maintain adequate insurance to protect the Association property, the common elements, and the Condominium property required to be insured by the Association pursuant to paragraph (b). The Association shall use its best efforts to obtain and maintain liability insurance for directors and officers at a reasonable cost, insurance for the benefit of Association employees, and flood insurance for common elements,

Association property, and units. An Association or group of Associations may self-insure against claims against the Association, the Association property, and the Condominium property required to be insured by an Association, upon compliance with Florida Statute Sections 624.460-624.488. A copy of each policy of insurance in effect shall be made available for inspection by Unit Owners at reasonable times.

(b) All hazard policies issued to protect condominium buildings shall provide that the word "building" wherever used in the policy shall include, but shall not necessarily be limited to, fixtures, installation or additions comprising that part of the building within the unfinished interior surfaces of the perimeter walls, floors and ceiling of the individual units initially installed or replacements thereof, or like kind or quality in accordance with the original plans and specifications or as existed at the time the unit was initially conveyed if the original plans and specifications are not available. However, the word "building" shall not include unit floor coverings, wall coverings or ceiling coverings, and does not include the following equipment if it is located within a unit and the Unit Owner is required to repair or replace such equipment; electrical fixtures, appliances, air conditioner or heating equipment, water heaters, or built-in cabinets. With respect to the coverage provided for by this paragraph, the Unit Owners shall be considered additional insureds under the policy.

(10) To pay all costs of power, water, sewer and other utility services rendered to the condominium and not billed to the owners of the separate condominium units.

(11) To employ personnel to perform the services required for proper administration of the Association.

(12) To approve leases, subleases or other transfers of a unit other than sales or mortgage of a unit and to charge a fee for such approval. Any such fee may be preset, but in no event shall exceed fifty ($50.00) dollars. However, if the lease or sublease is a renewal of a lease or sublease with the same lessee or sublessee, no charge shall be made.

(13) Internal disputes arising from the operation of the condominium among Unit Owners, Associations, and their agents and assigns shall be submitted to mandatory nonbinding arbitration as provided for in Section 718.1255, Florida Statutes.

(14) A certificate of compliance from a licensed electrical contractor or electrician may be accepted by the Board as evidence of compliance of the Condominium units to the applicable Fire and Life Safety Code.

(15) To levy reasonable fines for the failure of the owner of a Unit or its occupants, licensees or invitees to comply with any provision of the Declaration, the Association By-Laws or reasonable rules of the Association pursuant to Article XXV of the Declaration. A fine may not become a lien against a Unit. Fines or suspensions may be levied by the Association by providing fourteen (14) days written notice to the unit owner stating the provision or provisions of the Declaration, the Association By-Laws or reasonable rules of the Association and a statement of the date, time and place of hearing as follows:

(a) The Association may levy reasonable fines for the failure of the owner of a unit or its occupants, licensees or invitees to comply with any provision of the Declaration, the Association By-Laws or reasonable rules of the Association. A fine may not become a lien against a unit. A fine may be levied on the basis of each day of a continuing violation, with a single notice and opportunity for hearing. However, the fine may not exceed $100 per violation, or $1,000 in the aggregate.

(b) An Association may suspend for reasonable period of time, the right of a Unit Owner, or Unit Owner's tenants, guests, or invitees to use the common elements, common facilities, or any other Association property for failure to comply with any provision of the Declaration, the Association's By-laws, or reasonable rules of the Association.

(c) A fine or suspension may be not be imposed unless the Association first provides at least fourteen (14) days written notice and an opportunity for a hearing to the unit owner and, if applicable, its occupant, licensee or invitee. The hearing must be held before a committee of other unit owners who are neither board members nor persons residing in the board members household. If the committee does not agree the fine or suspension may not be imposed.

(d) If a Unit Owner is more than ninety (90) days delinquent in paying a monetary obligation to the Association, the Association may suspend the right of the Unit Owner or the Units occupants, licensees, or invitee to use common elements, common facilities, or any other Association property until the monetary obligation is paid in full. This right does not apply to limited common elements intended to be used only by that Unit, common elements needed to access the Unit, utility services provided to the Unit, parking spaces or elevators. Notice or hearing requirements set forth above do not apply to suspensions imposed under this paragraph.

(e) An Association may suspend the voting rights of a unit or member due to non-payment of any monetary obligation due to the Association which is more than ninety (90) days delinquent. A voting interest or consent right allocated to a Unit or member which has been suspended by the Association may not be counted toward the total number of voting interests necessary to constitute a quorum, the number of voting interests required to conduct an election, or the number of voting interests required to approve an action under the Florida Condominium Act or pursuant to the Declaration, Articles of Incorporation, or By-laws. The suspension ends upon full payment of all obligations currently due or overdue the Association. The notice and hearing requirements enforced in this section do not apply to a suspension imposed under this paragraph.

L. The undertakings and contracts authorized by the said first Board of Administration shall be binding upon the Association in the same manner as though such undertakings and contracts had been authorized by the first Board of Administration duly elected by the membership, provided any such undertakings and contracts shall be fair and reasonable and may be canceled by Unit Owners other than the Developer as provided in Section 718.302(1), Florida Statutes.

5. <u>OFFICERS</u>

A. The principal officers of the Association shall be a President, a Secretary and a Treasurer, and as many Vice Presidents, Assistant Secretaries and Assistant Treasurers as the Board of Administration may deem necessary.

B. The President shall be the chief officer of the Association. He shall preside at all meetings of the Association and of the Board of Administration. He shall have all of the general powers and duties which are usually vested in the office of president of an Association, including, but not limited to, the power to appoint committees from among the owners, from time to time as he may in his discretion decide is appropriate, to assist in the conduct of the affairs of the Association.

C. The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Administration shall appoint some other member of the Board to do so on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon by the Board of Administration.

D. The Secretary shall keep the minutes of all proceedings of the Directors and the members. He shall attend to the giving and service of all notices of the members and Directors, and such other notices required by law. He shall have custody of the seal of the Association and affix the same to instruments requiring a seal when duly signed. He shall keep records of the Association, its administration and salaries.

E. The Treasurer shall have custody of all property of the Association, including funds, securities, and evidence of indebtedness. He shall keep the books of the Association in accordance with good accounting practices.

F. The compensation of all officers and employees of the Association shall be fixed by the Directors. This provision shall not preclude the Board of Administration from employing a Director as an employee of the Association, nor preclude the contracting with a Director for the management of the condominium.

6. FISCAL MANAGEMENT

The provisions for fiscal management of the Association set forth in the Declaration of Condominium and Articles of Incorporation shall be supplemented by the following provisions:

A. The Association shall maintain accounting records for each condominium it manages in the county where the condominium is located, according to good accounting practices. The records shall be open for inspection by Unit Owners or their authorized representatives at reasonable times and written summaries of them shall be supplied at least annually to Unit Owners or their authorized representatives. The records shall include, but are not limited to:

(1) A record of all receipts and expenditures.

(2) An account for each unit designating the name and current address of the unit owner, the amount of each assessment, the date on which the assessments come due, the amount paid upon the account and the balance due.

B. The Board of Administration shall adopt a budget for each fiscal year which shall contain estimates of the cost of performing the functions of the Association, including but not limited to the common expense budget, which shall include, without limiting the generality of the foregoing, the estimated amounts necessary for maintenance, and operation of common elements and limited common elements, landscaping, streets and walkways, office expenses, utility services, replacement and operating reserve, casualty insurance, liability insurance, administration and salaries. The Board of Administration shall also establish the proposed assessment against each member as more fully provided in the Declaration of Condominium. Delivery of a copy of any budget to each member shall not affect the liability of any member for any such assessment, nor shall delivery of a copy of such budget or amended budget be considered as a condition precedent to the effectiveness of said budget originally adopted if it shall appear to be insufficient to pay costs and expenses of operation and management, or in the event of emergencies.

(1) The proposed annual budget of common expenses shall be detailed and shall show the amounts budgeted by accounts and expense classifications, including, if applicable, but not limited to, those expenses listed in Section 718.504(21), Florida Statutes.

(2) In addition to annual operating expenses, the budget shall include reserve accounts for capital expenditures and deferred maintenance. These accounts shall include, but are not limited to, roof replacement, building painting, and pavement resurfacing, regardless of the amount of deferred maintenance expense or replacement cost, and for any other item for which the deferred maintenance expense or replacement cost exceeds ten-thousand ($10,000) dollars. The amount to be reserved shall be computed by means of a formula which is based upon estimated remaining useful life and estimated replacement cost or deferred maintenance expense of each reserve item. The Association may adjust replacement reserve assessment annually to take into account any changes in estimates or extension of the useful life of a reserve item caused by deferred maintenance. This subsection does not apply to an adopted budget in which the members of an Association have determined by a majority vote at a duly called meeting of the Association, to provide no reserves or less reserves than required by this subsection. However, prior to turnover of control of an Association by a developer to Unit Owners other than a developer pursuant to Section 718.301, Florida Statutes, the developer may vote to waive the reserves or reduce the funding of reserves for the first two (2) fiscal years of the Association's operation, beginning with the fiscal year in which the initial declaration is recorded, after which time reserves may be waived or reduced only upon the vote of a majority of all non-developer voting interests voting in person or by limited proxy at a duly called meeting of the Association. Any vote to waive or reduce reserves for capital expenditures and deferred maintenance required by Section 718.112(2)(f)2,

Florida Statutes, shall be effective for only one annual budget. If a meeting of the unit owners has been called to determine to provide no reserves or reserves less adequate than required, and such result is not attained or a quorum is not attained, the reserves as included in the budget shall go into effect.

(3) Reserve funds and any interest accruing thereon shall remain in the reserve account or accounts, and shall be used only for authorized reserve expenditures unless their use for other purposes is approved in advance by a majority vote at a duly called meeting of the Association. Prior to turnover of control of an Association by a developer to Unit Owners other than the developer pursuant to Section 718.301, Florida Statutes, the developer-controlled Association shall not vote to use reserves for purposes other than that for which they were intended without the approval of a majority of all non-developer voting interests, voting in person or by limited proxy at a duly called meeting of the Association.

All provisions of Section 718.112(2)(a) through (m), Florida Statutes, are incorporated herein and included in these By-Laws.

C. The depository of the Association shall be such bank or banks as shall be designated from time to time by the Directors and in which the monies of the Association shall be deposited. Withdrawal of monies from such accounts shall be only by check signed by such person or persons as are authorized by the Directors.

D. A review of the accounts of the Association shall be made annually by an accountant, and a copy of the report shall be furnished to each member not later than May 1st of the year following the year for which the report is made.

E. The Association shall obtain and maintain adequate insurance or fidelity bonding of all persons who control or disburse funds of the Association in the principal sum required by Section 718.111(11)(h), Florida Statutes for each person. The insurance policy or fidelity bond must cover the maximum funds that will be in the custody of the Association or its management agent at any one time. As used in this paragraph the term "persons who control or disburse funds of the Association" includes, but is not limited to, those individuals authorized to sign checks and the president, secretary, and treasurer of the Association. The Association shall bear the cost of bonding.

F. Any meeting at which a proposed annual budget of an Association will be considered by the Board or Unit Owners shall be open to all Unit Owners. At least fourteen (14) days prior to such a meeting, the Board shall hand deliver to each Unit Owner, or mail to each Unit Owner at the address last furnished to the Association by the Unit Owner, a notice of such meeting and a copy of the proposed annual budget. An officer or manager of the Association, or other person providing notice of such meeting, shall execute an affidavit evidencing compliance with such notice requirement and such affidavit shall be filed among the official records of the Association.

If the Board adopts in any fiscal year an annual budget which requires assessments against Unit Owners which exceed one-hundred fifteen (115%) percent of assessments for the preceding fiscal year, the Board shall conduct a special meeting of the Unit Owners to consider a substitute budget if the Board receives, within twenty-one (21) days after adoption of the annual budget, a written request for a special meeting from at least ten (10) percent of all voting interests. The special meeting shall be conducted within sixty (60) days after adoption of the annual budget. At least fourteen (14) days prior to such special meeting, the Board shall hand deliver to each Unit Owner, or mail to each Unit Owner at the address last furnished to the Association, a notice of the meeting. An officer or manager of the Association, or other person providing notice of such meeting shall execute an affidavit evidencing compliance with this notice requirement and such affidavit shall be filed among the official records of the Association. Unit Owners may consider and adopt a substitute budget at the special meeting. A substitute budget is adopted if approved by a majority of all voting interests unless the By-Laws require adoption by a greater percentage of voting interests. If there is not a quorum at the special meeting or a substitute budget is not adopted, the annual budget previously adopted by the Board shall take effect as scheduled.

Any determination of whether assessments exceed one-hundred fifteen (115%) percent of assessments for the prior fiscal year shall exclude any authorized provision for reasonable

reserves for repair or replacement of the condominium property, anticipated expenses of the Association which the Board does not expect to be incurred on a regular or annual basis, or assessments for betterments to the condominium property.

If the developer controls the Board, assessments shall not exceed one-hundred fifteen (115%) percent of assessments for the prior fiscal year unless approved by a majority of all voting interests.

G. FINANCIAL REPORTING. Within ninety (90) days after the end of the fiscal year, or annually on a date on or before May 1st , the Association shall prepare and complete, or cause to be prepared and completed by a third party, a financial report for the preceding fiscal year. On or before May 1 of each year after the financial report is completed or received by the Association from the third party, but not later than one hundred twenty (120) days after the end of the fiscal year or other date as provided in the By-Laws, the Association shall mail to each Unit Owner at the address last furnished to the Association by the Unit Owner, or hand deliver to each Unit Owner, a copy of the financial report or a notice that a copy of the financial report will be mailed or hand delivered to the Unit Owner, without charge, upon receipt of a written request from the Unit Owner. The division shall adopt rules setting forth uniform accounting principles and standards to be used by all Associations and shall adopt rules addressing financial reporting requirements for multi-condominium Associations. The rules shall include, but not be limited to, uniform accounting principles and standards for stating the disclosure of at least a summary of the reserves, including information as to whether such reserves are being funded at a level sufficient to prevent the need for a special assessment and, if not, the amount of assessments necessary to bring the reserves up to the level necessary to avoid a special assessment. The person preparing the financial reports shall be entitled to rely on an inspection report prepared for or provided to the Association to meet the fiscal and fiduciary standards of the Florida Condominium Act. In adopting such rules, the division shall consider the number of members and annual revenues of an Association. Financial reports shall be prepared as follows:

(a) An Association that meets the criteria of this paragraph shall prepare or cause to be prepared a complete set of financial statements in accordance with generally accepted accounting principles. The financial statements shall be based upon the Association's total annual revenues, as follows:

(1) An Association with total annual revenues of one-hundred fifty thousand ($150,000) dollars or more, but less than three-hundred thousand ($300,000) dollars, shall prepare compiled financial statements.

(2) An Association with total annual revenues of at least three-hundred thousand ($300,000) dollars, but less than five-hundred thousand ($500,000) dollars, shall prepare reviewed financial statements.

(3) An Association with total annual revenues of five-hundred thousand ($500,000) dollars or more shall prepare audited financial statements.

(b) (1) An Association with total annual revenues of less than one-hundred fifty thousand ($150,000) dollars shall prepare a report of cash receipts and expenditures.

(2) An Association which operates less than fifty (50) units, regardless of the Association's annual revenues, shall prepare a report of cash receipts and expenditures in lieu of financial statements required by paragraph (a).

(3) A report of cash receipts and disbursements must disclose the amount of receipts by accounts and receipt classifications and the amount of expenses by accounts and expense classifications, including, but not limited to, the following, as applicable: costs for security, professional and management fees and expenses, taxes, costs for recreation facilities, expenses for refuse collection and utility services, expenses for lawn care, costs for building maintenance and repair, insurance costs, administration and salary expenses, and reserves accumulated and expended for capital expenditures deferred maintenance, and any other category for which the Association maintains reserves.

(c) An Association may prepare or cause to be prepared, without a meeting of or approval by the Unit Owners:

(1) Compiled, reviewed, or audited financial statements, if the Association is required to prepare a report of cash receipts and expenditures;

(2) Reviewed or audited financial statements, if the Association is required to prepare compiled financial statements; or

(3) Audited financial statements if the Association is required to prepare reviewed financial statements.

(d) If approved by a majority of the voting interests present at a properly called meeting of the Association, an Association may prepare or cause to be prepared:

(1) A report of cash receipts and expenditures in lieu of a compiled, reviewed, or audited financial statement;

(2) A report of cash receipts and expenditures or a compiled financial statement in lieu of a reviewed or audited financial statement; or

(3) A report of cash receipts and expenditures, a compiled financial statement, or a reviewed financial statement in lieu of an audited financial statement.

Such meeting and approval must occur prior to the end of the fiscal year and is effective only for the fiscal year in which the vote is taken, except that the approval also may be effective for the following fiscal year. With respect to an Association to which the developer has not turned over control of the Association, all Unit Owners, including the developer, may vote on issues related to the preparation of financial reports for the first two (2) fiscal years of the Association's operation, beginning with the fiscal year in which the declaration is recorded. Thereafter, all Unit Owners except the developer may vote on such issues until control is turned over to the Association by the Developer. Any audit or review prepared under this section shall be paid for by the Developer if done prior to turnover of control of the Association. An Association may not waive the financial reporting requirements of this section for more than three (3) consecutive years.

7. <u>PARLIAMENTARY RULES</u>

Robert's Rules of Order (latest edition) shall govern the conduct of the corporate meetings when not in conflict with the Articles of Incorporation and these By-Laws or with the Statutes of the State of Florida.

8. <u>AMENDMENTS TO BY-LAWS</u>

Amendments to these By-Laws shall be proposed and adopted in the following manner:

A. Amendments to these By-Laws may be proposed by the Board of Administration of the Association acting upon vote of a majority of the Directors, or by ten (10%) percent of the voting interests of the Association, whether meeting as members or by instrument in writing signed by them.

B. Upon any amendment or amendments to these By-Laws being proposed by said Board of Administration or members, such proposed amendment or amendments shall be transmitted to the President of the Association, or other officer of the Association in the absence of the President, who shall thereupon call a special joint meeting of the members of the Board of Administration of the Association and the membership for a date not sooner than twenty (20) days or later than sixty (60) days from receipt by such officer of the proposed amendment or amendments, and it shall be the duty of the Secretary to give each member written or printed notice of such meeting in the same form and in the same manner as notice of the call of a special meeting of the members is required as herein set forth.

C. In order for such amendment or amendments to become effective, the same must be approved by an affirmative vote of a majority of the entire membership of the Board of Administration and by an affirmative vote of the Owners of at least eighty (80%) percent of the total number of units in the condominium (i.e. twenty- nine (29) of the thirty-six (36) Unit Owners must vote for the amendment). No By-Law shall be revised or amended by reference to

its title or number only. Proposals to amend existing By-Laws shall contain the full text of the By-Laws to be amended; new words shall be inserted in the text and underlined, and words to be deleted shall be lined through with hyphens. However, if the proposed change is so extensive that this procedure would hinder rather than assist the understanding of the proposed amendment, it is not necessary to use underlining and hyphens as indicators of words added or deleted, but instead a notation must be inserted immediately preceding the proposed amendment in substantially the following language: "Substantial rewording of By-Law. See By-Law . . . for present text." Thereupon, such amendment or amendments to these By-Laws shall be transcribed, certified by the President and Secretary of the Association, and a copy thereof shall be recorded in the Public Records of Brevard County, Florida, within ten (10) days from the date on which any amendment or amendments have been affirmatively approved by the Directors and members. No amendment to the By-Laws is valid unless recorded with identification on the first page thereof of the book and page of the Public Records of Brevard County, Florida. Non-material errors or omissions in the by-law process shall not invalidate an otherwise properly promulgated amendment.

D. At any meeting held to consider such amendment or amendments to the By-Laws, any member of the Association may vote in person or by proxy on the amendment.

9. OFFICIAL RECORDS OF THE ASSOCIATION. Records of the Association shall be maintained as follows:

A. From the inception of the Association, the Association shall maintain each of the following items, when applicable, which shall constitute the official records of the Association:

(1) A copy of the plans, permits, warranties, and other items provided by the Developer pursuant to Section 718.301(4), Florida Statutes.

(2) A photocopy of the recorded Declaration of Condominium of each condominium operated by the Association and of each amendment to each declaration.

(3) A photocopy of the recorded By-Laws of the Association and of each amendment to the By-Laws.

(4) A certified copy of the Articles of Incorporation of the Association, or other documents creating the Association, and of each amendment thereto.

(5) A copy of the current rules of the Association.

(6) A book or books which contain the minutes of all meetings or the Association, of the Board of Directors, and of Unit Owners, which minutes shall be retained for a period of not less than 7 years.

(7) A current roster of all Unit Owners and their mailing addresses, unit identifications, voting certifications, and, if known, telephone numbers. The Association shall also maintain the electronic mailing addresses and the numbers designated by unit owners for receiving notice sent by electronic transmission of those unit owners consenting to receive notice by electronic transmission. The electronic mailing addresses and numbers provided by unit owners to receive notice by electronic transmission shall be removed from Association records when consent to receive notice by electronic transmission is revoked. However, the Association is not liable for an erroneous disclosure of the electronic mail address or the number for receiving electronic transmission of notices.

(8) All current insurance policies of the Association and Condominiums operated by the Association.

(9) A current copy of any management agreement, lease, or other contract to which the Association is a party or under which the Association or the Unit Owners have an obligation or responsibility.

(10) Bills of sale or transfer for all property owned by the Association.

(11) Accounting records for the Association and separate accounting records for each condominium which the Association operates. All accounting records shall be

maintained for a period of not less than seven (7) years. Any person who knowingly or intentionally defaces or destroys accounting records required to be maintained by this chapter, or who knowingly or intentionally fails to create or maintain accounting records required to be maintained by this chapter, is personally subject to a civil penalty pursuant to Section 718.501 (1)(d), Florida Statutes. The accounting records shall include, but not be limited to:

(a) Accurate, itemized, and detailed records of all receipts and expenditures.

(b) A current account and a monthly, bimonthly, or quarterly statement of the account for each unit designating the name of the Unit Owner, the due date and amount of each assessment, the amount paid upon the account, and the balance due.

(c) All audits, reviews, accounting statements, and financial reports of the Association or condominium.

(d) All contracts for work to be performed. Bids for work to be performed shall also be considered official records and shall be maintained by the Association.

(12) Ballots, sign-in-sheets, voting proxies, and all other papers relating to elections, which shall be maintained for a period of one (1) year from the date of the meeting to which the document relates.

(13) All rental records, when the Association is acting as agent for the rental of condominium units.

(14) A copy of the current Question and Answer Sheet as described by Section 718.504, Florida Statutes.

(15) All other records of the Association not specifically included in the foregoing which are related to the operation of the Association.

(16) A copy of the inspection report as provided for in Section 718.301(4)(p), Florida Statutes.

B. The official records of the Association shall be maintained within the State for at least seven (7) years. The records of the Association shall be made available to a unit owner within forty-five (45) miles of the Condominium property or within the county in which the Condominium property is located within five (5) working days after receipt of written request by the Board or its designee. However, such distance requirement does not apply to an Association governing a timeshare condominium. This paragraph may be complied with by having a copy of the official records of the Association available for inspection or copying on the condominium property or Association property, or the Association may offer the option of making the records of the Association available to a unit owner either electronically via the Internet or by allowing the records to be viewed in electronic format on a computer screen and printed upon request.

C. The official records of the Association are open to inspection by any Association Member or the authorized representative of such member at all reasonable times. The right to inspect the records includes the right to make or obtain copies, at the reasonable expense, if any, of the Association Member. The Association may adopt reasonable rules regarding the frequency, time, location, notice, and manner of record inspections and copying. The failure of an Association to provide the records within ten (10) working days after receipt of a written request shall create a rebuttable presumption that the Association willfully failed to comply with this paragraph. A Unit Owner who is denied access to official records is entitled to the actual damages or minimum damages for the Association's willful failure to comply with this paragraph. The minimum damages shall be fifty ($50.00) dollars per calendar day up to ten (10) days, the calculation to commence on the 11th working day after receipt of the written request. The failure to permit inspection of the Association records as provided herein entitles any person prevailing in an enforcement action to recover reasonable attorney's fees from the person in control of the records who, directly or indirectly, knowingly denied access to the records for inspection. Any person who knowingly or intentionally defaces or destroys accounting records that are required by the Florida Condominium Act, or knowingly or intentionally fails to create or maintain accounting records that are required by the Florida Condominium Act, is personally subject to a civil penalty pursuant to Section 718.501(1)(d), Florida Statutes. The Association

shall maintain an adequate number of copies of the Declaration, Articles of Incorporation, By-Laws, and Rules, and all amendments to each of the foregoing, as well as the Question and Answer Sheet provided for in Section 718.504, Florida Statutes and year end financial information required in Section 718.111(13), Florida Statutes, on the condominium property to ensure their availability to Unit Owners and prospective purchasers, and may charge its actual costs for preparing and furnishing these documents to those requesting the same. Notwithstanding the provisions of this paragraph, the following records shall not be accessible to Unit Owners:

(1) Any record protected by the lawyer-client privilege as described in Section 90.502, Florida Statutes, and any record protected by the work-product privilege including any record prepared by an Association attorney or prepared at the attorney's express direction, which reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the Association, and which was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or which was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceeding until the conclusion of the litigation or adversarial administrative proceedings.

(2) Information obtained by an Association in connection with the approval of the lease, sale, or other transfer of a unit.

(3) Personnel records of Association or management company employees, including, but not limited to, disciplinary, payroll, health and insurance records. For purposes of this paragraph, the term "Personnel Records" does not include written employment agreements with an Association employee or management company or budgetary or financial records that indicate the compensation paid to an Association employee.

(4) Medical records of Unit Owners.

(5) Social security numbers, driver's license numbers, credit card numbers, email addresses, telephone numbers, facsimile numbers, emergency contact information, addresses of a Unit Owner other than as provided to fulfill the Association's notice requirements and other personal identifying information of any person, excluding the person's name, unit designation, mailing address, property address and any address, email address or facsimile number provided to the Association to fulfill the Association's notice requirement. However, an owner may consent in writing to the disclosure of protected information described in this paragraph. The Association is not liable for the inadvertent disclosure of information that is protected under this paragraph if the information is included in an official record of the Association and is voluntarily provided by an owner and not requested by the Association.

(6) Electronic security measures that are used by the Association to safeguard data, including passwords.

(7) The software and operating system used by the Association which allows the manipulation of data, even if the owner owns a copy of the same software used by the Association. The data is part of the official records of the Association.

D. The Association shall prepare a Question and Answer Sheet as described in Section 718.504, Florida Statutes, and shall update it annually.

E. The Association or its authorized agent is not required to provide a prospective purchaser or lienholder with information about the Condominium or the Association other than information or documents required by the Florida Condominium Act to be made available or disclosed. The Association or its authorized agent may charge a reasonable fee to the prospective purchaser, lienholder, or the current unit owner for providing good faith responses to requests for information by or on behalf of a prospective purchaser, lienholder or the current unit owner for providing good faith responses to requests for information by or on behalf of a prospective purchaser or lienholder, other than that required by law, if the fee does not exceed $150.00 plus the reasonable cost of photocopying and any attorney's fees incurred by the Association in connection with the response.

The association and its authorized agent are not liable for providing such information in good faith pursuant to a written request if the person providing the information includes a written

statement in substantially the following form: "The responses herein are made in good faith and to the best of my ability as to their accuracy."

F. COMMINGLING. All funds collected by the Association shall be maintained separately in the Association's name. For investment purposes only, reserve funds may be commingled with operating funds of the Association. Commingled operating and reserve funds shall be accounted for separately and a commingled account shall not, at any time, be less than the amount identified as reserve funds. A manager or business entity required to be licensed or registered under Section 468.432, Florida Statutes, or an agent, employee, officer, or director of an Association, shall not commingle any Association funds with his or her funds or with the funds of any other condominium Association or the funds of a community Association as defined in Section 468.431, Florida Statutes.

THE UNDERSIGNED, being the Secretary of CAPE CROSSING CONDOMINIUM ASSOCIATION, INC., a corporation not for profit under the laws of the State of Florida, does hereby certify that the foregoing By-Laws were adopted as the By-Laws of said Association at a meeting held for such purpose on the 18th day of April, 2019.

[signature]
SECRETARY