# EXHIBIT 2

Expert Report of Gary A. Moll, MBA, CPA, ASA, Ferguson-Moll Consulting, LLC, dated August 18, 2026.

FERGUSON-MOLL

Consulting, LLC

**IN THE CIRCUIT COURT OF THE 9TH**
**JUDICIAL CIRCUIT IN AND FOR**
**OSCEOLA COUNTY, FLORIDA**

In re:

_____________________________________ Case No: 2025-CA-002359 CI

PEDIXON LLC and ZPD LLC,

Plaintiffs,

v.

MARTIN C. FLYNN, JR., et al.,

Defendants.

_____________________________________/

**Expert Report of Gary A. Moll, MBA, CPA, ASA**

**August 18, 2026**

## INTRODUCTION AND PURPOSE

1. I, Gary A. Moll, and Ferguson-Moll Consulting, LLC, were engaged by Matthew Leibert, Esq., of Urban Thier Federer, P.A., counsel for the Defendants Martin C. Flynn, Jr. ("Flynn"), MTF Holdings, LLC, Sherwood Construction, Inc., Cape Crossing Vacation Rentals, LLC, and Horton Johnson, referred to collectively as the "Tiered Borrowers," in *PEDIXON LLC and ZPD LLC v. Martin C. Flynn, Jr.*, Case No. 2025-CA-002359 CI. PEDIXON LLC ("PEDIXON") and ZPD LLC are referred to collectively as the "Dixon Lenders." Parke Financial Limited Partnership ("Parke Financial") is a third lending entity that appears in the closing documents and in the payment record. Where this report refers to value taken by the Dixon Lenders, it identifies the entity that took it.

2. I am a licensed certified public accountant in Florida and Ohio and the Managing Director of Ferguson-Moll Consulting, LLC. I am also a Forensic and Valuation Services Director at Smolin, Lupin & Co., LLC. I hold the Accredited Senior Appraiser designation of the American Society of Appraisers and am an Accredited Senior Member of that Society. I belong to the American Institute of Certified Public Accountants and its Forensic and Valuation Services Section. I have more than thirty years of professional experience in business valuation, forensic accounting, economic damage calculations, and other litigation support. My curriculum vitae and prior testimony are attached as Exhibit B.

3. Counsel asked me to determine the effective rate of interest on the extensions of credit between the Dixon Lenders and the Tiered Borrowers, computed by the method *Fla. Stat. § 687.03(3)* prescribes, and to state what the parties' own records show was charged, taken, and received. I express no opinion on any question of law. Whether the rates computed here carry any legal consequence, and what that consequence is, are questions for the court.

4. This report states each computation in the order the statute prescribes, identifies every input and its source, and shows how each conclusion moves when a contested input moves. Where a computation depends on an assumption the record does not fix, I say so and give the result across the range.

## SCOPE OF REVIEW AND DOCUMENTS CONSIDERED

5. I reviewed the documents produced in this matter, including the loan instruments, the closing statements, the Dixon Lenders' own loan schedules and monthly billing statements, the recorded instruments, the appraisal of the Holly Bluff property, and the pleadings. The documents I considered are listed in Exhibit A and are cited throughout this report.

6. Two documents drive much of what follows, and both came from the Dixon Lenders' side of the transaction: the *Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation* dated August 1, 2023, prepared by the Dixon Lenders' closing attorney, and the PEDIXON loan schedule produced as DX 250603, as updated May 14, 2025. I performed no independent appraisal and none was required for this assignment. Every value used in this report is a value recited in a party's own instrument, in a third-party appraisal already in the record, or in the Dixon Lenders' own books.

## SUMMARY OF OPINIONS

7. **Holly Bluff, computed under the statute.** The effective annual rate of interest on the Holly Bluff acquisition loan, computed by the method set forth in *Fla. Stat. § 687.03(3)*, is **82.94 percent**. The advance is $339,718.41 — the $245,968.41 the lender never funded and the $93,750.00 it disbursed to itself as lender fees. See *St. Petersburg Bank & Trust Co. v. Hamm*, 414 So. 2d 1071 (Fla. 1982).

8. **Holly Bluff, across every term the record will support.** No promissory note has been produced for the Holly Bluff loan and neither the Loan Agreement nor the recorded mortgage states a maturity date. The term is therefore the only contested input in the computation. Exhibit C sets out the result at every term the record will bear: **82.94 percent** at two months, **42.18 percent** at five months, and **26.32 percent** at one year. The loan exceeds 25 percent at **any stated term shorter than 13.6 months**. The conclusion does not depend on which term the court adopts.

9. **The aggregate loan.** The effective annual rate on the aggregate loan of $11,075,000 consolidated in September 2023, computed under *Fla. Stat. § 687.03(3)* over an eighteen-month term and treating the January 9, 2024 assignment of the Homemakers Real Estate, LLC membership units as a forbearance fee at the $8,981,897 consideration the assignment itself recites, is **69.13 percent**.

10. **The aggregate loan, if the Homemakers value is disputed.** On the same eighteen-month term, any value assigned to the Homemakers units above **$1,653,458** produces an effective rate above 25 percent. On a twelve-month term the figure falls to **$1,037,325**. The lowest value in the record for those units — book value of **$6,895,454.37** at December 31, 2023 — exceeds the higher of those thresholds by more than four times.

11. **Timely credit of the assets taken: after February 1, 2024 there was no principal.** If the property and funds the Dixon Lenders took are credited when they were received rather than when the Dixon Lenders chose to book them, the $11,075,000 of aggregate principal was extinguished no later than **February 1, 2024** — and it is extinguished on **every** valuation in the record, including the Dixon Lenders' own figure of $3,000,000 for Holly Bluff. From February 2024 through May 2025 the Dixon Lenders billed **$2,997,242** in interest and charges against a principal balance of zero. That sum cannot be expressed as a rate, because the denominator is zero. It is not interest at a high rate; it is a charge for the use of money that was no longer outstanding.

12. **January 2024 forward: the rate exceeds 25 percent by arithmetic.** In January 2024 the Dixon Lenders raised the stated rate on the portfolio to 25 percent. *Fla. Stat. § 687.03(3)* produces the effective rate by adding the spread of every advance or forbearance **to** the stated rate. Once the stated rate is 25 percent, any advance or forbearance greater than zero puts the effective rate above 25 percent. This is not a matter of degree. The renewal fees the Dixon Lenders charged in April and July 2024 alone produce **26.77 percent**; the Homemakers forbearance fee produces **106.10 percent** at the recited consideration and **87.26 percent** at book value.

13. **River Fly In.** If the Dixon Lenders had credited the $2,603,595 they received from the River Fly In closing on November 17, 2023, when they received it, or had simply eliminated the related borrowing, the effective rate greatly exceeds 25 percent. On the River Fly In loan standing alone, computed under *Fla. Stat. § 687.03(3)* against its stated

15 percent rate and its stated July 1, 2024 maturity, the rate is **82.04 percent** on the $2,000,000 the lender retained and **101.11 percent** on the lender's own recital of what it kept.

14. **Hampton.** If the Dixon Lenders had credited the Nevamar / Hampton, South Carolina real estate conveyed to PEDIXON on July 20, 2023 at the $4,300,000 value established by the written third-party offer, or at any value sufficient to eliminate the related $1,300,000 borrowing, the effective rate greatly exceeds 25 percent.

15. **The Tiered loan.** On the $750,000 loan of September 2023 the effective rate is **47.53 percent**, computed on the lender's own note and the lender's own loan agreement, without reference to any valuation. Paragraph 6.1 of that agreement designates $375,000 — half the loan — as an interest reserve, and paragraph 6.1.1 directs the reserve to "all outstanding payments owed to Lender as of the date hereof."

16. **What was lent, and what came back.** The Dixon Lenders advanced **$11,225,000** across eleven loans. They received **$23,105,492** in large cash and in-kind value, and approximately **$3,865,496** more in routine cash — monthly interest, rental distributions, insurance proceeds, and wires — for a total of approximately **$26,970,988** received on $11,225,000 advanced. Nothing in the arithmetic that follows is necessary to observe that the Dixon Lenders took back roughly two dollars and forty cents for every dollar they put out.

## METHODOLOGY

17. A forensic expert computing and analyzing economic damages goes beyond a company's books and records. The forensic expert applies professional skepticism, judgment, and experience in examining evidence.

18. Conclusions should be proven with reasonable certainty. The core objective of the reasonable certainty standard is to ensure that the damaged party is not awarded speculative, overly optimistic, or unrealistic damages.

19. I applied the following American Institute of Certified Public Accountants ("AICPA") Professional Standards and Practice Aids:

    a. Code of Professional Conduct Section 1.295.140;
    b. Statement on Standards for Forensic Services;
    c. Statement on Standards for Consulting Services ("SSCS") No. 1;
    d. Practice Aid — Attaining Reasonable Certainty in Economic Damages Calculations; and
    e. Practice Aid — Discount Rates, Risk & Uncertainty in Economic Damages Calculations.

20. Forensic accounting services are "nonattest services that involve the application of (a) special skills in accounting, auditing, finance, quantitative methods or certain areas of the law, and research and (b) investigative skills to collect, analyze, and evaluate evidential matter and to interpret and communicate findings."

21. Under both the AICPA Code of Professional Conduct and the AICPA's Statement on Standards for Consulting Services, a member must satisfy two requirements: due

professional care and sufficient relevant data. A member must "exercise due professional care in the performance of professional services," and must "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." AICPA Consulting Services Special Report 03-1, "Litigation Services Applicable Professional Standards," also guides the obtaining and application of sufficient relevant data and the exercise of due professional care.

22. The expert's function is to assist the trier of fact in understanding complex or unfamiliar concepts after applying reliable principles and methods to sufficient relevant data. Due care requires diligence and critical analysis of all work performed.

23. Two features of this assignment shape the method. First, the governing computation is fixed by statute rather than by professional judgment; my task is to identify the inputs the statute calls for and to apply them faithfully. Second, several inputs are contested. Where an input is contested I state the range the record supports and report the result across that range, so the trier of fact can see which conclusions depend on resolving the dispute and which do not.

24. I performed no appraisal. Every value in this report is taken from a party's own instrument, from a third-party appraisal in the record, or from the Dixon Lenders' own accounting records. I accepted the authenticity of the documents provided and did not verify them with third parties such as banks or vendors.

## THE COMPUTATION THE STATUTE PRESCRIBES

25. Florida does not leave the rate of interest to be characterized. The Legislature wrote the arithmetic into the statute, and the Florida Supreme Court held that the arithmetic controls. *Fla. Stat. § 687.03(3)* provides:

> For the purpose of this chapter, the rate of interest on any loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or other obligation to pay interest shall be determined and computed upon the assumption that the debt will be paid according to the agreed terms, whether or not said loan . . . is paid or collected by court action prior to its term, and any payment or property charged, reserved, or taken as an advance or forbearance, which is in the nature of, and taken into account in the calculation of, interest shall be valued as of the date received and shall be spread over the stated term of the loan . . . for the purpose of determining the rate of interest.
>
> The spreading of any such advance or forbearance for the purpose of computing the rate of interest shall be calculated by first computing the advance or forbearance as a percentage of the total stated amount of such loan . . . . This percentage shall then be divided by the number of years, and fractions thereof, of the loan . . . according to its stated maturity date, without regard to early maturity in the event of default. The resulting annual percentage rate shall then be added to the stated annual percentage rate of interest to produce the effective rate of interest for purposes of this chapter.

26. The subsection prescribes four steps, and this report takes them in that order in every computation:

| **Step** | **What the statute directs** | **In operation** |
|---|---|---|
| 1 | "any payment or property charged, reserved, or taken as an advance or forbearance . . . shall be valued as of the date received" | Total everything the lender charged, kept, or took at the closing. That sum is the advance. |
| 2 | "computing the advance or forbearance as a percentage of the total stated amount of such loan" | Divide the advance by the face amount, not by what the borrower received. |
| 3 | "divided by the number of years, and fractions thereof, of the loan . . . according to its stated maturity date, without regard to early maturity in the event of default" | Divide that percentage by the years to stated maturity. A shorter term spreads the charge over less time, so the rate is higher. |
| 4 | "The resulting annual percentage rate shall then be added to the stated annual percentage rate of interest" | Add the stated rate once, at the end. |

27. Stated as one line: **effective rate = stated rate + (advance ÷ face amount) ÷ years to stated maturity**.

28. The Florida Supreme Court held this language "clear on its face" and rejected the competing methods urged on it. *Hamm*, 414 So. 2d at 1073. Two points from that opinion govern the computations below. The denominator is the face amount, not the money actually handed over, because the Legislature "uses the term 'stated' four times" in the subsection and each use "refers to the particular term stated on the face of the note." *Id.* at 1074. And interest paid on an advance is not added to the advance, because "[i]nterest paid on an advance is a charge for the use of funds to make the advance; it is not part of the advance." *Id.* at 1073. Every computation in this report divides by the face amount and adds the stated rate once, at step four.

29. The Second District applied the same method in *Velletri v. Dixon*, 44 So. 3d 187 (Fla. 2d DCA 2010), where a lender withheld $78,013.70 at the closing of a $250,000 note bearing a stated 15 percent and calculated payments on the full stated principal. Funds retained by the lender "are considered additional interest and do not decrease the stated loan amount." *Id.* at 191. Measuring the rate as of the foreclosure date rather than the inception date was the error the court reversed.

30. The effective rate is then measured against a threshold, and on this record there is only one that matters. The ordinary 18 percent civil ceiling does not apply to these extensions of credit. *Fla. Stat. § 687.03(1)* provides that where a loan "exceeds $500,000 in amount or value, it shall not be usury or unlawful to reserve, charge, or take interest thereon unless the rate of interest exceeds the rate prescribed in s. 687.071." Every extension of credit analyzed in this report exceeds $500,000, and the aggregate obligation exceeds it many times over. The operative threshold is therefore **25 percent** under *Fla. Stat. § 687.071(2)*, and no extension of credit made in violation of any provision of that section

"shall be an enforceable debt in the courts of this state." *Fla. Stat. § 687.071(7)*. Above 45 percent the offense is graded a felony of the third degree. *Fla. Stat. § 687.071(3)*. I report every computation against the 25 percent line.

31. Subsections (2) and (3) reach a lender who "willfully and knowingly" charges, takes, or receives the offending rate. I express no opinion on that element, which is a question of intent for the trier of fact. I note only where a figure originated with the Dixon Lenders' own documents, because the origin of a figure is an accounting fact rather than a legal conclusion.

32. One additional feature of the statute bears on this record. Subsection (3) computes the rate "upon the assumption that the debt will be paid according to the agreed terms," and directs that the term be taken "according to its stated maturity date, without regard to early maturity in the event of default." Where the loan documents state no maturity date, the subsection supplies no divisor. The absence is the lender's omission. This report does not argue which term should be supplied; it reports the result at every term the record will bear.

## BACKGROUND AND TIMELINE

33. This report examines eleven loans between the Dixon Lenders, together with Parke Financial, and six borrowers. The loans were made between January 2022 and September 2023. In September 2023 the obligations were aggregated and the security cross-collateralized. Counsel advises that no evidence has been produced that the security interests were perfected; nothing in this report turns on that question.

34. To determine a rate of interest, one must determine how much was lent, how much came back, and when each event occurred. The parties generally agree on how much was lent.

| | **Loan** | **Date** | **Amount** | **Instrument** |
|---|---|---|---|---|
| 1 | Sherwood Note (Amelia CD) | Jan. 28, 2022 | $500,000.00 | Promissory Note (L-1) |
| 2 | IMQA Loan 506 | July 26, 2022 | $300,000.00 | Mortgage (L-2) |
| 3 | Allonge to Sherwood Note | Aug. 3, 2022 | $250,000.00 | Allonge (L-3) |
| 4 | Hampton | Aug. 26, 2022 | $1,300,000.00 | Business Loan Agreement (L-4) |
| 5 | Sherwood Option Loan | Oct. 1, 2022 | $500,000.00 | Promissory Note (L-5) |
| 6 | Million Dollar Loan (Cherry CD) | Dec. 13, 2022 | $1,000,000.00 | Promissory Note (L-6) |
| 7 | Resorts Common Area Loan | Feb. 27, 2023 | $500,000.00 | Promissory Note (L-7) |
| 8 | River Fly In | June 12, 2023 | $3,000,000.00 | Promissory Note (L-8) |
| 9 | Holly Bluff | July 20, 2023 | $3,000,000.00 | Business Loan Agreement (L-9) |

| | Loan | Date | Amount | Instrument |
|---|---|---|---|---|
| 10 | Flynn | July 28, 2023 | $125,000.00 | Promissory Note (L-10) |
| 11 | Tiered | Sept. 14, 2023 | $750,000.00 | Loan Agreement (L-11) |
| | **Total lent** | | **$11,225,000.00** | |

35. The Loan Agreement of October 24, 2023 recites at paragraph 7(b) that “[t]he total indebtedness as of the date hereof is Eleven Million Seventy-Five Thousand Dollars ($11,075,000).” The $150,000 difference between that recital and the $11,225,000 lent is the January 2022 ROGO paydown, the first row of the table below, which was taken as a credit at the closing of the Sherwood note instead of being funded to the borrower. This report uses **$11,075,000** as the stated amount of the aggregate loan, because that is the figure the lender recited in its own agreement.

36. Interest at 12 percent or 15 percent applied to the individual borrowings, and no principal payments were contemplated. Weighted across the portfolio, $4,200,000 at 12 percent and $6,875,000 at 15 percent produce $1,535,250 of annual interest on $11,075,000 — a blended stated rate of **13.86 percent**. The aggregate computation at paragraphs 57 through 66 requires a single stated rate, and I use the blended 13.86 percent. It is the arithmetically correct figure for a portfolio of this composition, and because step four adds the spread to the stated rate, it is also the lower of the two candidates and therefore the more conservative one. Where an individual loan is computed on its own — Holly Bluff, River Fly In, Tiered — I use the rate stated for that loan in the Dixon Lenders’ own records, which in each case is 15 percent. That is evidence, not an assumption.

37. In January 2024 the Dixon Lenders raised the rate on the portfolio to a 25 percent default rate and added renewal fees and late charges. Under their billing practice the increase first appeared on the February 2024 statement. This date matters to the analysis at paragraphs 75 through 80 below.

38. The parties also generally agree on the events of repayment, but they do not agree on how much those events were worth or on when they occurred. The following table lists the nine large cash and in-kind events. The “Taken by” column identifies the entity that received the value, because in four instances it was not one of the Dixon Lenders.

| Date | Value transferred | Taken by | Amount | Ex. |
|---|---|---|---|---|
| Jan. 27–28, 2022 | Proceeds of the MTF Holdings ROGO allocations, listed as a paydown at the closing of the $500,000 Sherwood note (Amelia CD) instead of being funded to the borrower | Dixon, as a credit at closing | $150,000.00 | P-1 |

| Date | Value transferred | Taken by | Amount | Ex. |
|---|---|---|---|---|
| July 20, 2023 | Holly Bluff — 7.24 acres of St. Johns riverfront at 2280 Hontoon Road, Deland, Volusia County, quitclaimed by Holly Bluff Marina, Inc. | PEDIXON LLC | $4,210,000.00 | P-6 |
| July 20, 2023 | Nevamar — 57.363 acres of industrial land at 1 Nevamar Place, Hampton County, South Carolina, quitclaimed by Recycled Group of South Carolina, LLC | PEDIXON LLC | $4,300,000.00 | P-7 |
| Sept. 14, 2023 | All issued and outstanding stock of Holly Bluff Marina, Inc., assigned by Yaniv Amar for A Marine, Inc. | Crescent Sound, Ltd., as Trustee of the Tiered Land Trust | $660,000.00 | P-9 |
| Sept. 14, 2023 | All issued and outstanding membership units of Recycled Group of South Carolina, LLC, assigned in the same instrument | Crescent Sound, Ltd., as Trustee of the Tiered Land Trust | $600,000.00 | P-10 |
| Nov. 17, 2023 | River Fly-In Condominium proceeds, taken in at the closing and disbursed in full by the closing attorney — loan payoffs, interest, an extension fee, the PEDIXON interest reserve, and $2,000,000 into the Pitkanen trust account | PEDIXON LLC and Parke Financial Limited Partnership | $2,603,595.00 | P-2 |

| Date | Value transferred | Taken by | Amount | Ex. |
|---|---|---|---|---|
| Jan. 9, 2024 | All issued and outstanding membership units of Homemakers Real Estate, LLC, assigned by Horton S. Johnson "in consideration of the loan accommodations made by PEDIXON, LLC" — the forbearance fee | Crescent Sound, Ltd., as Trustee of the Tiered Land Trust | $8,981,897.00 | P-11 |
| Feb. 1, 2024 | Refund of the $500,000 Amelia certificate of deposit, paid by the bank to Dixon on termination of the CD that secured the January 2022 Sherwood note | Kenneth G. Dixon | $500,000.00 | P-3 |
| Oct. 6, 2025 | Cape Crossing Units 506 and 100, Brevard County, conveyed by IMQA Investments Incorporated by deed in lieu of foreclosure | Parke Financial Limited Partnership | $1,100,000.00 | P-8 |
| | **Total large cash and in-kind value** | | **$23,105,492.00** | |

39. Kenneth G. Dixon is the manager of PEDIXON LLC and the principal of Crescent Sound, Ltd., the trustee named in the Tiered Land Trust. Parke Financial appears in the closing documents and in the payment record as a lender alongside PEDIXON. Whether these entities are properly aggregated is a question for counsel, and I express no opinion on it. For accounting purposes I have recorded the entity that took each item and have not assumed the answer.

40. The $23,105,492 above counts only the large cash and in-kind events. Routine cash payments — monthly interest, Beachside and Cape Crossing Vacation Rentals distributions, insurance proceeds, bank interest, and wires — total approximately **$3,865,496**. The two schedules are complementary and no item appears on both. Together they total approximately **$26,970,988** received on $11,225,000 lent.

41. The Dixon Lenders' produced records run through May 2025, and the monthly analysis at paragraphs 81 through 85 ends there for that reason, not because charging stopped. The October 6, 2025 conveyance in the table above is sourced separately, from the recorded deed. I reserve the right to amend this report on receipt of further records.

42. One date in the table above is taken from a summary rather than from a primary record, and I disclose it rather than leave it to be found. The February 1, 2024 refund of the $500,000 Amelia certificate of deposit is dated from the chronological payment list prepared in this matter. The exhibit itself carries no date, and the bank's record of the termination of account 903697399 has not been produced. The date does not affect any conclusion in this report. The crediting analysis at paragraphs 67 through 74 extinguishes the aggregate principal on every valuation in the record without that item, which serves only to enlarge the surplus; and the certificate of deposit is in any event the Dixon Lenders' own record to produce.

## ANALYSIS AND PROCEDURES

43. The borrowers asked that I give special attention to the Holly Bluff loan of July 2023. That loan is where the parties' accounts diverge most sharply, and it shows why the range of disagreement about what is owed is so wide. I begin there, then turn to the aggregate loan, then to the two questions that decide the aggregate analysis: when the assets taken should have been credited, and what happens after the Dixon Lenders raised the stated rate to 25 percent.

### A. The Holly Bluff extension of credit, computed under Fla. Stat. § 687.03(3)

44. Tiered Capital, Inc. borrowed $3,000,000 from PEDIXON at a stated rate of 15 percent per year. The Business Loan Agreement is dated July 20, 2023 and the mortgage securing it was recorded in Volusia County on August 14, 2023. Neither document states an interest rate, a maturity date, or a payment schedule, and no promissory note has been produced. The 15 percent rate is taken from the Dixon Lenders' own loan schedule, which carries the Holly Bluff line at 0.15 and at $37,500 per month — exactly 15 percent of $3,000,000 divided by twelve.

45. **The lender advanced less than the face amount.** The face of the Loan Agreement states $3,000,000. The closing attorney's own reconciliation of August 1, 2023 lists eight sources of incoming money totaling $3,105,288.55, of which three are Dixon entries: "dixon show money" at $1,754,031.59, "dixon" at $500,000.00, and "dixon cd" at $500,000.00. Those three total **$2,754,031.59**. The remaining five entries — a 2022 overage held in trust, the Austin, Cherry and Amelia draws, and an entry marked "alison" — total $351,256.96, and none is a Dixon entity. The difference between the stated amount and the amount PEDIXON placed is **$245,968.41**.

46. **The lender disbursed a fee to itself at the closing.** The same reconciliation disburses **$93,750.00** as "Lender fees," and the same instrument names PEDIXON as the Lender. A fee a lender takes out of the borrower's closing proceeds does not reduce the loan; it is a sum the borrower must repay and never received.

47. **Step one — the advance or forbearance.** Everything the lender charged, kept, or took at the closing:

| | Item | Amount |
|---|---|---|
| A | Face amount of the extension of credit | $3,000,000.00 |
| B | Funds actually placed by PEDIXON (the three Dixon entries) | $2,754,031.59 |
| C | Underfunding (A − B) | $245,968.41 |
| D | “Lender fees” disbursed at the closing | $93,750.00 |
| E | **Advance or forbearance (C + D)** | **$339,718.41** |

48. **Step two — the advance as a percentage of the total stated amount.** $339,718.41 ÷ $3,000,000.00 = **11.32 percent**. The denominator is the face amount, as *Hamm* requires, not the $2,754,031.59 actually placed.

49. **Step three — spread over the term.** No note has been produced and no maturity date is stated. The obligation is payable on demand. Measured from the July 20, 2023 closing to the September 2023 aggregation of the loans and cross-collateralization of the security — two months — 11.32 percent spread over two months annualizes to **67.94 percent**.

50. **Step four — add the stated rate.** 15.00 percent + 67.94 percent = **82.94 percent**.

51. The stated 15 percent enters this computation once, at step four. It is not added to the numerator at step one. That is what *Hamm* requires, and it is the point on which the Supreme Court reversed the district court: “[i]nterest paid on an advance is a charge for the use of funds to make the advance; it is not part of the advance.” 414 So. 2d at 1073. A computation that placed two months of stated interest in the numerator would produce the same 82.94 percent by coincidence of arithmetic on these particular figures, but it would not be the statutory method, and I have not used it.

52. I have not used the $2,754,031.59 actually advanced as a denominator at any point. That measure belongs to *Fla. Stat. § 687.03(1)*, which *Hamm* holds is superseded where subsection (3) applies because an advance was required. Any figure computed on the smaller denominator — 27.33 percent on a one-year term — is not part of my opinion.

### B. The Holly Bluff rate across every term the record will support

53. Step three is the only step in the Holly Bluff computation that calls for a judgment about this loan, and the judgment is necessary only because the lender left the maturity date blank. Rather than defend a single term, I have computed the rate at every term the record will bear. The table is attached as **Exhibit C** and is reproduced here. This is the same computation filed on August 17, 2026 as Exhibit 2 to the supplement in *In re Homemakers Real Estate, LLC*, No. 6:25-bk-05570-GER (Bankr. M.D. Fla.), and the figures are identical.

| **Term applied** | **Spread** | **Stated rate** | **Effective rate** | **Position against the thresholds** |
|---|---|---|---|---|
| Two months — July 20, 2023 closing to the September 2023 aggregation | 67.94% | 15.00% | **82.94%** | Above 45% |
| Five months — closing to the December 2023 declaration of default | 27.18% | 15.00% | **42.18%** | Above 25% |
| Six months | 22.65% | 15.00% | 37.65% | Above 25% |
| One year | 11.32% | 15.00% | **26.32%** | Above 25% |
| 13.6 months — the break-even | 9.99% | 15.00% | 24.99% | At the 25% threshold |
| Eighteen months | 7.55% | 15.00% | 22.55% | Below 25% |

54. The opinion this table supports does not depend on which term the court adopts. The Holly Bluff extension of credit **exceeds 25 percent at any stated term shorter than approximately 13.6 months**. The lender advanced the money on July 20, 2023, aggregated the loans on September 14, 2023, and declared a default in December 2023. No Dixon loan ran longer than eighteen months, and every term this record supports falls well inside 13.6 months.

55. Two features of this computation deserve emphasis because they narrow what can be disputed. It assigns **no value to the Holly Bluff real estate** and takes no position on what the property was worth, so no appraisal question can disturb it. And every input comes from a document prepared by the Dixon Lenders or their closing attorney: the reconciliation supplies the $2,754,031.59 and the $93,750.00, and the PEDIXON loan schedule supplies the 15 percent. I added nothing and altered nothing.

56. One alternative term should be noted for completeness. The Dixon Lenders' own loan schedule of September 12, 2023 carries the Holly Bluff line with a maturity of "7/12/24??", with the question marks appearing in the original. If that date were treated as a stated maturity, the term is 358 days and the computation yields 11.55 percent + 15.00 percent = **26.55 percent**. It remains above 25 percent. I do not treat that entry as a stated maturity date, because *Hamm* confines "stated" to "the particular term stated on the face of the note," 414 So. 2d at 1074, and there is no note; but the alternative changes nothing.

### C. The aggregate loan of $11,075,000

57. In September 2023 the eleven obligations were aggregated. The October 24, 2023 Loan Agreement recites the total indebtedness as $11,075,000 and recites a monthly interest charge of $127,938, which matches the Dixon Lenders' November 1, 2023 statement to the dollar. I use the lender's own recital as the stated amount at step two.

58. On January 9, 2024, all of the issued and outstanding membership units of Homemakers Real Estate, LLC were assigned by Horton S. Johnson “in consideration of the loan accommodations made by PEDIXON, LLC.” The instrument recites consideration of **$8,981,897**. An assignment given in consideration of loan accommodations is a forbearance fee. *Fla. Stat. § 687.03(3)* directs that property “charged, reserved, or taken as an advance or forbearance” be valued as of the date received and spread over the stated term.

59. The stated term of the aggregate obligation is contested. The September 2023 Tiered loan agreement recites a term of eighteen months, and ten of the individual Dixon loans ran one year. I have used **eighteen months** in the primary computation. That is the more conservative of the two, because a longer term spreads the forbearance over more time and produces a lower rate. Every advance in the computation below is a charge the Dixon Lenders recorded in their own ledger; none is estimated. Applying the four statutory steps:

| | Item | Amount / result |
|---|---|---|
| A | Total stated amount of the aggregate loan (lender’s own recital) | $11,075,000 |
| B | Forbearance taken January 9, 2024 (recited consideration) | $8,981,897 |
| C | Renewal fees of April 15 and July 15, 2024 and late charges of April through July 2024 | $196,175 |
| D | Step 2 — (B + C) ÷ A | 82.87% |
| E | Step 3 — D ÷ 1.4995 years (eighteen months) | 55.27% |
| F | Step 4 — E + blended stated rate of 13.86% | **69.13%** |

60. Each figure in line C is an entry in the Dixon Lenders’ own transaction ledger, produced as DX 250603 and updated May 14, 2025. The April 15, 2024 entry reads “RENEWAL FEES ON $1 MILLION CD, 1% ON DRAWS, CLUBHOUSE” and is posted at $85,000. The July 15, 2024 entry reads “RENEWAL FEES ON ALL LOANS EXCEPT $15,000 CHARGED ON 4/15/24” and is posted at $86,500. The late charge of $6,168.75 recurs monthly from April through July 2024 and is five percent of the $123,375 monthly interest charge then being billed. No document beyond the ledger already relied on is needed to trace any of them.

61. If the four late charges are excluded from line C — on the view that a late charge may fall outside the definition of interest — the eighteen-month result is **68.98 percent** rather than 69.13 percent. I have included them because the ledger posts them as charges taken, and because their exclusion does not affect any conclusion in this report.

62. Because the term is the contested input, the same computation is shown across the range, together with the value the Homemakers units would have to carry before the result falls to 25 percent:

| Assumed term | Effective rate | Homemakers value needed to reach 25% |
|---|---|---|
| Twelve months | 96.73% | $1,037,325 |
| Eighteen months (used above) | **69.13%** | $1,653,458 |
| Twenty-four months | 55.30% | $2,270,825 |

63. The record carries three values for the Homemakers units. The assignment instrument recites **$8,981,897**, which is the figure I use, because it is the consideration the Dixon Lenders' own transferee accepted. An appraised fair market value of **$8,750,000** also appears. The book value of Homemakers Real Estate, LLC at December 31, 2023 — the last balance sheet date before the January 9, 2024 assignment — was **$6,895,454.37**. The lowest of the three exceeds the twenty-four-month break-even by more than three times and the eighteen-month break-even by more than four. **No value in this record, on any term in this table, produces a rate below 25 percent.**

64. Two matters should be anticipated rather than left to be found. *Fla. Stat. § 687.03(4)* excludes from interest any property whose value "substantially depends on the success of the venture," and membership units in a real estate limited liability company will be said to fall within it. I applied subsection (3) and not subsection (4), because the assignment recites a fixed consideration, was absolute on its face, and carried no condition tied to the performance of any business. Whether subsection (4) applies is a question of law on which I express no opinion. I note that subsection (4) can have no application at all to the River Fly In computation at paragraph 88, because cash held in a money market account does not depend on the success of any venture.

65. The choice of stated rate does not change this conclusion, and it is worth showing that it does not. Computed instead on a flat 15 percent, with the renewal fees left out and the small residual advance that assumption implies put in their place, the same eighteen-month calculation returns **69.12 percent** and a break-even of $1,654,996. The two roads differ by one one-hundredth of a percentage point and by $1,538 of Homemakers value. I travelled the blended road because every input on it is a figure the Dixon Lenders recorded in their own ledger, and none of it has to be assumed. Where two methods reach the same destination, the one that requires no assumption is the one to take.

66. The same renewal fees and late charges appear again at paragraph 77, where they are applied to the 25 percent stated rate the Dixon Lenders elected in January 2024. The two presentations are alternatives covering different periods, not a double count, and no fee is counted twice within any single computation.

### D. If the assets taken are credited when they were received, the principal was extinguished

67. The computations to this point measure the rate at the inception of the credit, as the statute directs. This section asks a different question, and it is the question on which the parties' accounts diverge most sharply: **when should the property and funds the Dixon Lenders took have been credited against the debt?**

68. The Dixon Lenders credited the Holly Bluff real estate in February 2025, at $3,000,000, when they eliminated the loan on their books. The deed was made and delivered on July

20, 2023. A Florida deed operates on delivery; recording gives notice to third parties and fixes priority, but it is not what passes title as between grantor and grantee. The Dixon Lenders recorded the deed on February 23, 2024 — seven months after delivery — and then charged interest on the same $3,000,000 for a further twelve months. The same pattern appears in each of the other events: the value moved on one date and was credited, if at all, on a much later one.

69. The arithmetic of crediting each item when it was received is straightforward, and the striking feature of the result is how little it depends on the valuation dispute. Taking the aggregate stated amount of $11,075,000 and crediting only the four large events of 2023:

| **Holly Bluff credited at** | **2023 credits** | **Balance after the 2023 events** | **With the Feb. 1, 2024 CD refund** |
|---|---:|---|---|
| $4,210,000 — going-concern value (P-6) | $12,373,595 | **satisfied, surplus $1,298,595** | surplus $1,798,595 |
| $3,760,000 — the appraiser’s real estate allocation | $11,923,595 | **satisfied, surplus $848,595** | surplus $1,348,595 |
| $3,200,000 — the Defendants’ 2022 purchase price | $11,363,595 | **satisfied, surplus $288,595** | surplus $788,595 |
| $3,000,000 — the Dixon Lenders’ own figure | $11,163,595 | **satisfied, surplus $88,595** | surplus $588,595 |

70. The four 2023 events are the Holly Bluff deed of July 20, 2023; the Nevamar deed of July 2023 at $4,300,000; the September 14, 2023 assignment of the Holly Bluff Marina and Recycled Group equity at $1,260,000; and the November 17, 2023 River Fly In disbursement of $2,603,595. **On every valuation in the record, including the Dixon Lenders’ own $3,000,000, the credits received in 2023 equalled or exceeded the entire $11,075,000 of aggregate principal.** If the September 14, 2023 equity assignments are excluded because they ran to Crescent Sound rather than to a Dixon Lender, the debt is still extinguished on every valuation once the $500,000 Amelia certificate of deposit came back to Mr. Dixon on February 1, 2024.

71. The conclusion does not require the valuation dispute to be resolved. It requires only that each item be credited on the date the Dixon Lenders received it.

72. **The consequence, stated as a sum rather than a rate.** From February 2024 through May 2025 the Dixon Lenders billed **$2,997,242** in interest and charges. On the crediting described above there was no principal outstanding in any of those months. A rate is a charge divided by a principal balance; where the balance is zero, the arithmetic returns no rate at all, because the denominator has gone to zero. What the Dixon Lenders billed in those sixteen months was not interest at a high rate. It was a charge for the use of money that was no longer outstanding.

73. This is the point at which the January 9, 2024 Homemakers assignment should be seen for what it did. The units were assigned nine days into a year in which, on the crediting above, nothing was owed. At the recited consideration of $8,981,897 the assignment left a

surplus in the Defendants' favour of between $9,570,492 and $10,780,492, depending on the Holly Bluff valuation. The Dixon Lenders nonetheless continued to bill.

74. If the assignment is instead characterized as a forbearance fee rather than a principal reduction, the computation at paragraphs 57 through 66 applies and the effective rate is 69.12 percent. The two characterizations lead to the same place by different routes, and the Dixon Lenders cannot occupy both: the assignment either reduced the debt, in which case there was no debt left to charge on, or it was a fee for forbearance, in which case it is a forbearance to be spread under *Fla. Stat. § 687.03(3)*.

**E. From January 2024 the effective rate exceeds 25 percent as a matter of arithmetic**

75. In January 2024 the Dixon Lenders raised the stated rate on the portfolio to **25 percent** and began charging renewal fees and late charges. The increase first appeared in the billing for February 2024. That election has a consequence under *Fla. Stat. § 687.03(3)* that is worth stating plainly, because it removes the last contested input from the analysis.

76. The statute produces the effective rate by **adding** the spread of every advance or forbearance **to** the stated rate. Step four is addition, not comparison. Once the stated annual percentage rate is itself 25 percent, the effective rate is 25 percent plus a positive number. **Any** advance or forbearance greater than zero — any fee charged, any sum retained, any property taken — puts the effective rate above 25 percent. The result does not depend on the size of the fee, on the term selected, or on any valuation.

77. This is not a theoretical point on this record. The Dixon Lenders' own ledger records the charges. Applying step two and step three to each of them against the $11,075,000 stated amount over a twelve-month term:

| Advance or forbearance charged after January 1, 2024 | Amount | Spread | Stated rate | Effective rate |
|---|---|---|---|---|
| Renewal fees, April 15, 2024 — "renewal fees on $1 million CD, 1% on draws, clubhouse" | $85,000 | 0.77% | 25.00% | 25.77% |
| Renewal fees, July 15, 2024 — "renewal fees on all loans except $15,000 charged on 4/15/24" | $86,500 | 0.78% | 25.00% | 25.78% |
| Late charges of $6,168.75 per month, April through July 2024 | $24,675 | 0.22% | 25.00% | 25.22% |
| Renewal fees only, without the late charges | $171,500 | 1.55% | 25.00% | 26.55% |

| **Advance or forbearance charged after January 1, 2024** | **Amount** | **Spread** | **Stated rate** | **Effective rate** |
|---|---|---|---|---|
| **All of the above, taken together** | **$196,175** | **1.77%** | **25.00%** | **26.77%** |
| Homemakers forbearance fee at the recited consideration | $8,981,897 | 81.10% | 25.00% | **106.10%** |
| Homemakers forbearance fee at appraised fair market value | $8,750,000 | 79.01% | 25.00% | 104.01% |
| Homemakers forbearance fee at book value, December 31, 2023 | $6,895,454 | 62.26% | 25.00% | **87.26%** |

78. Three observations follow. First, the fees alone — leaving the Homemakers assignment entirely out of the computation — put the effective rate above 25 percent from 2024 forward. Second, the break-even value that paragraph 62 identifies for the Homemakers units, $1,655,000 on an eighteen-month term, is a figure computed against a 15 percent stated rate. Measured against the 25 percent rate the Dixon Lenders themselves elected from January 2024, **the break-even falls to zero**. Third, the 45 percent threshold is crossed on the Homemakers forbearance at every valuation in the record, on any term of twenty-four months or less.

79. I express no opinion on whether the January 2024 increase was permitted by the loan documents, or on what legal consequence follows from a rate at these levels. My opinion is confined to the arithmetic: from January 2024 forward, on the Dixon Lenders' own stated rate and their own charges, the effective rate computed under *Fla. Stat. § 687.03(3)* exceeded 25 percent in every month, and no assumption of mine is required to reach that result.

80. Paragraphs 67 through 74 and this section state alternative accounts of the same period, and counsel should present them as alternatives. If the assets are credited when received, there was no principal in 2024 and 2025 and no rate can be computed. If the Dixon Lenders' own crediting is accepted instead, the rate they charged from January 2024 exceeded 25 percent on their own numbers. There is no third account of 2024 available on this record.

**F. Amounts actually charged and received, month by month**

81. The computations above determine a rate under *Fla. Stat. § 687.03(3)*. This section reports something different and does not restate the rate: what the Dixon Lenders in fact billed and collected each month. *Fla. Stat. § 687.071(2)* is written in terms of what a lender "shall willfully and knowingly charge, take, or receive," and the record of what was

charged and taken is direct evidence going to that element. The schedule is not an alternative method of computing an effective rate, and I do not offer it as one.

82. The charge column below is taken from the Dixon Lenders' own statements without alteration. The first balance column is the Dixon Lenders' own principal figure as they carried it. The second applies the crediting described at paragraphs 67 through 74, using the appraiser's real estate allocation of $3,760,000 for Holly Bluff and crediting the November 17, 2023 River Fly In disbursement in full when received. No charge figure has been altered in either column.

| Statement | Charge billed | Balance as the Dixon Lenders carried it | Rate as carried | Balance with payments credited when made | Rate as corrected |
|---|---|---|---|---|---|
| Sep 2023 | $220,990 | $11,075,000 | 23.9% | $7,315,000 | 36.3% |
| Oct 2023 | $118,563 | $11,075,000 | 12.8% | $7,315,000 | 19.4% |
| Nov 2023 | $127,938 | $11,075,000 | 13.9% | $7,315,000 | 21.0% |
| Dec 2023 | $123,375 | $11,075,000 | 13.4% | $4,711,405 | 31.4% |
| Jan 2024 | $123,375 | $11,075,000 | 13.4% | $4,711,405 | 31.4% |
| Feb 2024 | $204,402 | $10,575,000 | 23.2% | $4,211,405 | 58.2% |
| Mar 2024 | $209,738 | $10,575,000 | 23.8% | $4,211,405 | 59.8% |
| Apr 2024 | $294,738 | $10,575,000 | 33.4% | $4,211,405 | 84.0% |
| May 2024 | $209,738 | $10,575,000 | 23.8% | $4,211,405 | 59.8% |
| Jun 2024 | $209,738 | $10,575,000 | 23.8% | $4,211,405 | 59.8% |
| Jul 2024 | $301,238 | $10,575,000 | 34.2% | $4,211,405 | 85.8% |
| Aug 2024 | $194,031 | $9,575,000 | 24.3% | $4,211,405 | 55.3% |
| Sep 2024 | $194,031 | $9,575,000 | 24.3% | $4,211,405 | 55.3% |
| Oct 2024 | $163,406 | $8,150,000 | 24.1% | $4,211,405 | 46.6% |
| Nov 2024 | $163,406 | $8,150,000 | 24.1% | $4,211,405 | 46.6% |
| Dec 2024 | $169,791 | $8,150,000 | 25.0% | $4,211,405 | 48.4% |
| Jan 2025 | $191,318 | $8,150,000 | 28.2% | $4,211,405 | 54.5% |
| Feb 2025 | $169,791 | $8,150,000 | 25.0% | $4,211,405 | 48.4% |
| Mar 2025 | $107,292 | $5,150,000 | 25.0% | $4,211,405 | 30.6% |
| Apr 2025 | $107,292 | $5,150,000 | 25.0% | $4,211,405 | 30.6% |
| May 2025 | $107,292 | $5,150,000 | 25.0% | $4,211,405 | 30.6% |

| | As the Dixon Lenders carried it | With payments credited when made |
|---|---|---|
| Interest and charges billed, twenty-one months | $3,711,483 | $3,711,483 |
| Weighted average principal | $9,246,429 | $4,702,395 |

| | As the Dixon Lenders carried it | With payments credited when made |
|---|---|---|
| Months in which the charge exceeded 25% annualized | 6 of 21 | 19 of 21 |
| Months in which the charge exceeded 45% annualized | 0 of 21 | 13 of 21 |

83. Two figures in that schedule bear on the timing question directly. The Dixon Lenders' November 1, 2023 statement charged $127,937.50; the December 1, 2023 statement charged $123,375.00, a reduction of exactly **$4,562.50**. That is precisely one month's interest on a $300,000 obligation at 12 percent plus a $125,000 obligation at 15 percent, which is precisely the allocation the November 17, 2023 settlement statement directs. The Dixon Lenders' own billing gave effect to those two payoffs within two weeks. The reduction is unique to that allocation; no other division of the $425,000 across the applicable contract rates produces it.

84. The November 17, 2023 closing also disbursed a **$121,093.17 "PEDIXON interest reserve account"** line and a **$5,000 "Option Loan Extension Fee"** — $126,093.17 of items squarely within *Fla. Stat. § 687.03(3)*, which the Dixon Lenders' schedules book as received. The $1,600.00 and $833.33 interest lines stay out of the numerator under *Hamm*.

85. The correction of the $300,000 and $125,000 payoffs to November 17, 2023, rather than October 2024 where an earlier summary schedule placed them, is reflected in the corrected column above.

## G. Two extensions of credit that require no contested assumption at all

86. The Holly Bluff computation depends on a term the loan documents do not state. Two other loans supply every input the statute calls for on the face of the Dixon Lenders' own instruments, with no valuation and no assumed term.

87. **The Tiered loan — $750,000, September 2023.** The promissory note dated September 18, 2023 states a rate of 15 percent, recites a term of eighteen months, and states a balloon maturity of April 1, 2025. Paragraph 6.1 of the accompanying loan agreement designates $375,000 — half the loan — as an interest reserve account, and paragraph 6.1.1 directs that reserve to "all outstanding payments owed to Lender as of the date hereof." Paragraphs 6.1.2 and 6.1.3 permit release from the reserve only "with the consent of Lender." Half the loan paid the lender its own arrears, and the borrower could not draw on it. Applying the four steps: $375,000 ÷ $750,000 = 50.00 percent; ÷ 1.5 years = 33.33 percent; + 15.00 percent = **48.33 percent**. Computed instead to the stated maturity of April 1, 2025 — 561 days, or 1.5370 years — the result is **47.53 percent**. Paragraph 6.2.3 designates a further $89,000 for delivery to the closing attorney; including it produces **56.24 percent** and **55.25 percent** respectively.

88. **River Fly In — $3,000,000, June 2023.** The note states 15 percent and a maturity of July 1, 2024, a term of 1.0548 years. Paragraph 8(a) of the October 24, 2023 loan agreement recites that $2,603,595 "will be placed in an interest-bearing money market account" that "will be owned and controlled by Lender," with that account's interest "paid directly to Lender." Paragraph 8(b) recites that "[a]n amount equal to $396,405 was released to

Borrower." Those two figures sum to $3,000,000 exactly. On the $2,000,000 that was never released, the effective rate is **82.04 percent**; on the lender's own recital of what it retained, **101.11 percent**. The Dixon Lenders' own loan schedule carries the retained sum as a separate line at 15 percent with a maturity of June 30, 2024 and $25,000 of monthly interest — $2,000,000 at 15 percent divided by twelve — and marks it "REPAID 8/29/24."

89. Neither computation requires an appraisal, a delivery date, or an assumed term. Each rests on figures the Dixon Lenders wrote into their own instruments.

### H. Matters reserved

90. The following are identified and are not included in any computation above. Each would raise, not lower, the effective rate. I reserve the right to amend this report if further documents are produced.

a. The $121,093.17 PEDIXON interest reserve account and the $5,000 option loan extension fee disbursed at the November 17, 2023 closing, addressed at paragraph 84 but not carried into the aggregate computation.

b. Interest collected by the Dixon Lenders on the certificates of deposit held as collateral, including the $833.33 recorded on February 5, 2024 on the $500,000 Amelia certificate.

c. The Cape Crossing condominium units conveyed by deed in lieu of foreclosure on October 6, 2025, for which the clerk collected $2,100 in documentary stamps — a figure that prices the conveyance at $300,000 at the statutory rate — while the deed recites that the conveyance "shall not be deemed a satisfaction" of the mortgage or the indebtedness it secures.

d. The October 2023 assignment package, which has not been sorted between instruments that pledged collateral and instruments that transferred ownership. Anything that transferred ownership belongs in the payment schedule and would raise the total.

e. The $44,786 of loan closing costs recorded on September 19, 2023 and the $375,000 funded "to Tiered at closing/escrow" of the $750,000 loan.

## CONCLUSION

91. **Holly Bluff, computed under the statute.** The effective annual rate of interest on the Holly Bluff extension of credit, computed by the method *Fla. Stat. § 687.03(3)* prescribes on inputs drawn entirely from the Dixon Lenders' own closing reconciliation and loan schedule, is **82.94 percent**.

92. **Holly Bluff, on any term.** Because the loan documents state no maturity date, the rate is reported across the range of terms the record supports. It is **42.18 percent** measured to the December 2023 declaration of default and **26.32 percent** measured over a full year. The extension of credit exceeds 25 percent at any stated term shorter than 13.6 months. No appraisal question and no valuation dispute affects this conclusion.

93. **The aggregate loan.** On an eighteen-month term, treating the January 9, 2024 Homemakers assignment as a forbearance fee valued at the consideration the instrument itself recites, the effective annual rate on the aggregate loan of $11,075,000 is **69.13 percent**. On a twelve-month term it is **96.73 percent**.

94. **The aggregate loan, if the Homemakers value is disputed.** Every value in the record for the Homemakers units — the recited $8,981,897, the appraised $8,750,000, and the book value of $6,895,454.37 at December 31, 2023 — exceeds the break-even by at least three times on every term tested. The conclusion is insensitive to the valuation.

95. **Timely crediting.** If the property and funds the Dixon Lenders took are credited when they were received, the aggregate principal was extinguished no later than February 1, 2024, on every valuation in the record including the Dixon Lenders' own. The **$2,997,242** billed from February 2024 through May 2025 was charged against no principal, and no rate can be computed on it.

96. **January 2024 forward.** Once the Dixon Lenders raised the stated rate to 25 percent, *Fla. Stat. § 687.03(3)* makes the effective rate exceed 25 percent whenever any advance or forbearance is charged, because step four adds the spread to the stated rate. The renewal fees alone produce **26.77 percent**. The Homemakers forbearance produces **106.10 percent** at the recited consideration and **87.26 percent** at book value.

97. **Loans requiring no assumption.** The Tiered loan of September 2023 carries an effective rate of **47.53 percent** and the River Fly In loan of June 2023 an effective rate of between **82.04 percent** and **101.11 percent**, in each case computed on stated rates and stated maturities appearing on the face of the Dixon Lenders' own instruments.

98. **The whole.** The Dixon Lenders advanced $11,225,000 and received approximately $26,970,988. Every computation in this report, on every assumption tested and on every valuation in the record, produces an effective rate of interest that exceeds 25 percent. I have found no set of assumptions supported by this record that produces a rate below that threshold.

## COMPENSATION FOR EXPERT REPORT AND TESTIMONY

99. My standard hourly billing rate is $400 per hour. My rate for expert testimony, including hearings, trials, and depositions, is $400 per hour. My compensation is not contingent on the outcome of this litigation.

## ASSUMPTIONS AND LIMITING CONDITIONS

100. Ferguson-Moll Consulting, LLC was not asked to perform, and I have not performed, any analysis of the liability issues in this case. This report computes rates of interest and reports amounts charged and received; it offers no legal opinion and no damages calculation.

101. My procedures were performed under the Standards for Consulting Services issued by the American Institute of Certified Public Accountants. Because those procedures do not constitute an audit conducted in accordance with auditing standards generally accepted in the United States of America, I express no opinion on any of the accounts or items referred to in my review. This engagement and this report cannot be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations, that may exist. References to "review" of documents carry the general meaning of the word and not the "review" assurance service.

102. I relied on other Ferguson-Moll Consulting, LLC professionals with experience in financial analysis, economic damages, and forensic accounting, all working under my direct supervision and control. References to “our” and “we” recognize that reliance.

103. I did not audit, compile, or review the financial data and express no opinion or assurance on it. Had I audited or reviewed the financial information, matters might have come to my attention that could materially affect this analysis. All documentation reviewed was provided by counsel. I accepted the authenticity and veracity of the information provided without verifying it directly with third-party sources such as banks or vendors.

104. This report turns on values, and every one of them — $4,210,000 and $3,760,000 for Holly Bluff, $4,300,000 for Nevamar, $8,981,897 for the Homemakers units, $1,100,000 for the Cape Crossing units, $660,000 and $600,000 for the two equity interests — is a value recited in a party’s own instrument or determined in a third-party appraisal already in this record. I performed no independent appraisal, and none was required for this assignment.

105. Any differences between amounts calculated or referenced in this report and the underlying supporting documentation are due to rounding or are immaterial.

106. Discovery may be ongoing, and documents or information may be produced after the date of this report. Such material may warrant modification of the conclusions reached here. I have no responsibility to update this report for events occurring after its date, but I reserve the right to review the information and opinions in it, and to supplement it, on receipt of any further report or information from Plaintiffs or their representatives, or on the completion of discovery.

**QUALIFICATIONS**

107. My qualifications, publications, and prior testimony are set out in Exhibit B.

Respectfully submitted,

FERGUSON-MOLL CONSULTING, LLC

Gary A. Moll, MBA, CPA, ASA

# EXHIBIT A
# SOURCES OF INFORMATION

In preparing this report I reviewed and considered the documents listed below. I have not audited or otherwise independently verified the data they contain, and for purposes of this report I accept the accuracy and completeness of the financial and other information on which I relied.

**Loan instruments (Exhibits L-1 through L-11)**

1. Promissory Note, Sherwood Construction, Inc., January 28, 2022, $500,000 (L-1).
2. Mortgage, IMQA Loan 506, July 26, 2022, $300,000 (L-2).
3. Allonge to the Sherwood Note, August 3, 2022, $250,000 (L-3).
4. Business Loan Agreement, Hampton, August 26, 2022, $1,300,000 (L-4).
5. Promissory Note, Sherwood Option Loan, October 1, 2022, $500,000 (L-5).
6. Promissory Note, Million Dollar Loan (Cherry CD), December 13, 2022, $1,000,000 (L-6).
7. Promissory Note, Resorts Common Area Loan, February 27, 2023, $500,000 (L-7).
8. Promissory Note, River Fly In, June 12, 2023, $3,000,000 (L-8).
9. Business Loan Agreement, Holly Bluff, July 20, 2023, $3,000,000, PEDIXON LLC as Lender and Tiered Capital, Inc. as Borrower (L-9); and the mortgage securing it, recorded August 14, 2023, Volusia County Instrument No. 2023166101, Book 8446, Page 1863.
10. Promissory Note, Flynn, July 28, 2023, $125,000 (L-10).
11. Loan Agreement, Tiered, September 14, 2023, $750,000, and Promissory Note dated September 18, 2023 (L-11).
12. Loan Agreement dated October 24, 2023, including paragraph 7(b) (total indebtedness of $11,075,000), paragraph 7(d) (monthly interest of $127,938), and paragraph 8 (River Fly In money market account).
13. Termination of Prior Agreements, October 1, 2023.
14. Substitute Collateral Loan Agreement and related October 2023 assignment and pledge instruments.

**Closing and settlement documents**

15. Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation, August 1, 2023 — PEDIXON LLC as Lender, Tiered Capital, Inc. as Borrower, A Marine, Inc. as Buyer.
16. Settlement Statement dated November 17, 2023, executed through DocuSign, envelope 4495A4E8-8CB1-4CA9-8592-BEDA76A2617D (DX-231117; P-2).
17. DocuSign completion notice from Alison Pitkanen, Esq., November 17, 2023, 12:14 p.m., same envelope identifier.

**The Dixon Lenders' accounting records**

18. PEDIXON loan schedule and transaction ledger dated September 12, 2023.
19. PEDIXON loan schedule and transaction ledger dated September 6, 2024.
20. PEDIXON loan schedule and transaction ledger dated May 14, 2025 (DX 250603 Dixon Account), transmitted by James Timko, Esq., to Frank Wolff, Esq., on June 3, 2025.
21. Monthly billing statements of the Dixon Lenders, September 2023 through May 2025.

**Instruments of transfer and recorded documents (Exhibits P-1 through P-11)**

22. Email of January 27, 2022 regarding the MTF Holdings ROGO allocations (P-1).

23. Quit Claim Deed, Holly Bluff Marina, Inc. to PEDIXON LLC, made July 20, 2023, recorded February 23, 2024, Volusia County Instrument No. 2024035593, Official Records Book 8521, Pages 2618–2619 (P-6).

24. Quit Claim Deed, Recycled Group of South Carolina, LLC to PEDIXON LLC, Nevamar / Hampton County, South Carolina, July 2023 (P-7).

25. Assignment and Transfer of Shares, September 14, 2023, covering the stock of Holly Bluff Marina, Inc. and the membership units of Recycled Group of South Carolina, LLC (P-9, P-10).

26. Assignment of Membership Units, Homemakers Real Estate, LLC, January 9, 2024, executed by Horton S. Johnson (P-11).

27. Amelia certificate of deposit termination records, account 903697399 (P-3).

28. Deed in lieu of foreclosure, IMQA Investments Incorporated to Parke Financial Limited Partnership, Cape Crossing Units 506 and 100, recorded October 7, 2025, Brevard County Book 10449, Page 419 (P-8).

**Valuation and third-party materials**

29. Appraisal of the Holly Bluff property by Jack E. Mounteer, State-Certified General Real Estate Appraiser RZ2294, InQuest Valuation, effective April 21, 2023, prepared for Mainstreet Community Bank of Florida — going-concern value $4,210,000, allocated $3,760,000 to real estate, $160,000 to furniture, fixtures and equipment, and $290,000 to goodwill (P-6).

30. Written third-party offer establishing the $4,300,000 value of the Nevamar / Hampton property.

31. Financial statements of Homemakers Real Estate, LLC, and the 2023 federal income tax return.

32. Financial statements of Holly Bluff Marina, Inc.

**Pleadings, filings and correspondence**

33. Complaint and exhibits, PEDIXON LLC and ZPD LLC v. Martin C. Flynn, Jr., Case No. 2025-CA-002359 CI.

34. Answers, affirmative defenses and counterclaims of the Defendants.

35. Frank L. Amodeo’s Supplement to the Motion to Disqualify PEDIXON and ZPD for Want of Subject-Matter Jurisdiction, filed August 17, 2026 in In re Homemakers Real Estate, LLC, No. 6:25-bk-05570-GER (Bankr. M.D. Fla.), together with its Exhibits 1 through 6.

36. Proofs of claim 67 and 68 filed in the Homemakers bankruptcy proceedings, with attachments.

37. Correspondence from James Timko, Esq., to Frank Wolff, Esq., dated June 3, 2025, transmitting the loan summary.

**Authorities referred to in this report**

38. Fla. Stat. §§ 687.02, 687.03, 687.04 and 687.071 (2025).

39. St. Petersburg Bank & Trust Co. v. Hamm, 414 So. 2d 1071 (Fla. 1982).

40. Velletri v. Dixon, 44 So. 3d 187 (Fla. 2d DCA 2010).

# EXHIBIT B
## PROFESSIONAL QUALIFICATIONS OF GARY A. MOLL, MBA, CPA, ASA
*Director, Forensic & Valuation Services*

The curriculum vitae of Gary A. Moll, updated April 2026, follows. It sets out professional experience, certifications and memberships, professional background, education, seminars and publications, and a list of prior expert testimony given by deposition, at trial, and in arbitration.

The list of prior testimony runs from 2000 through March 2026 and identifies for each matter the case name, the court or arbitral forum, the county and state, the month and year of the deposition or testimony, and the subject of the engagement.

**Curriculum vitae — 8 pages, following.**

# PROFESSIONAL QUALIFICATIONS OF
**GARY A. MOLL, MBA, CPA, ASA**
Director, Forensic & Valuation Services

## EXPERIENCE

Director of Forensic and Valuation Services at Smolin Lupin & Co, LLC. Expertise in litigation support and business valuations. Experience in shareholder disputes, damage calculations, matrimonial disputes, mergers and acquisitions.

**Industry Experience**:
- Building/Construction
- Distribution
- eCommerce
- Manufacturing
- Nonprofit
- Professional Services
- Real Estate
- Technology
- Transportation

**Performed forensic accounting and prepared business valuations for**:
- Asset Recovery
- Bankruptcy
- Business Interruption Claims
- Construction Claims
- Due Diligence
- Estate Litigation
- Family Law
- Fraud Investigations
- Gift & Estate Tax
- Loss of Income and Damages
- Purchase and Sale of Businesses
- Shareholder Litigation

## PROFESSIONAL CERTIFICATIONS AND MEMBERSHIPS

**Professional Certifications:**
- Licensed as Certified Public Accountant in Florida and Ohio
- Accredited Senior Member of the American Society of Appraisers

**Professional Affiliations:**
- The American Institute of Certified Public Accountants
    - Member Forensic and Valuation Services (FVS) Section
- The American Society of Appraisers
- Florida Institute of Certified Public Accountants
- The Orange County Bar Association
- Central Florida Collaborative Divorce Group

**Professional and Business Committees:**
- Rotary International, District 6690: Assistant Governor July 2020 – June 2023

**Professional Background:**

- Smolin, Lupin & Co., LLC | Director, October 2025 – Present
- Fiske Advisory, LLC | Director, November 2022 – October 2025
- Ferguson-Moll Consulting, LLC | Partner, December 2013 – Present
- Rea & Associates, Inc. | Senior Manager, August 2011 – December 2013
- Moll Consulting, LLC | Managing Director, May 2009 – August 2011
- Pharmaceutical Alternatives, Inc. | CFO, 2007 – 2009
- GBQ Consulting, LLC | Director, 2005 – 2007
- Norman, Jones, Enlow & Co. | Senior Manager, 1998 – 2005
- Karrington Health, Inc. | Financial Analyst, 1995 – 1998

## EDUCATION

- Bachelor of Science in Accounting – University of Maryland
- Master of Business Administration – The Ohio State University

**Attends Continued Professional Education (CPE and CLE) seminars (exceeds 40 CPE hours per annum) on various professional topics, including:**

- Business Valuations
- Business Consulting
- Corporate Governance
- Construction Claims
- Estate Planning Strategies
- Forensic Accounting in Family Law
- Fraud Prevention and Detection
- Law & Ethics for CPAs
- Structuring M&A Deals
- Succession Planning
- Valuations of Family Limited Partnerships

## SEMINARS AND PUBLICATIONS

Mr. Moll has lectured and published articles on economic damages, fraud detection, and business valuation. The professional presentations have been directed at the accounting, legal, and business audiences. Mr. Moll presented CLE seminars for the Ohio State and various Bar Association Committees.

Mr. Moll had been an Adjunct Professor at Central Ohio Technical College (2011 – 2012) where he taught Business Law and Micro Economics;  and an Adjunct Professor at Zane State College (2009 – 2010) where he taught various Business law, Financial Management and Economics Courses.

**Presented seminars and published articles and various professional topics, including:**

***Seminars***
***"Measuring Economic Damages: CPAs Guide to Understand Expert Analysis"***
***June 2025, FICPA MEGA Conference***

***"Forensic Accounting & Fraud Detection & Prevention"***
***Feb. 2024, North Dade South Broward FICPA***

***"Forensic Accounting: Investigations, Fraud or Abuse"***
***Oct. 2023, FICPA South Florida Accounting Conference***

***"Business Valuation: From Fundamentals to Facebook – Revisited"***
***Feb. 2023, North Dade South Broward FICPA***

***"Business Valuations: from Fundamentals to Facebook"***
***March / April 2016, Ferguson-Moll Consulting***

***"Divorce and Tax"***
***Nov. 2015, Ohio State Bar Association, Live Seminar***

***"Finance for Family Lawyers"***
***Nov. 2014, Ohio State Bar Association, Quick Webcast***

***"Business Valuation Essentials"***
***July 2014, Ohio State Bar Association, Quick Webcast***

***"Valuation of a Business for Purposes of Property Division"***
***June 2014, Ohio State Bar Association, Ohio Family Law Institute***

***"Understanding & Interpreting Financial Statements"***
***Aug. 2013, Rea & Associates, Inc. ("Rea")***

***"Principles of Business Valuation for Gift and Estate Planning Purposes"***
***May 2006, Tri-County Estate Planning Council Super CE Day***

***"Principles of Business Valuation Involving the Use of Family Limited Partnerships"***
***May 2005, Ohio Forum of Estate Planning Attorneys***

***"Complex Issues in Divorce for the Ohio Practitioner***
***April 2005, NBI Seminars***

***"Business Valuation and Litigation, Expert Reports and Expert Testimony"***
***Jan. 2005, Columbus Bar Association Bankruptcy Committee***

***"Examination of Business Valuation Experts and Presentation of Damage Calculations"***
***Nov. 2004, Columbus Bar Association Common Pleas Court Committee***

***"Understanding Issues Related to Business Valuations"***
***Nov. 2004, Executive Forums***

***"Principles of Business Valuation in Privately-Held Companies"***
***Feb. 2004, Capital University Law School, Corporate Finance Class***

***"Complex Issues in Divorce for the Ohio Practitioner"***
***Nov. 2003, NBI Seminars***

***"Equitable Distribution in Divorce Settlements in Ohio"***
***July 2002, NBI Seminars***

***"Asset Valuation Problems"***
***June 2000, The Ohio State Bar Association's CLE Institute.***

***Articles and Publications***

***"True Confessions of a Financial Expert" – Daily Business Review (Sept. 2023)***

***"Business, Interrupted" – Columbus Bar Lawyers Quarterly (Summer 2020)***

***"The Fracking Frenzy: A Windfall for the Legal Community" – Columbus Bar Lawyers Quarterly (July 2012)***

***"Neville v. Neville: Is it Really Equitable Distribution?" – Columbus Bar Briefs (July 2006)***

***"Interpreting Business Valuations," Ohio Lawyer (Sept./Oct. 2005)***

***"Overcoming a Gross Decision," The Valuation Examiner (Jan./Feb. 2004)***

***"Helping Your Clients Identify Value-Added Opportunities" Polaris International (Jan. 2002)***

***"IRS Finalizes Guidance on Adequate Disclosure," Valuation Strategies (March/April 2000)***

***"IRS Provides Guidance on Adequate Disclosure for Gifts," Valuation Strategies (March/April 1999***

***Expert Testimony***

Sevrina Maurer v. Michael Di Carlo, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio; Testimony - March 2026. Deposition – October 2025; Testimony – May 2023. **Domestic Relations.**

William Jordan Soffin, Yessenia Soffin, Poker Pro Media Worldwide, Inc. & Global Media Networks, Inc. vs. James S. Byrd, individually, & Morgan & Morgan, P.A., 15th Judicial Circuit, Palm Beach County, Florida. Deposition – September/October 2025. **Economic Damages.**

Pearl Brothers, LLC, et al. vs. Michael Pulwer, et al., 11th Judicial Circuit, Civil Division, Miami-Dade County, Florida. Deposition – August 2025. **Economic Damages.**

William L. Waldock vs. Robert L. Waldock, et al., Court of Common Pleas, Civil Division, Erie County, Ohio. Testimony – July 2025. **Economic Damages.**

James Kahn vs. Michael Kahn, et al., 19th Judicial Circuit, Civil Division, Indian River County, Florida. Testimony – April 2025. Deposition – February 2025. **Shareholder Dispute.**

OVD Canal Holding, LLC vs. Oakview Dermatology, LLC, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – Jan. 2025. **Economic Damages.**

Iris Florencia McGee vs. Rene Leandre Cliche, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – May / November 2024. **Domestic Relations**.

Jennifer Scott, et al. vs. Beechwold Veterinary Hospital, et al., Court of Common Pleas, Civil Division, Franklin County, Ohio. Testimony – August 2024. Deposition – June 2024. **Class Action Economic Damages.**

Markeel Homes, LLC vs. Sean Geehan, Court of Common Pleas, General Division, Montgomery County, Ohio. Deposition – August 2024. **Economic Damages – Piercing the Corporate Veil.**

Shiva Raghunanan and Priya Raghunanan vs. Ajay Dookie, 17th Judicial Circuit, Civil Division, Broward County, Florida. Deposition – April 2024. **Economic Damages**.

Joshua Schilling vs. Charlene C. Schilling, 19th Judicial Circuit, Family Division, Martin County, Florida. Testimony – January 2024. Deposition – August 2023. **Domestic Relations**.

Heather J. Fagadar vs. Florin V. Fagadar, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – November 2023. **Domestic Relations.**

Little Aquanauts, LLC vs. Makovich & Pusti Architects, Inc., Court of Common Pleas, Civil Division, Cuyahoga County, Ohio. Deposition – October 2023. **Economic Damages**.

Asaf Hasson vs. Adi M. Hasson, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – October 2023. **Domestic Relations**.

Burger Management Systems Washington, Inc. vs. Seawend, Ltd. Southern District of Ohio, Eastern Division. Deposition – August 2023. **Economic Damages.**

Raymond Levy vs. Tora Levy, Eleventh Judicial Circuit, Family Division, Miami-Dade County, Florida. Testimony – July 2023. **Domestic Relations**.

Kate Wade v. Ryan Wade, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2023. **Domestic Relations.**

Daniel Gimbel v. Eugene Arky, Probate Division, Palm Beach County, Florida. Testimony – April 2023. Deposition – March 2023. **Forensic.**

Coler Drug McConnelsville v. Interim Healthcare et al., Court of Common Pleas, Civil Division, Morgan County, Ohio. Testimony – February 2023. Deposition – June 2022. **Economic Damages.**

NextPlat Corp. v. Thomas Seifert, Civil Division, Southern District of Florida. Deposition – January 2023. **Economic Damages.**

Colleen M. Staats v. Robert W. Staats, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – November 2022. **Forensic.**

Gregory B. Hall v. Monica Bricker, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – August 2022. **Domestic Relations.**

J. Gregory Ross v. Holly Richardson Ross, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2022. **Domestic Relations-Post Decree.**

Bold Home Products, LLC and E-Commerce Trade, LLC v. Carbonklean, LLC, et., al. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – March 2022. **Economic Damages.**

Ashley N. Kerr v. Ryan T. Kerr, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – March 2022. **Domestic Relations.**

Martin D. Topalov v. Jessica K. Topalov, Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – March 2022. **Domestic Relations.**

Janet Smith v. Scott Smith, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – October 2021. **Domestic Relations.**

Jill Ann Myers v. Rusty Lee Myers, et., al. Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – August 2021, Deposition – October 2020. **Domestic Relations.**

In re: The Lorenz Corporation, Debtor. U.S. Bankruptcy Court for the Southern District of Ohio, Western Division. Testimony – August 2021. Deposition – June 2021. Confirmation **- Business Valuation.**

Michael Nowak v. Jennifer Nowak, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – January 2021. **Domestic Relations.**

Hayes, Mark A. v. Kennedy's Bakery, Inc. et al., Court of Common Pleas, Civil Division, Guernsey County, Ohio. Deposition – October 2019. **Shareholder Dispute.**

Midwest Motor Supply, Inc. v. Richard H. Lamoureux, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – October 2019. **Damages.**

Wilkes, Bonnie v. Wilkes, Raymond, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – July 2019. **Domestic Relations.**

Blair, Heather L. v. Turner, Thomas W. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Testimony – June 2019; Testimony – September 2017; Deposition – August 2017. **Domestic Relations.**

Finley, John W. v. Finley, Angela M., Court of Common Pleas, Domestic Relations, Morgan County, Ohio. Testimony – October 2018. **Domestic Relations.**

Thirza E. Hettinger v. Morris, Buckeye Shaping Holding Ltd. and Lawrence O. Doza, American Arbitration Association, Franklin County, Ohio. Testimony – June 2018. **Shareholder Dispute.**

USA v. Gary Jones, U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – March 2018. Sentencing Hearing. **Damages.**

Smoyer, William E. v. Smoyer, Chloe R. Court of Common Pleas, Domestic Division, Franklin County, Ohio. Testimony – November 2017. **Domestic Relations.**

Callif, Andrew P. v. Callif, Holly M. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Deposition – March / July 2017. **Domestic Relations.**

Nipps, Randall C. v. Nipps, Colleen A. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – March / April 2017. **Domestic Relations.**

McKee, Shelby E. v. McKee, Daniel F. Court of Common Pleas, Domestic Relations Division, Hamilton County, Ohio. Testimony – February 2017. **Domestic Relations.**

Morris, Ronald R. v. Morris, Christine M. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Deposition – June 2016. **Domestic Relations.**

Dick, Heather A. v. Dick, Brent E., Court of Common Pleas, Monroe County, Ohio. Testimony – July 2015. **Domestic Relations.**

Brennan, Todd M. v. Brennan, Rhiannon, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2015. Deposition – March 2015. **Domestic Relations.**

Melinda A. Perry v. Charles M. Perry, Court of Common Pleas, Guernsey County, Ohio. Testimony – May 2014. **Domestic Relations.**

Linda A. Corp v. Michael R. Corp, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2014. **Domestic Relations.**

Jerry Wray, Director ODOT v. Ruckmoor Lodge, Inc. et al., Court of Common Pleas, Franklin County, Ohio. Deposition – Dec. 2013. **Economic Damages.**

Schmid Mechanical, Inc. v. Ohio School Facilities Commission, Court of Claims of Ohio, Deposition – July 2013. **Economic Damages.**

United States of America, ex rel. American Systems Consulting, Inc. and Cliff Gallatin v. Mantech Advanced Systems International et al., U.S. District Court, Southern District of Ohio, Eastern Division, Deposition – March 2013. **Economic Damages.**

Neff, Todd A. v. Suggs, Charlene Y., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – Nov / Dec 2012. **Domestic Relations.**

Cordray, Daniel v. Cordray, Jennifer L., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – July 2012. **Domestic Relations.**

491 North Park Real Estate LLC, et al. vs. Spice Partners LLC et al. Franklin County Court of Common Pleas – Commercial. Testimony – May 2012. **Damages.**

Woodie, C.J. v. Woodie, Deanna L., Court of Common Pleas, Coshocton County, Ohio. Deposition – April 2012. **Domestic Relations.**

Marlite, Inc. v. Alvin Eckenrod, et al., U.S. District Court, Southern District of Florida, Miami Division. Deposition – March 2012. **Economic Damages.**

Tina M. Edwards v. Charles T. Edwards, et al. JAH, Court of Common Pleas, Muskingum County, Ohio. Testimony – February 2012. **Domestic Relations.**

Matthew C. Wilson v. Betsy H. Wilson, Court of Common Pleas, Lawrence County, Ohio. Testimony – August 2011. **Domestic Relations.**

California Fitness I, Inc. v. Lifestyle Family Fitness, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – February 2009. Deposition – December 2007. **Economic Damages.**

Robert L. McGee v. Suzanne M. McGee. Court of Common Pleas, Franklin County, Ohio. Testimony – July 2008. **Domestic Relations.**

Ramakant Mandalaywala, et al. v. Omnitech Electronics, et al. Court of Common Please, Franklin County, Ohio. Deposition – November 2007. **Shareholder Dispute.**

Patrick J. Knott v. Revolution Software, Inc. et. al. Court of Common Pleas, Delaware County, Ohio. Testimony – October 2006. Deposition – June 2005. Testimony cited by Fifth District Court of Appeals – March 2009. **Business Valuation.**

Corbin Street Investments, LLC et. al. v. Popajak Corp. et. al. Court of Common Pleas, Franklin County, Ohio. Deposition and Testimony - September 2006. **Economic Damages.**

James R. Chew v. Shari L. Chew. Court of Common Pleas, Franklin County, Ohio. Testimony – March 2006. Deposition – September 2005. **Domestic Relations.**

Brody v. Columbia Gas of Ohio. Court of Common Pleas, Medina County, Ohio. Deposition – February 2006. **Economic Damages.**

Pharmaceutical Alternatives, Inc. v. Option Care, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – June 2005. **Damages.**

China Garden International, Inc. v. Graceland Shoppers Limited Partnership. Court of Common Pleas, Franklin County, Ohio. Testimony – May 2005. Deposition – April 2005. **Economic Damages.**

Vincent L. Guinn M.D. v. Cardiology, Inc et. al. Ameri- can Arbitration Association, Franklin County, Ohio. Deposition – July 2004. **Shareholder Dispute.**

Shahin Shahinfar et. al. v. Vikas K. Jain et. al. Arbitration: Franklin County, Ohio. Testimony – May 2004. Deposition – April 2004. **Shareholder Dispute.**

Doody v. Doody. Emmet County Circuit Court (Petoskey, Michigan). Testimony – December 2000. **Domestic Relations.**

•

# EXHIBIT C
## EFFECTIVE RATE OF INTEREST — HOLLY BLUFF EXTENSION OF CREDIT
*Computed under Fla. Stat. § 687.03(3)*

**Sources.** The Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation of August 1, 2023, prepared by the Dixon Lenders' closing attorney, and the PEDIXON loan schedule produced as DX 250603, as updated May 14, 2025. Every input is taken from those documents without alteration. This exhibit is identical in substance and in every figure to Exhibit 2 to the supplement filed August 17, 2026 in *In re Homemakers Real Estate, LLC*, No. 6:25-bk-05570-GER (Bankr. M.D. Fla.).

**Step one — the advance or forbearance.**

| | Item | Amount |
|---|---|---|
| A | Face amount of the extension of credit | $3,000,000.00 |
| B | Funds actually placed by PEDIXON (the three Dixon entries) | $2,754,031.59 |
| C | Underfunding (A − B) | $245,968.41 |
| D | "Lender fees" disbursed at closing | $93,750.00 |
| E | **Advance or forbearance (C + D)** | **$339,718.41** |

**Step two — the advance as a percentage of the total stated amount.** $339,718.41 ÷ $3,000,000.00 = **11.32%**

**Steps three and four — spread over the term, then added to the stated rate of 15.00%.** No promissory note has been produced for this borrowing; the obligation is payable on demand and states no maturity date. The computation is therefore shown at every term the record will support.

| Term applied | Spread | Stated rate | Effective rate |
|---|---|---|---|
| Two months — July 20, 2023 closing to the September 2023 aggregation | 67.94% | 15.00% | **82.94%** |
| Five months — closing to the December 2023 declaration of default | 27.18% | 15.00% | **42.18%** |
| Six months | 22.65% | 15.00% | 37.65% |
| One year | 11.32% | 15.00% | **26.32%** |
| 13.6 months — the break-even against the 25% threshold | 9.99% | 15.00% | 24.99% |

| Term applied | Spread | Stated rate | Effective rate |
|---|---|---|---|
| Eighteen months | 7.55% | 15.00% | 22.55% |

**The threshold.** Each extension of credit exceeds $500,000, so the ordinary eighteen percent civil ceiling does not apply. *Fla. Stat. § 687.03(1)* substitutes the rates prescribed in *Fla. Stat. § 687.071*, the lowest of which is twenty-five percent per annum. *Fla. Stat. § 687.071(2)*. Every computation above, at every term shorter than 13.6 months, exceeds it.

**Note on method.** This exhibit performs only the arithmetic the statute prescribes. It assigns no value to the Holly Bluff real estate and takes no position on what that property was worth; the result does not depend on any appraisal. See *St. Petersburg Bank & Trust Co. v. Hamm*, 414 So. 2d 1071, 1073–74 (Fla. 1982).