# EXHIBIT 4

Forensic Document Examination Report of Thomas Vastrick, dated August 25, 2026.

**Member:**
American Society of Questioned Document Examiners

American Academy of Forensic Sciences – QD Section

Southeastern Association of Forensic Document Examiners

**Certified:**
American Board of Forensic Document Examiners

Thomas W. Vastrick

Forensic Document Examiner

***WEBSITE:* *thomaswvastrick.com***
***EMAIL:* *vastrick@yahoo.com***

**Orlando, FL (Main) Office**
522 S Hunt Club Blvd Suite 217
Apopka, FL 32703

**Tallahassee, FL (Branch) Office**
1400 Village Square Blvd #3-149
Tallahassee, FL 32312

(407) 234-3219

August 25, 2026

Mr Matthew A Leibert
Urban Their Federer PA
5782A S Semoran Blvd
Orlando FL 32822

**File No. 265515**

# FORENSIC DOCUMENT EXAMINATION REPORT

## Scope of Work

Determine whether the submitted documents bear evidence of alteration.

The submitted documents consist of the following:

**Exhibit Q-1a** Copy of one two-page Trustee Deed dated September 13, 2023 Version 1 plus a third page Exhibit A. (APPENDIX 1)

**Exhibit Q-1b** Copy of one two-page Trustee Deed dated September 13, 2023 Version 2 plus a third page Exhibit A. (APPENDIX 2)

**Exhibit Q-1c** Copy of one two-page Trustee Deed dated September 13, 2023 Version 3 plus a six-page Exhibit A. (APPENDIX 3)

**Exhibit Q-2** Copy of a one-page Quit Claim Deed dated July 2023 bearing a Docusign Yaniv Amar signature entry as Owner of Recycled Group of South Carolina, LLC, no day entry, no witness entries, and no notary entries and an Exhibit A Property description for Hoover Street North property. (APPENDIX 4)

**Exhibit Q-3a** Copy of a one-page Quit Claim Deed dated July 2023 bearing a Docusign Yaniv Amar signature entry for Holly Bluff Marina, Inc, no day entry, no witness entries, and no notary entries and an Exhibit A Property description for two parcels. (APPENDIX 5)

**Exhibit Q-3b** Copy of a one-page Quit Claim Deed dated July 20, 2023 bearing a Docusign Yaniv Amar signature entry for Holly Bluff Marina, Inc, day entry; two witness signatures, names and addresses; and notary entries with no visible seal and an Exhibit A Property description for two parcels (same as Exhibit 3a). (APPENDIX 6)

**Exhibit Q-4a** Copy of one five-page Security Pledge Agreement dated October 30, 2023 bearing a DocuSign Flynn signature entry. (APPENDIX 7)

**Exhibit Q-4b** Copy of one five-page Security Pledge Agreement dated October 30, 2023 bearing a DocuSign Flynn signature entry, plus a one-page completed notary page with no page number. (APPENDIX 8)

**Exhibit Q-4c** Copy of one five-page Security Pledge Agreement dated October 30, 2023 bearing a DocuSign Flynn signature entry and a DocuSign Dixon signature entry, plus a one-page completed notary page with no page number (copy of same notary page on Exhibit 4b). (APPENDIX 9)

**Exhibit Q-5a** Copy of one Assignment and Transfer of Cash Flow dated October 30, 2023 bearing a DocuSign Flynn signature entry and no notary entries. (APPENDIX 10)

**Exhibit Q-5b** Copies of two different Assignment of Transfer of Shares dated October 30, 2023 bearing a DocuSign Flynn signature entry and no notary entries. (APPENDIX 11)
**Exhibit Q-5c** Copy of one Assignment of All Contracts and Building Rights dated October 30, 2023 bearing a Docusign Flynn signature entry and no witness entries. (APPENDIX 12)
**Exhibit Q-6a** Copy of one Assignment and Transfer of Cash Flow dated October 30, 2023 bearing a DocuSign Flynn signature entry and notary entries. (APPENDIX 13)
**Exhibit Q-6b** Copies of two different Assignment of Transfer of Shares dated October 30, 2023 bearing a DocuSign Flynn signature entry and different notary entries on each copy. (APPENDIX 14)
**Exhibit Q-6c** Copy of one Assignment of All Contracts and Building Rights dated October 30, 2023 bearing a DocuSign Flynn signature entry and two witness entries. (APPENDIX 15)
**Exhibit Q-7a** Copy of one ten-page Loan Agreement bearing DocuSign Flynn, Amar, and Johnson signature entries on Page 10 but no Dixon entry on Page 9 nor Lezcano entry on Page 10. (APPENDIX 16)
**Exhibit Q-7b** Copy of one ten-page Loan Agreement bearing DocuSign Flynn, Amar, Johnson, and Lezcano signature entries on Page 10 but no Dixon entry on Page 9. (APPENDIX 17)

**Conclusions (with Reasons and Bases)**

The Trustee Deeds designated as Exhibits Q-1a, Q-1b, and Q-1c are of a common document. There is evidence to support that Exhibit Q-1a existed prior to Exhibits Q-1b or Q-1c. The time differential of this difference is unknown. There is evidence to support that Exhibit Q-1b existed subsequent to Exhibit Q-1a but prior to Exhibit Q-1c. Page 2 of Exhibits Q-1b and Q-1c are from the same source document though these documents bear different Exhibits A. There is evidence to support that the address entries of the witnesses were written after the notary entries were entered. The time differential of these entries is unknown. The Johnson signature entries on Exhibits Q-1a through Q-1c are font-generated and do not represent handwriting.

The Quit Claim Deeds designated as Exhibit Q-2 and Exhibits Q-3a and Q-3b are different documents but may share a common template. Exhibit Q-3b bears entries common to Page 1 of Exhibit Q-3a in addition to bearing a handwritten day entry, witness entries and notary entries. As such, there is evidence to support that Exhibit Q-3a existed prior to Exhibit Q-3b. The time differential of this difference is unknown. The Amar signature entries on Exhibits Q-2, Q-3a and Q-3b are font-generated and do not represent handwriting.

The notary page on the Security Pledge Agreements designated as Exhibits Q-4b and Q-4c are copies of the same source document. As such, this page does not exist on both documents in their original form and has been added to at least one of these documents. Since Exhibit 4c contains an entry (DocuSign Dixon signature entry), there is evidence to support that the notary page on Exhibit 4c was completed prior to the placement of the Dixon entry. It was noted that the common notary page attached to Exhibits 4b and 4c does not reflect a page designation nor any information that ties this page to the other pages on Exhibit Q-4b. Exhibit Q-4c contains two different DocuSign envelope ID numbers on Pages 1-5, one of which differs from the DocuSign envelope ID number on Exhibit Q-4b. The notary page of Exhibit Q-4c does not contain two different DocuSign envelope ID numbers. As such, there is evidence to support that the notary page reflected on Exhibits Q-4b and Q-4c did not originate on Exhibit Q-4c and may not have originated on Exhibit Q-4b. Exhibit Q-4a does not contain a notary page. Based on the observations above the evidence supports that Exhibit Q-4a existed before Exhibit Q-4b and Exhibit Q-4b existed before Exhibit Q-4c. The Dixon signature entry on Exhibit Q-4c has not been notarized.

There is evidence to support that the Assignments designated as Exhibits Q-5a through Q-5c existed prior to Exhibits Q-6a through Q-6c based on the absence of notary entries on Exhibits Q-5a through Q-5c.

There is evidence to support that the Loan Agreement designated Exhibit Q-7a existed prior to Exhibit Q-7b based on the absence/presence of the DocuSign Lezcano signature entry on these documents.

The DocuSign signature entries within the submitted documents that were notarized were not notarized under proper remote online notarization (RON) procedures. Notarizations were listed as in-person yet were DocuSigned. In addition, remote online notarization is required to be recorded. Notaries in Florida are required to become a Remote Online Notary as an active traditional Florida notary commission does not qualify one to notarize remotely.

The DocuSign signature entries within the submitted documents that were notarized were not notarized under proper In-Person Electronic Notarization (IPEN) procedure. IPEN procedures require the notary to affix an electronic seal and electronic signature in such instances. An active traditional Florida notary commission does qualify one to notarize through the IPEN procedure. The notary either must be physically present when the affiant signature is affixed or the affiant must explicitly acknowledge the signature in person. Either RON or IPEN procedures must be used in the State of Florida for valid notarizations of electronic signatures, such as through DocuSign, even when done face-to-face.

## Limitations and Further Analyses

As noted above in detail, the use of copies for examination purposes has inherent limitations. Should any original documetns become available, it is requested that they be submitted for further analyses. In addition, it is suggested that certificate of completion be obtained and submitted for the specified Envelope ID numbers contained within documents submitted for examination.

## Published Industry Standards

This examination was conducted utilizing published industry standard examination methodologies (APPENDIX 18) as accredited by the American National Standards Institute and published by the Academy Standards Board (ANSI/ASB). Instrumentation and procedures used were fully compliant with the published industry standards.

## Education, Training, and Experience

A copy of my curriculum vitae is attached as APPENDIX 19. Annual list of testimonies from 2021 to present are attached as APPENDIX 20.

## Compensation

Compensation is based on an hourly rate of $400.00 per hour. Compensation is not based in any way on the conclusions reached. My fee schedule outlining my compensation rates is attached as APPENDIX 21.



Thomas W. Vastrick
Forensic Document Examiner

# APPENDIX 1

THIS INSTRUMENT PREPARED BY:

1980 N. Atlantic Ave
Suite 328
Cocoa Beach, FL 32931

# TRUSTEE'S DEED

**THIS INDENTURE,** made September 13, 2023, by and between Homemakers Real Estate, LLC, a Florida limited liability company, hereinafter referred to as Grantor, whose mailing address is 2875 S. ORANGE AVE, STE. 500 #6409, ORLANDO, FL 32806 and CRESCENT SOUND LTD, Trustee, of Tiered Land Trust, u/t/d September 13, 2023, hereinafter referred to as Grantee, whose post office address is 1627 East Vine Street, Suite E, Kissimmee FL 34744.

(Wherever used the term "Grantor" and "Grantee" shall include singular and plural, heirs, legal representative, and assigns of individuals, and the successors and assigns of corporation, wherever the context so admits or requires.)

## WITNESSETH

Grantor, in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), and other good and valuable considerations, receipt of which is hereby acknowledged, does hereby grant, bargain, transfer and convey to Trustee, its successors and assigns, all Grantor's interest in and to the real property described on Exhibit A attached hereto, lying and being situated in Brevard County, Florida.

TOGETHER WITH all appurtenances, privileges, rights, interest, dower, reversions, remainders and easements thereunto appertaining:

TO HAVE AND TO HOLD said real estate with the following powers and for the following uses and purposes, to wit:

1. The Trustee is vested with full rights of ownership over the above described real estate and Trustee is specifically granted and given the power and authority:
   (a) To protect and conserve said real estate and improvements located thereon and to pay the taxes assessed thereon;
   (b) To sell said real estate, for cash or credit, at public or private sale, to exchange said real estate for other property and to grant options to sell said property, and to determine the price and terms of sales, exchange and options;
   (c) To execute leases and subleases for terms as long as 20 years, to subdivide or improve said real estate and tear down or alter improvements, to grant easements, give consent and make contracts relating to said real estate or its use and to release or dedicated any interest in said real estate:
   (d) To borrower money and to mortgage, pledge or encumber any or all of the said real estate to secure payment thereof;
   (e) To manage, control and operate said real estate, to collect the rents, issues and profits, to pay all expenses thereby incurred, and in addition, to manage and operate any business that may now or hereafter be operated and maintained on said real estate, and in general, to exercise any powers authorized by law;
   (f) The Trustee's liability hereunder, under the Trust Agreement or by operation of law to any persons firm or corporation is limited to the trust assets and the Trustee shall not become individually or personally obligated in any manner related thereto;

2. The Trustee shall hold said real estate in accordance with the terms and conditions of that certain Homemakers Land Trust Agreement dated September 13, 2023.

3. No purchaser, grantee, mortgagee, lessee, assignee or any other person dealing with the Trustee need see to the application of any proceeds of any sales, lease, mortgage or pledge, but the receipt of the Trustee shall be a complete discharge and acquittance therefor. Any and all persons, including but not limited to grantees, mortgagees, lessees, transferees and assigns dealing with said Trustee need not inquire into the identification or status of any beneficiary under this deed or any collateral

**No documentary excise taxes are due on the recording of this instrument.**

DocuSign Envelope ID: 9078288B-FE20-4A15-A658-110FB6D3929D

instrument nor inquire into or ascertain the authority of such Trustee to act in and exercise the powers granted by this deed or of adequacy or disposition of any consideration paid to the Trustee nor inquire into the provisions of said unrecorded Trust Agreement and any amendments thereto collateral hereto.

4. This conveyance is made in conformance with the provisions of Sections 689.071, Florida Statutes.

5. By its acceptance of this conveyance, the Trustee covenants and agrees to do and perform the duties, acts and requirements upon it binding.

6. Each and every power hereinabove set forth may be exercised by any Trustee. Any instrument executed by any Trustee or any act taken by any Trustee shall be binding upon the trust and all of the Trustees as fully and completely as if all Trustees had executed the said instrument or taken said action.

7. A certificate signed by Trustee or any successor trustee under this instrument and acknowledged by him/her before a notary public shall be conclusive evidence upon all persons and for all purposes of the facts stated in the certificate representing the terms of this instrument and the identity of the Trustees who from time to time are serving under it.

**In Witness whereof,** the Grantor has signed and sealed this deed the date above written.

Signed, sealed and delivered in the presence of:

**HOMEMAKERS REAL ESTATE, LLC**

DocuSigned by:

By: *Horton S. Johnson*

Horton S. Johnson, Manager

Witness 1 Signature

Printed Name of Witness

Witness 2 Signature

Printed Name of Witness

State of Florida
County of Orange

The foregoing instrument was acknowledged before me by means of [ ] physical presence or [ ] online notarization, this 13th day of September 2023 by Horton S. Johnson who [ ] is personally known or [ ] has produced a driver's license as identification.

[Seal]

Notary Public
Print Name: ______________________
My Commission Expires: ______________________

**No documentary excise taxes are due on the recording of this instrument.**

EXHIBIT A
LEGAL DESCRIPTION

(26 UNITS)

**No documentary excise taxes are due on the recording of this instrument.**

# APPENDIX 2

Version 2



THIS INSTRUMENT PREPARED BY:

1980 N. Atlantic Ave
Suite 328
Cocoa Beach, FL 32931

# TRUSTEE'S DEED

**THIS INDENTURE,** made September 13, 2023, by and between Homemakers Real Estate, LLC, a Florida limited liability company, hereinafter referred to as Grantor, whose mailing address is 2875 S. ORANGE AVE, STE. 500 #6409, ORLANDO, FL 32806 and CRESCENT SOUND LTD, Trustee, of Tiered Land Trust, u/t/d September 13, 2023, hereinafter referred to as Grantee, whose post office address is 1627 East Vine Street, Suite E, Kissimmee FL 34744.

(Wherever used the term "Grantor" and "Grantee" shall include singular and plural, heirs, legal representative, and assigns of individuals, and the successors and assigns of corporation, wherever the context so admits or requires.)

## WITNESSETH

Grantor, in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), and other good and valuable considerations, receipt of which is hereby acknowledged, does hereby grant, bargain, transfer and convey to Trustee, its successors and assigns, all Grantor's interest in and to the real property described on Exhibit A attached hereto, lying and being situated in Brevard County, Florida.

TOGETHER WITH all appurtenances, privileges, rights, interest, dower, reversions, remainders and easements thereunto appertaining:

TO HAVE AND TO HOLD said real estate with the following powers and for the following uses and purposes, to wit:

1. The Trustee is vested with full rights of ownership over the above described real estate and Trustee is specifically granted and given the power and authority:
   (a) To protect and conserve said real estate and improvements located thereon and to pay the taxes assessed thereon;
   (b) To sell said real estate, for cash or credit, at public or private sale, to exchange said real estate for other property and to grant options to sell said property, and to determine the price and terms of sales, exchange and options;
   (c) To execute leases and subleases for terms as long as 20 years, to subdivide or improve said real estate and tear down or alter improvements, to grant easements, give consent and make contracts relating to said real estate or its use and to release or dedicated any interest in said real estate:
   (d) To borrower money and to mortgage, pledge or encumber any or all of the said real estate to secure payment thereof;
   (e) To manage, control and operate said real estate, to collect the rents, issues and profits, to pay all expenses thereby incurred, and in addition, to manage and operate any business that may now or hereafter be operated and maintained on said real estate, and in general, to exercise any powers authorized by law;
   (f) The Trustee's liability hereunder, under the Trust Agreement or by operation of law to any persons firm or corporation is limited to the trust assets and the Trustee shall not become individually or personally obligated in any manner related thereto;

2. The Trustee shall hold said real estate in accordance with the terms and conditions of that certain Homemakers Land Trust Agreement dated September 13, 2023.

3. No purchaser, grantee, mortgagee, lessee, assignee or any other person dealing with the Trustee need see to the application of any proceeds of any sales, lease, mortgage or pledge, but the receipt of the Trustee shall be a complete discharge and acquittance therefor. Any and all persons, including but not limited to grantees, mortgagees, lessees, transferees and assigns dealing with said Trustee need not inquire into the identification or status of any beneficiary under this deed or any collateral

**No documentary excise taxes are due on the recording of this instrument.**

DocuSign Envelope ID: 9078288B-FE20-4A15-A658-110FB6D3929D

instrument nor inquire into or ascertain the authority of such Trustee to act in and exercise the powers granted by this deed or of adequacy or disposition of any consideration paid to the Trustee nor inquire into the provisions of said unrecorded Trust Agreement and any amendments thereto collateral hereto.

4. This conveyance is made in conformance with the provisions of Sections 689.071, Florida Statutes.

5. By its acceptance of this conveyance, the Trustee covenants and agrees to do and perform the duties, acts and requirements upon it binding.

6. Each and every power hereinabove set forth may be exercised by any Trustee. Any instrument executed by any Trustee or any act taken by any Trustee shall be binding upon the trust and all of the Trustees as fully and completely as if all Trustees had executed the said instrument or taken said action.

7. A certificate signed by Trustee or any successor trustee under this instrument and acknowledged by him/her before a notary public shall be conclusive evidence upon all persons and for all purposes of the facts stated in the certificate representing the terms of this instrument and the identity of the Trustees who from time to time are serving under it.

**In Witness whereof,** the Grantor has signed and sealed this deed the date above written.

Signed, sealed and delivered in the presence of:

**HOMEMAKERS REAL ESTATE, LLC**

DocuSigned by:

By: *Horton S. Johnson*

Horton S. Johnson, Manager

Witness 1 Signature

Gabrielle Milotte

Printed Name of Witness

Witness 2 Signature

Anthony Amodeo

Printed Name of Witness

State of Florida
County of Orange

The foregoing instrument was acknowledged before me by means of [✓] physical presence or [ ] online notarization, this 13th day of September 2023 by Horton S. Johnson who [ ] is personally known or [✓] has produced a driver's license as identification.

[Seal]

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

Notary Public
Print Name: Janelle Morea
My Commission Expires: 1/5/2025

**No documentary excise taxes are due on the recording of this instrument.**

DocuSign Envelope ID: 9078288B-FE20-4A15-A658-110FB6D3929D

EXHIBIT A
LEGAL DESCRIPTION

(26 UNITS)

**No documentary excise taxes are due on the recording of this instrument.**

# APPENDIX 3

CFN 2024031262 OR BK 9992 Page 2830 Recorded 02/14/2024 at 03:34 PM Rachel M. Sadoff, Clerk of Courts, Brevard County Doc. D: $0.70

VERSION 3 RECORDED
PAGE 3 SUBSTITUTED W/ GRACE
27 UNITS
NO ID ON ADDITIONAL PAGES

DocuSign Envelope ID: 9078288B-FE20-4A16-A658-110FB6D3929D

THIS INSTRUMENT PREPARED BY:

1980 N. Atlantic Ave
Suite 328
Cocoa Beach, FL 32931

## TRUSTEE'S DEED

**THIS INDENTURE,** made September 13, 2023, by and between Homemakers Real Estate, LLC, a Florida limited liability company, hereinafter referred to as Grantor, whose mailing address is 2875 S. ORANGE AVE, STE. 500 #6409, ORLANDO, FL 32806 and CRESCENT SOUND LTD, Trustee, of Tiered Land Trust, u/t/d September 13, 2023, hereinafter referred to as Grantee, whose post office address is 1627 East Vine Street, Suite E, Kissimmee FL 34744.

(Wherever used the term "Grantor" and "Grantee" shall include singular and plural, heirs, legal representative, and assigns of individuals, and the successors and assigns of corporation, wherever the context so admits or requires.)

## WITNESSETH

Grantor, in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), and other good and valuable considerations, receipt of which is hereby acknowledged, does hereby grant, bargain, transfer and convey to Trustee, its successors and assigns, all Grantor's interest in and to the real property described on Exhibit A attached hereto, lying and being situated in Brevard County, Florida.

TOGETHER WITH all appurtenances, privileges, rights, interest, dower, reversions, remainders and easements thereunto appertaining:

TO HAVE AND TO HOLD said real estate with the following powers and for the following uses and purposes, to wit:

1. The Trustee is vested with full rights of ownership over the above described real estate and Trustee is specifically granted and given the power and authority:
   (a) To protect and conserve said real estate and improvements located thereon and to pay the taxes assessed thereon;
   (b) To sell said real estate, for cash or credit, at public or private sale, to exchange said real estate for other property and to grant options to sell said property, and to determine the price and terms of sales, exchange and options;
   (c) To execute leases and subleases for terms as long as 20 years, to subdivide or improve said real estate and tear down or alter improvements, to grant easements, give consent and make contracts relating to said real estate or its use and to release or dedicated any interest in said real estate:
   (d) To borrower money and to mortgage, pledge or encumber any or all of the said real estate to secure payment thereof;
   (e) To manage, control and operate said real estate, to collect the rents, issues and profits, to pay all expenses thereby incurred, and in addition, to manage and operate any business that may now or hereafter be operated and maintained on said real estate, and in general, to exercise any powers authorized by law;
   (f) The Trustee's liability hereunder, under the Trust Agreement or by operation of law to any persons firm or corporation is limited to the trust assets and the Trustee shall not become individually or personally obligated in any manner related thereto;

2. The Trustee shall hold said real estate in accordance with the terms and conditions of that certain Homemakers Land Trust Agreement dated September 13, 2023.

3. No purchaser, grantee, mortgagee, lessee, assignee or any other person dealing with the Trustee need see to the application of any proceeds of any sales, lease, mortgage or pledge, but the receipt of the Trustee shall be a complete discharge and acquittance therefor. Any and all persons, including but not limited to grantees, mortgagees, lessees, transferees and assigns dealing with said Trustee need not inquire into the identification or status of any beneficiary under this deed or any collateral

**No documentary excise taxes are due on the recording of this instrument.**

instrument nor inquire into or ascertain the authority of such Trustee to act in and exercise the powers granted by this deed or of adequacy or disposition of any consideration paid to the Trustee nor inquire into the provisions of said unrecorded Trust Agreement and any amendments thereto collateral hereto.

4. This conveyance is made in conformance with the provisions of Sections 689.071, Florida Statutes.

5. By its acceptance of this conveyance, the Trustee covenants and agrees to do and perform the duties, acts and requirements upon it binding.

6. Each and every power hereinabove set forth may be exercised by any Trustee. Any instrument executed by any Trustee or any act taken by any Trustee shall be binding upon the trust and all of the Trustees as fully and completely as if all Trustees had executed the said instrument or taken said action.

7. A certificate signed by Trustee or any successor trustee under this instrument and acknowledged by him/her before a notary public shall be conclusive evidence upon all persons and for all purposes of the facts stated in the certificate representing the terms of this instrument and the identity of the Trustees who from time to time are serving under it.

**In Witness** whereof, the Grantor has signed and sealed this deed the date above written.

Signed, sealed and delivered in the presence of:

HOMEMAKERS REAL ESTATE, LLC

DocuSigned by:

By: Horton S. Johnson

Horton S. Johnson, Manager

Witness 1 Signature

Gabrielle Milotte - 1650 Sandlake Rd Orlando, FL 32809

Printed Name of Witness + Address

Witness 2 Signature

Anthony Amodeo - 4998 Dockside DR. Orlando, FL 32822

Printed Name of Witness + Address

State of Florida
County of Orange

The foregoing instrument was acknowledged before me by means of [✓] physical presence or [ ] online notarization, this 13th day of September 2023 by Horton S. Johnson who [ ] is personally known or [✓] has produced a driver's license as identification.

[Seal]

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

Notary Public
Print Name: Janelle Morea
My Commission Expires: 1/5/2025

**No documentary excise taxes are due on the recording of this instrument.**

**EXHIBIT A**

**LEGAL DESCRIPTION**

The land referred to herein below is situated in the County of BREVARD, State of FL, and described as follows:

Condominium Unit 103, CAPE CROSSING, a Condominium, together with an undivided Interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 104, CAPE CROSSING, a Condominium, together with an undivided Interest in the time elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 107, CAPE CROSSING, a Condominium, together with an undivided Interest in the common elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 202, CAPE CROSSING, a Condominium, together with an undivided Interest in the common elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 203, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 205, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 206, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 207, CAPE CROSSING, a Condominium, together with an undivided Interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 303, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 305, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 307, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 402, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 403, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 404, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 407, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 503, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 504, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 505, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Condominium Unit 507, CAPE CROSSING, a Condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded In Official Record Book 8418, Page 1832, as amended from time to time, of the Public Records of BREVARD County, Florida.

Building #2 Unit 101

A parcel of land lying in Section 11, Township 24 South, Range 36 East, Tallahassee Base Meridian, Brevard County, Florida, being a part of the lands as described in Official Records Book 6890, Page 2520, Public Records of Brevard County, Florida, and being more particularly described as follows:

Commence at the intersection of the Westerly right-of-way line of North Courtenay Parkway and the South Property Line of the Canaveral Port Authority (described as the Point-of-Beginning in Official Records Book 6212, Page 2393, aforesaid Public Records); thence S79°58'00"W, along the South line of the Canaveral Port Authority, a distance of 58.85 feet; thence S10°02'00"E, perpendicular to said South line of the Canaveral Port Authority, a distance of 121.30 feet to the Point-of-Beginning; thence continue S10°02'00"E, a distance of 52.67 feet; thence S79°58'00"W, a distance of 21.00 feet; thence N10°02'00"W, a distance of 70.00 feet; thence N79°58'00"E, a distance of 12.33 feet; thence S10°02'00"E, a distance of 17.33 feet; thence N79°58'00"E, a distance of 8.67 feet to the Point-of-Beginning.

Building #2 Unit 102

A parcel of land lying in Section 11, Township 24 South, Range 36 East, Tallahassee Base Meridian, Brevard County, Florida, being a part of the lands as described in Official Records Book 6890, Page 2520, Public Records of Brevard County, Florida, and being more particularly described as follows:

Commence at the intersection of the Westerly right-of-way line of North Courtenay Parkway and the South Property Line of the Canaveral Port Authority (described as the Point-of-Beginning in Official Records Book 6212, Page 2393, aforesaid Public Records); thence S79°58'00"W, along the South line of the Canaveral Port Authority, a distance of 79.85 feet; thence S10°02'00"E, perpendicular to said South line of the Canaveral Port Authority, a distance of 103.97 feet to the Point-of-Beginning; thence continue S10°02'00"E, a distance of 70.00 feet; thence S79°58'00"W, a distance of 20.67 feet; thence N10°02'00"W, a distance of 52.67 feet; thence N79°58'00"W, a distance of 8.33 feet; thence N10°02'00"W, a distance of 17.33 feet; thence N79°58'00"E, a distance of 12.33 feet to the Point-of-Beginning.

The Land is described as follows:
211 Ivory Coral Lane, Unit 101
Merritt Island, FL 32953

Parcel 1:
Building #5 Unit 101

A parcel of land lying in Section 11, Township 24 South, Range 36 East, Tallahassee Base Meridian, Brevard County, Florida, being a part of the lands as described in Official Records Book 6890, Page 2520, Public Records of Brevard County, Florida, and being more particularly described as follows:

Commence at the intersection of the Westerly right-of-way line of North Courtenay Parkway and the South Property Line of The Canaveral Port Authority (described as the Point-of-Beginning in Official Records Book 6212, Page 2393, aforesaid Public Records); thence South 79 degrees 58 minutes 00 seconds West, along the South Line of the Canaveral Port Authority, a distance of 172.97 feet to a point; thence continuing along said South property line South 82 degrees 14 minutes 00 seconds West, a distance of 289.71 feet; thence South 07 degrees 46 minutes 00 seconds East, perpendicular to said South line of the Canaveral Port Authority, a distance of 148.30 feet to the POINT-OF-BEGINNING; thence continue South 07 degrees 46 minutes 00 seconds East, a distance of 52.67 feet; thence South 82 degrees 14 minutes 00 seconds West, a distance of 21.00 feet; thence North 07 degrees 46 minutes 00 seconds West, a distance of 70.00 feet; thence North 82 degrees 14 minutes 00 seconds East a distance of 12.33 feet; thence South 07 degrees 46 minutes 00 seconds East, a distance of 17.33 feet; thence North 82 degrees 14 minutes 00 seconds East a distance of 8.67 feet to the POINT-OF-BEGINNING.

The Land is described as follows:
211 Ivory Coral Lane, Unit 103
Merritt Island, FL 32953

Parcel 2:
Building #5 Unit 103

A parcel of land lying in Section 11, Township 24 South, Range 36 East, Tallahassee Base Meridian, Brevard County, Florida, being a part of the lands as described in Official Records Book 6890, Page 2520, Public Records of Brevard County, Florida, and being more particularly described as follows:

Commence at the intersection of the Westerly right-of-way line of North Courtenay Parkway and the South Property Line of The Canaveral Port Authority (described as the Point-of-Beginning in Official Records Book 6212, Page 2393, aforesaid Public Records); thence South 79 degrees 58 minutes 00 seconds West, along the South Line of the Canaveral Port Authority, a distance of 172.97 feet to a point; thence continuing along said South property line South 82 degrees 14 minutes 00 seconds West, a distance of 331.38 feet; thence South 07 degrees 46 minutes 00 seconds East, perpendicular to said South line of the Canaveral Port Authority, a distance of 148.30 feet to the POINT-OF-BEGINNING; thence continue South 07 degrees 46 minutes 00 seconds East, a distance of 52.67 feet; thence South 82 degrees 14 minutes 00 seconds West, a distance of 20.67 feet; thence North 07 degrees 46 minutes 00 seconds West, a distance of 70.00 feet; thence North 82 degrees 14 minutes 00 seconds East a distance of 12.33 feet; thence South 07 degrees 46 minutes 00 seconds East, a distance of 17.33 feet; thence North 82 degrees 14 minutes 00 seconds East a distance of 8.33 feet to the POINT-OF-BEGINNING.

# APPENDIX 4

DocuSign Envelope ID: CDEB0C28-9858-4726-B635-4A019F108BEC

PREPARED BY AND RETURN TO:
Alison Pitkanen, Esq.
1980 N. Atlantic Ave, Suite 328
Cocoa Beach, FL 32931
407-449-0037

# Quit Claim Deed

Made this _____ **day of July 2023 A.D.**, by and between **Recycled Group of South Carolina, LLC, a South Carolina limited liability company,** whose address is **1 Nevamar Place, Hampton, South Carolina 29924** hereinafter called the Grantor, and PEDIXON LLC, a Florida limited liability company, whose address is **1627 East Vine Street, Suite E, Kissimmee, FL 34744,** hereinafter called the Grantee.

(Whenever used herein the term "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth:** that the Grantor, for and in consideration of the sum of Ten Dollars and 00/100 ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, does hereby remise, release, and quit claim unto the Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to, all that certain land situate in Hampton County, South Carolina viz:

See Exhibit A attached hereto

This Property is not the homestead of the Grantor.

**Together** with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

**To Have And To Hold** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee forever.

**In Witness Whereof,** the said Grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed, and delivered in our presence:*

Recycled Group of South Carolina, LLC
DocuSigned by:
Yaniv Amar
_______________________________
Yaniv Amar, Owner

Witness #1 Signature_______________________________

Witness #1 Printed Name_______________________________

Witness #2 Signature_______________________________

Witness #2 Printed Name_______________________________

State of Florida
County of _____________________

The foregoing instrument was acknowledged before me by means of [ ] physical presence or [ ] online notarization, on this _____ day of July 2023 by Yaniv Amar, owner for Recycled Group of South Carolina, LLC, who [ ] is personally known or [ ] has produced a driver's license as identification.

[Seal]

_______________________________
Notary Public
Print Name: _______________________________
My Commission Expires: _______________________________

**EXHIBIT "A"**
**PROPERTY**

Hoover Street North 57.363 acres, designated as Parcel "D", as shown on plat filed in Plat Cabinet A, Slide 45, Page 1

All that certain piece, parcel or tract of land, together with improvements thereon, situate, lying and being located in the Northern section of the Town of Hampton, in Hampton County, South Carolina, containing 57.363 acres, designated as Parcel "D" on plat prepared by C. Lawton Maner, R.L.S., #8370, dated May 1995, and revised July 13, 1995, and recorded in the Office of the Clerk of Court for Hampton County in Plat Cabinet A, Slide 45, page 1. According to said plat, said property is generally bounded as follows:

On the Northeast by property of Bethlehem Baptist Church, Westinghouse Electric Corporation, Nix Street, Chambers Medical Tech. of S.C., Inc. and Georgia-Pacific Resins, Inc.,; on the Southeast by property of Chambers Medical Tech. of S.C., Inc., Georgia-Pacific Resins, Inc., Mill Street, Hallie Capers, Jr., 50 foot wide street right-of-way Commercial Credit Corp., John Eddie Fields Est., and H. and B. Railroad; on the Southwest by property of John Eddie Fields Est., H. and B. Railroad and Laverne Fennell; and on the Northwest by property of Laverne Fennell, U.S. Hwy. 601 and Westinghouse Electric Corporation. For a more accurate description as to the metes and bounds, see the aforementioned plat, which is incorporated herein by reference.

# APPENDIX 5

PREPARED BY AND RETURN TO:
Alison Pitkanen, Esq.
1980 N. Atlantic Ave, Suite 328
Cocoa Beach, FL 32931
407-449-0037

# Quit Claim Deed

Made this _____ **day of July 2023 A.D.**, by and between **Holly Bluff Marina, Inc., a Florida corporation,** whose address is **2280 Hontoon Road, Deland, Florida 32720** hereinafter called the Grantor, and PEDIXON LLC, a Florida limited liability company, whose address is **1627 East Vine Street, Suite E, Kissimmee, FL 34744,** hereinafter called the Grantee.

(Whenever used herein the term "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth:** that the Grantor, for and in consideration of the sum of Ten Dollars and 00/100 ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, does hereby remise, release, and quit claim unto the Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to, all that certain land situate in Volusia County, Florida viz:

See Exhibit A attached hereto

This Property is not the homestead of the Grantor.

**Together** with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

**To Have And To Hold** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee forever.

**In Witness Whereof,** the said Grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed, and delivered in our presence:*

Holly Bluff Marina, Inc.
DocuSigned by:
Yaniv Amar
Yaniv Amar, President of A Marine, Inc.
on behalf of Holly Bluff Marina, Inc.

Witness #1 Signature____________________

Witness #1 Printed Name____________________

Witness #2 Signature____________________

Witness #2 Printed Name____________________

State of Florida
County of ____________________

The foregoing instrument was acknowledged before me by means of [_] physical presence or [_] online notarization, on this ______ day of July 2023 by Yaniv Amar, President of A Marine, Inc., on behalf of Holly Bluff Marina, Inc., who [_] is personally known or [_] has produced a driver's license as identification.

[Seal]

____________________
Notary Public
Print Name: ____________________
My Commission Expires: ____________________

# EXHIBIT "A"
# PROPERTY

PARCEL 1:

That part of Government Lot 1 in Section 35, Township 17 South, Range 29 East, and that part of Lot 2 in Section 36, Township 17 South, Range 29 East, lying on the Westerly and Northerly side of a county road,

running down the Beresford Peninsula, described as follows: Commencing at the Southwest corner of Lot 4 of Assessor's Subdivision of Government Lots 5 and 6, Section 25, Township 17 South, Range 29 East, run thence East along the North line of Government Lots 1 and 2, Section 36, Township 17 South, Range 29 East, a distance of 894.60 feet to the center line of the graded county road as now laid out; run thence South 8°15'45" West along or near the center line of said county road a distance of 396.00 feet; thence South 22°11'00" West along county road a distance of 528.53 feet; thence South 34°22'20" West along county road a distance of 760.00 feet; thence South 47°29'20" West along a county road a distance of 539.00 feet to the point of beginning; run thence along county road South 54°33'00" West a distance of 627.50 feet; thence South 76°01'30" West, a distance of 277.70 feet; thence North 78°44'10" West, a distance of 283.40 feet to the Easterly bank of the St. Johns River; thence along the Easterly bank of St. Johns River, North 48°12'00" East a distance of 165.57 feet; thence North 37°22'35" East, a distance of 381.42 feet; thence North 42°01'30" East, a distance of 271.95 feet; thence South 65°17'55" East, a distance of 574.45 feet to the point of beginning, all lying and situate in Volusia County, Florida.

Subject to an easement of access for vehicles and utility services to the property abutting the premises on the Northerly boundary, over that portion of the premises described as follows:

From the point of beginning of the parcel above described, continued thence South 54°33'00" West along county road 60 feet; run thence North 58°39'28" West 450 feet; run thence South 65°17'55" East 476.84 feet to the point of beginning.

Less and except that portion conveyed by Warranty Deed recorded in Official Records Book 3759, page 563, of the Public Records of Volusia County, Florida.

PARCEL 2:

That part of Gov't Lot 1 in Sec. 35, TWP. 17S, RGE. 29E, Volusia County, Florida, Lying on the Westerly and Northerly side of a County Road Running Down the Beresford Peninsular, Described as follows: Commencing at the S.W. corner of Lot 4 of Assessors Subdivision of Gov't Lots 5 and 6, Sec. 25, Twp. 17S, RGE. 29E, run thence East along the N. line of Gov't Lots 1 and 2, Sec. 36, TWP. 17S, RGE. 29E, 894.60 ft. to the center line of the graded county road as now laid out; thence run S 08° 15'45 N along or near said center line 396.00 ft.; thence S. 22° 11 '00"W, 528.53 ft.; thence S 34° 22'20" W., 760.00 ft.; thence S 47°29'20"W, 539.00 ft.; thence S. 54°33'00" W, 627.50 ft. to a Point of Beginning: thence run S. 21°35'40"E, 6.00 ft.; thence S. 68°24'20" W, along the Platted line of Peninsular Drive according to a map in Map Book 23, Page 58 and 59, 132.40 ft.; thence S. 78° 20'10"W along said platted line, 160.52 FT; Thence N 83°09'50"W, along said platted line, 390.72 ft. to the St. Johns River; thence N 32°29'21"E, 111.09 ft. along the St. Johns River; Thence S. 41° 48'00"E, 86.00 ft. to a point mentioned in a deed recorded in deed book 355, page 270; thence S 78°44'10"E, 283.40 ft.; thence N 76°10'30"E 277.70 ft. in accordance with said deed to the Point of Beginning. Less and except Road Right of Way.

# APPENDIX 6

2/23/2024 12:14:55 PM Instrument #2024035593 #1 Book:8521 Page:2618
Doc Stamps $0.70 Transfer Amt $10.00

DocuSign Envelope ID: CDEB0C[redacted]635-4A019F108BEC

PREPARED BY AND RETURN TO:
Alison Pilkanen, Esq.
1980 N. Atlantic Ave, Suite 328
Cocoa Beach, FL 32931
407-449-0037

# Quit Claim Deed

Made this 20th day of July 2023 A.D., by and between **Holly Bluff Marina, Inc., a Florida corporation,** whose address is **2280 Hontoon Road, Deland, Florida 32720** hereinafter called the Grantor, and PEDIXON LLC, a Florida limited liability company, whose address is **1627 East Vine Street, Suite E, Kissimmee, FL 34744,** hereinafter called the Grantee.

(Whenever used herein the term "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth:** that the Grantor, for and in consideration of the sum of Ten Dollars and 00/100 ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, does hereby remise, release, and quit claim unto the Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to, all that certain land situate in Volusia County, Florida viz:

See Exhibit A attached hereto

This Property is not the homestead of the Grantor.

**Together** with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

**To Have And To Hold** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee forever.

**In Witness Whereof,** the said Grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed, and delivered in our presence:*

Holly Bluff Marina, Inc.
DocuSigned by:
Yaniv Amar
Yaniv Amar, President of A Marine, Inc.
on behalf of Holly Bluff Marina, Inc.

Witness #1 Signature [signature]

Witness #1 Printed Name David Ruiz
Address - 3319 Forton DR, Orlando, FL 32824

Witness #2 Signature [signature]

Witness #2 Printed Name Anthony Amadio
Address - 4998 Dockside DR, Orlando, FL 32822

State of Florida
County of Florida

The foregoing instrument was acknowledged before me by means of [✓] physical presence or [ ] online notarization, on this 20th day of July 2023 by Yaniv Amar, President of A Marine, Inc., on behalf of Holly Bluff Marina, Inc., who [ ] is personally known or [✓] has produced a driver's license as identification.

[Seal]

[signature]
Notary Public
Print Name: Janelle Morea
My Commission Expires: 1/5/25

DocuSign Envelope ID: CDEB0C2[redacted]019F108BEC

**EXHIBIT "A"**
**PROPERTY**

PARCEL 1:

That part of Government Lot 1 in Section 35, Township 17 South, Range 29 East, and that part of Lot 2 in Section 36, Township 17 South, Range 29 East, lying on the Westerly and Northerly side of a county road,

running down the Beresford Peninsula, described as follows: Commencing at the Southwest corner of Lot 4 of Assessor's Subdivision of Government Lots 5 and 6, Section 25, Township 17 South, Range 29 East, run thence East along the North line of Government Lots 1 and 2, Section 36, Township 17 South, Range 29 East, a distance of 894.60 feet to the center line of the graded county road as now laid out; run thence South 8°15'45" West along or near the center line of said county road a distance of 396.00 feet; thence South 22°11'00" West along county road a distance of 528.53 feet; thence South 34°22'20" West along county road a distance of 760.00 feet; thence South 47°29'20" West along a county road a distance of 539.00 feet to the point of beginning; run thence along county road South 54°33'00" West a distance of 627.50 feet; thence South 76°01'30" West, a distance of 277.70 feet; thence North 78°44'10" West, a distance of 283.40 feet to the Easterly bank of the St. Johns River; thence along the Easterly bank of St. Johns River, North 48°12'00" East a distance of 165.57 feet; thence North 37°22'35" East, a distance of 381.42 feet; thence North 42°01'30" East, a distance of 271.95 feet; thence South 65°17'55" East, a distance of 574.45 feet to the point of beginning, all lying and situate in Volusia County, Florida.

Subject to an easement of access for vehicles and utility services to the property abutting the premises on the Northerly boundary, over that portion of the premises described as follows:

From the point of beginning of the parcel above described, continued thence South 54°33'00" West along county road 60 feet; run thence North 58°39'28" West 450 feet; run thence South 65°17'55" East 476.84 feet to the point of beginning.

Less and except that portion conveyed by Warranty Deed recorded in Official Records Book 3759, page 563, of the Public Records of Volusia County, Florida.

PARCEL 2:

That part of Gov't Lot 1 in Sec. 35, TWP. 17S, RGE. 29E, Volusia County, Florida, Lying on the Westerly and Northerly side of a County Road Running Down the Beresford Peninsular, Described as follows: Commencing at the S.W. corner of Lot 4 of Assessors Subdivision of Gov't Lots 5 and 6, Sec. 25, Twp. 17S, RGE. 29E, run thence East along the N. line of Gov't Lots 1 and 2, Sec. 36, TWP. 17S, RGE. 29E, 894.60 ft. to the center line of the graded county road as now laid out; thence run S 08° 15'45 N along or near said center line 396.00 ft.; thence S. 22° 11 '00"W, 528.53 ft.; thence S 34° 22'20" W., 760.00 ft.; thence S 47°29'20"W, 539.00 ft.; thence S. 54°33'00" W, 627.50 ft. to a Point of Beginning: thence run S. 21°35'40"E, 6.00 ft.; thence S. 68°24'20" W, along the Platted line of Peninsular Drive according to a map in Map Book 23, Page 58 and 59, 132.40 ft.; thence S. 78° 20'10"W along said platted line, 160.52 FT; Thence N 83°09'50"W, along said platted line, 390.72 ft. to the St. Johns River; thence N 32°29'21"E, 111.09 ft. along the St. Johns River; Thence S. 41° 48'00"E, 86.00 ft. to a point mentioned in a deed recorded in deed book 355, page 270; thence S 78°44'10"E, 283.40 ft.; thence N 76°10'30"E 277.70 ft. in accordance with said deed to the Point of Beginning. Less and except Road Right of Way.

# APPENDIX 7

# SECURITY PLEDGE AGREEMENT

Pledge of Stock, Cash Flow and ROGOS

DATED: October 30, 2023

MARTIN C. FLYNN, JR. ("Flynn") and PEDIXON LLC, a Florida limited liability company ("Lender" and "Secured Party") hereby enter into this security pledge agreement (the "Pledge Agreement") as a condition precedent of the Loan Agreement executed on this date.

Said Note, loan agreement and documents executed of even date herewith may be referred to herein as the "Loan Documents."

MTF Holdings LLC, a Florida limited liability company, and WM Holdings Group, LLC, a Florida Limited liability company are entities primarily owned and controlled by Flynn, and each have directly benefited from the loan accommodation made by Lender.

Flynn, MTF Holdings, LLC and WM Holdings Group, LLC shall be collectively referred to as the "Obligor," and by execution hereof, and in exchange for the loan modification made by Secured Party, each shall guarantee the Loan Agreement and all terms of this Pledge Agreement.

In further consideration of the substitution of collateral set forth in the Loan Agreement, and the mutual covenants and agreements between Obligor and Secured Party, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Obligor and Secured Party agree as follows:

**I.** **SECURITY INTEREST AND COLLATERAL.** To secure the payment and performance of the indebtedness under the Loan Agreement and each and every debt, liability and obligation of every type and description which Obligor may now or at any time hereafter owe to Secured Party (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several; all such debts, liabilities and obligations being herein collectively referred to as the "Obligations"), Obligor hereby grants Secured Party a priority security interest (herein called the "Security Interest") in the following property (herein called the "Collateral"):

**a.** ROGOS. All of Obligor's interest in and to all building rights in the State of Florida, as of the date hereof, and any building rights acquired until such time as all Obligations are satisfied and/or released by the Secured Party.

**b.** Cash Flow. Obligor's percentage interest in any cash flow, payments, management fees and tax credits directly from any entity formed for the purpose of constructing and operating low-income multifamily housing projects, including but not limited to the following projects (the "Projects"):

**i.** Keys Affordable Development, LLC. That certain 51 unit low-income multifamily housing project in Marathon, Florida in Marathon, Florida
**ii.** Keys Affordable Development II, LLC. That certain 42-unit low-income multifamily housing project in Marathon, Florida.
**iii.** Keys Affordable Development IV, LLC.
**iv.** Quint Development, LLC.

**v.** Tri-Star Affordable Development, LLC.
**vi.** The Cash Flow shall include the cash flow, payments, management fees and tax credits from all affordable housing projects to which Obligor, or any affiliate or related party, has a current interest and to which Obligor acquires an interest until such time as the Obligations are fully satisfied and/or released by Secured Party.

**c.** Membership Units.

**i.** All of the membership units of MTF Holdings, LLC, and
**ii.** All of the membership units of WM Holdings, LLC.

**II.** **TRUST PROPERTY HELD IN TRUST**. The ROGOS, Cash Flow and Membership Units shall be collectively referred to herein as the "Trust Property." Upon execution hereof, Obligor hereby assigns unto Secured Party all of its interest in the following pledged Collateral to be held in trust by Alison Pitkanen Law Firm (the "Firm").

**a.** ROGOS; and
**b.** Cash Flow; and
**c.** Membership Units of MTF Holdings, LLC; and
**d.** Membership Units of WM Holdings, LLC.

Secured Party shall only exercise its right to execute any assignment after the Notice and Opportunity to Cure requirements are met.

**III.** **Notice and Opportunity to Cure Requirements.** Obligor party shall be entitled to written notice of any default under the Loan Agreement and this Pledge Agreement, and shall have fifteen (15) days from receipt of such notice to cure such default prior to the exercise of any remedy provided herein ("Notice and Opportunity to Cure Requirements"). Secured Party agrees to cooperate with Obligor in any and all attempts by Obligor to cure any default within the default cure period.

**IV.** **REPRESENTATIONS, WARRANTIES AND AGREEMENTS.** Obligor represents, warrants and agrees that:

a. Obligor has (or will have at the time Obligor acquires rights in Collateral hereafter arising) absolute title to each item of Collateral free and clear of all security interest, liens and encumbrances, except the Security Interest, and will defend the Collateral against all claims or demands of all persons other than Secured Party. Obligor will not sell or otherwise dispose of the Collateral or any interest therein without the prior written consent of Secured Party.

b. This Agreement has been duly and validly authorized by all necessary corporate action.

c. Obligor hereby represents and warrants to Lender, in order to induce Lender to enter into the Loan Agreement, as follows: (a) there are no actions, suits or proceeding pending or threatened against or affecting Obligor before any court of law or equity, or any administrative board, or before any governmental authority, nor is Obligor in default under the terms of any other indebtedness or obligation or with respect to any governmental authority;

d. All representations and warranties previously made by Obligor in connection with the Loan Documents are true and correct, and incorporated herein by this reference.

c. Obligor will:

i. promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest;

ii. keep all Collateral free and clear of all security interests, liens and encumbrances except the Security Interest;

iii. at all reasonable times, permit Secured Party or its representatives to examine or inspect any Collateral, wherever located, and to examine, inspect and copy Obligor's books and records pertaining to the Collateral and its business and financial condition;

iv. pay when due or reimburse Secured Party on demand for all costs of collection of any of the Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by Secured Party in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Security Interest or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings;

v. execute, deliver or endorse any and all instruments, documents, assignments, security agreements and other agreements and writings which Secured Party may at any time reasonably request in order to secure, protect, perfect or enforce the Security Interest and Secured Party's rights under this Agreement;

vi. not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in violation of any federal, state or local law, statute or ordinance; and

V. **COLLECTION RIGHTS OF SECURED PARTY.** Secured Party may at any time after the occurrence of the Notice and Opportunity to Cure Requirements, provide notice to an authorized agent of the Project, that such right to payment has been assigned or transferred to Secured Party for security and shall be paid directly to Secured Party. The parties acknowledge that there may be advance notice provisions required to effectuate the assignment of the Collateral. Obligor shall take all reasonable and necessary steps to consummate Secured Party’s execution of the assignment of any of the Collateral upon the exercise of this provision.

VI. **EVENTS OF DEFAULT**. Each of the following occurrences shall constitute an event of default under this Agreement (herein called "Event of Default"):

a. <u>Default on Obligations</u>. Failure to make any payment when due under the Loan Documents or any other Obligations.

b. <u>Other Defaults</u>. Failure of any Obligor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of any Obligor to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and such Obligor, relating to the Obligations.

c. <u>False Statements</u>. Any warranty, representation or statement made or furnished to Lender by or on behalf of an Obligor under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

d. Insolvency. The dissolution or termination of the existence of Obligor as a going business, the insolvency of Obligor, the appointment of a receiver for any part of property of Obligor, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws or against Obligor.

**VII. REMEDIES UPON EVENT OF DEFAULT.** After satisfaction of the proper Notice and Opportunity to Cure Requirements, Secured Party may exercise any one or more of the following rights and remedies in the Event of Default:

a. declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand;

b. exercise the assignment of the Trust Property. The Firm shall be authorized to release the Trust Property directly to Lender if Lender so elects. Obligor shall fully cooperate to effectuate the transfer of any of the Trust Property.

c. exercise its collection rights granted hereunder. Obligor shall fully cooperate to effectuate the collection rights directly to Secured Party.

d. exercise and enforce any or all rights and remedies available upon default to a secured party under the Uniform Commercial Code, including but not limited to the right to take possession of any Collateral, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Obligor hereby expressly waives), and the right to sell, lease or otherwise dispose of any or all of the Collateral, and in connection therewith. Secured Party may require Obligor to make the Collateral available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties, and if notice to Obligor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least 10 calendar days prior to the date of intended disposition or other action;

e. exercise or enforce any or all other rights or remedies available to Secured Party by law or agreement against the Collateral, against Obligor or against any other person or property.

VIII. **MISCELLANEOUS.**

a. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by Secured Party. A waiver signed by Secured Party shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any of Secured Party's rights or remedies. All rights and remedies of Secured Party shall be cumulative and may be exercised singularly or concurrently, at Secured Party's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to, nor bar the exercise or enforcement of any other.

b. All notices to be given to Obligor shall be deemed sufficiently given if delivered or mailed by regular or certified mail, postage prepaid, to Obligor at its address set forth herein or at the most recent address shown on Secured Party's records.

c. This Agreement shall be binding upon and inure to the benefit of Obligor and Secured Party and their respective heirs, representatives, successors and assigns and shall take effect when signed by Obligor and delivered to Secured Party, and Obligor waives notice of Secured Party's acceptance hereof.

d. Secured Party may execute this Agreement if appropriate for the purpose of filing, but the failure of Secured Party to execute this Agreement shall not affect or impair the validity or effectiveness of this Agreement.

e. A carbon, photographic or other reproduction of this Agreement or of any financing statement signed by the Obligor shall have the same force and effects as the original for all purposes of a financing statement.

f. This Agreement shall be governed by the laws of the State of Florida.

g. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby.

h. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations.

i. Obligor hereby ratifies and confirms that all the terms, covenants, conditions, warranties, representations and agreement contained in the Loan Documents.

j. Should there be any conflict between the terms of this Pledge Agreement and the Loan Agreement, this Pledge Agreement shall control.

**OBLIGOR:**

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA...

By: Martin C. Flynn, Jr.
Individually, and
as Manager of MTF Holdings, LLC, and
as Manager of WM Holdings, LLC

**SECURED PARTY:**

By: Kenneth G. Dixon, Manager of PEDIXON LLC

# APPENDIX 8

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

6th UNNUMBERED
NO DIXON SIGNATURE

**SECURITY PLEDGE AGREEMENT**

Pledge of Stock, Cash Flow and ROGOS

DATED: October 30, 2023

MARTIN C. FLYNN, JR. ("Flynn") and PEDIXON LLC, a Florida limited liability company ("Lender" and "Secured Party") hereby enter into this security pledge agreement (the "Pledge Agreement") as a condition precedent of the Loan Agreement executed on this date.

Said Note, loan agreement and documents executed of even date herewith may be referred to herein as the "Loan Documents."

MTF Holdings LLC, a Florida limited liability company, and WM Holdings Group, LLC, a Florida Limited liability company are entities primarily owned and controlled by Flynn, and each have directly benefited from the loan accommodation made by Lender.

Flynn, MTF Holdings, LLC and WM Holdings Group, LLC shall be collectively referred to as the "Obligor," and by execution hereof, and in exchange for the loan modification made by Secured Party, each shall guarantee the Loan Agreement and all terms of this Pledge Agreement.

In further consideration of the substitution of collateral set forth in the Loan Agreement, and the mutual covenants and agreements between Obligor and Secured Party, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Obligor and Secured Party agree as follows:

I. **SECURITY INTEREST AND COLLATERAL.** To secure the payment and performance of the indebtedness under the Loan Agreement and each and every debt, liability and obligation of every type and description which Obligor may now or at any time hereafter owe to Secured Party (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several; all such debts, liabilities and obligations being herein collectively referred to as the "Obligations"), Obligor hereby grants Secured Party a priority security interest (herein called the "Security Interest") in the following property (herein called the "Collateral"):

   a. ROGOS. All of Obligor's interest in and to all building rights in the State of Florida, as of the date hereof, and any building rights acquired until such time as all Obligations are satisfied and/or released by the Secured Party.

   b. Cash Flow. Obligor's percentage interest in any cash flow, payments, management fees and tax credits directly from any entity formed for the purpose of constructing and operating low-income multifamily housing projects, including but not limited to the following projects (the "Projects"):

      i. Keys Affordable Development, LLC. That certain 51 unit low-income multifamily housing project in Marathon, Florida in Marathon, Florida
      ii. Keys Affordable Development II, LLC. That certain 42-unit low-income multifamily housing project in Marathon, Florida.
      iii. Keys Affordable Development IV, LLC.
      iv. Quint Development, LLC.

v. Tri-Star Affordable Development, LLC.
vi. The Cash Flow shall include the cash flow, payments, management fees and tax credits from all affordable housing projects to which Obligor, or any affiliate or related party, has a current interest and to which Obligor acquires an interest until such time as the Obligations are fully satisfied and/or released by Secured Party.

c. Membership Units.

i. All of the membership units of MTF Holdings, LLC, and
ii. All of the membership units of WM Holdings, LLC.

II. **TRUST PROPERTY HELD IN TRUST.** The ROGOS, Cash Flow and Membership Units shall be collectively referred to herein as the "Trust Property." Upon execution hereof, Obligor hereby assigns unto Secured Party all of its interest in the following pledged Collateral to be held in trust by Alison Pitkanen Law Firm (the "Firm").

a. ROGOS; and
b. Cash Flow; and
c. Membership Units of MTF Holdings, LLC; and
d. Membership Units of WM Holdings, LLC.

Secured Party shall only exercise its right to execute any assignment after the Notice and Opportunity to Cure requirements are met.

III. **Notice and Opportunity to Cure Requirements.** Obligor party shall be entitled to written notice of any default under the Loan Agreement and this Pledge Agreement, and shall have fifteen (15) days from receipt of such notice to cure such default prior to the exercise of any remedy provided herein ("Notice and Opportunity to Cure Requirements"). Secured Party agrees to cooperate with Obligor in any and all attempts by Obligor to cure any default within the default cure period.

IV. **REPRESENTATIONS, WARRANTIES AND AGREEMENTS.** Obligor represents, warrants and agrees that:

a. Obligor has (or will have at the time Obligor acquires rights in Collateral hereafter arising) absolute title to each item of Collateral free and clear of all security interest, liens and encumbrances, except the Security Interest, and will defend the Collateral against all claims or demands of all persons other than Secured Party. Obligor will not sell or otherwise dispose of the Collateral or any interest therein without the prior written consent of Secured Party.

b. This Agreement has been duly and validly authorized by all necessary corporate action.

c. Obligor hereby represents and warrants to Lender, in order to induce Lender to enter into the Loan Agreement, as follows: (a) there are no actions, suits or proceeding pending or threatened against or affecting Obligor before any court of law or equity, or any administrative board, or before any governmental authority, nor is Obligor in default under the terms of any other indebtedness or obligation or with respect to any governmental authority;

d. All representations and warranties previously made by Obligor in connection with the Loan Documents are true and correct, and incorporated herein by this reference.

c. Obligor will:

i. promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest;

ii. keep all Collateral free and clear of all security interests, liens and encumbrances except the Security Interest;

iii. at all reasonable times, permit Secured Party or its representatives to examine or inspect any Collateral, wherever located, and to examine, inspect and copy Obligor's books and records pertaining to the Collateral and its business and financial condition;

iv. pay when due or reimburse Secured Party on demand for all costs of collection of any of the Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by Secured Party in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Security Interest or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings;

v. execute, deliver or endorse any and all instruments, documents, assignments, security agreements and other agreements and writings which Secured Party may at any time reasonably request in order to secure, protect, perfect or enforce the Security Interest and Secured Party's rights under this Agreement;

vi. not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in violation of any federal, state or local law, statute or ordinance; and

V. **COLLECTION RIGHTS OF SECURED PARTY.** Secured Party may at any time after the occurrence of the Notice and Opportunity to Cure Requirements, provide notice to an authorized agent of the Project, that such right to payment has been assigned or transferred to Secured Party for security and shall be paid directly to Secured Party. The parties acknowledge that there may be advance notice provisions required to effectuate the assignment of the Collateral. Obligor shall take all reasonable and necessary steps to consummate Secured Party's execution of the assignment of any of the Collateral upon the exercise of this provision.

VI. **EVENTS OF DEFAULT.** Each of the following occurrences shall constitute an event of default under this Agreement (herein called "Event of Default"):

a. Default on Obligations. Failure to make any payment when due under the Loan Documents or any other Obligations.

b. Other Defaults. Failure of any Obligor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of any Obligor to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and such Obligor, relating to the Obligations.

c. False Statements. Any warranty, representation or statement made or furnished to Lender by or on behalf of an Obligor under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

d. Insolvency. The dissolution or termination of the existence of Obligor as a going business, the insolvency of Obligor, the appointment of a receiver for any part of property of Obligor, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws or against Obligor.

VII. **REMEDIES UPON EVENT OF DEFAULT.** After satisfaction of the proper Notice and Opportunity to Cure Requirements, Secured Party may exercise any one or more of the following rights and remedies in the Event of Default:

a. declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand;

b. exercise the assignment of the Trust Property. The Firm shall be authorized to release the Trust Property directly to Lender if Lender so elects. Obligor shall fully cooperate to effectuate the transfer of any of the Trust Property.

c. exercise its collection rights granted hereunder. Obligor shall fully cooperate to effectuate the collection rights directly to Secured Party.

d. exercise and enforce any or all rights and remedies available upon default to a secured party under the Uniform Commercial Code, including but not limited to the right to take possession of any Collateral, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Obligor hereby expressly waives), and the right to sell, lease or otherwise dispose of any or all of the Collateral, and in connection therewith. Secured Party may require Obligor to make the Collateral available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties, and if notice to Obligor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least 10 calendar days prior to the date of intended disposition or other action;

e. exercise or enforce any or all other rights or remedies available to Secured Party by law or agreement against the Collateral, against Obligor or against any other person or property.

VIII. **MISCELLANEOUS.**

a. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by Secured Party. A waiver signed by Secured Party shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any of Secured Party's rights or remedies. All rights and remedies of Secured Party shall be cumulative and may be exercised singularly or concurrently, at Secured Party's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to, nor bar the exercise or enforcement of any other.

b. All notices to be given to Obligor shall be deemed sufficiently given if delivered or mailed by regular or certified mail, postage prepaid, to Obligor at its address set forth herein or at the most recent address shown on Secured Party's records.

c. This Agreement shall be binding upon and inure to the benefit of Obligor and Secured Party and their respective heirs, representatives, successors and assigns and shall take effect when signed by Obligor and delivered to Secured Party, and Obligor waives notice of Secured Party's acceptance hereof.

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

d. Secured Party may execute this Agreement if appropriate for the purpose of filing, but the failure of Secured Party to execute this Agreement shall not affect or impair the validity or effectiveness of this Agreement.

e. A carbon, photographic or other reproduction of this Agreement or of any financing statement signed by the Obligor shall have the same force and effects as the original for all purposes of a financing statement.

f. This Agreement shall be governed by the laws of the State of Florida.

g. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby.

h. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations.

i. Obligor hereby ratifies and confirms that all the terms, covenants, conditions, warranties, representations and agreement contained in the Loan Documents.

j. Should there be any conflict between the terms of this Pledge Agreement and the Loan Agreement, this Pledge Agreement shall control.

**OBLIGOR:**

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA...

By: Martin C. Flynn, Jr.
Individually, and
as Manager of MTF Holdings, LLC, and
as Manager of WM Holdings, LLC

**SECURED PARTY:**

By: Kenneth G. Dixon, Manager of PEDIXON LLC

**STATE OF FLORIDA**
**COUNTY OF** Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ✓ physical presence or __ online notarization on October 30th, 2023, by Martin C. Flynn, Jr.

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Notary: Check one of the following:

____ Personally known OR
✓ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

# APPENDIX 9

Docusign Envelope ID: 545249E8-5982-4DFA-92C0-E713A3E9775F

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

6 + A UNNUMBERED PG (ONLY 1 D ON G+ PMCO) DIXON SIGNATURE

# SECURITY PLEDGE AGREEMENT

Pledge of Stock, Cash Flow and ROGOS

DATED: October 30, 2023

MARTIN C. FLYNN, JR. ("Flynn") and PEDIXON LLC, a Florida limited liability company ("Lender" and "Secured Party") hereby enter into this security pledge agreement (the "Pledge Agreement") as a condition precedent of the Loan Agreement executed on this date.

Said Note, loan agreement and documents executed of even date herewith may be referred to herein as the "Loan Documents."

MTF Holdings LLC, a Florida limited liability company, and WM Holdings Group, LLC, a Florida Limited liability company are entities primarily owned and controlled by Flynn, and each have directly benefited from the loan accommodation made by Lender.

Flynn, MTF Holdings, LLC and WM Holdings Group, LLC shall be collectively referred to as the "Obligor," and by execution hereof, and in exchange for the loan modification made by Secured Party, each shall guarantee the Loan Agreement and all terms of this Pledge Agreement.

In further consideration of the substitution of collateral set forth in the Loan Agreement, and the mutual covenants and agreements between Obligor and Secured Party, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Obligor and Secured Party agree as follows:

I. **SECURITY INTEREST AND COLLATERAL.** To secure the payment and performance of the indebtedness under the Loan Agreement and each and every debt, liability and obligation of every type and description which Obligor may now or at any time hereafter owe to Secured Party (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several; all such debts, liabilities and obligations being herein collectively referred to as the "Obligations"), Obligor hereby grants Secured Party a priority security interest (herein called the "Security Interest") in the following property (herein called the "Collateral"):

   a. ROGOS. All of Obligor's interest in and to all building rights in the State of Florida, as of the date hereof, and any building rights acquired until such time as all Obligations are satisfied and/or released by the Secured Party.

   b. Cash Flow. Obligor's percentage interest in any cash flow, payments, management fees and tax credits directly from any entity formed for the purpose of constructing and operating low-income multifamily housing projects, including but not limited to the following projects (the "Projects"):

      i. Keys Affordable Development, LLC. That certain 51 unit low-income multifamily housing project in Marathon, Florida in Marathon, Florida
      ii. Keys Affordable Development II, LLC. That certain 42-unit low-income multifamily housing project in Marathon, Florida.
      iii. Keys Affordable Development IV, LLC.
      iv. Quint Development, LLC.

Docusign Envelope ID: 545249E8-5982-4DFA-92C0-E713A3E9775F

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

v. Tri-Star Affordable Development, LLC.
vi. The Cash Flow shall include the cash flow, payments, management fees and tax credits from all affordable housing projects to which Obligor, or any affiliate or related party, has a current interest and to which Obligor acquires an interest until such time as the Obligations are fully satisfied and/or released by Secured Party.

c. Membership Units.

i. All of the membership units of MTF Holdings, LLC, and
ii. All of the membership units of WM Holdings, LLC.

II. TRUST PROPERTY HELD IN TRUST. The ROGOS, Cash Flow and Membership Units shall be collectively referred to herein as the "Trust Property." Upon execution hereof, Obligor hereby assigns unto Secured Party all of its interest in the following pledged Collateral to be held in trust by Alison Pitkanen Law Firm (the "Firm").

a. ROGOS; and
b. Cash Flow; and
c. Membership Units of MTF Holdings, LLC; and
d. Membership Units of WM Holdings, LLC.

Secured Party shall only exercise its right to execute any assignment after the Notice and Opportunity to Cure requirements are met.

III. **Notice and Opportunity to Cure Requirements.** Obligor party shall be entitled to written notice of any default under the Loan Agreement and this Pledge Agreement, and shall have fifteen (15) days from receipt of such notice to cure such default prior to the exercise of any remedy provided herein ("Notice and Opportunity to Cure Requirements"). Secured Party agrees to cooperate with Obligor in any and all attempts by Obligor to cure any default within the default cure period.

IV. **REPRESENTATIONS, WARRANTIES AND AGREEMENTS.** Obligor represents, warrants and agrees that:

a. Obligor has (or will have at the time Obligor acquires rights in Collateral hereafter arising) absolute title to each item of Collateral free and clear of all security interest, liens and encumbrances, except the Security Interest, and will defend the Collateral against all claims or demands of all persons other than Secured Party. Obligor will not sell or otherwise dispose of the Collateral or any interest therein without the prior written consent of Secured Party.

b. This Agreement has been duly and validly authorized by all necessary corporate action.

c. Obligor hereby represents and warrants to Lender, in order to induce Lender to enter into the Loan Agreement, as follows: (a) there are no actions, suits or proceeding pending or threatened against or affecting Obligor before any court of law or equity, or any administrative board, or before any governmental authority, nor is Obligor in default under the terms of any other indebtedness or obligation or with respect to any governmental authority;

d. All representations and warranties previously made by Obligor in connection with the Loan Documents are true and correct, and incorporated herein by this reference.

c. Obligor will:

i. promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest;

ii. keep all Collateral free and clear of all security interests, liens and encumbrances except the Security Interest;

iii. at all reasonable times, permit Secured Party or its representatives to examine or inspect any Collateral, wherever located, and to examine, inspect and copy Obligor's books and records pertaining to the Collateral and its business and financial condition;

iv. pay when due or reimburse Secured Party on demand for all costs of collection of any of the Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by Secured Party in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Security Interest or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings;

v. execute, deliver or endorse any and all instruments, documents, assignments, security agreements and other agreements and writings which Secured Party may at any time reasonably request in order to secure, protect, perfect or enforce the Security Interest and Secured Party's rights under this Agreement;

vi. not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in violation of any federal, state or local law, statute or ordinance; and

V. **COLLECTION RIGHTS OF SECURED PARTY.** Secured Party may at any time after the occurrence of the Notice and Opportunity to Cure Requirements, provide notice to an authorized agent of the Project, that such right to payment has been assigned or transferred to Secured Party for security and shall be paid directly to Secured Party. The parties acknowledge that there may be advance notice provisions required to effectuate the assignment of the Collateral. Obligor shall take all reasonable and necessary steps to consummate Secured Party's execution of the assignment of any of the Collateral upon the exercise of this provision.

VI. **EVENTS OF DEFAULT.** Each of the following occurrences shall constitute an event of default under this Agreement (herein called "Event of Default"):

a. Default on Obligations. Failure to make any payment when due under the Loan Documents or any other Obligations.

b. Other Defaults. Failure of any Obligor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of any Obligor to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and such Obligor, relating to the Obligations.

c. False Statements. Any warranty, representation or statement made or furnished to Lender by or on behalf of an Obligor under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

d. Insolvency. The dissolution or termination of the existence of Obligor as a going business, the insolvency of Obligor, the appointment of a receiver for any part of property of Obligor, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws or against Obligor.

VII. **REMEDIES UPON EVENT OF DEFAULT.** After satisfaction of the proper Notice and Opportunity to Cure Requirements, Secured Party may exercise any one or more of the following rights and remedies in the Event of Default:

a. declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand;

b. exercise the assignment of the Trust Property. The Firm shall be authorized to release the Trust Property directly to Lender if Lender so elects. Obligor shall fully cooperate to effectuate the transfer of any of the Trust Property.

c. exercise its collection rights granted hereunder. Obligor shall fully cooperate to effectuate the collection rights directly to Secured Party.

d. exercise and enforce any or all rights and remedies available upon default to a secured party under the Uniform Commercial Code, including but not limited to the right to take possession of any Collateral, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Obligor hereby expressly waives), and the right to sell, lease or otherwise dispose of any or all of the Collateral, and in connection therewith. Secured Party may require Obligor to make the Collateral available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties, and if notice to Obligor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least 10 calendar days prior to the date of intended disposition or other action;

e. exercise or enforce any or all other rights or remedies available to Secured Party by law or agreement against the Collateral, against Obligor or against any other person or property.

VIII. **MISCELLANEOUS.**

a. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by Secured Party. A waiver signed by Secured Party shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any of Secured Party's rights or remedies. All rights and remedies of Secured Party shall be cumulative and may be exercised singularly or concurrently, at Secured Party's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to, nor bar the exercise or enforcement of any other.

b. All notices to be given to Obligor shall be deemed sufficiently given if delivered or mailed by regular or certified mail, postage prepaid, to Obligor at its address set forth herein or at the most recent address shown on Secured Party's records.

c. This Agreement shall be binding upon and inure to the benefit of Obligor and Secured Party and their respective heirs, representatives, successors and assigns and shall take effect when signed by Obligor and delivered to Secured Party, and Obligor waives notice of Secured Party's acceptance hereof.

Docusign Envelope ID: 545249E8-5982-4DFA-92C0-E713A3E9775F

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

d. Secured Party may execute this Agreement if appropriate for the purpose of filing, but the failure of Secured Party to execute this Agreement shall not affect or impair the validity or effectiveness of this Agreement.

e. A carbon, photographic or other reproduction of this Agreement or of any financing statement signed by the Obligor shall have the same force and effects as the original for all purposes of a financing statement.

f. This Agreement shall be governed by the laws of the State of Florida.

g. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby.

h. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations.

i. Obligor hereby ratifies and confirms that all the terms, covenants, conditions, warranties, representations and agreement contained in the Loan Documents.

j. Should there be any conflict between the terms of this Pledge Agreement and the Loan Agreement, this Pledge Agreement shall control.

**OBLIGOR:**

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA

By: Martin C. Flynn, Jr.
Individually, and
as Manager of MTF Holdings, LLC, and
as Manager of WM Holdings, LLC

**SECURED PARTY:**

DocuSigned by:
KGD
5B6B99603255463

By: Kenneth G. Dixon, Manager of PEDIXON LLC

Docusign Envelope ID: 545249E8-5982-4DFA-92C0-E713A3E9775F

**STATE OF FLORIDA**
**COUNTY OF** Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ✓ physical presence or __ online notarization on October 30th, 2023, by Martin C. Flynn, Jr.

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

[signature]
Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Notary: Check one of the following:
____ Personally known OR
✓ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

# APPENDIX 10

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Cash Flow**

**For value received,** pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr., individually, WM Holdings, LLC, and MTF Holdings, LLC hereby unconditionally assign and transfer the following unto PEDIXON LLC.

All of its percentage interest in any cash flow, payments, management fees and tax credits directly from any entity formed for the purpose of constructing and operating low-income multifamily housing projects, including but not limited to the following projects:

- Keys Affordable Development, LLC. That certain 51 unit low-income multifamily housing project in Marathon, Florida in Marathon, Florida
- Keys Affordable Development II, LLC. That certain 42-unit low-income multifamily housing project in Marathon, Florida.
- Keys Affordable Development IV, LLC.
- Quint Development, LLC.
- Tri-Star Affordable Development, LLC.
- The Cash Flow shall include the cash flow, payments, management fees and tax credits from all affordable housing projects to which Obligor, or any affiliate or related party, has a current interest and to which Obligor acquires an interest until such time as the Obligations are fully satisfied and/or released by Secured Party.

The undersigned represents and warrants that said Cash Flow has not been assigned, transferred or otherwise encumbered; and that and all proper notice provisions have been met to effectuate the legal transfer of the Cash Flow unto PEDIXON LLC.

Executed on this 30th day of October 2023.

DocuSigned by:

By: Martin C. Flynn, Jr.

8788014E49D94EA...

Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF** ________________

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ____ physical presence or __ online notarization on October ____, 2023, by Martin C. Flynn, Jr.

______________________________
Notary Public, State of Florida
Name: ___________________________
(Please print or type)

Commission Number:
Commission Expires:

Notary: Check one of the following:
____ Personally known OR
____ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: ______________________________

# APPENDIX 11

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Shares**

**For value received,** pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr. hereby unconditionally assigns and transfers the following unto PEDIXON LLC.

> The issued and outstanding shares of membership units of WM Holdings, LLC, a Florida limited liability company. The undersigned represents and warrants that he is owner of all the issued and outstanding shares of said company, and that the shares have not been sold, transferred, assigned, or otherwise encumbered as of the date hereof.

The undersigned hereby and irrevocably constitutes and appoints Alison Pitkanen, Esquire, as attorney-in-fact, to transfer the said shares on the books of company.

Executed on this 30th day of October 2023.

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA...

By: ____________________

Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF** ____________

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ____ physical presence or __ online notarization on October ____, 2023, by Martin C. Flynn, Jr.

____________________
Notary Public, State of Florida
Name: ____________________
(Please print or type)

Commission Number:
Commission Expires:

Notary: Check one of the following:
____ Personally known OR
____ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: ____________________

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Shares**

**For value received**, pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr. hereby unconditionally assigns and transfers the following unto PEDIXON LLC.

> The issued and outstanding shares of membership units of MTF Holdings, LLC, a Florida limited liability company. The undersigned represents and warrants that he is owner of all the issued and outstanding shares of said company, and that the shares have not been sold, transferred, assigned, or otherwise encumbered as of the date hereof.

The undersigned hereby and irrevocably constitutes and appoints Alison Pitkanen, Esquire, as attorney-in-fact, to transfer the said shares on the books of company.

Executed on this 30th day of October 2023.

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA...

By: ______________________________

Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF ________________**

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ____ physical presence or __ online notarization on October ____, 2023, by Martin C. Flynn, Jr.

______________________________
Notary Public, State of Florida
Name: ______________________________
(Please print or type)

Commission Number:
Commission Expires:

Notary: Check one of the following:
____ Personally known OR
____ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: ______________________________

# APPENDIX 12

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**ASSIGNMENT OF ALL CONTRACTS AND BUILDING RIGHTS**

MTF Holdings LLC, a Florida limited liability company, WM Holdings, LLC, a Florida limited liability company and Martin C. Flynn, Jr. (collectively the "Assignor") for and in consideration of the sum of TEN ($10.00) DOLLARS and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged hereby assigns, grants, transfers and delivers unto PEDIXON LLC (the "Assignee") the following:

- All building rights contracts in the State of Florida, and
- All of its ownership and interest in and to all current building rights in the State of Florida
- All of its ownership and interest in and to all State of Florida building rights that may be vested or acquired from the date hereof, until such time as the indebtedness owed to PEDIXON, LLC is fully satisfied.

TO HAVE AND TO HOLD the same unto the Assignee, its personal representatives, heirs and assigns forever.

The Assignor acknowledges and agrees that it has full right and authority to assign and transfer its interest in the ROGOS as stated herein, that they are free from all encumbrances; and that the Assignor has good right and title to assign the same aforesaid.

Assignor agrees to execute any additional documentation that may be required to effectuate the assignment of the aforesaid ROGOS unto Assignee.

Assignor and Assignee agree that the intention of this Assignment is to transfer all of the building rights contracts, and all interests in and to the building rights, to which Assignee has an interest, in the State of Florida. The undersigned agrees to take any action reasonably necessary to effectuate the assignment of said contract and/or building right as contemplated hereunder.

This Assignment shall survive the closing on the date hereof.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this 30th day of October 2023.

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

ASSIGNOR:

_______________________
Printed name:_______________

DocuSigned by:
Martin C. Flynn, Jr.
8788014E49D94EA...
_______________________
By: Martin C. Flynn, individually and
Manager of MTF Holdings, LLC, and
Manager of WM Holdings, LLC

_______________________
Printed name:_______________

# APPENDIX 13

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Cash Flow**

**For value received**, pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr., individually, WM Holdings, LLC, and MTF Holdings, LLC hereby unconditionally assign and transfer the following unto PEDIXON LLC.

All of its percentage interest in any cash flow, payments, management fees and tax credits directly from any entity formed for the purpose of constructing and operating low-income multifamily housing projects, including but not limited to the following projects:

- Keys Affordable Development, LLC. That certain 51 unit low-income multifamily housing project in Marathon, Florida in Marathon, Florida
- Keys Affordable Development II, LLC. That certain 42-unit low-income multifamily housing project in Marathon, Florida.
- Keys Affordable Development IV, LLC.
- Quint Development, LLC.
- Tri-Star Affordable Development, LLC.
- The Cash Flow shall include the cash flow, payments, management fees and tax credits from all affordable housing projects to which Obligor, or any affiliate or related party, has a current interest and to which Obligor acquires an interest until such time as the Obligations are fully satisfied and/or released by Secured Party.

The undersigned represents and warrants that said Cash Flow has not been assigned, transferred or otherwise encumbered; and that and all proper notice provisions have been met to effectuate the legal transfer of the Cash Flow unto PEDIXON LLC.

Executed on this 30th day of October 2023.

DocuSigned by:

By: Martin C. Flynn, Jr.
8788014E49D94EA...
Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF** Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ✓ physical presence or __ online notarization on October 30, 2023, by Martin C. Flynn, Jr.

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

[signature]
Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Notary: Check one of the following:
___ Personally known OR
✓ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

# APPENDIX 14

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Shares**

**For value received**, pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr. hereby unconditionally assigns and transfers the following unto PEDIXON LLC.

> The issued and outstanding shares of membership units of WM Holdings, LLC, a Florida limited liability company. The undersigned represents and warrants that he is owner of all the issued and outstanding shares of said company, and that the shares have not been sold, transferred, assigned, or otherwise encumbered as of the date hereof.

The undersigned hereby and irrevocably constitutes and appoints Alison Pitkanen, Esquire, as attorney-in-fact, to transfer the said shares on the books of company.

Executed on this 30th day of October 2023.

DocuSigned by:

By: Martin C. Flynn, Jr.

87B8014E49D94EA

Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF** Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ✓ physical presence or __ online notarization on October 30, 2023, by Martin C. Flynn, Jr.

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

J Morea
Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Notary: Check one of the following:
___ Personally known OR
✓ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**Assignment and Transfer of Shares**

**For value received**, pursuant to the terms of the loan documents executed of even date herewith, the undersigned, Martin C. Flynn, Jr. hereby unconditionally assigns and transfers the following unto PEDIXON LLC.

> The issued and outstanding shares of membership units of MTF Holdings, LLC, a Florida limited liability company. The undersigned represents and warrants that he is owner of all the issued and outstanding shares of said company, and that the shares have not been sold, transferred, assigned, or otherwise encumbered as of the date hereof.

The undersigned hereby and irrevocably constitutes and appoints Alison Pitkanen, Esquire, as attorney-in-fact, to transfer the said shares on the books of company.

Executed on this 30th day of October 2023.

DocuSigned by:
Martin C. Flynn, Jr.
8789014E49D84EA

By: ______________________

Martin C. Flynn, Jr.

**STATE OF FLORIDA**
**COUNTY OF** Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of ✓ physical presence or __ online notarization on October 30, 2023, by Martin C. Flynn, Jr.

Janelle Morea
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

J Morea
Notary Public, State of Florida
Name: Janelle Morea
(Please print or type)

Commission Number: HH077342
Commission Expires: 1/5/2025

Notary: Check one of the following:
___ Personally known OR
✓ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: License

# APPENDIX 15

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

**ASSIGNMENT OF ALL CONTRACTS AND BUILDING RIGHTS**

MTF Holdings LLC, a Florida limited liability company, WM Holdings, LLC, a Florida limited liability company and Martin C. Flynn, Jr. (collectively the "Assignor") for and in consideration of the sum of TEN ($10.00) DOLLARS and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged hereby assigns, grants, transfers and delivers unto PEDIXON LLC (the "Assignee") the following:

- All building rights contracts in the State of Florida, and
- All of its ownership and interest in and to all current building rights in the State of Florida
- All of its ownership and interest in and to all State of Florida building rights that may be vested or acquired from the date hereof, until such time as the indebtedness owed to PEDIXON, LLC is fully satisfied.

TO HAVE AND TO HOLD the same unto the Assignee, its personal representatives, heirs and assigns forever.

The Assignor acknowledges and agrees that it has full right and authority to assign and transfer its interest in the ROGOS as stated herein, that they are free from all encumbrances; and that the Assignor has good right and title to assign the same aforesaid.

Assignor agrees to execute any additional documentation that may be required to effectuate the assignment of the aforesaid ROGOS unto Assignee.

Assignor and Assignee agree that the intention of this Assignment is to transfer all of the building rights contracts, and all interests in and to the building rights, to which Assignee has an interest, in the State of Florida. The undersigned agrees to take any action reasonably necessary to effectuate the assignment of said contract and/or building right as contemplated hereunder.

This Assignment shall survive the closing on the date hereof.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this 30th day of October 2023.

SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF:

ASSIGNOR:

Printed name: Janelle Morera

Printed name: David Ruiz

DocuSigned by:
Martin C. Flynn, Jr.
879801AE49D84EA

By: Martin C. Flynn, individually and Manager of MTF Holdings, LLC, and Manager of WM Holdings, LLC

# APPENDIX 16

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

# LOAN AGREEMENT

## MODIFICATION OF ORIGINAL LOAN: RELEASE OF RIVER FLY MORTGAGE, ESTABLISH SHOW MONEY ACCOUNT & SUBSTITUTE COLLATERAL

THIS LOAN AGREEMENT is entered on this 24TH day of October 2023, between the following lender, borrower and guarantors.

**LENDER:**

- PEDIXON LLC, whose address is 1627 East Vine Street, Suite E, Kissimmee, FL 34744

**BORROWER:**

- Florida Space Coast Resorts, Inc., whose address is 1650 Sand Lake Road.

(referred to herein as the "Borrower")

**GUARANTORS:**

- Sherwood Construction, Inc.
- Homemakers Real Estate, LLC
- Cape Crossing Vacation Rentals, LLC
- 650 85TH LLC
- MTF Holdings, LLC
- Martin C. Flynn, Jr.
- Yaniv Amar
- Horton S. Johnson
- Holly Bluff Marina, Inc.
- A Marine, Inc.

The Guarantors join in the execution of this Agreement to acknowledge and guaranty the modified terms of the Original Loan, which is a part of the Consolidated Loan entered into by the Parties. The Original Loan and Consolidated Loan are defined below.

Borrower and Guarantors may be collectively referred to herein as the "Obligor."

Borrower and Obligor may be collectively referred to herein as the "Parties."

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

For good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties make the following acknowledgments and agree to the terms and conditions stated herein.

1) **Original Loan & Loan Amount.** This Loan Agreement references and modifies the June 2023 loan accommodation to Florida Space Coast Resorts, Inc. in the original principal amount of Three Million Dollars ($3,000,000.00) (the "Loan Amount"). The original loan includes a promissory note and several other loan-related documents simultaneously executed as a condition for making the loan, all of which may be hereafter referred to as the "Original Loan."

2) **River Fly-In Mortgage (RFI Mortgage).** To secure the Original Loan, there is a mortgage encumbering real estate property more particularly described on the schedule attached (the "Property"). Said RFI Mortgage is recorded at Book 9815 Page 2132, and subsequently modified by the Mortgage Assumption and Restatement recorded at Book 9846 Page 1937, official records of Brevard County, Florida (collectively the "RFI Mortgage").

3) **Promissory Note**. The payment of the Original Loan is evidenced by that certain promissory note dated June 12, 2023 in the original principal amount of Three Million Dollars with a maturity date of July 1, 2024 (the "Promissory Note").

4) **Purpose.**

   a) The post-closing covenants under the Original Loan have not been met. Specifically, Lender has not received a loan policy of title insurance, and Borrower is no longer in possession of the Property to effectuate the issuance of a loan policy.
   b) The Parties have agreed to modify the Original Loan subject to the conditions herein.
   c) Obligor has offered, and Lender has agreed, to substitute collateral to secure the Original Loan in exchange for a release of the RFI Mortgage.
   d) The Loan Amount is not being changed hereunder.
   e) Except as otherwise stated herein and the documents executed herewith (the "Related Documents"), the Original Loan shall remain in full force and effect.
   f) The Promissory Note dated June 12, 2023, a copy of which is attached hereto, remains in full force and effect.

5) **Consideration.** In exchange for the substitution of collateral granted hereunder, and the other promises and covenants made herein, Lender has agreed to provide a full release of the RFI Mortgage, and shall reinstate the Original Loan.

6) **Loan Closing**. On the date hereof, Lender has agreed to modify the Original Loan by agreeing to accept the substitution of collateral defined herein and all other terms and conditions set forth herein. On the Loan Closing, the Lender will be granted a priority security interest in the Substitute Collateral (defined below).

7) **Consolidated Loan Remains in Effect**.

   a) The Original Loan is part of the Indebtedness under the Consolidated Loan.
   b) The Indebtedness is defined as all loans, together with all other obligations, debts and liabilities of Borrower and Guarantor to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Guarantor, or any one or more of them; whether now or hereafter existing, voluntary or involuntary, due or not due, absolute or contingent, liquidated or unliquidated; whether Borrower and/or Guarantor may be liable individually or jointly with others; whether Borrower and/or Guarantor may be obligated as a guarantor, surety, or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such Indebtedness may be or hereafter may become otherwise unenforceable. The total indebtedness as of the date hereof is Eleven Million Seventy-Five Thousand Dollars and No/Cents ($11,075,000).

c) In September 2023, the Indebtedness (inclusive of the Original Loan) was consolidated by the Obligor under the agreement referred to as the "Consolidated Loan."

d) The Obligor acknowledges that all of the guaranties made under the Consolidated Loan are in full force and effect, and as of the date hereof, the monthly payment due to Lender under the Consolidated Loan is $127,938.00 (the "Total Monthly Interest Payment").

e) Nothing in this Agreement modifies or changes the Consolidated Loan or the Indebtedness as defined thereunder.

8) **Allocation of Loan Amount.**

a) **Cash Collateral Account (the "Account')**. A monetary amount equal to $2,603,595.00 will be placed in an interest-bearing money market account established by Alison Pitkanen Law Firm (the "Firm").

i) The Parties direct and authorize the Firm to open an interest-bearing money market account for said funds.

ii) The Account will be owned and controlled by Lender.

iii) The interest earned under this Account shall be paid directly to Lender.

iv) No funds shall be released from this Account without the written consent of Lender.

v) In the event of default in the payment of the Indebtedness, Lender shall have the right to terminate this Account, at which time the funds will be released directly to Lender, including all accrued interest.

vi) Upon termination of this Account, the funds shall be applied to the Indebtedness in the following order:

- outstanding interest under the Original Loan;
- outstanding principal under the Consolidated Loan;
- any late fees under the Indebtedness;
- any remaining balance shall be applied to the principal amount of the Indebtedness. Lender in Lender's discretion shall determine the order in which the Indebtedness is repaid.

b) **Loan Balance Secured by Substitute Collateral**. An amount equal to $396,405 was released to Borrower under the Original Loan. Said funds are not yet due to Lender. Said funds shall be secured by the Substitute Collateral as defined herein.

9) **Substitute Collateral (the "Security Interests").** The Parties acknowledge that it is difficult to ascertain the present and/or future value of the Substitute Collateral, and Obligor is unable to provide a priority security interest in any real property. For this reason, Obligor grants the following various forms of collateral to secure the Loan Amount under the Original Loan.

Each Obligor shall take all reasonable and necessary steps to ensure that Lender has a perfected security interest in the following Substitute Collateral, including the execution of any documentation that may be required, from time to time, after execution of this Agreement, to effectuate Lender's priority security interest in the following.

a) **Affordable Housing Interest**. Lender shall have a priority security interest in the three affordable housing projects identified on the schedule attached and incorporated herein. To perfect this security interest, the relevant Obligor hereunder, who is the record owner of the affordable housing interest, shall execute assignments and options of all its interest unto Lender.

i) Counsel for Lender shall hold the executed assignments in trust.

ii) Said assignments shall be released to Lender, at Lender's discretion, in the event of a default hereunder.

b) **Additional ROGOS**. Lender shall have a priority security interest in all of the ROGOS owned by Obligor, including any newly acquired ROGOS. These ROGOS are in addition to the ROGOS already encumbered by Lender. Said ROGOS are more particularly described on the attached schedule.

i) Lender will permit the ROGOS to be utilized for future development projects as long the following conditions precedent are met:

(1) Lender receives advance written notice, and

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

(2) Lender receives payment in the amount of One Hundred Thousand Dollars ($100,000.00).

ii) The intention of securing the ROGOS is to guarantee that Lender shall be entitled to the proceeds in the event of any transfer, sale or utilization of the ROGOS.

iii) Lender has no intention of preventing the ROGOS from being utilized for development purposes.

c) **Assignment of Holly Bluff Proceeds**. Lender shall have a priority security interest in the Proceeds of Holly Bluff Marina, Inc. (the "Marina").

i) Proceeds. The Proceeds shall include all monies or other property received resulting from Obligor's transactions on, about or relating to the Marina, including but not limited to slip rentals and boat sales.

ii) Supplemental Payment. As part of the consideration to reinstate the Original Loan, Borrower and Obligor must prove the ability to meet the payment obligations. Accordingly, Marina and Obligor hereby assign and transfer unto Lender an amount equal to Twenty-Seven Thousand Dollars ($27,000.00) on the first day of each month, commencing with the first payment due on January 1, 2024, and consecutive monthly payments on the 1st day of each month thereafter during the term of the Original Loan.

1. Lender will apply this payment to the Total Monthly Interest Payment.

2. The intention of the Supplemental Payment is for the Lender to collect at least One Hundred Twenty-Seven Thousand Dollars and No/Cents ($127,000.00) per month. Under the Consolidated Loan, there is an existing requirement for Obligor to make a weekly payment to Lender. The Supplemental Payment will ensure that Obligor delivers to Lender sufficient funds to meet the payment obligations of the Indebtedness.

iii) Waiver. This requirement may be waived by Lender, in Lender's sole discretion, from time to time, as long as Lender is in receipt of all of the payments due under the Original Loan, Consolidated Loan and the Indebtedness.

d) **Amelia Village Retainage**. Lender shall have a priority security interest in the full retainage amount due to Sherwood Construction, Inc. under the Amelia Village project. This retainage shall be assigned to Lender. The current information detailing the Amelia Village retainage is set forth on the attached schedule.

e) **RFI Contract**. Lender shall have a priority security interest in the furniture contract and management agreement to be negotiated with River Fly-In Condominium, Inc.

f) **Trust Property.** On this date, the following shall be added and made part of the Trust Property (as that term is originally defined under the Consolidated Loan), and secured by Lender until such time as the Indebtedness is satisfied.

i) all of the stock of Florida Space Coast Resorts, Inc.

ii) all of the membership units owned and controlled by Martin C. Flynn, Jr in MTF Holdings, LLC. Martin C. Flynn, Jr. represents and warrants that his ownership interest constitutes ninety-nine percent (99%) of the issues and outstanding membership units of MTF Holdings, LLC.

iii) The Trust Property shall be transferred unto CRESENT SOUND LTD. as the Trustee of the TIERED LAND TRUST AGREEMENT.

iv) Lender shall receive an assignment of beneficial ownership in the Trust Property, which shall be executed contemporaneously herewith, and held in trust by the Firm.

g) **Survival.** This provision shall survive closing until the Indebtedness is fully satisfied.

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

10) **Conditions Precedent to Release of Mortgage & Substitution of Collateral.**

a) River Fly-In Condominium, Inc. must deliver an amount equal to $2,603,595.00 unto Firm. These funds are being delivered pursuant to the Termination Agreement between Borrower and River Fly-In Condominium, Inc. (a copy of this termination agreement is attached for reference purposes).

b) Lender will be provided with a priority security interest in the Substitute Collateral.
   (a) The Substitute Collateral will be cross collateralized with all other existing loan accommodations made by Lender to Obligor.

c) The parties will execute all documents necessary to effectuate the terms and conditions hereunder to fulfill the loan requirements set forth herein. The attached hereto identifies and incorporates the documents executed contemporaneously herewith.

11) **Representations and Warranties**. Each Obligor represents and warrants to Lender, as of the date of this Agreement, and at all times any Indebtedness exists, that:

a) Authorization. The execution, delivery, and performance of this Agreement and all Related Documents by Obligor, to the extent to be executed, delivered or performed by Obligor, have been duly authorized by all necessary action by Obligor; do not require the consent or approval of any other person, regulatory authority or governmental body; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Obligor or (b) by law, governmental regulation, court decree, or order applicable to Obligor.

b) Legal Effect. This Agreement constitutes, and any instrument or agreement required hereunder to be given by Obligor when delivered will constitute, legal, valid, and binding obligations of Obligor enforceable against Obligor in accordance with their respective terms.

c) Litigation and Claims. No litigation, claim, investigation, administrative proceedings or similar action (including those for unpaid taxes) against Obligor is pending or threatened, and no other event has occurred which may materially adversely affect Obligor's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

d) Taxes. To the best of Obligor's knowledge, all tax returns and reports of Obligor that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Obligor in good faith in the ordinary course of business and for which adequate reserves have been provided.

e) Binding Effect. This Agreement, the promissory note, the Security Interests, directly or indirectly securing repayment of the Indebtedness, and all of the Related Documents are binding upon Obligor as well as upon Obligor's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

f) Information. All information heretofore or contemporaneously herewith furnished by Obligor to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Obligor to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

g) Survival of Representation and Warranties. Obligor understands and agrees that Lender, without independent investigation, is relying upon the above representations and warranties in extending the Loan to Obligor. Obligor further agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as the Indebtedness shall be paid in full.

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

12) **Affirmative Covenants**. Each Obligor covenants and agrees with Lender that, while this Agreement is in effect, it will:

a) Litigation. Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

b) Financial Records. Maintain its books and records in accordance with generally accepted accounting principles, or with sound accounting principles applied on a consistent basis, and permit Lender to examine and audit Obligor's books and records at all reasonable times or to confirm Obligor's compliance with this Agreement.

c) Taxes, Charges and Liens. Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Obligor or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Obligor's properties, income, or profits. Provided however, Obligor will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Obligor shall have established on its book adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Obligor, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Obligor's properties, income, or profits.

d) Performance. Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Obligor learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

e) Additional Assurances. Each Obligor shall make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorney may reasonably request to evidence and secure the Original Loan, and to perfect all Security Interests.

13) **Negative Covenants**. Each Obligor covenants and agrees with Lender that while this Agreement is in effect, Obligor shall not, without the prior written consent of Lender: (a) Engage in any business activities substantially different that those in which Obligor is presently engaged, or (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell collateral out of the ordinary course of business.

14) **Event of Default.** Each of the following shall constitute an Event of Default under this Agreement:

a) Default on Indebtedness. Failure to make any payment when due on the Consolidated Loan or any other Indebtedness.

b) Other Defaults. Failure of any Obligor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or failure of any Obligor to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and such Obligor, including, without limitation, a default under any other loan referred to in the Note as constituting a default under the Note.

c) Default in Favor of Third Parties. Should an Obligor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

that may materially affect any of such Obligor's property or such Obligor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

d) False Statements. Any warranty, representation or statement made or furnished to Lender by or on behalf of an Obligor under this Agreement or the Related Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

e) Insolvency. The dissolution or termination of the existence of Borrower as a going business, the insolvency of Borrower, the appointment of a receiver for any part of property of Borrower, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws or against Borrower.

f) Adverse Change. A material adverse change occurs in Obligor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

g) Insecurity. Lender, in good faith, deems itself insecure.

15) **Effect of an Event of Default on Indebtedness**. In the event Obligor fails to make a timely payment hereunder, Lender shall have the right to all of the following remedies, including all of the remedies available at law or in equity. Lender's failure to exercise any of its rights hereunder shall not constitute a waiver of any rights provided herein.

a) Account Terminated. The Cash Collateral Account shall be terminated, and the funds shall be returned to Lender as stated herein.

b) Exercise of Affordable Options. Lender may exercise any or all of its options under the affordable housing projects.

c) Beneficial Ownership in Trust Property. Lender, at Lender's option, shall have the right to the beneficial ownership of the Trust Property. The assignment of beneficial ownership in the Trust Property is being held in trust by the Firm.

16) **Effect of All Events of Default.** If any Event of Default shall occur, all commitments and obligations of Lender under this Agreement or any other agreement immediately will terminate, and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Obligor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

17) **Miscellaneous.**

a) Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b) Applicable Law. This Agreement has been delivered to Lender and accepted by Lender in the State of Florida. If there is a lawsuit, Obligor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, the State of Florida. Lender and Borrower waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Obligor against the other. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

c) Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

d) Multiple Parties; Corporate Authority. All obligations of each Obligor under this Agreement shall be joint and several, and all references to any Guarantor or Obligor shall mean each and every Obligor. This means that each of the persons signing below is responsible for all obligations in this Agreement.

e) Notices. All notices required to be given under this Agreement shall be given in writing, may be sent by email (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United State mail, first class, postage prepaid, addressed to party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Obligor, notice to any Obligor will constitute notice to all parties named as Obligor. For notice purposes, Obligor will keep Lender informed at all times of Obligor's current address(es).

f) Severability. If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

g) Successors and Assigns. All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns.

h) Survival. All warranties, representations, and covenants made by Obligor in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will survive the making of the Loan and delivery to Lender of the Related Documents, regardless of any investigation made by Lender or on Lender's behalf.

i) Time is of the Essence. Time is of the essence in the performance of this Agreement.

j) Survival of Agreement. This Agreement shall survive the execution of this Agreement.

k) Schedules and Exhibits. All schedules and exhibits referred to herein and attached hereto shall be incorporated and made part of this Agreement.

   i) Schedule 1 Property – from RFI Mortgage

   ii) Schedule 2 Copy of Existing Promissory Note dated June 12, 2023

   iii) Schedule 3 Identification of Three (3) Affordable Housing Projects

   iv) Schedule 4 ROGOS

   v) Schedule 5 Amelia Village Retainage

   vi) Schedule 6 Termination Agreement between Borrower and River Fly-In Condominium, Inc.

   vii) Schedule 7 Related Documents – executed contemporaneously herewith to meet the loan requirements

The undersigned Lender has agreed to the foregoing as of the date first set forth above.

______________________________
Kenneth G. Dixon
As Manager of PEDIXON LLC

DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

The undersigned Obligors have agreed to the foregoing as of the date first set forth above.

DocuSigned by:
By: Martin C. Flynn, Jr.
8788014E49D94EA...
**Martin C. Flynn, Jr.**
Individually
AND as President of Sherwood Construction
AND as Manager of 650 85th LLC,
AND as Member of MTF Holdings, LLC,
AND as Manager of Cape Crossing Vacation Rentals, LLC
AND as President of Tiered Capital, Inc.

DocuSigned by:
By: Yaniv Amar
E2853266EC5F4F8...
**Yaniv Amar**
Individually
AND as Manager of Recycled Group of South Carolina, LLC
AND as President of A Marine, Inc.
AND as President of Holly Bluff Marina, Inc.

DocuSigned by:
By: Horton S. Johnson
ED9DF901DDEE488...
**Horton S. Johnson**
Individually
AND as Manager of Homemakers Real Estate, LLC
AND as Trustee of the Horton S. Johnson Revocable Trust dated August 3, 2012

**FLORIDA SPACE COAST RESORTS, INC.**

By: ______________________________
Alexandra Lezcano, Authorized Agent

# APPENDIX 17

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20
DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C58C9

# LOAN AGREEMENT

## MODIFICATION OF ORIGINAL LOAN: RELEASE OF RIVER FLY MORTGAGE, ESTABLISH SHOW MONEY ACCOUNT & SUBSTITUTE COLLATERAL

THIS LOAN AGREEMENT is entered on this 24TH day of October 2023, between the following lender, borrower and guarantors,

**LENDER:**

- PEDIXON LLC, whose address is 1627 East Vine Street, Suite F, Kissimmee, Fl 34744

**BORROWER:**

- Florida Space Coast Resorts, Inc., whose address is 1650 Sand Lake Road.

(referred to herein as the "Borrower")

**GUARANTORS:**

- Sherwood Construction, Inc.
- Homemakers Real Estate, LLC
- Cape Crossing Vacation Rentals, LLC
- 650 85TH LLC
- MTF Holdings, LLC
- Martin C. Flynn, Jr.
- Yaniv Amar
- Horton S. Johnson
- Holly Bluff Marina, Inc.
- A Marine, Inc.

The Guarantors join in the execution of this Agreement to acknowledge and guaranty the modified terms of the Original Loan, which is a part of the Consolidated Loan entered into by the Parties. The Original Loan and Consolidated Loan are defined below.

Borrower and Guarantors may be collectively referred to herein as the "Obligor."

Borrower and Obligor may be collectively referred to herein as the "Parties."



EXHIBIT
B

Case 6:26-bk-00399-LVV Doc 81 Filed 05/19/26 Page 123 of 267
DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20
DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

For good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties make the following acknowledgments and agree to the terms and conditions stated herein.

1) **Original Loan & Loan Amount.** This Loan Agreement references and modifies the June 2023 loan accommodation to Florida Space Coast Resorts, Inc. in the original principal amount of Three Million Dollars ($3,000,000.00) (the "Loan Amount"). The original loan includes a promissory note and several other loan-related documents simultaneously executed as a condition for making the loan, all of which may be hereafter referred to as the "Original Loan."

2) **River Fly-In Mortgage (RFI Mortgage).** To secure the Original Loan, there is a mortgage encumbering real estate property more particularly described on the schedule attached (the "Property"). Said RFI Mortgage is recorded at Book 9815 Page 2132, and subsequently modified by the Mortgage Assumption and Restatement recorded at Book 9846 Page 1937, official records of Brevard County, Florida (collectively the "RFI Mortgage").

3) **Promissory Note.** The payment of the Original Loan is evidenced by that certain promissory note dated June 12, 2023 in the original principal amount of Three Million Dollars with a maturity date of July 1, 2024 (the "Promissory Note").

4) **Purpose.**

   a) The post-closing covenants under the Original Loan have not been met. Specifically, Lender has not received a loan policy of title insurance, and Borrower is no longer in possession of the Property to effectuate the issuance of a loan policy.
   b) The Parties have agreed to modify the Original Loan subject to the conditions herein.
   c) Obligor has offered, and Lender has agreed, to substitute collateral to secure the Original Loan in exchange for a release of the RFI Mortgage.
   d) The Loan Amount is not being changed hereunder.
   e) Except as otherwise stated herein and the documents executed herewith (the "Related Documents"), the Original Loan shall remain in full force and effect.
   f) The Promissory Note dated June 12, 2023, a copy of which is attached hereto, remains in full force and effect.

5) **Consideration.** In exchange for the substitution of collateral granted hereunder, and the other promises and covenants made herein, Lender has agreed to provide a full release of the RFI Mortgage, and shall reinstate the Original Loan.

6) **Loan Closing.** On the date hereof, Lender has agreed to modify the Original Loan by agreeing to accept the substitution of collateral defined herein and all other terms and conditions set forth herein. On the Loan Closing, the Lender will be granted a priority security interest in the Substitute Collateral (defined below).

7) **Consolidated Loan Remains in Effect.**

   a) The Original Loan is part of the Indebtedness under the Consolidated Loan.
   b) The Indebtedness is defined as all loans, together with all other obligations, debts and liabilities of Borrower and Guarantor to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Guarantor, or any one or more of them; whether now or hereafter existing, voluntary or involuntary, due or not due, absolute or contingent, liquidated or unliquidated; whether Borrower and/or Guarantor may be liable individually or jointly with others; whether Borrower and/or Guarantor may be obligated as a guarantor, surety, or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such Indebtedness may be or hereafter may become otherwise unenforceable. The total indebtedness as of the date hereof is Eleven Million Seventy-Five Thousand Dollars and No/Cents ($11,075,000).

c) In September 2023, the Indebtedness (inclusive of the Original Loan) was consolidated by the Obligor under the agreement referred to as the "Consolidated Loan."

d) The Obligor acknowledges that all of the guaranties made under the Consolidated Loan are in full force and effect, and as of the date hereof, the monthly payment due to Lender under the Consolidated Loan is $127,938.00 (the "Total Monthly Interest Payment").

e) Nothing in this Agreement modifies or changes the Consolidated Loan or the Indebtedness as defined thereunder.

8) **Allocation of Loan Amount.**

a) **Cash Collateral Account (the "Account")**. A monetary amount equal to $2,603,595.00 will be placed in an interest-bearing money market account established by Alison Pitkanen Law Firm (the "Firm").

i) The Parties direct and authorize the Firm to open an interest-bearing money market account for said funds.
ii) The Account will be owned and controlled by Lender.
iii) The interest earned under this Account shall be paid directly to Lender.
iv) No funds shall be released from this Account without the written consent of Lender.
v) In the event of default in the payment of the Indebtedness, Lender shall have the right to terminate this Account, at which time the funds will be released directly to Lender, including all accrued interest.
vi) Upon termination of this Account, the funds shall be applied to the Indebtedness in the following order:
- outstanding interest under the Original Loan;
- outstanding principal under the Consolidated Loan;
- any late fees under the Indebtedness;
- any remaining balance shall be applied to the principal amount of the Indebtedness. Lender in Lender's discretion shall determine the order in which the Indebtedness is repaid.

b) **Loan Balance Secured by Substitute Collateral**. An amount equal to $396,405 was released to Borrower under the Original Loan. Said funds are not yet due to Lender. Said funds shall be secured by the Substitute Collateral as defined herein.

9) **Substitute Collateral (the "Security Interests").** The Parties acknowledge that it is difficult to ascertain the present and/or future value of the Substitute Collateral, and Obligor is unable to provide a priority security interest in any real property. For this reason, Obligor grants the following various forms of collateral to secure the Loan Amount under the Original Loan.

Each Obligor shall take all reasonable and necessary steps to ensure that Lender has a perfected security interest in the following Substitute Collateral, including the execution of any documentation that may be required, from time to time, after execution of this Agreement, to effectuate Lender's priority security interest in the following.

a) **Affordable Housing Interest**. Lender shall have a priority security interest in the three affordable housing projects identified on the schedule attached and incorporated herein. To perfect this security interest, the relevant Obligor hereunder, who is the record owner of the affordable housing interest, shall execute assignments and options of all its interest unto Lender.
i) Counsel for Lender shall hold the executed assignments in trust.
ii) Said assignments shall be released to Lender, at Lender's discretion, in the event of a default hereunder.

b) **Additional ROGOS**. Lender shall have a priority security interest in all of the ROGOS owned by Obligor, including any newly acquired ROGOS. These ROGOS are in addition to the ROGOS already encumbered by Lender. Said ROGOS are more particularly described on the attached schedule.

i) Lender will permit the ROGOS to be utilized for future development projects as long the following conditions precedent are met:
(1) Lender receives advance written notice, and

(2) Lender receives payment in the amount of One Hundred Thousand Dollars ($100,000.00).

ii) The intention of securing the ROGOS is to guarantee that Lender shall be entitled to the proceeds in the event of any transfer, sale or utilization of the ROGOS.

iii) Lender has no intention of preventing the ROGOS from being utilized for development purposes.

c) **Assignment of Holly Bluff Proceeds**. Lender shall have a priority security interest in the Proceeds of Holly Bluff Marina, Inc. (the "Marina").

i) Proceeds. The Proceeds shall include all monies or other property received resulting from Obligor's transactions on, about or relating to the Marina, including but not limited to slip rentals and boat sales.

ii) Supplemental Payment. As part of the consideration to reinstate the Original Loan, Borrower and Obligor must prove the ability to meet the payment obligations. Accordingly, Marina and Obligor hereby assign and transfer unto Lender an amount equal to Twenty-Seven Thousand Dollars ($27,000.00) on the first day of each month, commencing with the first payment due on January 1, 2024, and consecutive monthly payments on the 1st day of each month thereafter during the term of the Original Loan.

1. Lender will apply this payment to the Total Monthly Interest Payment.

2. The intention of the Supplemental Payment is for the Lender to collect at least One Hundred Twenty-Seven Thousand Dollars and No/Cents ($127,000.00) per month. Under the Consolidated Loan, there is an existing requirement for Obligor to make a weekly payment to Lender. The Supplemental Payment will ensure that Obligor delivers to Lender sufficient funds to meet the payment obligations of the Indebtedness.

iii) Waiver. This requirement may be waived by Lender, in Lender's sole discretion, from time to time, as long as Lender is in receipt of all of the payments due under the Original Loan, Consolidated Loan and the Indebtedness.

d) **Amelia Village Retainage**. Lender shall have a priority security interest in the full retainage amount due to Sherwood Construction, Inc. under the Amelia Village project. This retainage shall be assigned to Lender. The current information detailing the Amelia Village retainage is set forth on the attached schedule.

e) **RFI Contract**. Lender shall have a priority security interest in the furniture contract and management agreement to be negotiated with River Fly-In Condominium, Inc.

f) **Trust Property.** On this date, the following shall be added and made part of the Trust Property (as that term is originally defined under the Consolidated Loan), and secured by Lender until such time as the Indebtedness is satisfied.

i) all of the stock of Florida Space Coast Resorts, Inc.

ii) all of the membership units owned and controlled by Martin C. Flynn, Jr in MTF Holdings, LLC. Martin C. Flynn, Jr. represents and warrants that his ownership interest constitutes ninety-nine percent (99%) of the issues and outstanding membership units of MTF Holdings, LLC.

iii) The Trust Property shall be transferred unto CRESENT SOUND LTD. as the Trustee of the TIERED LAND TRUST AGREEMENT.

iv) Lender shall receive an assignment of beneficial ownership in the Trust Property, which shall be executed contemporaneously herewith, and held in trust by the Firm.

g) **Survival.** This provision shall survive closing until the Indebtedness is fully satisfied.

10) **Conditions Precedent to Release of Mortgage & Substitution of Collateral.**

a) River Fly-In Condominium, Inc. must deliver an amount equal to $2,603,595.00 unto Firm. These funds are being delivered pursuant to the Termination Agreement between Borrower and River Fly-In Condominium, Inc. (a copy of this termination agreement is attached for reference purposes).

b) Lender will be provided with a priority security interest in the Substitute Collateral.
   (a) The Substitute Collateral will be cross collateralized with all other existing loan accommodations made by Lender to Obligor.

c) The parties will execute all documents necessary to effectuate the terms and conditions hereunder to fulfill the loan requirements set forth herein. The attached hereto identifies and incorporates the documents executed contemporaneously herewith.

11) **Representations and Warranties**. Each Obligor represents and warrants to Lender, as of the date of this Agreement, and at all times any Indebtedness exists, that:

a) Authorization. The execution, delivery, and performance of this Agreement and all Related Documents by Obligor, to the extent to be executed, delivered or performed by Obligor, have been duly authorized by all necessary action by Obligor; do not require the consent or approval of any other person, regulatory authority or governmental body; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Obligor or (b) by law, governmental regulation, court decree, or order applicable to Obligor.

b) Legal Effect. This Agreement constitutes, and any instrument or agreement required hereunder to be given by Obligor when delivered will constitute, legal, valid, and binding obligations of Obligor enforceable against Obligor in accordance with their respective terms.

c) Litigation and Claims. No litigation, claim, investigation, administrative proceedings or similar action (including those for unpaid taxes) against Obligor is pending or threatened, and no other event has occurred which may materially adversely affect Obligor's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

d) Taxes. To the best of Obligor's knowledge, all tax returns and reports of Obligor that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Obligor in good faith in the ordinary course of business and for which adequate reserves have been provided.

e) Binding Effect. This Agreement, the promissory note, the Security Interests, directly or indirectly securing repayment of the Indebtedness, and all of the Related Documents are binding upon Obligor as well as upon Obligor's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

f) Information. All information heretofore or contemporaneously herewith furnished by Obligor to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Obligor to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

g) Survival of Representation and Warranties. Obligor understands and agrees that Lender, without independent investigation, is relying upon the above representations and warranties in extending the Loan to Obligor. Obligor further agrees that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as the Indebtedness shall be paid in full.

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20
DocuSign Envelope ID: FA265EF5-31FC-48FE-A327-47C1E98C5BC9

12) **Affirmative Covenants**. Each Obligor covenants and agrees with Lender that, while this Agreement is in effect, it will:

a) Litigation. Promptly inform Lender in writing of (a) all material adverse changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

b) Financial Records. Maintain its books and records in accordance with generally accepted accounting principles, or with sound accounting principles applied on a consistent basis, and permit Lender to examine and audit Obligor's books and records at all reasonable times or to confirm Obligor's compliance with this Agreement.

c) Taxes, Charges and Liens. Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Obligor or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Obligor's properties, income, or profits. Provided however, Obligor will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Obligor shall have established on its book adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Obligor, upon demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Obligor's properties, income, or profits.

d) Performance. Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in the Related Documents in a timely manner, and promptly notify Lender if Obligor learns of the occurrence of any event which constitutes an Event of Default under this Agreement or under any of the Related Documents.

e) Additional Assurances. Each Obligor shall make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorney may reasonably request to evidence and secure the Original Loan, and to perfect all Security Interests.

13) **Negative Covenants**. Each Obligor covenants and agrees with Lender that while this Agreement is in effect, Obligor shall not, without the prior written consent of Lender: (a) Engage in any business activities substantially different that those in which Obligor is presently engaged, or (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, change its name, dissolve or transfer or sell collateral out of the ordinary course of business.

14) **Event of Default.** Each of the following shall constitute an Event of Default under this Agreement:

a) Default on Indebtedness. Failure to make any payment when due on the Consolidated Loan or any other Indebtedness.

b) Other Defaults. Failure of any Obligor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or failure of any Obligor to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and such Obligor, including, without limitation, a default under any other loan referred to in the Note as constituting a default under the Note.

c) Default in Favor of Third Parties. Should an Obligor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person

Case 6:26-bk-00399-LVV Doc 81 Filed 05/19/26 Page 128 of 267


that may materially affect any of such Obligor's property or such Obligor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

d) False Statements. Any warranty, representation or statement made or furnished to Lender by or on behalf of an Obligor under this Agreement or the Related Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

e) Insolvency. The dissolution or termination of the existence of Borrower as a going business, the insolvency of Borrower, the appointment of a receiver for any part of property of Borrower, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws or against Borrower.

f) Adverse Change. A material adverse change occurs in Obligor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

g) Insecurity. Lender, in good faith, deems itself insecure.

15) **Effect of an Event of Default on Indebtedness.** In the event Obligor fails to make a timely payment hereunder, Lender shall have the right to all of the following remedies, including all of the remedies available at law or in equity. Lender's failure to exercise any of its rights hereunder shall not constitute a waiver of any rights provided herein.

a) Account Terminated. The Cash Collateral Account shall be terminated, and the funds shall be returned to Lender as stated herein.

b) Exercise of Affordable Options. Lender may exercise any or all of its options under the affordable housing projects.

c) Beneficial Ownership in Trust Property. Lender, at Lender's option, shall have the right to the beneficial ownership of the Trust Property. The assignment of beneficial ownership in the Trust Property is being held in trust by the Firm.

16) **Effect of All Events of Default.** If any Event of Default shall occur, all commitments and obligations of Lender under this Agreement or any other agreement immediately will terminate, and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of any Obligor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

17) **Miscellaneous.**

a) Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

b) Applicable Law. This Agreement has been delivered to Lender and accepted by Lender in the State of Florida. If there is a lawsuit, Obligor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, the State of Florida. Lender and Borrower waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Obligor against the other. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

c) Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

d) Multiple Parties; Corporate Authority. All obligations of each Obligor under this Agreement shall be joint and several, and all references to any Guarantor or Obligor shall mean each and every Obligor. This means that each of the persons signing below is responsible for all obligations in this Agreement.

e) Notices. All notices required to be given under this Agreement shall be given in writing, may be sent by email (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United State mail, first class, postage prepaid, addressed to party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Obligor, notice to any Obligor will constitute notice to all parties named as Obligor. For notice purposes, Obligor will keep Lender informed at all times of Obligor's current address(es).

f) Severability. If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

g) Successors and Assigns. All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns.

h) Survival. All warranties, representations, and covenants made by Obligor in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will survive the making of the Loan and delivery to Lender of the Related Documents, regardless of any investigation made by Lender or on Lender's behalf.

i) Time is of the Essence. Time is of the essence in the performance of this Agreement.

j) Survival of Agreement. This Agreement shall survive the execution of this Agreement.

k) Schedules and Exhibits. All schedules and exhibits referred to herein and attached hereto shall be incorporated and made part of this Agreement.

i) Schedule 1 Property – from RFI Mortgage

ii) Schedule 2 Copy of Existing Promissory Note dated June 12, 2023

iii) Schedule 3 Identification of Three (3) Affordable Housing Projects

iv) Schedule 4 ROGOS

v) Schedule 5 Amelia Village Retainage

vi) Schedule 6 Termination Agreement between Borrower and River Fly-In Condominium, Inc.

vii) Schedule 7 Related Documents – executed contemporaneously herewith to meet the loan requirements

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20
DocuSign Envelope ID: FA265EF6-31FC-48FE-A327-47C1E98C5BC9

The undersigned Lender has agreed to the foregoing as of the date first set forth above.

Kenneth G. Dixon
As Manager of PEDIXON LLC

DocuSign Envelope ID: D1157520-7C51-4CF7-8D2C-73E9F6A42D20
DocuSign Envelope ID: FA285EF5-31FC-48FE-A327-47C1E98C5BC9

The undersigned obligors have agreed to the foregoing as of the date first set forth above.

By: Martin C. Flynn, Jr.
**Martin C. Flynn, Jr.**
Individually
AND as President of Sherwood Construction
AND as Manager of 650 85th LLC,
AND as Member of MTF Holdings, LLC,
AND as Manager of Cape Crossing Vacation Rentals LLC
AND as President of Tiered Capital, Inc.

DocuSigned by:
By: Yaniv Amar
**Yaniv Amar**
Individually
AND as Manager of Recycled Group of South Carolina LLC
AND as President of A Marine, Inc.
AND as President of Holly Bluff Marina, Inc.

DocuSigned by:
By: Horton S. Johnson
**Horton S. Johnson**
Individually
AND as Manager of Homemakers Real Estate, LLC
AND as Trustee of the Horton S. Johnson Revocable Trust dated August 3, 2012

FLORIDA SPACE COAST RESORTS, INC.
DocuSigned by:
By: Alexandra M. Lezcano
Alexandra Lezcano, Authorized Agent

# APPENDIX 18

ANSI/ASB Standard 035, First Edition
2020

# Standard for the Examination of Documents for Alterations

*This document is copyrighted © by the AAFS Standards Board, LLC. 2020 All rights are reserved.*
*410 North 21st Street, Colorado Springs, CO 80904, www.asbstandardsboard.org.*

# Standard for the Examination of Documents for Alterations

ASB Approved January 2019

ANSI Approved September 2020

Academy Standards Board
410 North 21st Street
Colorado Springs, CO 80904

This document may be downloaded for free at: www.asbstandardsboard.org

*This document is provided by the AAFS Standards Board for free. You are permitted to print and download the document and extracts from the document for your own use, provided that:*

- *you do not modify this document or its related graphics in any way;*
- *you do not use any illustrations or any graphics separately from any accompanying text; and,*
- *you include an acknowledgement alongside the copied material noting the AAFS Standards Board as the copyright holder and publisher.*

*You expressly agree not to reproduce, duplicate, copy, sell, resell, or exploit for any commercial purposes, this document or any portion of it. You may create a hyperlink to www.asbstandardsboard.org to allow persons to download their individual, free copy of this document. Your hyperlink must not portray AAFS, the AAFS Standards Board, this document, our agents, associates and affiliates in an offensive manner, or be misleading or false. You may not use our trademarks as part of your link without our written agreement for you to do so.*

*The AAFS Standards Board retains the sole right to submit this document to any other forum for any purpose.*

*Certain commercial entities, equipment or materials may be identified in this document to describe a procedure or concept adequately. Such identification is not intended to imply recommendations or endorsement by the AAFS or the AAFS Standards Board, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.*

*This document is copyrighted © by the AAFS Standards Board, LLC. 2020 All rights are reserved.*
*410 North 21st Street, Colorado Springs, CO 80904, www.asbstandardsboard.org.*

## Forward

Forensic Document Examiners (FDE) are often asked to determine if documents have been changed or altered since originally created. This determination requires the FDE to conduct a variety of examinations.

An alteration is a revision or modification to a document by physical, chemical, electronic, or mechanical means, or a combination thereof. An alteration can generally be categorized as an addition, deletion, obliteration, or substitution of information and can be revealed by a variety of techniques. Examination of an alteration requires a broad range of knowledge, skills, and abilities to effectively apply appropriate scientific and technical methods, and properly evaluate the findings in order to reach appropriate conclusions. This standard summarizes commonly accepted techniques, technologies, and procedures.

This document was revised, prepared, and finalized as a standard by the Forensic Document Examination Consensus Body of the AAFS Standards Board. The draft of this standard was developed by the Forensic Document Examination Subcommittee of the Organization of Scientific Area Committees (OSAC) for Forensic Science.

The AAFS Standards Board (ASB) is an ANSI-accredited Standards Developing Organization with the purpose of providing accessible, high quality science-based consensus forensic standards. The ASB is a wholly owned subsidiary of the American Academy of Forensic Sciences (AAFS), established in 2015 and accredited by the American National Standards Institute (ANSI) in 2016. The ASB consists of Consensus Bodies (CB), which are open to all materially interested and affected individuals, companies, and organizations; a Board of Directors; and Staff.

The following applies to all ASB documents:

> the term **'shall'** indicates that a provision is mandatory, and can be audited for compliance
>
> the term **'should'** indicates that a provision is not mandatory, but recommended as good practice.

All hyperlinks and web addresses shown in this document are current as of the publication date of this standard.

**Keywords:** *forensic document examiner, alterations, obliterations, insertions, deletions, interlineations additions, substitutions.*

# Table of Contents

1 Scope ........ 1
2 Normative References ........ 1
3 Terms and Definitions ........ 1
4 Requirements ........ 2
4.1 Competence ........ 2
4.2 Equipment ........ 3
4.3 Considerations and Limitations ........ 4
4.4 Procedures ........ 5
4.5 Non-destructive Examinations ........ 6
4.7 Reporting ........ 8
5 Conformance Requirements ........ 9
5.1 Conformance ........ 9
5.2 Conformance to Equipment ........ 9
5.3 Conformance to Competence ........ 9
Annex A (informative) Bibliography ........ 10

# Standard for the Examination of Documents for Alterations

## 1 Scope

This document establishes the minimum required procedure(s) used by Forensic Document Examiners (FDE) in the examination of documents for alterations.

## 2 Normative References

The following reference is a document that is indispensable for the application of the standard. For a dated reference, only the edition cited applies.

SWGDOC *Standard for Scope of Work of Forensic Document Examiners*, 2013

## 3 Terms and Definitions

For purposes of this document, the following definitions apply.

**3.1**
**alteration**
A modification made to a document by any combination of physical, chemical, or mechanical means including, but not limited to, obliterations, additions, overwritings, or erasures.

**3.2**
**digital image**
An image that is stored in numerical form.

**3.3**
**document**
Any material that conveys a message or contains information on which a set of observations can be made. May be used interchangeably with “item”.

**3.4**
**digital image processing**
Any activity that transforms a digital image.

**3.5**
**electrostatic detection device**
**EDD**
An instrument that uses electrostatic charge as the mechanism to visualize paper fiber disturbances (for example, indentations, erasures, typewritten material/lift off).

**3.6**
**erasure**
The area where material has been removed from a document by chemical, abrasive, or other means.

**3.7**
**fluorescence**
A process by which radiant flux of certain wavelengths is absorbed and reradiated nonthermally at other, usually longer, wavelengths.

**3.8**
**infrared**
**IR**
Referring to radiant flux having wavelengths longer than the wavelengths of visible light, usually from ~700 nm to 1400 nm (~0.7 µm to 1.4 µm) as per the International Commission on Illumination (CIE) for IR-A.

**3.9**
**infrared luminescence**
**IRL**
The emission of radiant energy during a transition from an excited electronic state of an atom, molecule, or ion to a lower electronic state (fluorescence or phosphorescence, or both), where the spectrum of the excitation source is in the ultraviolet (UV) or visible region of the electromagnetic spectrum, or both, and the spectrum of the emitted energy is in the far red or infrared (IR) region of the electromagnetic spectrum.

**3.10**
**indentations**
Latent or visible impressions in paper or other media.

**3.11**
**side lighting**
Illumination from a light source that is at a low angle of incidence, or even parallel, to the surface of the item. Syn., oblique lighting.

**3.12**
**transmitted light**
Illumination that passes through a document.

**3.13**
**ultraviolet**
**UV**
Referring to radiant flux having wavelengths shorter than the wavelengths of light, usually wavelengths from about 10 nm to 380 nm.

# 4 Requirements

## 4.1 Competence

### 4.1.1 General

Competency in the examination of altered documents is based upon a combination of the requisite knowledge, skills, and abilities acquired through appropriate education, training, and experience specific to forensic document examination.

### 4.1.2 Requisite Knowledge, Skills, and Abilities

It is critical that the FDE has a knowledge base that includes the manufacturing processes of materials used in the production and preservation of documents as well as the skills and abilities to

analyze, compare, and evaluate case-related items. Training requirements can be found in SWGDOC *Standard for Scope of Work of Forensic Document Examiners*, 2013.

### 4.2 Equipment

#### 4.2.1 General

The FDE shall ensure that all equipment and apparatus is properly maintained and calibrated, as required by manufacturer's specifications, and documented as required by the laboratory practices and quality assurance procedures.

#### 4.2.2 Standard Equipment

**4.2.2.1** Appropriate light source(s) to distinguish fine detail shall be available. Natural, incandescent, fluorescent, light emitting diode (LED), or fiber optic lighting sources are generally used. These may include transmitted, side, and vertical incident lighting.

**4.2.2.2** Optical or digital magnification necessary to resolve fine detail shall be available. The magnification level and the equipment used to observe the feature(s) should be recorded.

**4.2.2.3** Image capture device(s) capable of sufficient resolution to record accurate detail shall be available. The equipment used and the resolution needed to observe the feature(s) should be recorded.

**4.2.2.4** Infrared (IR) image conversion device or system with appropriate light sources and filters for use in infrared reflectance (IRR) and infrared luminescence (IRL) examinations shall be available.

**4.2.2.5** Long-wave, mid-wave, and short-wave ultraviolet (UV) sources shall be available.

**4.2.2.6** Measuring devices shall be available, these may include paper micrometer, typewriter grids, rulers, and magnifiers with reticle patterns.

**4.2.2.7** An electrostatic detection device (EDD) shall be available.

**4.2.2.8** The FDE shall have the time, facilities, and equipment necessary to complete all applicable procedures and prevent deleterious effects. The FDE shall conform to the requirements in SWGDOC *Standard for Scope of Work of Forensic Document Examiners*, 2013.

**4.2.2.9** Other equipment or devices generally accepted in the forensic document examination discipline that should be available for the examination of documents for alterations, as deemed appropriate by the FDE, may include:

- hand tools (e.g., scalpel, spatula, tweezers);
- magnetic properties detector;
- software for digital image processing.

## 4.3 Considerations and Limitations

**4.3.1** Items submitted for examination can have limitations that interfere with the procedures in this standard. Limitations can be due to the submission of non-original documents; the condition, quantity, or comparability of the material submitted; or from limited discriminating characteristics. The FDE shall ensure that limitations are noted and recorded.

NOTE This standard may not cover all aspects of unusual, uncommon, or specialized examinations.

**4.3.2** The examination of the original item(s) is always preferable, as images and copying processes can mask physical characteristics of a document. The FDE should request the original item(s) if not previously submitted.

**4.3.3** If the original item(s) is not made available for examination, the FDE should use the best available evidence to assess the quality of the significant details present in the item(s). If the details have been reproduced with sufficient clarity for examination purposes, continue with the applicable procedures to the extent possible.

**4.3.4** Document examinations should be conducted prior to any destructive processing (e.g., latent prints, DNA, ink chemistry). The FDE shall handle the items as required to avoid compromising subsequent examinations. The results of prior storage conditions, handling, testing, or destructive processing can interfere with the examination.

**4.3.5** The procedures in this standard can require destructive changes to an item. Prior to making such changes, the FDE shall obtain and record permission from the responsible party requesting the examination and advise them as to the potential benefits and subsequent limitations of these examinations and the extent of possible physical changes to the document. Destructive examinations are defined in section 4.6.

**4.3.6** The FDE shall ensure that images are captured and documented before and after making destructive changes to the evidence or to the images of the evidence. The FDE shall contemporaneously record the procedures performed to allow for an independent review and assessment of the images by another FDE, including any relevant setting(s) and variable(s) (see SWGDOC *Standard for Use of Image Capture and Storage Technology in Forensic Document Examination*, 2013 for additional information).

**4.3.7** The FDE shall ensure that material(s) removed from the item under examination shall be documented and may be imaged prior to and after removal, and preserved separately for subsequent examination(s). These materials can be of value and can include staples, other binding devices, other attached documents, and trace materials.

**4.3.8** The FDE shall consider that characteristics associated with alteration may have occurred during normal preparation, handling, and storage of the document. Some alterations might not have observable physical characteristics or be detectable based on the type of examination(s) in this standard or due to the examination of a non-original document. The absence of observed physical characteristics does not support a definite determination that the document is unaltered.

**4.3.9** This standard does not apply to chemical ink examinations. For additional information, refer to SWGDOC *Standard for Test Methods for Forensic Writing Ink Comparison,* 2013.

### 4.4 Procedures

**4.4.1** The FDE shall conduct an initial assessment of the document to determine the appropriate examinations, the sequence of examinations, and the potential limiting factors.

**4.4.2** Subsequent to the completion of the initial assessment, the FDE shall proceed to the applicable examinations. The FDE may discontinue the procedure at any point during the examination. The FDE shall record the reason(s) for such a decision.

NOTE The remaining procedures in section 4.4 need not be performed in the order listed below. All procedures may not be applicable to the item(s) being examined.

**4.4.3** The FDE shall perform applicable procedures and contemporaneously record examinations performed and relevant observations in the notes. The results and accompanying notes should have sufficient detail to allow for an independent review and assessment of the conclusions by another FDE. The FDE shall include any relevant information, observations, equipment used, methods, evaluations, and conclusions, opinions, or interpretations.

**4.4.4** The examination of a document for alterations can include observations of the following:

a) handwriting;

   1) overwriting or obliteration of entries;

   2) crowded or awkward spacing of writing;

   3) inconsistent handwriting features;

   4) characteristics of the writing media, such as variation in color and intensity or class of writing instrument;

b) printing processes and defects;

   1) variation in features used to characterize printing processes;

   2) type of printing process;

   3) color or intensity of printing media;

   4) physical characteristics of the print media, such as the morphology, magnetic, infrared, and ultraviolet properties;

   5) use of different fonts, sizes, styles, spacing, and margins;

   6) crowded or awkward placement of printed text, such as irregular vertical and/or horizontal alignment;

   7) different class characteristics, such as artifacts and misspellings;

c) paper characteristics;

   1) area(s) of discoloration or other physical changes to the optical properties of the substrate;

   2) paper fiber disturbance;

   3) variation in paper characteristics, such as thickness, length, width, opacity, guillotine marks, watermarks, and UV fluorescence;

   4) paper cuts, tears, perforations, and folds;

   5) indentations;

d) fastening or binding characteristics;

   1) inconsistent or multiple binding methods;

   2) presence, absence, or removal of adhesives;

   3) alignment and number of staples and staple holes;

   4) the makeup, condition, placement, and effect of paper clips on a document;

   5) presence and alignment of multiple hole punches and perforations;

   6) presence or absence of expected markings;

e) miscellaneous characteristics;

   1) presence of an obscuring substance;

   2) smearing of printing/writing media;

   3) sequence of preparation of elements of the document, such as intersections of writing media, mechanical impressions, folds, and printed text;

   4) cutting and pasting or substitution;

   5) insertion(s) or omission(s) of pages or entries.

### 4.5 Non-destructive Examinations

**4.5.1** The FDE shall ensure that applicable non-destructive procedures be performed.

**4.5.2** The FDE shall visually examine all sides of the item macroscopically and microscopically.

**4.5.3** The FDE shall record observations, measurements, or both in the case notes, to include but not limited to the following:

a) paper;

b) letter, word, line, and margin spacing;

c) color;

d) fastening and binding marks;

e) facsimile information;

f) trash, roller, and picker bar marks.

**4.5.4** The FDE shall examine the document using various optical techniques and light sources, such as side lighting, transmitted lighting, UV, IRR, and IRL.

**4.5.5** The FDE shall examine the document with imaging techniques, such as photography or digital image processing.

**4.5.6** A measurement scale shall be included in the image area when photographing a submitted item.

**4.5.7** Capture conditions, including resolution, color, and bit depth, shall be permanently recorded, within the metadata or otherwise, when a submitted item is scanned.

**4.5.8** The FDE shall examine the print media with a magnetic properties detector, if available.

**4.5.9** If the documents require examination for latent indentations, the FDE shall process the physical documents using oblique lighting and/or EDD.

**4.5.10** The FDE shall record visualized entries.

**4.5.11** The FDE may attempt to decipher and transcribe visualized entries.

**4.5.12** The FDE shall analyze and compare the observed features and characteristics of the document to known items (if available), and evaluate the findings.

**4.5.13** The FDE shall determine the need for destructive examinations. If unnecessary, discontinue examinations, reach a conclusion(s), and report accordingly.

### 4.6 Destructive Examinations

**4.6.1** Destructive examinations are those that damage or otherwise change the item. They should be performed after non-destructive methods have been exhausted. All findings shall be recorded in the case notes. Consideration should be given to the order in which destructive examinations are performed.

**4.6.2** The FDE shall inform the party requesting a potentially destructive examination as to the potential benefits and limitations of the procedure and the extent of possible physical changes to the document.

NOTE Destructive testing may consume the item(s) or otherwise limit subsequent examinations by any party.

**4.6.3** Prior to destructive testing, obtain and record permission from the responsible party requesting the examination.

**4.6.4** The use of destructive examinations can interfere with other types of forensic examinations (for example, chemical analysis of ink or latent print examinations).

**4.6.5** The item shall be imaged before and after the use of destructive techniques, as outlined in section 4.3.6.

**4.6.6** When an obscuring substance is present (e.g., correction fluid, correction tape), the obscured entry can be visualized by several destructive methods.

**4.6.7** When using solvents, the FDE shall ensure that testing be performed prior to general application to each item in order to determine the best course of action.

CAUTION Exposure to solvents, in an attempt to counteract the obscuring substance, can have a deleterious effect on inks, toner, or the substrate. Refer to the Safety Data Sheet (SDS) for proper application and any health and safety effects.

**4.6.7.1** Prior to application of a liquid to the item submitted for examination, initial testing should be performed on non-casework items, that are made of similar materials.

**4.6.7.2** Apply a solvent or other visualization substance to make paper translucent for visualization of the obscured entry.

**4.6.7.3** Apply a solvent capable of counteracting the obscuring substance.

**4.6.8** If applicable, physically remove (for example, abrade, scrape, lift, or peel) the obscuring substance from the entry.

**4.6.9** Entries physically obscured by synthetic or biological substances (such as blood, grease, tape, or gum) may be recovered by removal of the substance after freezing.

**4.6.10** The FDE shall analyze and compare the observed features and characteristics of the document to known items (if available), and evaluate the findings.

**4.6.11** The FDE shall conduct other forensic document examinations as appropriate (e.g., handwriting comparison, typewriter comparison), resulting from observations made during or after destructive processing.

**4.6.12** The conclusions or opinions resulting from the procedures in this standard can be reached after the examination(s) have been conducted. The number and nature of examination(s) are dependent on the material being evaluated.

**4.6.13** The conclusions or opinions based on the results of the above examinations, comparisons, and evaluations shall be reported accordingly.

## 4.7 Reporting

**4.7.1** Reports generated as the result of the procedures used in this standard shall be complete and thorough. The report shall contain the stated purpose of the examination(s), the

examination(s) conducted, observations, conclusions and/or opinions, limitations and sources of uncertainty (as applicable), and includes the method(s) used.

**4.7.2** The conclusions and/or opinions in the report shall address the following, as appropriate:

a) whether or not characteristics indicative of alterations were observed;

b) whether or not any of the altered entries were decipherable;

c) the text or description of altered and original entries;

d) the method or sequence of alterations;

e) images of alterations and original entries; and

f) apparent alterations in documents that can actually be the result of software, hardware, or user affected variations, and can occur during normal or legitimate document production.

# 5 Conformance Requirements

## 5.1 Conformance

Conformance to this standard will be achieved if an implementation and its associated data records conform to normative ("shall") Section 4.

Documentation to verify conformance with the above requirements shall be maintained by each laboratory and individual FDE and shall be made available to auditors upon judicially or administratively authorized request.

## 5.2 Conformance to Equipment

Conformance to 4.2 Equipment requires that the forensic document examiner ensures that all equipment and apparatus is properly maintained and calibrated (4.2.1) and maintains the documentation. The forensic document examiner shall also demonstrate that the Standard Equipment (4.2.2) is always accessible and useable upon demand for any examinations that the laboratory or individual forensic document examiner might agree to undertake.

## 5.3 Conformance to Competence

Conformance to 4.1 Competence, requires the laboratory or individual FDE to maintain and supply evidence of technical competence in the examination of altered documents (e.g., by maintaining records of completion of training to competence in areas specific to forensic document examination, including initial training, continuing education, and training on specific equipment; participating in inter-laboratory comparison; participating in individual proficiency testing; or by demonstrating laboratory accreditation in accordance with ISO/IEC 17025:2017 or individual certification issued in accordance with ISO/IEC 17024:2012 and ISO/IEC 17011:2017).

# Annex A
(informative)

## Bibliography

This is not meant to be an all-inclusive list as the group recognizes other publications on this subject may exist. At the time this standard was drafted, these were the publications available for reference. Additionally, any mention of a particular software tool or vendor as part of this bibliography is purely incidental, and any inclusion does not imply endorsement.

1] Aginsky, V.N., "Determining the sequence of non-intersecting media on documents: ballpoint pen ink and laser toner entries," *J. Am. Soc. Questioned Doc. Examiners*, 2003. 5, 1.

2] Aginsky, V.N., "Examination of Paper and Toner in Page Insertion/Substitution Cases using TLC, GC-MS and FT-IR Microspectroscopy," *JASQDE*, 2012. 15(2).

3] Berx, V., and J. De Kinder. "The Application of Profilometry in the Analysis of the 'Crossing Lines' Problem," paper presented at the ASQDE Annual Meeting, San Diego, CA, August 14–18, 2002. (JASQDE. Vol 8. No 1, pp1-8, 2005)

4] Casey, M.A., "Alteration of pari-mutuel tickets," *J. Criminal Law Criminol. Police Sci*., 1971, 62, 282.

5] Casey, M.A. and D.J. Purtel. "IBM correcting Selectric typewriter: an analysis of the use of the correctable film ribbon in altering typewritten documents," *J. Forensic Sci*., 1976. 21, 208.

6] Ferrer, A., C.S. Silva, M.F. Pimentel, R.S. Honorato, C. Pasquini, J.M. Prats Montalbán, A.J. Ferrer Riquelme. "Near Infrared Hyperspectral Imaging for Forensic Analysis of Document Forgery," *Analyst*, 2014,139, 5176-5184

7] Flynn, W.J., "Paper Mate's new erasable pen," *J. Police Sci. Admin*., 1979. 7, 346.

8] Godown, L., "Recent developments in writing sequence determination," *Forensic Sci. Int*., 1982. 20, 227.

9] Godown, L., "Sequence of writing," *J. Criminal Law Criminol. Police Sci*., 1963. 54, 101.

10] Hammond, D.L., "Validation of LAB Color Mode as a Nondestructive Method to Differentiate Black Ballpoint Pen Inks," *Journal of Forensic Sciences*, 2007. 52: 967–973.

11] Harris, J.L., "Eyeing the evidence," *Southern Calif. Alumni Rev.*, 1940. 21, 16.

12] Hilton, O., "Characteristics of Erasable Ball point Pens", Forensic Science Journal, 26, pp 269-275, 1984.

13] Hilton, O., "Photographic methods of deciphering erased pencil writing," *Int. Criminal Police Rev*., 1955. 85, 47.

14] Hilton, O., "Proof of an unaltered document," *J. Criminal Law Criminol. Police Sci*., 49, 601, pp. 60, 162. 1959

15] Igoe, T.J. and BL. Reynolds. "A lifting process for determining the writing sequence of two intersecting ball-point pen strokes," *Forensic Sci. Int.*, 1982. 20, 201.

16] Jones, W., R.B., Cody, J.F., McClelland, "Differentiating Writing Inks Using Direct Analysis in Real Time Mass Spectrometry," *Journal of Forensic Sciences*, July 2006, Vol.51(4), p.915-918.

17] Kumar, R., NR. Pal, B. Chanda, JD. Sharma. "Forensic Detection of Fraudulent Alteration in Ball-Point Pen Strokes, Signal Processing and Analysis," *IEEE Transactions on Information Forensics and Security*, April 2012, Vol.7(2), pp.809-820.

18] Li, B. and G. Ouyang. "An Examination of the Sequence of Intersecting Seal and Laser Printing Toner Line," *J Forensic Sci*, 2017. 62: 476–482.

19] Licht, G.A., "Common chemicals for common criminals: check washing again," *J. Am. Soc. Questioned Doc. Examiners*, 2000. 3, 65.

20] Licht, G.A. and J.L., Brown. "Shandon Xylene Substitute in Document Examinations," *J. Am. Soc. Questioned Doc. Examiners*, Vol.2 No.2, 94, 1999.

21] Longhetti, A. and P.L. Kirk. "Restoration and decipherment of erasures and obliterated or indented writing," *J. Criminal Law Criminol*., 1950. 41, 518.

22] Lukáš, G., M. Oravec, P. Gemeiner, M. Čeppan. "Principal Component Analysis for the Forensic Discrimination of Black Inkjet Inks Based on the Vis–NIR Fibre Optics Reflection Spectra," *Forensic Science International*, December 2015, Vol.257, pp.285-292.

23] Maldonado, H.I., A.H. Sierra. "Crayon Obliteration Over Ballpoint Pen Writing," *Journal of Forensic Sciences*, Nov, 1992, Vol.37(6), p.1679-1683.

24] Novotny, M., "Determining the Sequence of Original Ink Writing and Toner Printing," paper presented at the ASQDE Annual Meeting, San Diego, CA, August 14–18, 2002. (JASQDE, Vol 8, No 1, pp 37-47, 2005)

25] Pfefferli, P. and J. Mathyer. "Eraser Mate un stylo a bille à encre effacable," *Rev. Int. Criminol. Police Tech*. 1979. 4, 407. (English abstract available at: https://www.ncjrs.gov/App/publications/Abstract.aspx?id=70716)

26] Sharf, S., R. Gabbay, S. Brown. "Infrared Luminescence of Indented Writing as Evidence of Document Alteration," *Journal of Forensic Sciences*, Jul 1997, Vol.42(4), pp.729-732.

**SWGDOC documents can be downloaded from:**

https://www.nist.gov/topics/forensic-science/forensic-document-examination-subcommittee

http://www.swgdoc.org/index.php/standards/published-standards

SWGDOC *Standard for Scope of Work of Forensic Document Examiners*, 2013

SWGDOC *Standard for Test Methods for Forensic Writing Ink Comparison*, 2013

SWGDOC *Terminology Relating to the Examination of Questioned Documents*, 2013

SWGDOC *Standard for Physical Match of Paper Cuts, Tears, and Perforations in Forensic Document Examinations*, 2013

SWGDOC *Standard for Examination of Handwritten Items*, 2013

SWGDOC *Standard for Indentation Examinations*, 2013

SWGDOC *Standard for Non-destructive Examination of Paper*, 2013

SWGDOC *Standard for Minimum Training Requirements for Forensic Document Examiners*, 2013

SWGDOC *Standard for Examination of Documents Produced with Liquid Ink Jet Technology*, 2013

SWGDOC *Standard for Examination of Documents Produced with Toner Technology*, 2013

SWGDOC *Standard for Examination of Typewritten Items*, 2013

SWGDOC *Standard for Use of Image Capture and Storage Technology in Forensic Document Examination*, 2013

ASB™
AAFS Standards Board

Academy Standards Board
410 North 21st Street
Colorado Springs, CO 80904

www.asbstandardsboard.org

# APPENDIX 19

**Member:**
American Society of Questioned Document Examiners

American Academy of Forensic Sciences – QD Section

Southeastern Association of Forensic Document Examiners

**Certified:**
American Board of Forensic Document Examiners

Thomas W. Vastrick

Forensic Document Examiner

***WEBSITE:*** ***thomaswvastrick.com***
***EMAIL:*** ***vastrick@yahoo.com***

**Orlando, FL (Main) Office**
522 S Hunt Club Blvd Suite 217
Apopka, FL 32703

**Tallahassee, FL (Branch) Office**
1400 Village Square Blvd #3-149
Tallahassee, FL 32312

(407) 234-3219

# CURRICULUM VITAE

## 1. Education and Training

Bachelor of Science in Forensic Science with Minor in Chemistry from California State University at Sacramento, 1977.

Two-year, full-time, in-residence training program with the U.S. Postal Inspection Service Headquarters Crime Laboratory in Washington, DC from 1977 to 1979.

## 2. Experience

Full-time Forensic Document Examiner with the U.S. Postal Inspection Service Southern Region Crime Laboratory from 1980 to 1992.

Private consulting services in Forensic Document Examination since 1990.

Research Manager, National Center for Forensic Science, University of Central Florida, Orlando, FL 2011 to 2015

Examinations include handwriting, hand printing, alterations, typewriting, computer generated documents, indented writing, counterfeiting, nondestructive ink & paper analyses, burned and soaked document restoration, sequence of strokes, office machine products, and mechanical impressions.

## 3. Courtroom Testimony

Have testified as an expert in Forensic Document Examination over 400 times and provided over 100 depositions. Have testified in federal, state and local courts along with military hearings, arbitration hearings and administrative law hearings.

Have testified in Federal District Court in:
**Alabama, Arkansas, Florida, Georgia, Louisiana, Michigan, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.**

Have testified in the state courts in:
**Alabama, Arizona, Arkansas, California, Florida, Georgia, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, Tennessee, and Texas.**

## 4. Certification

Certified through technical testing by the American Board of Forensic Document Examiners (ABFDE) continuously since 1982. The ABFDE is the only certification body that is recognized by all federal government agencies employing Forensic Document Examiners along with many state and municipal law enforcement agencies. The ABFDE is also the only certification board with Diplomates that meet published standards for required education and training with 100% compliance.

Served on the ABFDE Board of Directors 1987 to 1995.

Served as Secretary of the ABFDE Board of Directors 1991 to 1995.

## 5. Professional Affiliations

- American Society of Questioned Document Examiners (ASQDE)
  - President – 2024 to present
  - Secretary – 2018 to 2020, 2022 to 2024
  - Regular Member – 1982 to 2019
  - Life Member – 2019 to present
  - Program Chair - 1993
  - Journal Editorial Staff – 2000 to present
  - Newsletter Editor – 1983 to 1992
- American Academy of Forensic Sciences (AAFS)
  - Retired Fellow - Questioned Documents Section – 2020 to present
  - Fellow 2004 to 2020
  - Member 1995 to 2004
  - Section Chairman – Questioned Documents Section – 2012 to 2016
  - Academy Board of Directors – 2017 to 2021
- Southeast Association of Forensic Document Examiners (SAFDE)
  - Program Chairman – 1997, 1998, 2000, 2011
  - Workshop Facilitator – 1998, 2001
  - Regular Member – 1980s to present
- Academy Standards Board – Forensic Document Examination Consensus Body
  - 2017 to present
- Expert Working Group on Human Factors in Handwriting Examination (work completed)
  - U.S. Department of Commerce
  - National Institute of Standards and Technology
  - 2015 to 2020
- Scientific Working Group – Forensic Document Examination (not currently active)
  - Main SWGDOC Committee – 1999 to 2001
  - Legal Issues Sub-committee Chairman – 1999 to 2001
  - Executive Committee – 1999 to 2001
  - Working Committee – 2001 to 2014

## 6. Published Research Papers

- ***A NON-DESTRUCTIVE PRELIMINARY TEST FOR THE DETERMINATION OF PAGE INSERTION OF A MULTIPAGED QUESTIONED DOCUMENT*** - published in Identification News, Vol. 31, No. 9, September 1981.
- ***CHECKWRITER IDENTIFICATION - INDIVIDUALITY*** - published in Journal of Forensic Sciences, Vol. 27, No. 1, January 1982.
- ***ILLUSIONS OF TRACING*** - published in Journal of Forensic Sciences, Vol. 27, No.1, January 1982.
- ***THE EXAMINATION OF NOTARY SEALS*** - published in Journal of Forensic Science, Vol. 27, No. 4, October 1982.
- ***THE FORENSIC VALUE OF RIGHT-HAND JUSTIFICATION*** - published in Forensic Science International, 1990.
- ***FRAUD AND QUESTIONED DOCUMENT EXAMINATION*** - Published in The White Paper, Vol. 7, No. 2, April-May 1993.
- ***SOLVE THE CROSS-WORD PUZZLE*** - Published in Security Management, December 1994.

## 6. Published Research Papers (continued)

- ***DEPOSING FORENSIC EXPERT WITNESSES: AN EXPERT'S VIEWPOINT*** – Published in The Memphis Bar Association Magazine, December 1995.
- ***HAS THAT DOCUMENT BEEN ALTERED*** - Published in The Florida Defender, Fall, 1998.
- ***THE UNIQUENESS OF HANDWRITING*** - Published in the inaugural edition of the Journal of American Society of Questioned Document Examiners, Vol. 1 No. 1, 1998.
- ***INDENTED WRITING: THE INVISIBLE EVIDENCE –*** Published in The Florida Defender, FLL, 1999.
- ***SELECTING A QUALIFIED FORENSIC DOCUMENT EXAMINER*** - Published in The Florida Defender, Fall, 2001.
- ***CLUES OF INK*** - Published in FSA Times (The Institute of Internal Auditors), Vol. 2, No. 2, 2003.
- ***ADMISSIBILITY ISSUES IN FORENSIC DOCUMENT EXAMINATION*** - Published in The Journal of American Society of Questioned Document Examiners, Vol 7, No. 1, 2004.
- ***IS IT REAL? PROVING (OR DISPROVING) THE AUTHENTICITY OF IMMIGRATION DOCUMENTS*** – Published in the Tennessee Bar Journal, Vol. 42, No. 7, 2006.
- ***DEVELOPMENT OF AN EXTENSIVE FORENSIC HANDWRITING DATABASE – STATISTICAL COMPONENTS*** – Papers from the Seventh International Workshop on Statistical Simulation, Rimini, Italy (co-author, non-presenter)
- ***FORENSIC HANDWRITING COMPARISON EXAMINATION IN THE COURTROOM*** – Published in The Judges' Journal, American Bar Association, Vol. 54, No. 3, Summer 2015.
- ***MEASURING THE FREQUENCY OCCURRENCE OF HANDWRITING AND HAND PRINTING CHARACTERISTICS*** – (co-author) - published in Journal of Forensic Sciences, Vol 62, No. 1, 2017. doi: 10.1111/1556-4029.13248
- ***MEASURING THE FREQUENCY OCCURRENCE OF HANDWRITTEN NUMERAL CHARACTERISTICS*** – (co-author) – published in Journal of Forensic Sciences, Vol 63, No. 4, 2018. doi: 10.1111/1556-4029.13678 (Selected as JFS 2018 Noteworthy Article)
- ***MEASURING THE FREQUENCY OCCURRENCE OF HANDWRITTEN NUMERAL CHARACTERISTICS*** – ***AN EXPANDED LIST*** (co-author) – published in Journal of Forensic Sciences, Vol 66, No. 1, 2021. doi: 10.1111/1556-4029.14559
- ***INSTITUTIONAL PREJUDICE BY THE COURTS INVOLVING CERTAIN OPPOSING HANDWRITING OPINIONS*** (co-author) – published as Letter to the Editor (not peer-reviewed) in Journal of the American Society of Questioned Document Examiners, Vol 24, No. 1, 2021. ISSN 1524-7287

## 7. Professional Papers (unpublished) and Presentations

- ***CHECKWRITER IDENTIFICATION*** - ASQDE, Rochester, NY, 1979.
- ***AN UPDATE OF MODEL DIFFERENTIATION OF CHECKWRITERS BY DOMESTIC MANUFACTURERS*** - ASQDE - North Lake Tahoe, NV, 1983.
- ***THE USE OF VIDEOTAPES TO ENHANCE COURTROOM PRESENTATIONS*** - ASQDE, Montreal, Canada, 1985.
- ***PLASTIC PAPER AS A QUESTIONED DOCUMENT*** - ASQDE, Savannah, GA, 1986.
- ***STANDARD REGISTER CHECKWRITERS*** - ASQDE, San Jose, CA, 1990.
- ***COMPARATIVE ANALYSES OF PHOTOGRAPHIC FILMS, PAPERS, CHEMICALS AND TECHNIQUES FOR USE ON DEMONSTRATIVE COURT CHARTS*** - ASQDE, Kissimmee, FL, 1991.
- ***A NEW DOMESTIC CHECKWRITER MANUFACTURER*** - ASQDE, Ottawa, Canada, 1993.

**7. Professional Papers (unpublished) and Presentations (continued)**

- ***COMPUTERIZED HANDWRITING*** - ASQDE, Long Beach, CA, 1994.
- ***THE UNIQUENESS OF HANDWRITING - SURVEY RESULTS*** - ASQDE, Chicago, IL, 1995.
- ***PRESENTATION SOFTWARE*** - ASQDE, Chicago, IL, 1995.
- ***A COLLECTION OF FAX FONTS, PART II*** (Contributor) - ASQDE, Chicago, IL, 1995.
- ***THE THIRD EXAMINER*** - ASQDE, Phoenix, AZ, 1997.
- ***AN OVERVIEW OF POINT AND SHOOT DIGITAL CAMERAS*** – AAFS, San Francisco, CA, 1998.
- ***THE EXPERT CRITIC IN A CIVIL MATTER*** – SAFDE, Atlanta, GA, 1999.
- ***A CRITICAL LOOK AT CRITICS*** – MAFS/SWAFS joint meeting, Cape Girardeau, MO, 1999.
- ***THE SKILL LEVEL OF PSEUDO-TREMOR*** – ASQDE, Ottawa, Ontario, Canada, 2000.
- ***HOW KNOWN ARE THOSE KNOWNS*** – AAFS, Atlanta, GA, 2002.
- ***HANDWRITING IDENTIFICATION – BACK TO REALITY*** – ASQDE, San Diego, CA, 2002.
- ***THE PITFALLS OF BAD SCIENCE*** – ASQDE, Memphis, TN, 2004.
- ***CASE REVIEW: METHODOLOGY STANDARDIZATION*** – ASQDE, Boulder, CO, 2007.
- ***FREQUENCY OCCURRENCE OF VARIATION AS A TOOL FOR (DIS) ASSOCIATION OF HANDWRITING*** – SAFDE, 2010.
- ***JUNK CRITICISM IN THE COURTROOM*** – AAFS, Chicago, IL, 2011.
- ***INSTITUTIONAL PREJUDICE AGAINST INDETERMINATE CONCLUSIONS*** – SAFDE, Atlanta, GA, 2011.
- ***CURRENT STATUS OF FREQUENCY OCCURRENCE STUDY*** – AAFS, Washington, DC, 2013.
- ***TACKY CONCLUSIONS – SIGNATURE TRANSFER BY TAPE?*** – SAFDE, Atlanta, GA, 2013.
- ***TRENDS IN FREQUENCY OCCURRENCE STUDY*** – NIST, Gaithersburg, MD, 2013.
- ***OH BROTHER, ANOTHER PAPER ON FOLLOWING PROCEDURES –*** AAFS, Las Vegas, NV, 2016.
- ***EMPLOYMENT IN FORENSIC SCIENCE THROUGH RESEARCH –*** AAFS Young Forensic Scientists Forum, Seattle, WA, 2018.
- ***ADVANCING YOUR CAREER –*** AAFS Young Forensic Scientists Forum, Baltimore, MD, 2019.
- ***DECIPHERMENT OF LATENT HANDWRITING IMPRESSIONS – POINT/COUNTERPOINT –*** AAFS, Anaheim, CA, 2020.
- ***BASICS OF EXPERT TESTIMONY FROM THE PERSPECTIVE OF AN EXPERT WITNESS –*** ASQDE, Virtual, 2020.
- ***INTRA-WRITER FREQUENCY OF OCCURRENCE AS A TOOL OR PROCESS FOR ASSOCIATION AND DISSOCIATION OF HANDWRITING –*** ASQDE, Virtual, 2020.
- ***TIGER KING; FORENSIC DOCUMENT EVIDENCE INVOLVING THE DISAPPEARANCE OF JACK DONALD LEWIS –*** AAFS, Virtual, 2021.
- ***INSTITUTIONAL PREJUDICE BY THE COURTS INVOLVING CERTAIN OPPOSING HANDWRITING OPINIONS*** – AAFS, Seattle, WA, 2022
- ***REPORT WRITING IN A NEW RULE 702 WORLD – HANDWRITING COMPARISON EXAMINATION*** – AAFS, half-day workshop, Orlando, FL, 2023

## 7. Professional Papers (unpublished) and Presentations (continued)

- ***REPORT WRITING IN THE UNITED STATES*** – International Knowledge Exchange on Documents, Virtual, 2023
- ***FORENSIC DOCUMENT EXAMINATION: A DYING DISCIPLINE OR AN EMERGING ENTITY*** – SAFDE, Peachtree City, GA, 2023
- ***STANDARDS OR GUIDELINES*** – SAFDE, Peachtree City, GA, 2023
- ***THE HITLER DIARIES REVISITED*** – AAFS, Denver, CO, 2024
- ***CASE STUDIES OF KNOWN HANDWRITING SPECIMENS*** – ASQDE, Atlanta, GA, 2024
- ***DEPOSITIONS – WHAT YOU CAB EXPECT*** – ASQDE, Las Vegas, NV, 2025
- ***CHALLENGING SIGNATURES WORKSHOP*** – ASQDE, Las Vegas, NV, 2025
- ***VARIATION AS A PARAMETER OF COMPLEXITY ASSESSMENT*** – SAFDE Pensacola, FL, 2026

## 8. Books and Publications

- ***THE CLASSIFICATION AND IDENTIFICATION OF CHECKWRITERS*** - a monograph published by The American Board of Forensic Document Examiners, 1991.
- ***FORENSIC DOCUMENT EXAMINATION TECHNIQUES*** – published by The Institute of Internal Auditors Research Foundation, 2004, ISBN 0-89413-541-4.
- ***FORENSIC SCIENCE AND LAW: INVESTIGATIVE APPLICATIONS IN CRIMINAL, CIVIL AND FAMILY JUSTICE*** – published by CRC Press, 2005, ISBN 0-8493-1970-6 (contributing author).
- ***SCIENTIFIC EXAMINATION OF QUESTIONED DOCUMENTS – SECOND EDITION*** – published by CRC Press, 2006, ISBN 0-8493-2044-5 (contributing author).
- ***FORENSIC HANDWRITING EXAMINATION AND HUMAN FACTORS: IMPROVING THE PRACTICE THROUGH A SYSTEMS APPROACH*** – published by National Institute of Standards and Technology, Department of Commerce in conjunction with the National Institute of Justice, Department of Justice NIST.IR.8282, 2020 (contributing author).
- ***FORENSIC DOCUMENT EXAMINATION IN THE 21ST CENTURY*** – published by CRC Press, 2020, ISBN 9780367251550 (contributing author).

## 9. Teaching Experience

Conducted lectures and workshops for American Academy of Forensic Sciences, American Society of Questioned Document Examiners, Tennessee Bureau of Investigation, University of Memphis Law School, University of Central Florida, National Center for Forensic Science, State Technical Institute at Memphis, Institute of Police Technology & Management's Public Safety Institute Division, Union University, Institute of Internal Auditors, state bar association conventions, district attorneys general convention, banks, election officials, insurance investigators, fraud investigators, private investigators, attorneys, law enforcement personnel and other document examiners concerning empirical statistics in handwriting; handwriting specimens; detecting forgeries; alterations; and capabilities of Forensic Document Examiners.

Primary trainer for interns in forensic document examination from University of Central Florida.

Course Administrator for National Center for Forensic Sciences post graduate certificate course.

Training officer for government document examiners supplemental training, Instituto de Ciencias Forenses de Puerto Rico.

Conducted technical workshops concerning handwriting, signatures, frequency occurrence of handwriting and hand printing characteristics, legal issues, report writing, and checkwriters at various regional and national conferences of forensic document examiners.

Conducted training of signature, petition, and ballot examinations for the State of Florida Supervisors of Election statewide along with periodic county-level training classes.

## 10. Awards

Special Recognition Award for Research and Advancement of Profession – American Society of Questioned Document Examiners, 2016.

Ordway Hilton Award (for sustained superior contributions to The American Academy of Forensic Sciences, The Questioned Document Section of The American Academy of Forensic Sciences, and the forensic science community) – American Academy of Forensic Sciences, 2018

# APPENDIX 20

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS |
|---|---|---|---|---|---|---|---|
| Personal Protection Order | 2/16/21 | Grand Haven MI | Michigan | 20th Circuit Ottawa Co. | Engle | Hand printing | |
| Chris Gorton v Diane Floyd | 3/12/21 | Lee County, FL | Florida | 20th Circuit | | Signature | Hand Printing |
| LSW v Covington-Campanella | 3/19/21 | | Federal | Southern Dist. Of FL - Depo. | | Signature | |
| Berry v Cook | 3/26/21 | | Florida | Zoom depo for testimony | | Alteration | Writing transfer |
| Estate of Cruz Sr. v Cruz Jr. | 4/1/21 | Seminole Co., FL | Florida | Deposition | | Signatures | |
| Deutches Bank v Jenkins | 4/1/21 | | Florida | Deposition | | Signatures | |
| Hollinger v Rex Engineering | 4/9/21 | | Florida | Deposition | | Signatures | Ink |
| Feterman v Betancourt | 5/13/21 | Dade Co., FL | Florida | Videotaped testimony | | Signatures | |
| Meyer v U-Haul and Meyer | 5/14/21 | Alachua Co. Civil Div J | Florida | Streaming Testimony | Donna Keim | Signatures | |
| Estate of Grover Larkins Sr. | 5/23/21 | Miami Dade Circuit | Florida | Deposition | | Signatures | hand printing |
| Ward v Emfidsson | 6/1/21 | Volusia County | Florida | Volusia County | Jennifer Taylor | Signature | |
| LSW v Covington-Campanella | 6/9/21 | W Palm Beach FL | Federal | S Dist of FL | D Middlebrooks | Signature | |
| Schnieder v Schneider | 6/24/21 | Manatee County | Florida | 12th Circuit | Hudson | Signature | |
| Estate of Grover Larkins Sr. | 7/5/21 | Miami Dade Co. | Florida | Circuit Probate | Hirsch | Signature | Hand Printing |
| Shah v Gauwitz | 7/6/21 | | Florida | Arbitration Hearing | | Signature | Hand Printing, Frequency of Occ. |
| Dixon v Universal Ins. | 8/19/21 | Miami Dade Co. | Florida | Deposition | | Signature | Hand printing, initials |
| State v James Marshall Jr | 8/27/21 | Alachua CO. Criminal | Florida | Deposition | | hand printing | |
| Jody Meyer v U-Haul | 8/31/19 | Alachua Co Civil | Florida | 8th Circuit | | electronic signature | |
| State v James Marshall Jr | 9/3/21 | Alachua Co. Crim. 3C | Florida | 8th Circuit | Colaw | hand printing | |
| State v Rychman | 9/17/21 | St. Lucie Co Criminal | Florida | Deposition | | sign | hand printing |
| Fisherman's Creek | 10/6/21 | Palm Beach Gardens | Florida | HOA | | Hand printing | |
| Mota Pizza v Sterling Retail | 10/7/21 | Miami Dade | Florida | Deposition | | Signatures | |
| Linaje v Agrasanchez | 11/4/21 | Miami Dade | Florida | Arbitration Hearing | | Signature | |
| Stack v TN Dept. of Treasury | 11/17/21 | Nashville TN | Tennessee | State Agency Hearing | | Signature | |
| Sanger v Ahn | 11/23/21 | San Francisco CA | California | Superior Dept 611-ZR | | Water soaked documents | |
| Lolim v Gamayo | 12/9/21 | Broward Co. | Florida | 17th Circuit Court | Singer | Signatures | |

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS OR OTHER SUBJECTS |
|---|---|---|---|---|---|---|---|
| Rout v Sunderaj & Thompson | 1/19/22 | Nassau Bahamas | Bahamas | | | Signature | |
| untitled case | 1/26/22 | Anniston AL | Alabama | Calhoun County Grand Jury | | hand printing | |
| Amoyal v Amoyal | 1/27/22 | Jacksonville FL | Florida | Deposition | | Alterations | |
| Livingston v Cooper Tire | 2/1/22 | Orlando FL | Florida | Deposition | | Signature | |
| Primerica v Williams, Shorter | 4/6/22 | Overland Park KS | Kansas | Deposition | | Signatures | HP and cursive |
| Schexnayder v Moreau | 4/28/22 | New Roads LA | Louisiana | Pointe Coupee Parish Div C | Batiste | Signature | |
| Mims v Rhims | 5/18/22 | Orlando FL | Florida | Deposition | | Signatures | |
| Whaley v Synovus Securities | 6/28/22 | Columbus GA | Georgia | Deposition | | Signature | |
| Pshenichnikov v Rumiantcev/Antika | 7/6/22 | Broward Co. FL | Florida | Deposition | | Signatures | |
| Estate of Mark Pettingill | 7/8/22 | DeLand FL | Florida | Evidenciary Hearing | Hudson | Alterations | |
| Arbarbanell v Jutras | 8/4/22 | Indian River Co FL | Florida | Indian River Co. Courtroom 3 | Merz | Digitally Captured Signature | Indeterminate conclusion |
| Mota v Pena | 8/8/22 | Dade Co. FL | Florida | Dade Country | | signature | |
| Maxwell v Maxwell | 8/9/22 | Savannah GA | Georgia | deposition | | signature | |
| Chase v Kristy McPherson | 8/11/22 | Florida | Florida | ? Co. | | signature | |
| FL v McMillon | 8/17/22 | Jacksonville FL | Florida | Duval County Criminal #608 | | hand printing | |
| Mobley v Pendergrass | 9/9/22 | Jacksonville FL | Florida | Duval Co. Div CC | Mitchell | hand printing | signature |
| Klein v Brin-Klein | 9/19/22 | Miami FL | Florida | Dade Co. 11th Judicial Circuit | Fernandez-Karavetsos | hand printing | |
| Maxwell v Maxwell | 11/9/22 | Savannah GA | Georgia | Chatham County Courtroom 2C | Goldwire Colbert | signature | in limine hearing |
| Maxwell v Maxwell | 11/17/22 | Savannah GA | Georgia | Chatham County Courtroom 2C | Goldwire Colbert | Signature | in limine hearing |
| Prazan v Plantation Boat Mart | 11/22/22 | Monroe Co. FL | Florida | Deposition | | Signature | |
| Adams v adams | 12/7/22 | Miami-Dade Co. FL | Florida | Deposition | | Signature | |

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS OR OTHER SUBJECTS |
|---|---|---|---|---|---|---|---|
| Lucky Bucks v HRI CORP | 1/12/23 | Atlanta GA | Georgia | Arbitration | | Signatures | |
| Estate of Jake Charles Lymas Jr | 1/23/23 | Memphis TN | Tennessee | Trial | Gomes | Signatures | |
| Estate of Meade | 2/6/23 | Orlando FL | Florida | deposition | | alteration | initials |
| Estate of Trenholm | 2/15/23 | Orlando FL | Florida | deposition | | Signatures | |
| Estate of John Willard | 4/17/23 | Dickson TN | Tennessee | Dickson Co. Chancery #5 | Wolfe | alteration | signatures |
| Soria Suarez v Castro Cruz | 5/8/23 | Tavares, FL | Florida | Lake County 5th Dist. | Welke | alteration | Cuban documents |
| Estate of Kim Gail Clark | 5/17/23 | Orlando FL | Florida | Orange County | Murphy | Signatures | |
| Colson v Tarpon Springs | 5/22/23 | Clearwater FL | Florida | Pinellas Co. Circuit | Muscarella | Signature Transfer | |
| Fisher v Harris | 5/23/23 | Melbourne, FL | Florida | deposition | | Signatures | |
| Laing v Adams | 6/1/23 | Bushnell, FL | Florida | Sumter Co. Circuit | Nimeth | signatures | |
| Silveman v Montoute | 7/11/23 | Levy Co. | Florida | Levy Co. Circuit | DeThomasis | alteration | copy v original |
| Logan v Logan | 7/18/23 | Sarrasota FL | Florida | deposition | | signatures | |
| Estate of Eugene Philips | 7/19/23 | Valdosta GA | Georgia | Lowndes Co. Probate | Powell | Signatures | |
| Logan v Logan | 7/20/23 | Sarrasota FL | Florida | Sarasota Co. Probate | | signatures | |
| Mikhail v Hakem | 7/25/23 | Tavares, FL | Florida | 2nd District Circuit, Leon Co. | Miller | Signatures | |
| Jeffrey Cox v Century Financial | 8/23/23 | Orlando FL | Missouri | deposition | | Signatures | |
| CLJ v Halickman | 8/31/23 | West Plm Beach FL | Florida | deposition | | Signatures | cut and paste |
| Tano-Cloytom Enterprises Onetti | 9/11/23 | Orlando FL | Florida | Orange Co. | | Hand Printing | in itials |
| Bradley v Carpenter | 10/4/23 | Decatur GA | Georgia | Decature Co. | | Signature | |
| Krugman-Kadi v Krugman-Kadi | 10/12/23 | Gainesville FL | Florida | Alachua County | | Signature | |
| Christner v Baiamonte | 10/16/23 | Sarrasota FL | Florida | deposition | | Signature | |
| Lucas Site v Sentinel Baywods | 10/27/23 | Orlando FL | Florida | deposition | | Signature | |
| Miller v Miller | 11/10/23 | Lee County MS | Mississippi | deposition for trial | | signature | |
| Moyer v All In One Pools | 11/14/23 | Orlando FL | Florida | arbitration hearing | | signature | |
| Mohamed v Mohamed | 11/15/23 | Miami FL | Florida | Dade Co. Courtroom 3-3 | | signature | |
| McCard v Eager | 11/16/23 | Ocala FL | Florida | deposition | | signature | cut and paste |
| Halickman v CLJ | 12/7/23 | W Palm Beach FL | Florida | W Palm Beach Co. FL | | signature transfer | |
| Logan v Logan | 12/21/23 | Sarrasota FL | Florida | deposition | | Signature | |

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS OR OTHER SUBJECTS |
|---|---|---|---|---|---|---|---|
| Estate of Nyya Finley | 1/26/24 | Broward Co. FL | Florida | Hearing | Rodriguez | Signature | hand printing |
| Logan v Logan | 1/30/24 | Sarasota Co. FL | Florida | Hearing | | Signature | |
| Daresha Garmon v Enterprise | 2/5/24 | Broward Co. FL | Florida | Deposition | | Digitally Captured Signature | Digitally Captured Initials |
| Borden v Cabrera | 2/15/24 | Monroe Co, FL | Florida | Deposition | | Signatures | |
| Christner v Baiamonte | 2/28/24 | Sarasota Co. FL | Florida | Hearing | | Signature | |
| Sanders v Kensington Garden | 3/21/24 | Pinella Co. FL | Florida | Hearing | | elecrtronic signature | |
| Mickler v Mickler | 4/5/24 | Hillsborough Co FL | Florida | Deposition | | initials | |
| Florida v ClRk | 5/3/24 | Alachua Co FL | Florida | Deposition | | HP | |
| Ngyuen v Truong | 5/6/24 | Volusia Co. FL | Florida | Hearing | Upchurch | Signatures | |
| Luther v Kelzer | 5/8/24 | Orange Co FL | Florida | Hearing | Jordan | Exact Replication | |
| Florida v Clark | 5/8/24 | Alachua Co. FL | Florida | Criminal Court 1B | | HP | Indications |
| Lima v Hernandez | 5/14/24 | Lee Co. FL | Florida | Circuit Court | Swift | Signatures | |
| Estate of Gerald Anderson | 5/29/24 | Alachua Co. FL | Florida | Hearing | | Signatures | Indications |
| Adams v Casey | 6/11/24 | Santa Rosa Co. FL | Florida | Hearing | Drake | Signatures | Simulations |
| Estate of Audi | 6/12/24 | Orange Co. FL | Florida | Deposition | | Signatures | |
| Lucas v Sentinel Capital | 6/20/24 | Orange Co. FL | Florida | Evidentiary Hearing | Rodriguez | Signatures | |
| Wagner v Patel et al | 6/26/24 | Orange Co. FL | Florida | Deposition | | Hand Printing | |
| Nguyen v Truong | 8/7/24 | Volusia Co. FL | Florida | Deposition | | Signatures | |
| Candidacy of Cynthia Harris | 8/13/24 | Orange Co FL | Florida | Hearing | Minton | Exact Replication | |
| Savalia v Lunagariya | 9/18/24 | Osceola Co. FL | Florida | Hearing | Derenthal | Exact Replication | Signatures |
| Perry Roofing v Meadows | 9/25/24 | Levy Co. FL | Florida | Deposition | | signature | taken in Tallahassee |
| PF v Adams | 9/26/24 | Scotland | Scotland | Hearing | | signature | |
| Shivkova v Novikov | 10/17/24 | FL Arbitration | Florida | Deposition | | Signature | |

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS OR OTHER SUBJECTS |
|---|---|---|---|---|---|---|---|
| Estate of Peter and Marcia Nielsen | 1/15/25 | Savannah GA | Georgia | Probate | Tom Bordeaux | hand printing | |
| Estate of Bruce Lansford | 1/28/25 | Marion Co. FL | Florida | Probate | | signature | |
| Estate of Antonio Audi | 2/14/25 | Flagler Co, FL | Florida | Probate | | signature | Frequency of Occurrence |
| West v Buffington | 2/19/25 | Marrion Co TN | Tennessee | Chancery | | signature | |
| Bass v Lafayette Nursing Home | 2/24/25 | Lafayette Co FL | Florida | Probate | Darren Jackson | signature | Docusign |
| Appeal by Anthony Walker | 3/10/25 | Volusia Co. FL | Florida | Circuit | Kathleen McNeilly | hand printing | |
| Vega v County of Volusia | 3/14/25 | Volusia Co. FL | Florida | Circuit | | alterations | |
| Catalonia v Fetes | 3/18/25 | Dade Co. FL | Florida | Deposition | | alteration | |
| Gomez v Tammy Insurance | 3/20/25 | Dade Co. FL | Florida | Deposition | | alteration | |
| Gomez v Tammy Insurance | 4/8/25 | Dade Co. FL | Florida | Circuit | | exact replication | |
| Catalonia Club v Fetes | 4/23/25 | Dade Co. FL | Florida | Circuit | | initials | Daubert |
| Presley Trust v Dove | 5/23/25 | Hamilton Co., TN | Tennessee | Deposition | | signature | |
| Clark v Gulf Coast Construction | 5/28/25 | Bay Co., FL | Florida | Deposition | | signature | exact replication/cut and paste |
| Ruthie Lee v Deutsche Bank | 6/2/25 | Glynn Co. GA | Georgia | Superior #3 | Robert Guy Jr. | signature | |
| Estate of Perez Torrez | 6/27/25 | Dade Co. FL | Florida | Probate | Ruiz | Cuban birth certificates | counterfeit/alteration |
| Brever v Bryant, Gambucci et al | 7/18/25 | Collier Co, Fl | Florida | Deposition | | alterations | |
| Mills v UPS Store et al | 8/11/25 | Hinds Co. MS | Federal | Deposition | | alterations | |
| Turcotte v ATT Restoration | 8/12/25 | Volusia Co. FL | Florida | Testimony by Deposition | | signature | overwrirting, exact replication |
| Johnson Foundation v Piovera | 8/25/25 | Manatee Co. FL | Florida | Circuit | David Caskey | Original or Copy | |
| Janns v Armstrong | 9/24/25 | Collier Co. FL | Florida | Circuit | Janeice Martin | signature | tracing/simulation |
| Snow Majd (unknown style | 9/24/25 | Duval Co. FL | Florida | Circuit | Michelle Kalil | signature | |
| Atichson v Longacre | 10/6/25 | Volusia Co. FL | Florida | Deposition | | signature | |
| Strunk Funeral v Strunk | 10/6/25 | Indian River Co. | Florida | Deposition | | signature | |

| TITLE | DATE | LOCATION | VENUE | COURT | JUDGE | SUBJECT | SPECIALS OR OTHER SUBJECTS |
|---|---|---|---|---|---|---|---|
| Endocronology Con. v Shift 4 Pay. | 1/6/26 | | Pennsylvania | Arbitration | Steven Petrikis - Arb | common authorship HP | |
| Dunn v Menendez | 1/21/26 | Dade Co. FL | Federal | Bancruptcy, Courtroom 8 | Laurel Isicoff | signature | |
| State v Craig Morris | 1/22/26 | Collier Co. FL | Florida | deposition | | hand printing, cursive | |
| Endocronology Con. V Shift 4 Pay. | 3/6/26 | | Pejnsylvania | arbitration | Steven Petrikis - Arb | common authorship HP | |
| Thomas v Thomas | 3/10/26 | Gadsden Co. FL | Florida | Circuit Courtroom 3 | David Frank | signature | |
| Roxie Powell v Lanier Rehab Center | 3/25/26 | Duval Co. FL | Florida | deposition | | signature | |
| FL v Brandon Allen | 3/31/26 | Marion Co. FL | Florida | deposition | | HP | |
| Long v Herndon | 4/30/26 | | Florida | | | | |
| Powell v Lanier | 4/28/26 | Duval Co. FL | Florida | Room 739 | | signature | |
| Hodgson v MMA Trucking et al | 5/7/26 | Hillsborough CO. FL | Florida | | | signature | |
| Perry Roofing v Iva Meadows | 5/18/26 | Levy Co, FL | Florida | Levy Co. Circuit Court | Luis Bustamante | signature | hand printing |
| Green Reit v All Florida | 6/30/26 | Brevard Co. FL | Florida | | | alteration | |
| Richard v Grier | 7/7/26 | Fulton Co. GA | Georgia | deposition | | signature | |
| Levit v Levit | 7/15/26 | Flagler Co. FL | Florida | Flagler Co. Circuit | France | Daubert Hearing Opposing Experts | Signature |
| Jay Collins v James Fishback | 7/21/26 | Leon Co. FL | Florida | Leon Circuit C-3 | David Frank | signature | |
| Estate of A Audi v Luigi Audi | 8/24/26 | Volusia Co., FL | Florida | deposition | | signature | disparate known specimens |

# APPENDIX 21

**Member:**
American Society of Questioned Document Examiners
American Academy of Forensic Sciences – QD Section
Southeastern Association of Forensic Document Examiners

**Certified:**
American Board of Forensic Document Examiners

Thomas W. Vastrick

Forensic Document Examiner

***WEBSITE:*** ***thomaswvastrick.com***
***EMAIL:*** ***vastrick@yahoo.com***

**Orlando, FL (Main) Office**
522 S Hunt Club Blvd Suite 217
Apopka, FL 32703
**Tallahassee, FL (Branch) Office**
1400 Village Square Blvd #3-149
Tallahassee, FL 32312

(407) 234-3219

## FEE SCHEDULE

**1. Retainer Fee - $3,000.00**
Retainer fee is **non-refundable**. Fee includes up to six hours for:
- Examination time and travel time.
- Preparation of written reports, affidavits, declarations.
- Telephonic conferences and local in-person conferences.

Retainer fee does not include:
- Deposition
- Testimony
- Court appearance
- Expenses

If an examination, including travel, is estimated to exceed five hours, additional retainer may be required to cover additional estimated examination time and travel expenses.

**2. Hourly Examination Fee - $400.00/hr. , $4,000.00/day**
This charge is for all examination and travel time (outside Orlando or Tallahassee areas) in excess of the six hours covered by the retainer fee. Examinations outside of the above areas are on a portal-to-portal basis. Overnight travel will be billed at the daily rate for the initial travel date, return date and any additional appearance date(s).

**3. Indented Writing Examinations - $50.00 per sheet**
The examination for indented writings often involves the use of an electrostatic detection device. There is a charge of $50.00 per image. Any image with evidentiary value will be attached to the written report. This charge is for the images only. Hourly rates, as noted above, apply to the time necessary to conduct these examinations.

**4. Court Appearance - $1,600 up to 4 hours (0-4 hrs), $400.00 per hour thereafter / $4,000.00 per day**
These fees apply to the following:
- Travel time portal to portal
- Court appearance (whether or not testimony is actually given)
- Streaming testimony (whether or not testimony is actually given).
- Testimony preparation.
- Pre-trial conferences.

Testimony will require advance payment equivalent to the approximated cost to include portal-to portal time for travel and testimony, chart preparation, mileage, and expenses. Overnight travel will be billed on a daily basis from the initial travel date to the return date. Examination payments must be up to date prior to appearance. Appearance fee is refundable with notice of at least 48 hours in advance minus expenses already incurred.

**5. Deposition Appearance/Interrogatory Fees - $1,600 up to 4 hours (0-4 hrs), $400.00 per hour thereafter / $4,000.00 per day**
These fees apply to the following:
- Travel time portal to portal.
- Appearance on site (whether deposition/interrogatory actually happens).
- An advance equivalent to the approximated cost to include portal-to portal time for travel and testimony, will be required. Advance is refundable if deposition is cancelled more than 24 hours in advance.

**6. "On-call" Fees - $250.00/hr.**
While on-call for local on-site testimony not requiring on-site presence, a fee of $250.00 per hour is charged.

**7. Office Fees**
Regular and customary charges are made for such items as photocopies.

**8. Travel Fees**
A. Automobile travel - $0.50 per mile
B. B. Out-of-town travel
- * Airline tickets are to be prepaid by client unless other arrangements have been made. Flights over 3 hours will require business class or higher.
- * Necessary car rental, hotel, taxi or meal expenses will be reimbursed to expert as noted above.

***NOTE: Rates periodically increase. Above rates are guaranteed for 18 months after initial retention at which time contemporaneous rates will apply.***